Receipt # 062773

ORIGINAL

ECF

FILED
APR 22 2005
U.S. COURT OF
FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SSA MARINE, INC.,** | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| **v.** | ) | **05- 490C** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

1. Plaintiff, SSA Marine, Inc. ("SSA" or "plaintiff"), hereby files this claim against the United States under the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* for damages suffered under Contract No. TRN-C-00-03-00054-00 administered by the United States Agency for International Development ("USAID" or "the government").

**JURISDICTION & PARTIES**

2. Plaintiff, a Washington corporation with its principal place of business at 1131 SW Klickitat Way, Seattle, WA 98134, is a privately owned company that has been in the business of marine terminal operations and stevedoring for more than fifty years. Its breadth of experience and diversity of offerings are unsurpassed in the field. SSA has more than 150 marine operations in ports throughout the world, and it provides a full spectrum of transportation services including terminal management, stevedoring, rail yard operations, container freight station and container exam station operations, project development management, technology

system design, installation and training, equipment procurement, marketing support, trucking, warehousing, off-dock yard operations, and feasibility studies.

3. Defendant is the United States of America, acting by and through the United States Agency for International Development.

4. The United States Court of Federal Claims has jurisdiction over this claim pursuant to 41 U.S.C. § 609 and 28 U.S.C. § 1491. Plaintiff filed a certified claim with the contracting officer on July 26, 2004, seeking damages resulting from USAID's improper contract administration and failure to comply with the contract payment terms. The claim was denied in its entirety on November 29, 2004.

**FACTUAL BACKGROUND**

5. In anticipation of the need to reestablish port operations in Iraq following the U.S.-led, coalition force invasion of that country, USAID contacted SSA to determine whether SSA would consider assisting the U.S. with respect to Iraq's principal port facility and on February 12, 2003, issued a request for proposals under Port Solicitation No. TRN-03-009. Plaintiff entered into negotiations with USAID and submitted a proposal that reflected the contents of those discussions on February 24, 2003.

6. On March 20, 2003, the United States and its coalition partners began the invasion of Iraq. Contract No. TRN-C-00-03-00054-00 ("the Contract") was awarded to SSA shortly thereafter on March 24, 2003. The stated purpose of the Contract was "to quickly, effectively and safely complete those tasks essential to assess, improve, maintain, and – if necessary – operate Umm Qasr port in support of humanitarian and reconstruction assistance to the people of Iraq." Contract Section C.I.

7. The work performed under the Contract was divided into three contract line items ("CLINs"). CLIN 001 called for the preparation of a port management assessment. CLIN 002 involved planning the implementation of port management improvements. Finally, CLIN 003 anticipated the direct operation and management of the port on an as-needed basis. Specifically, CLIN 003 provided in part that:

> From time to time, and especially in the instance of local or regional conflict, it may be in the interest of the US Government that part or all of the Umm Qasr port be managed directly by the Contractor. The contractor shall be prepared to accept this task within four weeks of contract inception. As required, USAID will facilitate transfer of authority over the port from national or local agencies to the Contractor. It is expected that direct operations of the port will occur only on an emergency basis and that direct operations will continue for an unspecified period of time until a transition of authority returns control to national or local agencies.

Contract Section C.III.3.

8. CLINs 001 and 002 and certain cost items under CLIN 003 were negotiated on a cost-plus-fixed-fee basis. The estimated cost items under CLIN 003 included labor costs for SSA employees and associated overhead. Those limited CLIN 003 costs were estimated at $3,541,480.00. Thus, a fixed fee relating only to those CLIN 003 costs was proposed at the maximum amount of $354,148.00.

9. At the time the Contract was negotiated and awarded, however, it was impossible to estimate the most significant costs for operating the port under CLIN 003, because the condition of the port and estimated cargo volumes were unknown at that time, and it was unknown for how long USAID would ask SSA to operate the port. Instead, those estimated costs were to be outlined in the implementation plan prepared under CLIN 002.

10. Because the scope of CLIN 003 activities could not be predicted with any certainty at the time the contract was formed, CLIN 003 contained a separate funding mechanism that required USAID to provide start up capital for initial port operations, and provided that once

the port became operational and was able to generate revenues, the port operations and an agreed upon amount of contractor profit would be funded by those revenues. Specifically, the Contract provided as follows:

> Financing Port Operations: In the event that USAID directs the contractor to manage and operate the port, start up funds and working capital to begin implementation of the operation plan shall be provided by USAID. Start up capital shall be provided to cover initial facility and equipment replacement and repair as proposed by the contractor and approved by USAID from the port assessment, improvement plan and operational plan. Start up working capital shall be provided to cover initial operation of the port. After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners. USAID shall approve the fee and charge schedule and the level of contractor profit from operations. The contractor shall present USAID with monthly financial statements outlining the costs, revenues and profits from operations. The contractor shall maintain separate bank account(s) and records regarding port costs and revenues under this contract. To the extent that revenues exceed costs and negotiated maximum profit margin or level, USAID shall determine the use of any remaining funds in the port operation accounts.

Contract Section C.III.3.

11. Plaintiff sent personnel to Iraq to begin work on CLINs 001 and 002 on or around April 4, 2003. On May 21, 2003, USAID exercised its authority under CLIN 003 to transfer the port to civilian control, and SSA was directed to assume responsibility for management and operation of the port under CLIN 003. On or around May 23, 2003, control of the port was transferred to SSA from the British military (17th Port and Maritime Regiment) in what was the first transfer of authority over reconstruction efforts to civilian control.

