Sher & Blackwell
ATTORNEYS AT LAW
Suite 900 • 1850 M Street, N.W. • Washington, D.C. 20036
Telephone: 202.463.2500 • Facsimile: 202.463.4950 • www.sherblackwell.com
A LIMITED LIABILITY PARTNERSHIP

Writer's Direct Dial:
(202) 463-2510/2516

July 26, 2004

**Via Electronic & Express Mail**

Tad Findeison
Contracting Officer
USAID Iraq Mission
APO AE 09316
Baghdad, Iraq

Re: Contract No. TRN-C-00-03-00054-00
CONTRACT DISPUTES ACT CLAIM

Dear Mr. Findeison:

We are writing on behalf of our client SSA Marine, Inc. ("SSA") for purposes of submitting a formal claim under the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, for $4,400,004.40 plus interest. The claimed amounts are due and owing to SSA under Contract No. TRN-C-00-03-00054-00 ("the Contract") as a result of the Agency for International Development's ("USAID") failure to comply with the terms of Section C.III.3 of the Contract. Specifically, USAID failed to comply with the funding provisions set forth in the clause entitled "Financing Port Operations." Pursuant to the explicit terms of this clause, USAID was required to provide start up funds and working capital for the port. Once the port was operational and able to generate revenue, certain aspects of the Contract—port operation costs and contractor profit—were to be funded from the port revenues. USAID, however, refused to provide working capital and refused to permit the use of port revenues as required by the Contract. Although USAID ultimately reimbursed port operation costs through other means, it never approved contractor profit as required by the Contract. As a result, although SSA has fully and successfully performed the Contract under extremely difficult conditions, it has not received full and fair compensation for its services.[1]

[1] Although USAID ultimately reimbursed SSA for port operation costs, the Contract clearly did not anticipate that SSA would have to front the money for those costs in the first place. The Contract clearly provided for USAID to provide start up capital for the initial costs and for later costs to be funded through port revenues. Instead SSA was forced to advance the money, resulting in a situation where SSA was essentially providing USAID with an interest free loan. Although USAID is liable to SSA for the costs associated with providing this funding, including interest on the amounts advanced, for the sake of narrowing the issues and simplifying the claim, SSA has chosen not to include those damages in this claim.

We recognize that you have only recently become the Contracting Officer for this Contract. Accordingly, we believe some background information might be useful.

**I. Background**

A. SSA Marine, Inc.

SSA is a privately owned company that has been in the business of marine terminal operations and stevedoring for more than fifty years. Its breadth of experience and diversity of offerings are unsurpassed in the field. SSA has more than 150 terminal operations in ports throughout the world, and it provides a full spectrum of transportation services including terminal management, stevedoring, rail yard operations, project development management, technology system design, installation and training, equipment procurement, marketing support, trucking, warehousing, off-dock yard operations, and feasibility studies.

B. The Solicitation and Contract Award

On February 12, 2003, USAID issued a request for proposals under Port Solicitation TRN-03-009. The stated purpose of the contract to be awarded was "to quickly, effectively and safely complete those tasks essential to assess, improve, maintain, and – if necessary – operate Umm Qasr port in support of humanitarian and reconstruction assistance to the people of Iraq." Section C.I.

The work to be performed was divided into three contract line items or "CLINs." CLIN 001 called for the preparation of a port management assessment. CLIN 002 involved planning the implementation of port management improvements. Finally, CLIN 003 anticipated the direct operation and management of the port on an as-needed basis. Specifically, CLIN 003 provided in part that:

> From time to time, and especially in the instance of local or regional conflict, it may be in the interest of the US Government that part or all of the Umm Qasr port be managed directly by the Contractor. The contractor shall be prepared to accept this task within four weeks of contract inception. As required, USAID will facilitate transfer of authority over the port from national or local agencies to the Contractor. It is expected that direct operations of the port will occur only on an emergency basis and that direct operations will continue for an unspecified period of time until a transition of authority returns control to national or local agencies.

Section C.III.3.

