U.S. AGENCY FOR
INTERNATIONAL
DEVELOPMENT

November 29, 2004

Stevedoring Services of America
Attn: Mr. Bob Watters
1131 S.W. Klickitat Way
Seattle, WA 98134

Dear Mr. Watters,

I received SSA's Contract Disputes Act claim concerning the issue of profit under contract TRN-C-00-03-00054-00 for the management of the seaport in Iraq. I have reviewed the documentation SSA submitted in support of it. I do not agree that SSA is entitled to profit in the amount of $4,400,004 and will address each of the points raised in the claim which are noted in italics below.

1) *The contract was not governed by a single pricing provision.*

The contract that was negotiated was a cost-plus-fixed-fee or CPFF (term) type contract as described in FAR 16.306(d)(2) which is quoted below:

> *(2) The term form describes the scope of work in general terms and obligates the contractor to devote a specified level of effort for a stated time period. Under this form, if the performance is considered satisfactory by the Government, the fixed fee is payable at the expiration of the agreed-upon period, upon contractor statement that the level of effort specified in the contract has been expended in performing the contract work. Renewal for further periods of performance is a new acquisition that involves new cost and fee arrangements.*

The provision cited in the claim, CLIN 003 Financing Port Operations, does not refer to a different type of **pricing mechanism** but rather refers to a different method for **financing the reimbursement** of contract costs and fees. The provision addressed the situation in which SSA was directed to start managing and operating the port, which in fact it was requested to do on 5/21/03. In this situation, rather than reimbursing SSA's costs and profit with USAID funds, USAID wanted the option to reimburse the contractor with port revenues should that be necessary or appropriate. As quoted in the contract provision, in the event that this option was chosen "working capital for labor, facilities and equipment operation and maintenance, port overhead, and contractor profits shall be obtained from fees and charges to carriers and cargo

owners…The contractor shall present USAID with monthly financial statements outlining the costs, revenues, and profits from operations. The contractor shall maintain separate bank accounts and records regarding port costs and revenues under this contract. To the extent that revenues exceed costs and negotiated maximum profit margin or level, USAID shall determine the use of any remaining funds in the port operation accounts." In this situation, SSA was charged with collecting revenues from the operations of the port and putting it in an account on the behalf of USAID. In the event the revenue exceeded the costs due, USAID would determine the use of such additional funds. With regard to the reference to "negotiated maximum profit margin or level", USAID was referring to the maximum 10% profit that was already negotiated in the contract based upon the contract's level of effort. There was never any explicit promise on the part of USAID in the contract or elsewhere to automatically allow SSA further profit just because the port was accepting cargo. In fact the provision further states that "USAID shall approve the fee and charge schedule and the level of profit from contractor operations." The level of profit referred to in this sentence concerned the case where, should SSA incur more level of effort than what was required by Section F of the contract due to CLIN 003 port operations, USAID would consider the possibility of an equitable adjustment to the contract which could include profit (or fee in the case of a CPFF contract).

2) *The FPO clause does not apply only if SSA supplies additional services supporting the operation of the Umm Qasr Port.*

As stated above, USAID stated and intended that additional profit would only be considered in the event that additional labor was expended over and above that which was negotiated in the contract. In this regard, SSA's claim goes on to say that "the contract anticipated that SSA would only operate the port on an emergency, short term basis." SSA claims that, since it was asked to continue port operations for approximately one year, this was not anticipated by the contract. However, a closer reading of the contract proves otherwise. In section C under CLIN 003, Direct Operation of the Port, the contract says "It is expected that direct operations of the port will occur only on an emergency basis and that direct operations will continue for an unspecified period of time until a transition of authority returns control to national or local agencies." This is exactly what occurred during the term of the contract. The contractor was asked to operate the port for a period of a year after which time the operation was indeed turned back over to the Iraqi authorities. SSA contends that the mere fact that the period of operation of the port continued for one year means it goes beyond the meaning of "on an emergency basis". However, the period of one year can certainly constitute an emergency period and, in fact, was just that. The control of the port was taken from the Iraqis and turned over to SSA and then was returned to the Iraqis once the state of emergency had ended. The contract also bears out the fact that the state of emergency was expected to be more than just a few months. In Section F.2, Level of Effort, the level of effort for each labor category for CLIN 003 was calculated on a yearly basis (2080 hours). This demonstrates that the parties realized that the operation of the port could go on for a year and could, in fact, go beyond a year as is evidenced by the fact that there were two option years (which were later deleted) in case the situation required that.

3) *Profit was mandatory, not payable only at the contracting officer's discretion.*

This has already been addressed above.

4) *Payment of profit under the FPO Clause would not result in a violation of the statutory requirement that profit not exceed 10% of the total contract price.*

This statement is not correct. This is a cost-plus-fixed-fee (term) contract and the contract is constructed according to the method for CPFF (term) contracts stated in FAR 16.306. The terms of the contract make it clear as to what was agreed to in the contract. The level of effort is set forth as is the amount of fee associated with that level of effort. For the provision of the total labor hours stated in provision F.2 of the contract for CLINs 001, 002, and 003, USAID agreed to reimburse SSA respectively in the amount of $642,370 (which includes $58,400 in fee), $280,987 (which includes $25,500 in fee), and $3,895,628 (which includes $354,148 in fee). This amounts to a total of $4,818,985 which includes a total $438,048 in fixed fee. If SSA expended the stated level of effort, then the full fixed fee amount is payable. If SSA expended less than the level of effort stated in Section F.2, then a negotiated reduced fixed fee would be paid. In the event that SSA expended a greater level of effort than stated, then SSA could request an equitable adjustment.

SSA raised the issue of using port revenues to justify additional profit during contract negotiations and the Contracting Officer said this was not possible because this is a CPFF (term) type of contract and FAR 15.404-4(i)(C) limits fees on this type of contract to a statutory limit of 10 percent. SSA raised the issue at the post-award conference and the same Contracting Officer again informed SSA that this was not possible. SSA raised the issue a third time with the Administrative Contracting Officer, Alvera Reichert, and was informed a third time that this was not possible unless SSA incurred additional level of effort under the contract. In each instance, SSA was informed that per FAR 15.404, there is a statutory limit of 10% that cannot be exceeded absent an increase in the contract level of effort. To date, SSA has not shown that it expended more than the level of effort stated in provision F.2 of the contract. However, if indeed SSA has expended a greater level of effort than that required by the contract, SSA should document the situation accordingly and present it to the Contracting Officer for consideration of an equitable adjustment. As of this point in time, SSA has not submitted any proof of an increased level of effort and USAID is unaware of any such increase. For these reasons, the Contracting Officer hereby denies your claim for payment dated 7/26/04 in the amount of $4,400,004.

This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S.C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Notwithstanding this decision, I would like to thank SSA for the services rendered in a very difficult situation in support of the US Government's efforts in Iraq.

Yours truly,

Anne Quinlan
Contracting Officer