IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SSA MARINE, INC., | ) | |
| Plaintiff, | ) | Civil Action No. 05-490C<br>(Chief Judge Damich) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE REPORT AND TESTIMONY OF THE GOVERNMENT'S EXPERT WITNESS

John W. Butler
SHER & BLACKWELL LLP
1850 M Street, N.W.
Suite 900
Washington, DC 20036
(202) 463-2510

Of Counsel:

Heather M. Spring
SHER & BLACKWELL LLP
1850 M Street, N.W.
Suite 900
Washington, DC 20036
(202) 463-2516

August 29, 2006

**TABLE OF CONTENTS**


Page

TABLE OF AUTHORITIES .......... iii

BACKGROUND .......... 2

ARGUMENT .......... 3

A. The Proffered Expert Testimony Consists Entirely Of Inadmissible Legal Conclusions .......... 3

1. *Legal Testimony Is Not Permitted* .......... 3

2. *The Proposed Testimony* .......... 6

B. The Proffered Expert Testimony Does Not Offer Specialized Knowledge .......... 9

1. *The Contractual Arrangement* .......... 10

2. *Support of the Damages Calculation* .......... 13

a. Profit Rate .......... 14

b. Tonnage .......... 15

CONCLUSION .......... 18

EXHIBITS

Exhibit 1 Expert Report of Charles L. Wilkins (June 8, 2006).

Exhibit 2 Transcript of the Deposition Testimony of Charles L. Wilkins (August 1, 2006).

Exhibit 3 Defense Contract Audit Agency Report No. 4261-2006S17900001 (Revised) (April 14, 2006).

Exhibit 4 Transcript of the Deposition Testimony of Robert Skaggs and Sterling Munro (July 19, 2006).

# TABLE OF AUTHORITIES

Page

**Cases**

*Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207 (D.C. Cir. 1997)...... 4

*Casper v. SMG*, 389 F. Supp. 2d 618 (D.N.J. 2005) ................................................3-4

*Crow Tribe of Indians v. Racicot*, 87 F.3d 1039 (9th Cir. 1996) .................................... 5

*Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557 (7th Cir. 2003).... 4

*Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461
(S.D.N.Y. 2005) ........................................................................... 10, 11, 18

*In re Initial Pub. Offering Sec. Lit.*, 174 F. Supp. 2d 61 (S.D.N.Y. 2001) ........................ 4

*Loeb v. Hammond,* 407 F.2d 779 (7th Cir. 1969) ....................................................... 5

*Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977)............................... 4

*Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361 (Fed. Cir. 2003)....................... 5

*Salem v. U.S. Lines Co.*, 370 U.S. 31 (1962) ........................................................... 18

*United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296
(6th Cir. 1998) .................................................................................... 4

*United States ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94 (D.D.C. 2002) . 4, 5, 6

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994).................................................... 4

**Rules**

Federal Rule of Evidence 104 ......................................................................... 1

Federal Rule of Evidence 702 ................................................................. 1, 3, 18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SSA MARINE, INC., <br> Plaintiff, <br> v. <br> THE UNITED STATES, <br> Defendant. | Civil Action No. 05-490C <br> (Chief Judge Damich) |

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE REPORT AND TESTIMONY OF THE GOVERNMENT'S EXPERT WITNESS

Plaintiff SSA Marine, Inc. ("SSA") respectfully submits this memorandum of law in support of its motion in limine to exclude the report and testimony of Charles L. Wilkins pursuant to Federal Rules of Evidence 104 and 702.

The Expert Report of Charles L. Wilkins, dated June 8, 2006 (copy attached hereto as Exhibit 1), states that Mr. Wilkins was retained as an expert on damages and sets forth two opinions to be expressed by Mr. Wilkins in his testimony: 1) "the claimed profit calculation is inconsistent with the profit limitations contained in the federal statutes and regulations;" and 2) "SSA Marine's claim for additional profit of $4,400,004.40 is unsupported and therefore, unreliable as a basis for damages." (Wilkins Report at 3-4).