12. Contrary, however, to the explicit terms of Section C.III.3, USAID failed to provide start up working capital to cover the initial operation of the port. Plaintiff was forced to fund start up costs out of its own pocket.

13. On or about June 17, 2003, USAID ordered SSA to open the port to commercial cargo in addition to the humanitarian aid cargo originally anticipated by the Contract. The

handling of commercial cargo was beyond the scope of the Contract, and SSA recommended adding additional personnel to handle the additional cargo. USAID, however, never responded to the recommendation.

14. In addition to the introduction of commercial cargo, passenger vessels began calling Um Qasr on or about July 16, 2003. Much of the passenger vessel traffic consisted of returning Iraqi immigrants being ferried from the Dubai port of Jabal Ali. SSA assisted with the implementation and activation of immigration and customs facilities and systems, and the enhanced training of Iraq customs and immigration officials needed for this service.

15. In accordance with the terms of Section C.III.3, SSA developed and proposed a tariff that was designed to generate sufficient revenue to finance the port operations and to allow SSA a reasonable profit. Through the sole billing and collection efforts of SSA, the port did ultimately generate revenue and funds were promptly collected by SSA and made available to USAID for operations and payment of a reasonable profit. In accordance with the terms Section C.III.3, SSA proposed a reasonable level of profit based on a fixed price of $2.20 per metric ton of cargo moved through the port. The proposed fixed price was well below the rate SSA would have charged a commercial customer under circumstances presenting similar physical security risks and commercial/logistical difficulties. By letter of August 12, 2003, SSA explained the basis for the proposed level of profit, providing examples of commercial profit levels. USAID has never challenged the reasonableness of the proposed amount.

16. Contrary to the terms of Section C.III.3, USAID consistently refused to approve any level of profit to be earned by SSA from port revenues. In fact, USAID refused to allow SSA to use port revenues for any purpose, including working capital for port operations. As

such, SSA was required to fund the port operations itself subject to reimbursement by the government.

17. Due to USAID's failure to comply with the terms of Section C.III.3, SSA was required to advance approximately $10 million of its own money to fund the port operations. At no point has USAID recognized or acknowledged the additional burden—outside the scope of the Contract—that such unanticipated funding placed on SSA.

18. In order to avoid having the costs of port operations paid for out of the port revenues, USAID modified the Contract to provide for such costs to be reimbursed by the government. It refused, however, to acknowledge that plaintiff was entitled to profit for the CLIN 003 work that was not included in the original cost estimate and refused to include any profit figure or additional fixed fee in the modification. Plaintiff was nevertheless forced to execute the modification in order to receive any reimbursement for the funds it had advanced to enable the port to operate. Indeed, USAID used the urgent need for additional funds to pay for armed security guards to protect SSA's personnel as leverage to coerce SSA to sign a modification.

19. SSA continuously operated the entire port, in a war zone, for a total of fifteen months. It had eleven employees of its own on the ground and was responsible for managing between 2,500 and 3,000 Iraqi civilians. The port was neglected and in serious disrepair when SSA took control. At the time SSA transferred control back to the Iraqi Government, Um Qasr was a functioning commercial seaport.

20. The total cost of the contract, including the amounts that were originally to be paid for with port revenues but were instead paid on a reimbursement basis, exceeded $14

million. The total fixed fee paid to plaintiff (for CLINs 001, 002, and 003) was only $437,148.00.

**COUNT I – BREACH OF CONTRACT**

21. The allegations set forth in paragraphs 1 through 20 above are incorporated herein.

22. USAID violated the terms of the contract by failing to approve and allow payment of a reasonable profit for work done under CLIN 003 as required by Section C.III.3 of the Contract.

23. In accordance with the terms of the contract, plaintiff proposed a level of profit based on a fixed fee of 2.20 per metric ton. The proposed amount was reasonable and consistent with commercial operations under similar conditions. USAID never challenged the reasonableness of the calculation and never proposed a different rate. As such the only basis available to calculate the profit due is the $2.20 per ton figure. Based on that rate and the amount of cargo moved through the port (2,000,002 metric tons), plaintiff is entitled to $4,400,004.40 (four million, four hundred thousand, four dollars and forty cents), which has not been paid.

**COUNT II – BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

24. The allegations set forth in paragraphs 1 through 23 are incorporated herein.

25. USAID failed to properly administer the contract. It hindered plaintiff's performance by failing to properly fund the contract and acted in bad faith when it failed to approve a reasonable profit as required by the terms of the solicitation and as promised during negotiations. USAID further acted improperly in its negotiation of modifications.

26. Although much of the damage resulting from USAID's improper behavior is difficult to calculate, it is clear that the government's breach at a minimum resulted in the loss of profit to plaintiff in the amount $4,400,004.40 (four million, four hundred thousand, four dollars and forty cents) as calculated above.

**REQUEST FOR RELIEF**

27. For the reasons stated above, SSA respectfully requests that the Court reverse the contracting officer's denial of its claim and award plaintiff $4,400,004.40 (four million, four hundred thousand, four dollars and forty cents), plus interest and costs.

Respectfully submitted,

John W. Butler
SHER & BLACKWELL
1850 M St., N.W., Ste. 900
Washington, D.C. 20036
(202) 463-2510 (tel)
(202) 463-4950 (fax)

Of Counsel:

Heather M. Spring
SHER & BLACKWELL
1850 M St., N.W., Ste. 900
Washington, D.C. 20036
(202) 463-2516 (tel)
(202) 463-4950 (fax)

Dated: April 22, 2005