With respect to the funding of CLIN 003, the terms of the solicitation (later incorporated into the Contract) provided for USAID to provide start up capital for initial port operations, but anticipated that once the port became operational and was able to generate revenues, the port operations and contractor profit would be funded by those revenues:

> Financing Port Operations: In the event that USAID directs the contractor to manage and operate the port, start up funds and working capital to begin

> implementation of the operation plan shall be provided by USAID. Start up capital shall be provided to cover initial facility and equipment replacement and repair as proposed by the contractor and approved by USAID from the port assessment, improvement plan and operational plan. Start up working capital shall be provided to cover initial operation of the port. After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners. USAID shall approve the fee and charge schedule and the level of contractor profit from operations. The contractor shall present USAID with monthly financial statements outlining the costs, revenues and profits from operations. The contractor shall maintain separate bank account(s) and records regarding port costs and revenues under this contract. To the extent that revenues exceed costs and negotiated maximum profit margin or level, USAID shall determine the use of any remaining funds in the port operation accounts.

Section C.III.3 ("the FPO Clause"). SSA's proposal and cost estimates for CLIN 003 were thus based on the understanding that primary funding for CLIN 003 would be based on the above provision. However, due to the substantial uncertainties involved in operating the port, SSA was unwilling to undertake responsibility for port operations without at least some guaranteed funding.[2] As such, SSA's proposal included cost estimates and a fixed fee for certain limited items under CLIN 003 (i.e., labor costs for SSA employees and associated overhead). Those limited CLIN 003 costs were estimated at $3,541,480.00. Thus, a fixed fee relating only to those CLIN 003 costs was proposed at the maximum amount of $354,148.00.[3]

---

[2] SSA's proposal explicitly stated that it agreed to the FPO Clause only on the following conditions:

- USAID continues to pay for SSA staff costs.
- USAID and SSA mutually agree to a business plan outlining forecasted volumes, revenues and costs to agree on the tariffs and profits.
- If there is a 10% or greater drop off in cargo vs. the mutually agreed to forecasts, then USAID and SSA will renegotiate tariff rates to bring the actual P/L more in line with the originally agreed to business plan numbers.
- SSA is not responsible for capex purchases of any equipment nor will the purchase of any equipment, financed and paid for out of working capital be required to go against SSA's balance sheet.

SSA Proposal at Part 7, page 1 (attached hereto as Ex. 1).

[3] SSA made clear that the proposed fixed fee was exclusive of profits to be earned under the FPO Clause:

> SSA is willing to accept this 10% of total project cost profit figure for CLIN 003 provided SSA and USAID can come to a mutual agreement on:
>
> 1. SSA being able to generate profit from CLIN 003 operations, and
>
> 2. the form and or amount of profit SSA can make on operations associated with CLIN 003. (e.g. the form to be either on a per ton handled basis, flat fee or other mutually agreed to form)

SSA Proposal at Part 6, page 1 (Ex. 1).

The proposal clearly indicated that the other costs of port operation—which obviously could not be estimated at the time of the proposal without any knowledge of the condition of the port, or any information about expected cargo volumes or other operational issues—would be outlined in the implementation plan developed under CLIN 002. (SSA Proposal, Part 5, page 3, attached hereto as Ex. 1).

SSA was awarded the Contract on March 24, 2003. The Contract as executed included the FPO Clause and the other solicitation provisions relied upon by SSA in its proposal, as quoted above.

C. Operation of the Port

On May 21, 2003, USAID exercised its authority under CLIN 003 to transfer the port to civilian control, and SSA was directed to assume responsibility for management and operation of the port under CLIN 003. (See Letter from Anne Quinlan to Bob Watters dated May 21, 2003, and USAID Press Release dated May 23, 2003, Ex. 2 & Ex. 3).

Problems with CLIN 003 funding began immediately. Despite USAID's obligations under the Contract to provide working capital for the initial expenditures needed to begin port operations, the agency refused to do so. Instead, it forced SSA to bear the burden of start-up costs without even providing prompt reimbursement.[4] In addition to its failure to provide a working capital fund, USAID further breached the Contract by refusing to allow funding for port operations and contractor profit to be derived from port revenues. SSA had developed and proposed a tariff that was designed to generate sufficient revenue to finance the port operations and allow SSA a reasonable profit as provided for in the Contract. The port did ultimately generate revenue, and funds were available for these purposes. On August 12, 2003, SSA proposed a reasonable level of profit based on a fixed price of $2.20 per metric ton of cargo moved through the port. (Ex. 5). The letter explained the basis for the proposed level of profit, and USAID has never challenged the reasonableness of that amount.