The first opinion is on its face a legal conclusion, which is an improper subject for expert testimony. Although the second opinion may at first glance appear to offer valid testimony, a closer look at the report and Mr. Wilkins's deposition testimony reveals that it too is based almost entirely on Mr. Wilkins's legal conclusions under procurement statutes and regulations. Moreover, to the extent Mr. Wilkins relies on anything other than procurement regulations and statutes, he fails to offer any

analysis grounded in specialized knowledge or expertise. As such, the proposed testimony will not be helpful to the Court and must be excluded.

## BACKGROUND

This case turns on the meaning of Section C.III.3 of Contract No. TRN-C-00-03-00054-00 (the "contract"), referred to as the "financing port operations clause." This clause addressed the manner in which contract operations would be paid for if the United States asked SSA to operate the Port of Umm Qasr, Iraq. Among other things, the clause required the United States to approve a level of contractor profit from operations after port operations began. The government did order SSA to operate the port. *See* Joint Preliminary Status Report, page 6, item 6 (October 11, 2005). By letter of August 12, 2003, at the request of USAID, SSA proposed a profit level of $2.20 per ton of cargo moved through the port. USAID responded that no profit from operations would be allowed. According to USAID, the limited fixed fee included at the time the contract was awarded was the only source of profit authorized by the contract. The case therefore presents the contract interpretation question of whether the government was required to approve a level of profit from operations. If SSA succeeds on entitlement, determining quantum will require a determination as to whether the proposed $2.20 per ton is an appropriate measure of profit.

During discovery, the United States designated Charles L. Wilkins as an expert witness to testify at trial. An expert report setting forth Mr. Wilkins's proposed testimony was served on SSA on June 8, 2006 ("the Wilkins Report"). SSA was somewhat surprised by the subject matter of the proffered testimony. Early in these proceedings, the United States indicated that it planned to designate an expert to testify about profit standards under the Federal Acquisition Regulation (FAR). Counsel for SSA cautioned that SSA would move to exclude any "expert testimony" on

legal issues, and the matter was discussed during a status call with the Court. Despite these early discussions, the Wilkins Report consists almost entirely of legal conclusions and discussion of the federal procurement statutes and regulations. A deposition conducted on August 1, 2006, confirmed that the Wilkins Report is based on Mr. Wilkins's interpretation of the contract in light of his beliefs regarding what he deems to be the applicable law. Because these are not permissible subjects for expert testimony, Mr. Wilkins should not be permitted to submit an affidavit in support of or in opposition to any motion for summary judgment or to testify at trial, and the Wilkins Report should be excluded from evidence.

## ARGUMENT

A. <u>The Proffered Expert Testimony Consists Entirely Of Inadmissible Legal Conclusions</u>.

*1. Legal Testimony Is Not Permitted.*

The Federal Rules of Evidence allow for expert testimony to be admitted if it will assist the trier the fact. Rule 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. It is firmly established that legal opinions do not offer the type of specialized knowledge that might assist the trier of fact.

> "The rule prohibiting experts from providing their legal opinions or conclusions is 'so well established that it is often deemed a basic premise of or assumption of evidence law—a kind of axiomatic principle.' In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law.'"

*Casper v. SMG*, 389 F. Supp. 2d 618, 621 (D.N.J. 2005) (quoting *In re Initial Pub. Offering Sec. Lit.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001). The rationale for this exclusion has been explained as follows:

> Rule 702 of the Federal Rules of Evidence permits the admission of expert testimony that will help the trier of fact "to understand the evidence or to determine a fact in issue . . . ." It is established, however, that expert testimony consisting of legal conclusions will not be permitted because such testimony merely states what result should be reached, thereby improperly influencing the decisions of the trier of fact and impinging upon the responsibilities of the court. *See Burkhart v. Washington Metro. Area Transit Authority*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997) ("[A]n expert may offer his opinion as to facts, that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied").

*United States ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94, 98 (D.D.C. 2002); *see also Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."); *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 301 (6th Cir. 1998) ("'experts' may not testify as to the legal effect of a contract."); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards"); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("this Court requires the exclusion of testimony which states a legal conclusion."); *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.").