Even though USAID clearly understood that port revenues were to be used to fund the Contract pursuant to the FPO Clause,[5] USAID refused to permit SSA to use any of the moneys collected for any purpose. Although subsequent modifications ultimately provided for port costs to be paid after the fact with appropriated funds, USAID refused to provide any new fixed fees in conjunction with these new funding provisions. Instead, SSA was forced to continue to rely solely on the FPO Clause,

[4] In fact, USAID personnel improperly used the safety of SSA personnel as leverage to get a modification executed by refusing to release funds urgently needed to secure additional security forces until SSA would agree to execute a contract modification that was not acceptable to SSA. (See Letter from Deborah Simms to Daniel Flynn dated Aug. 22, 2003, Ex. 4). Such behavior was typical of the manner in which the Contract administered.

[5] *See*, e.g., E-mail messages of multiple dates from John Abood, Thomas Wheelock, Ross Wherry, Exs. 6-9. Also, a number of public statements refer to the use of tariffs to finance port operations. *See* USAID publications: "Connecting Iraq to the World," "Accomplishments: Seaport," and "Fact Sheet, USAID Accomplishments in Iraq." Exs. 10-12.

which was left intact by the modifications, but USAID continued its refusal to approve a profit level under that clause.

While port operation costs were eventually reimbursed, because USAID did not provide working capital as required by the Contract and did not permit SSA to use collected funds for expenditures as required by the Contract, SSA was required to front approximately $10 million of its own money to fund the port operations, subject to slow reimbursement from the government. Further, as a result of USAID's refusal to permit profit to be obtained from the port revenues, SSA was permitted to earn only $437,148.00 for fifteen months of work in a war zone on a contract with a total cost of over $14 million.

Despite these hardships (on top of the already difficult conditions of operating in Iraq), SSA continued to perform and by any account the reconstruction and port operations (although limited by the amount of funding provided) were a success.

**II. Basis for the Claim**

The manner in which port operations were to be funded and port revenues were to be used is made clear by the express language of the Contract. As noted above, the relevant clause provides as follows:

> Financing Port Operations: In the event that USAID directs the contractor to manage and operate the port, start up funds and working capital to begin implementation of the operation plan shall be provided by USAID. Start up capital shall be provided to cover initial facility and equipment replacement and repair as proposed by the contractor and approved by USAID from the port assessment, improvement plan and operational plan. Start up working capital shall be provided to cover initial operation of the port. After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners. USAID shall approve the fee and charge schedule and the level of contractor profit from operations. The contractor shall present USAID with monthly financial statements outlining the costs, revenues and profits from operations. The contractor shall maintain separate bank account(s) and records regarding port costs and revenues under this contract. To the extent that revenues exceed costs and negotiated maximum profit margin or level, USAID shall determine the use of any remaining funds in the port operation accounts.

Section C.III.3 (emphasis added).

A. The Plain Language of the Contract Required USAID to Approve a Reasonable Profit to be Earned from Port Revenues

It is a well established rule of contract construction that the plain meaning must govern in the absence of any ambiguity. *See, e.g., Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed. Cir. 2000) ("In interpreting a contract, '[w]e begin with the plain language.' *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). 'We give the words of the agreement their ordinary meaning unless the parties

mutually intended and agreed to an alternative meaning.' *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cr. 1998)"); *Appeal of – HGM, Inc.*, ASBCA 53150, 03-1 BCA ¶ 32,168 (2003) ("We are guided by the well-settled principle that contract language should generally be given its plain and ordinary meaning unless the parties attach some different or special meaning to the text.").

Here there is no ambiguity; the meaning of the language is clear.[6] Nevertheless, USAID has so far refused to admit that the FPO Clause means what it says. In this regard, USAID refused to provide start up capital for port operations, it refused to allow port revenues to be used to fund port operations, and it refused to allow the contractor to derive a profit from port revenues. In other words, USAID has effectively read the FPO Clause out of the Contract, in direct violation of well established law. *See Jowett, Inc., supra* at 1368 ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.").