Testimony regarding requirements under procurement statutes or regulations such as the FAR clearly constitutes a legal opinion that must be excluded. The Federal Circuit has confirmed this in holding that interpretation of the FAR's cost

accounting standards ("CAS") may not be the subject of expert testimony. The court stated as follows:

> [T]he interpretation of CAS—is an issue of law, not an issue of fact, as we have made clear in our prior decisions. The views of the self-proclaimed CAS experts, including professors of economics and accounting, a former employee of the CAS Board, and a government contracts accounting consultant, as to the proper interpretation of those regulations is simply irrelevant to our interpretive task; such evidence should not be received, much less considered, by the Board on the interpretive issue. That interpretive issue is to be approached like other legal issues—based on briefing and argument by the affected parties.

*Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1369 (Fed. Cir. 2003) (internal citations and parentheticals omitted).

Likewise, matters of contract interpretation are legal issues that are beyond the province of expert testimony. For example, in *Mossey*, *supra*, the court excluded a proposed expert's interpretation of the type of contract that was at issue, noting that:

> In this case, Mr. Leiper's report lifts language directly from the Federal Acquisition Regulations ("FAR") to explain his conclusion that the PaL-Tech contract with PHNC was not a personal services contract. Terms such as "personal services contract," "employer-employee relationship" and "direct hire" have specific meanings with respect to contract interpretation, and these meanings are invoked by Leiper in reaching what necessarily must be viewed as legal conclusions. The entire "Nature of the Contract" section of Mr. Leiper's report . . . provides definitions of legal and regulatory terms coupled with Mr. Leiper's conclusions on how these terms affect PaL-Tech's contract. None of Mr. Leiper's statements would help the trier of fact "better understand the evidence" or "determine a fact in issue." Rather they are impermissible legal conclusions that intrude upon the duties of, and effectively substitute for the judgment of, the trier of fact and the responsibility of the Court to instruct the trier of fact on the law.

*Mossey,* 231 F. Supp. 2d at 98 (internal citations omitted); *see also Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("The interpretation of a contract is an issue of law which this court reviews de novo."); *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969) ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony.").

*2. The Proposed Testimony.*

Mr. Wilkins's proffered testimony falls squarely within the prohibition against legal conclusions by expert witnesses. The testimony begins and ends with a legal conclusion—that the contract is exclusively a cost-plus-fixed-fee contract under the FAR and that profit is therefore subject to statutory and regulatory limitations.[1]

Like the excluded testimony in *Mossey, supra*, the bulk of the Wilkins Report opines on the "nature of the contract" entered into by SSA and the United States. The first three pages of the substantive analysis, under the heading "The Contractual Arrangement" (pages 5-8), address Mr. Wilkins's assumption and conclusion that the contract between SSA and USAID was exclusively a cost-plus-fixed-fee contract. Mr. Wilkins's opinion as to the type of contract involved is a legal conclusion. *See Mossey*, 231 F. Supp. 2d at 98. This legal conclusion forms the basis for the remainder of the report. The reliance on legal analysis is obvious in Mr. Wilkins's first opinion, that SSA's "profit calculation is inconsistent with the profit limitations contained in the federal statutes and regulations." (Wilkins Report at 3-4). His reliance on legal conclusions is equally evident in the analysis presented for his second opinion, which is that that SSA's claim "is unsupported and therefore, unreliable as a basis for damages." (Wilkins Report at 3). In fact, the very first section of analysis in the Wilkins Report relating to SSA's support for its claim is entitled: "*Federal Statutes and Regulations Require* that Profit be Linked to Risk." (Wilkins Report at 8) (emphasis added).

---

[1] This memorandum addresses the procedural issue of admissibility only. It is not intended to be a brief on the substantive merits of Mr. Wilkins's expert report. The absence of argument regarding the merits should not, therefore, be construed as agreement with any legal or factual assertion made by Mr. Wilkins.