USAID has attempted to excuse its breach of the FPO Clause as follows:

> Section B.2 of SSA's contract with USAID is clear that the contract is a "cost plus, fixed fee" [sic] agreement. Under this type of arrangement, SSA's profit is firmly established in the contract at the statutory maximum rate of 10% and cannot be supplemented unless SSA provides services over and above those contemplated under the contract.
>
> We understand that the intent of the "Financing Port Operations" section of the contract to which you refer in your letter is that, in the event SSA supplies additional services supporting the operation of the Umm Qasr Port, USAID would consider paying SSA additional profit, perhaps paid from port revenues. Since SSA has to date not provided such additional services under the contract, USAID cannot agree to additional profit under the contract, whether paid with appropriated funds or port tariff revenues. Indeed, not only would such approval be inconsistent with the terms of the contract, it would result in a violation of the statutory requirement that the profit on "cost plus, fixed fee" [sic] arrangements not exceed 10% of the total contract price.

(Letter from Alvera Reichert to Bob Watters (undated), Ex. 13). USAID's analysis is not only illogical, it is contrary to the plain terms of the Contract and to governing principles of federal acquisition law.

1. *The Contract was not governed by a single pricing provision.*

USAID's first argument is that the only payment mechanism used in the Contract was the cost-plus-fixed-fee ("CPFF") arrangement. This position is clearly contradicted by the existence of a second payment provision in the Contract. The FPO Clause explicitly provides a separate mechanism for funding port operations under CLIN 003 and paying contractor profit. Although the Contracting Officer may not

---

[6] "A contract is ambiguous only when it is susceptible to two reasonable interpretations." *Hunt Construction Group, Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (*citing A-Transport Northwest Co., Inc. v. United States*, 36 F.3d 1576, 1584 (Fed. Cir. 1994)).

have been accustomed to the use of multiple payment mechanisms in a single contract, doing so is clearly not contrary to law as she suggests. Indeed, the FAR specifically permits contracts to combine pricing mechanisms as necessary to meet the government's interests. FAR 16.102(b) provides that "[c]ontracts negotiated under Part 15 may be of any type or combination of types that will promote the Government's interest." (emphasis added).[7] Given the unusual and urgent nature of the Contract, the use of a separate pricing mechanism to govern a portion of the Contract for which the amount of required work was still undefined was reasonable and appropriate.[8] Moreover, regardless of USAID's rationale, that is what was done.

Although the mere existence of the FPO Clause is enough to establish the use of multiple pricing mechanisms, the fact that the FPO Clause was intended to provide a separate source of funding above and beyond the CPFF clause is made clear by the fact that the cost estimates and fixed fees established under the CPFF mechanism only covered a fraction of the actual costs to be incurred under CLIN 003. If the only pricing mechanism had been the CPFF clause, then the total cost of the port operations and a proportionately higher fixed fee would have been established under that clause. As noted above, however, the fixed fee was never increased when additional funds were added to the Contract.

2. *The FPO Clause does not apply only if SSA supplies additional services supporting the operation of the Umm Qasr Port.*

As discussed above, when interpreting the meaning of a contract provision, the plain meaning must govern in the absence of any ambiguities. In this case the plain language is clear:

> After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners.

Section C.III.3 (emphasis added). Contrary to USAID's view of the "intent" of the clause, it explicitly does not provide that port funding and profit would be derived from port revenues "in the event SSA supplies additional services supporting the operation of the Umm Qasr Port." (Ex. 13). Had that been the intent, it would have been very easy to draft the clause with that language. Instead, the clause was drafted by USAID to explicitly provide that port revenues would be used for contractor profit "after port operations begin." Port operations did begin, fees and charges to carriers and cargo owners were assessed, and revenues earned were sufficient to pay contractor profit.

---

[7] *See also, Appeals of Kaiser Marquardt*, ASBCA No. 49800, 99-1 BCA ¶ 30,216 (1999); *Appeal of TRW, Inc.*, ASBCA No. 42191, 92-1 BCA ¶ 24, 566 (1991); *Protest of United Computer Systems, Inc.*, GSBCA No. 10303-P, 90-1 BCA ¶ 22,546 (1989) (each of which involved contracts or solicitations with multiple pricing mechanisms).

[8] *See, e.g.,* E-mail message from Thomas Wheelock dated Aug. 8, 2003, indicating that when the contract was written USAID had no idea what to expect when SSA entered the port. (Ex. 6).

There are no other prerequisites to SSA receiving an agreed upon profit from those revenues.