The legal conclusions regarding type of contract and the implications of that classification under the FAR are evident throughout the report. A reference to the FAR and/or limitations relating to cost-plus-fixed-fee contracts can be found on virtually every page of analysis. *See*, for example, page 4 ("SSA Marine's claim . . . would cause the total contract profit to exceed the 10 percent limit on a Cost-Plus-Fixed-Fee . . . type government contract"); page 5 ("This contract is a Cost-Plus-Fixed-Fee Level of Effort type contract . . . as described in 48 Code of Federal Regulations Part 16.306(d)(2)"); page 5 ("Since the contract was a Cost-Plus-Fixed-Fee level of effort type . . ."); page 6 ("the statutory maximum 10 percent fee"); page 7 ("the 10 percent statutory maximum fee"); page 8 ("Federal Statutes and Regulations Require . . ."); page 8 ("the FAR states that . . ."); page 9 ("The DoD Weighted Guidelines Method, which is contained in the DoD FAR Supplement . . . "); pages 9-10 ("The aforementioned regulations and guidelines underscore . . ."); page 11 ("the statutory 10 percent for a CPFF contract"); page 13 ("Under a Cost-Plus-Fixed-Fee government contract . . ."); page 14 ("the Statutory Maximum for a Cost Plus Fixed Fee Contract"); page 15 ("the 10 percent statutory limit"); page 15 ("the limit in the Federal Acquisition Regulation"); page 15 ("cannot exceed the statutory maximum of 10 percent on a cost plus fixed fee contract"); page 15 ("the 10 percent statutory maximum cap for a Cost-Plus-Fixed Fee government contract"); page 16 ("In the case of a Cost-Plus-Fixed-Fee type contract . . .").

Mr. Wilkins confirmed during deposition that his entire report was dependant on the legal conclusion that the contract is exclusively governed by cost-plus-fixed-fee limitations:

> Q And my question to you is, switching now to your report, does your report assume any particular interpretation or view of the contract?

A Well, again, that's a little vague. If you're asking me if I have made an assumption about the type of contract this is, my answer is yes.

Q Let's start with that. And what assumption have you made there?

A That it's a cost–plus–fixed–fee contract.

Q And is that assumption a fundamental foundation on which the report is built?

A Yes.

Q What's the significance of your opinion that this is a cost–plus–fixed-fee contract?

A Well, the significance is that there's – there are some statutory and regulatory parameters around a cost–plus–fixed–fee contract.

(Transcript of Wilkins Deposition at 41 ("Wilkins Tr.")) (Copy attached hereto as Ex. 2). Later in the deposition, Mr. Wilkins again confirmed that his interpretation of the contract was central to his analysis:

Q . . . you've linked the issues of contract interpretation and interpretation of the [Financing Port Operations] clause, and I assume that's – is it correct that you've linked the two because they're both interpretation issues?

A And because they both involve potential fee. I mean, you know, it's the whole profit issue.

Q And that contract interpretation exercise, was that important to putting together your report?

A Interpretation – if I define "interpretation" as contract type and what it means and so forth, yes, it was important to the report.

(Wilkins Tr. at 67-68). On re-direct questioning, Mr. Wilkins once again stated that his conclusion regarding the contract type is based on the FAR and that his view on the contract type is the basis for his conclusion that SSA's claim should be denied.

Q Mr. Wilkins, you had an exchange with Mr. Dinackus just now about different types of government contracts; is that correct?

A Yes.

Q And you spoke of cost-plus-fixed-fee contracts and you spoke of fixed-price contracts; is that correct?

A Yes.

Q Are the distinctions between those two types of contracts codified in the FAR?

A Yes.

* * *

Q So at the end of the day, is it your opinion that the 10 percent limit is what governs the claim that SSA has before USAID?

A It's my opinion that the 10 percent is driven statutorily by the contract type that SSA performed the work under.

(Wilkins Tr. at 98, 102).

In sum, the entire thrust of Mr. Wilkins's proposed testimony – reflected by references on virtually every page of his report to the FAR, statutory provisions, and to contract type – is to provide his views on the legal consequences that flow from the classification of the contract type under the FAR. These issues can and should be addressed by counsel in briefs with citations to appropriate law, not through an expert witness.