Even if we assume for the sake of argument that USAID's interpretation of the provision had any merit (which it does not), SSA did provide additional services not contemplated when the Contract was executed. The Contract anticipated that SSA would only operate the port on an emergency, short term basis. (See Section C.III.3, quoted above at part I.B). Instead, SSA operated the port for more than a year. Control of the port was transferred to SSA on May 21, 2003. (See Ex. 2 & Ex. 3) and was transferred to the Iraqi Port Authority in stages commencing on May 29, 2004, and continuing until completion of the Contract on June 30, 2004. At no time during this period did USAID advise SSA to cease operations under CLIN 003. Such long term management went far beyond what was originally anticipated by the Contract.

Further, the Contract anticipated that SSA would manage the port solely to facilitate the movement of humanitarian goods and reconstruction materials and supplies into Iraq. (*See* E-Mail message from Deborah Simms to John Walsh dated June 12, 2003, Ex. 14). SSA was, however, ordered to open the port to commercial operations as well. (*See* Ex. 15). These operations accordingly also constituted additional services performed by SSA to serve Umm Qasr.

3. *Profit was mandatory, not payable only at the contracting officer's discretion.*

The terms of the Financing Port Operations clause are mandatory, not discretionary. The clause states that:

> . . . contractor profits shall be obtained from fees and charges to carriers and cargo owners. USAID shall approve . . . the level of contractor profit from operations . . .

Section C.III.3. (emphasis added). Thus, the Contracting Officer's statement that: "USAID would consider paying SSA additional profit, perhaps paid from port revenues" (emphasis added) is in direct conflict with the plain language of the Contract. SSA proposed a reasonable level of profit to be earned on a fixed-price, per tonnage basis. (*See* Ex. 5). The reasonableness of the proposed $2.20 per ton profit level was never challenged. As such, the Contracting Officer was obligated to approve the profit. Its failure to do so was a breach of the Contract resulting in significant financial loss to SSA.

4. *Payment of profit under the FPO Clause would not result in a violation of the statutory requirement that profit not exceed 10% of the total contract price.*

As discussed above, the profit due under the FPO clause is separate from the CPFF portion of the Contract. The profit relates to aspects of work that were not covered by the cost estimates and resulting fixed fees. Since the profit due is not related to the CPFF portion of the Contract, the 10% limit is not applicable. Even if it

was, Ms. Reichert's statement that any additional profit would result in more than 10% of the total contract price being paid is plainly wrong.

The total contract price—including the operating costs that were supposed to be funded under the FPO Clause but were not—exceeded $14 million dollars. SSA has only been permitted to earn approximately $400,000 (i.e., approximately 3% of the total contract price). Ms. Reichert's claims, accordingly, have no basis in fact or law.

B. Even If There Was Any Ambiguity In The Meaning Of The FPO Clause, Application Of Principles Of Interpretation Lead Only To The Conclusion That USAID Was Obligated To Approve Profit.

As discussed above, because the language of the FPO Clause is not ambiguous, the plain meaning must govern, and there is no reason to look beyond the language of the contract itself. However, even if the language were ambiguous, application of standard rules of construction simply reaffirms the fact that USAID was obligated to approve a level of profit to be paid out of port revenues.

The purpose of contract interpretation is to determine the intent of the parties at the time the contract was executed. *See Veit & Company, Inc. v. United States*, 56 Fed. Cl. 30, 34 (Fed. Cl. 2003). The intent of the parties in this case is clear from the language of the contract, but it is also made clear by pre-dispute statements of the parties. By e-mail of March 18, 2003, John Abood of USAID urged SSA to execute the Contract despite outstanding matters, and recognized that a profit margin to be derived from operation of the port still had to be set. (Ex. 7). Even as of August 10, 2003, USAID clearly recognized that it was required to approve a level of profit for SSA. (*See* E-mail from Thomas Wheelock dated Aug. 10, 2003, Ex. 6). Moreover, should this matter proceed to litigation, the sworn statements of USAID employees involved in the negotiations will confirm that the intent was for profit to be derived from port revenues.

In addition, SSA made absolutely clear in its proposal that its understanding of USAID's intent under the FPO Clause was for profit relating to port operations under CLIN 003 to be derived from port revenues with the limited exception of the specific items for which costs were estimated and a fixed fee proposed. USAID accepted the proposal on this basis with no amendment to the FPO Clause and without requesting cost estimates and/or fixed fees for additional port operation costs under CLIN 003. (*See* Ex. 1 at Parts 5-7, setting forth SSA's conditions and understandings). It is quite evident that USAID agreed with SSA's understanding of the Contract.