B. The Proffered Expert Testimony Does Not Offer Specialized Knowledge.

Because the legal conclusions in the Wilkins Report are so pervasive and so interwoven with the text and analysis of the entire report, there is no basis upon which the Court could segregate any part of the report from those impermissible legal conclusions. Anything that is not itself a legal conclusion is either based on a legal conclusion or stated in support of a legal conclusion. As such, the entire Wilkins Report and its subject matter are subject to exclusion.

Even if, *arguendo*, any portion of Mr. Wilkins's proffered testimony could be divorced from his legal conclusions, those portions consist of unsupported assertions and arguments with respect to subjects about which Mr. Wilkins has admitted he has

no knowledge, let alone expertise. Because the proffered witness is in no sense an "expert" with respect to any factual issue presented in the case, his proposed testimony does not offer any assistance to the Court in understanding the evidence or issues in this case. SSA has no doubt that Mr. Wilkins's experience and training may make him a valuable consultant to industry and government clients in any number of situations involving government contracts. Taking nothing away from that expertise, however, SSA just as clearly urges that Mr. Wilkins's expertise has no bearing on *this* case, a case that seeks to determine the reasonable profit of a marine terminal operator running a port in a foreign war zone. Although the entire report is properly excludable solely on the grounds that it consists of legal conclusions, in the interest of a complete record SSA explains below why each section of Mr. Wilkins's report is inadmissible on other grounds as well.

*1. The Contractual Arrangement.*

The first section of analysis in the Wilkins Report begins on page 5 and contains a description of the "Contractual Arrangement" from the perspective of the United States. An expert is not needed to restate the contract terms,[2] and as discussed above, interpretation of those terms is a matter for the Court. Accordingly, the FAR quotations and overview of the contract that make up the discussion on pages

---

[2] *See, e.g., Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005):

> To the extent that [the expert] is simply rehashing otherwise admissible evidence about which he has no personal knowledge, such evidence—taken on its own—is inadmissible. While an expert must of course rely on facts or data in formulating an expert opinion, *see* Fed. R. Evid. 703, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.

.

5-6 are not admissible unless they support some proffered testimony that is admissible. Since those discussions do not serve that purpose, they are inadmissible.

An expert also may not properly opine on the intent and motives of parties. *Highland Capital Management*, 379 F. Supp. 2d at 470 ("inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." (internal quotations and brackets omitted)). Nevertheless, Mr. Wilkins opines (at 6) that certain expenses "were considered 'pass-through' costs," and (at 7) that a 10 percent fee cap "was deemed applicable and appropriate by both USAID and SSA Marine representatives." Other than the FAR or the language of the contract itself, Mr. Wilkins offers absolutely no factual basis for these conclusions. To the extent that they are not merely legal conclusions, they are bald speculation, and they are excludable as such.

The discussion of pass-through costs (page 7) provides a good example of why Mr. Wilkins is not qualified to speak to the issues that he chose to address in his report. His opinion on this point assumes that contract operations involved "the nominal use of SSA Marine's procurement system" (Wilkins Report at 7), but Mr. Wilkins had no basis to make the assumption that the use of SSA's procurement system was "nominal." Deposition testimony revealed that Mr. Wilkins has no knowledge of the actual port operations and activities under the contract (*see* Wilkins Tr. 20-34), including any information about SSA's procurement systems or practices:

> Q And do you have any knowledge of how SSA went about procuring goods and services in Iraq in order to operate the port of Umm Qasr?
>
> A You mean specifically, as you termed earlier, day to day how they did it?
>
> Q Yes.
>
> A No.