Moreover, even if the parties had differing intents, any ambiguity must be resolved in favor of the non-drafting party if its interpretation is reasonable and was relied upon. *See Veit & Co., supra* at 35. It is clear from the proposal that SSA reasonably interpreted the provision to provide for profit to be derived from port revenues and it is further clear that SSA relied on that interpretation in submitting is proposal. The estimated costs and fixed fee included in the proposal were limited only to certain specified items with the explicitly stated understanding that the remaining contract costs and profit would be derived from port revenues rather than under the CPFF financing. As discussed above, if the original cost estimates under CLIN 003 had included the total costs for operating the port, the estimates, and accordingly the

fixed fee, would have been significantly higher than the $3 million/$300,000 reflected in the proposal. In fact, the amount of any cost estimate that covered all of the planned-for port operations would almost certainly have been even higher than the actual costs of $14 million, given the uncertainties at the outset as well as the fact that USAID, for its own reasons, decided after operations began not to modernize or equip the port as originally intended.

**III. Conclusion**

For all of the above reasons, SSA respectfully requests the Contracting Officer to issue a final decision that SSA is entitled to payment of $4,400,004.40, plus interest (*See* Exs. 5 & 16—setting forth the rate per ton and total tonnage).

Sincerely,

John W. Butler
Heather M. Spring
Sher & Blackwell, LLP
1850 M Street, N.W.
Suite 900
Washington, D.C. 20036

*Counsel for SSA Marine, Inc.*

cc: Anne Quinlan
John Abood
(Via E-mail & Courier)

**CERTIFICATION**

I, Daniel Flynn, on behalf of SSA Marine, Inc., hereby certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Daniel Flynn
Executive Vice President

## EXHIBITS

| | |
|---|---|
| Exhibit 1 | SSA, USAID Port Solicitation TRN-03-009 Cost Proposal, dated February 24, 2003. |
| Exhibit 2 | Letter from Anne Quinlan to Bob Watters dated May 21, 2003. |
| Exhibit 3 | USAID Press Release dated May 23, 2003. |
| Exhibit 4 | Letter from Deborah Simms to Daniel Flynn dated August 22, 2003. |
| Exhibit 5 | Letter from Daniel Flynn to Tom Wheelock dated August 12, 2003. |
| Exhibit 6 | E-mail message from Tom Wheelock to Craig Hautamaki, Fergus Moran, John Walsh, and Dan Flynn, with copy to Deborah Simms dated August 10, 2003. |
| Exhibit 7 | E-mail exchange between Bob Watters and John Abood with copies to Anne Quinlan, Dana Peterson, Ross Wherry, and Denise Stone dated March 18, 2003. |
| Exhibit 8 | E-mail exchange between Tom Wheelock and John Gaughan with copies to Craig Hautamaki, Robert McLeod, Neil Price, Lewis Lucke, and Deborah Simms dated September 13, 2003, September 14, 2003, and September 15, 2003. |
| Exhibit 9 | E-mail message from Thomas Wheelock to Anne Quinlan, Donald Sampler, Ross Wherry, James Guy with copies to Earl Gast and Daniel Flynn dated May 5, 2003 and Reply of Ross Wherry to Thomas Wheelock with copies to Earl Gast, Daniel Flynn, Anne Quinlan, James Guy, and Donald Sampler of the same date. |
| Exhibit 10 | USAID Publication: Connecting Iraq to the World, Transportation Rehabilitation, November 2003. |
| Exhibit 11 | USAID Publication: Assistance for Iraq, Accomplishments: Seaport, June 7, 2004. |
| Exhibit 12 | CPA Publication: The U.S. Agency for International Development, Fact Sheet, USAID Accomplishments in Iraq, March 2003 to March 2004, March 18, 2004. |
| Exhibit 13 | Letter from Alvera Reichert to Bob Watters (undated). |
| Exhibit 14 | E-mail exchanges of June 11 and June 12, 2003, by and between Joanne Giordano, Roberta Rossi, Deborah Simms, and John Walsh, with copies to Lewis Lucke, Brain Black, Fergus Moran, Earl Gast, Robert MacLeod, Sam Sakhleh, and Thomas Wheelock. |

Exhibit 15 Letter from Deborah Simms to Fergus Moran dated June 14, 2003.

Exhibit 16 Summary of Cargo Moved and Monthly Vessel Reports detailing the cargo moved through the term of the contract.