> Q Is it correct that the assumption in the paragraph that we've just read into the record is that for what you deemed pass-through costs, there is only a nominal effort by the contractor?
>
> A Ask me that again. I didn't quite understand you.
>
> Q Is it correct that one of the underlying assumptions of the statement in the paragraph that we have just read is that for what you deem or what you call pass-through costs, there is only a nominal effort on the part of the contractor?
>
> A That is a correct assumption, and it's – it's typical in the industry, government contract industry. And you have to think about it in terms of contractors have systems and procedures and practices and staff and so forth already set up. And what happens when they're asked to buy an nth item, they simply are adding, in the context of the task that these staff are already undertaking, one additional item or series of items. I'm not trying to minimize it.
>
> As a general rule, if additional people are required or if additional resources are required, they're minimal to the overall already-established resources that are dedicated to the function, in this case procurement.
>
> Q Do you know what SSA's procurement process was in Iraq?
>
> A I don't in detail, no.
>
> Q Do you know how much of their man-hour effort was spent on procuring goods and services to run the port?
>
> A No, I didn't go to that level of detail.
>
> Q Do you know what goods and services SSA, in fact, procured in order to operate the port?
>
> A Not specifically no.

(Wilkins Tr. at 32-34).[3]

In a similar vein, to the extent Mr. Wilkins (at 7) discusses USAID's "customary practice" regarding pass-through costs, that is a subject that is better addressed by USAID. Mr. Wilkins's mere reference to a declaration from the contracting officer,

---

[3] Mr. Wilkins also admitted more broadly that he had no familiarity with the maritime industry, and specifically that he had no knowledge of marine terminal operations, stevedoring operations, land side cargo handling operations, or marine port security. (Wilkins Tr. at 19-20.) He also testified that he has no familiarity with what SSA did at the port or what the working conditions were. (Wilkins Tr. at 21-29.)

Anne Quinlan, adds nothing to testimony that could be given directly by Ms. Quinlan. Equally telling is that Ms. Quinlan's declaration itself (Attachment II to the Wilkins Report) says nothing about "pass-through costs," and in particular says nothing about "pass-through costs" in the context of the SSA contract. Mr. Wilkins confirmed these points during his deposition. (Wilkins Tr. at 36-40). Accordingly, although the government might be able to construct an argument that Mr. Wilkins's general observations would be of some minimal utility to the Court if he were commenting on an actual statement of policy by USAID or upon a statement of fact by a USAID official with knowledge of the subject at issue, the situation here is that Mr. Wilkins is making general comments about a USAID official's declaration that itself does not even reference the subject matter of Mr. Wilkins's observations, much less tie that subject matter to the contract before the Court. This is speculation built on generalization, and SSA respectfully urges the Court to reject it.

In sum, even setting aside the pervasive legal argument contained in the "Contractual Arrangement" segment of the Wilkins Report (pages 5-8), that section must be excluded because the conclusions set forth therein are demonstrably lacking in any factual basis and are in any event beyond the expertise of the proffered witness.

*2. Support of the Damages Calculation.*

The second substantive section of the Wilkins Report begins on page 8 and is entitled: "B. SSA Marine's Claim for Additional Revenue is Unsupported." SSA calculated its reasonable profit under the contract by multiplying the per ton profit rate it had proposed in August of 2003 by the total estimated tonnage moved through the port of Um Qasr during the contract term. The Wilkins Report criticizes the calculation as being contrary to procurement statutes and regulations and as lacking

adequate support in the claim documents. The first criticism (Wilkins Report at 8, 9, 10, 13, 14, 15) – that SSA's claim is inconsistent with statutes and regulations that Mr. Wilkins deems relevant – is entirely legal and has thus been fully addressed above.[4] We address the remaining arguments below.

a. Profit Rate.

Mr. Wilkins criticizes SSA's proposed profit rate of $2.20 per ton. (Wilkins Report at 10-13). The criticism is not based on any industry knowledge or experience.[5] Nor is it based on any understanding of contract operations or performance.[6] Instead, it is based solely on Mr. Wilkins's belief that SSA "failed to adequately explain its selection of its eight comparable contracts" (Wilkins Report at 10) and failed "to adequately document its efforts to arrive at the $2.20 per ton figure." (Wilkins Report at 12). During deposition, Mr. Wilkins clarified that he is not offering an opinion on the actual comparability of the chosen contracts. Indeed, since he knows nothing of the industry, he has no basis to make such a comparison or to critique such a comparison made by someone else. Given that, he is merely complaining about the timing and format of the information and explanation provided. (Wilkins Tr. at 78-86). When pressed to explain what more he would have wanted, he was not able to say. *Id.* As to his complaint that the $2.20 per ton was not "arithmetically calculated," this too is nothing more than argument. Government

[4] The Wilkins Report (at 8-10) cites to FAR and DFAR methodologies used to determine the government's pre-negotiation objectives for profit when a cost analysis is required. In addition to improperly addressing a legal issue, Mr. Wilkins fails to offer any suggestions or explanation for how or whether those methodologies have any applicability to this case. Indeed, he expressly admitted that the DoD provisions were not relevant to the SSA contract. (Wilkins Tr. at 58).

[5] As noted above, Mr. Wilkins has no knowledge or understanding of marine terminal operations, port operations, or stevedoring. (*See* Wilkins Tr. at 19-20).

[6] Mr. Wilkins has no knowledge or information regarding the day-to-day operations involved in performance of the contract. (*See* Wilkins Tr. at 20-29).

counsel is well able to make any such argument if he so chooses, but this is not the role of experts, particularly "experts" that know nothing of the industry involved or of how prices are set in that industry. Mr. Wilkins clearly has no such knowledge.

Mr. Wilkins essentially admits that his observations regarding the proper profit level are based solely on the FAR, rather than on any knowledge of the marine terminal industry, when he comments on the report of Christopher Morton, SSA Marine's designated expert witness. Reduced to its essence, Mr. Wilkins's sole complaint about Mr. Morton's report is that Mr. Morton did not view the issue through the lens of the FAR (*see* Wilkins Report at 13). When that sole, legal criticism is removed, Mr. Wilkins in fact credits Mr. Morton's report, stating that: "His expert report may therefore, prove valid when dealing with *commercial* port operations contracts, but it is not relevant to a government contract dispute." *Id.* (emphasis in original). This statement about what is and is not relevant (the FAR is relevant, but industry practice is not) neatly sums up the problem with Mr. Wilkins's report. That is, to the extent that Mr. Wilkins's opinions about the $2.20 per ton figure are not legal opinions (and most of them are), they are outside the scope of his expertise.

b. <u>Tonnage.</u>

The Wilkins Report maintains (at 13) that SSA's tonnage calculations are unsupported, but does not offer any specialized knowledge or expert analysis to support this opinion. Instead, Mr. Wilkins simply asserts that a report compiled by the Defense Contract Audit Agency ("DCAA") "points out several major faults in SSA Marine's calculation," and from this he concludes that "SSA Marine failed to maintain proper accountability of tonnage that flowed through the port." (Wilkins Report at 14). As an initial matter, Mr. Wilkins mischaracterizes the findings of DCAA. The DCAA

report was not an "audit report" as stated by Mr. Wilkins. Instead the report was based upon the application of "agreed upon procedures."[7] It did not, as Mr. Wilkins indicates, result in any conclusions or opinions, let alone identify "major faults." That language is Mr. Wilkins's, not that of the DCAA report.

Putting aside these mischaracterizations, SSA's objection to this part of the Wilkins Report is that Mr. Wilkins does not add any specialized knowledge, expertise, or analysis to the DCAA findings. His lack of experience in the matters that are the subject of that report is obvious from his testimony. Indeed, his core conclusion that the tonnage numbers provided by SSA in support of its claim cannot be trusted is directly contradicted by both the DCAA Report and its authors. Excluding cargo that arrived at the port on dhows,[8] which are wooden coastal trading vessels, DCAA reported that SSA's claim is based on tonnage moved that was actually *less* than what DCAA was able to verify from its review of invoices to vessels that called at the port. Mr. Robert Skaggs, the DCAA auditor that handled the review of tonnage figures, confirmed this at his deposition:

---

[7] The practical difference between an audit report and "agreed upon procedures" is explained in the referenced DCAA Report itself:

> This report pertains only to the performance of agreed-upon procedures as listed and identified in the paragraph above concerning SSA's claim under USAID Contract No. TRN-C-00-03-00054-00. We were not engaged to, and did not perform an examination, the object of which would be the expression of an opinion on the subject matter of this report. Accordingly, we do not express such an opinion.

DCAA Report (revised) dated April 14, 2006, at 2 (Attached hereto as Exhibit 3).

[8] DCAA was not able to review tonnage invoiced for dhows because the shippers were invoiced on a per ship basis and payments were made in cash. DCAA disregarded SSA's estimate entirely and counted dhow tonnage as zero. DCAA Report co-author Robert Skaggs's explanation of why a zero figure was used for dhows is explored in depth at pages 37-40 of his deposition transcript, which is included as Exhibit 4. The exchange there provides useful insight into the underpinnings of the DCAA Report upon which Mr. Wilkins relies.

Q So that means that disregarding dhows, that the tonnage claimed by SSA is less than the tonnage invoiced; is that correct?

A Yes.

Robert Skaggs Deposition Transcript at 28 (attached as Exhibit 4). Later on, Mr. Skaggs testified that he did not have any reason to believe that *any* of the SSA tonnage figures were inaccurate:

Q Do you have any reason to believe that SSA's tonnage figures are not accurate for any of the classes of cargo covered by your report?

A Not really.

(Skaggs Tr. at 37.)

Again, the intent here is not to debate the merits of the opinions stated by Mr. Wilkins, but merely to illustrate that he has no expertise in this area that would allow him to provide testimony that would be even remotely useful in understanding information that the government might seek to introduce as evidence, such as the DCAA Report. To be clear, SSA does not argue as a general matter than an expert may not offer an opinion based on facts gathered by others. Experts obviously do that all of the time. What is not permissible, however, is for a purported expert to offer opinions about facts gathered by others when that expert knows nothing about the subject matter of those facts. By his own admission, Mr. Wilkins knows nothing about the marine terminal business or SSA's operations in Iraq. In any event, he does not analyze, explicate, or expand upon anything that DCAA has said; he simply repeats it (incompletely and inaccurately), adding adjectives as he goes. Mr. Wilkins adds nothing new with respect to the DCAA Report, and he is in any event not qualified to do so.

In the absence of the application of any independent methodology or analysis, Mr. Wilkins is doing nothing more than arguing the government's case. "Whatever expertise [a witness] may possess, no expert may 'supplant the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence.'" *Highland Capital Management, L.P.*, 379 F. Supp. 2d at 469.

In short, Mr. Wilkins does not add anything of evidentiary value to the record. All that he does is to make arguments based on existing evidence. That is the role of counsel, not experts. *See id.*; *see also Salem v. U.S. Lines Co.*, 370 U.S. 31, 35-36 (1962) (holding that expert testimony is unnecessary and may be excluded if the trier of fact is capable of drawing his or her own conclusions from the facts presented). Such uninformed commentary does not constitute "scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence or to determine a fact in issue," and Mr. Wilkins (whatever his other considerable professional talents) is not "qualified as an expert by knowledge, skill, experience, training or education" to assist the Court with respect to the facts of a case that asks what profit a marine terminal operator should reasonably earn in a war zone. *See* Fed. R. Evid. 702.

## CONCLUSION

The Wilkins Report consists almost entirely of legal conclusions. To the extent that there is any substantive content beyond those legal conclusions, that content is either of a nature that does not require expert explanation, or that content involves matters outside of Mr. Wilkins's expertise. Accordingly, Plaintiff SSA Marine, Inc. respectfully requests that the report and testimony of Charles L. Wilkins be excluded from evidence, whether offered at trial or by affidavit in connection with summary judgment motions.

Respectfully submitted,

/s/ John W. Butler
John W. Butler
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2510 (tel)
(202) 463-4950 (fax)

Of counsel:

Heather M. Spring
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2516 (tel)
(202) 463-4950 (fax)

Dated: August 29, 2006