IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SSA MARINE, INC.<br>v.<br>THE UNITED STATES | Case No. 05-490C<br>(Chief Judge Damich) |

# <u>EXPERT REPORT OF CHARLES L. WILKINS</u>

## I. INTRODUCTION

I was retained on behalf of the Defendant by the US Department of Justice with regard to the above-referenced matter to evaluate the damages aspects of SSA Marine, Inc.'s ("SSA Marine") claim.

## II. QUALIFICATIONS OF EXPERT

I am a Senior Managing Director in the Forensic and Litigation Consulting practice of FTI Consulting, Inc. ("FTI") in Washington, DC. I have more than thirty-five years of experience involving public contracts from both inside the aerospace and defense industry and as a professional advisor. My industry experience includes the aerospace and defense, Indian gaming, healthcare, manufacturing, government, telecommunications, oil and gas, utility, energy, and construction sectors, among others.

During my professional career I have developed or overseen the development of a large number of claims submitted to a wide variety of government agencies or other contractors on many diverse products, the acquisition of which was on government contracts. These products included: ships; tanks; trucks and other vehicles; guns and other armament; aircraft and space craft; services; and other products. As a professional consultant I have worked with clients in the



EXHIBIT 1

development, review, and resolution of many claims asserted against their customers on all types of contracts. My experience on claims includes: 1) identifying the issues that are the basis for the claim, 2) documenting or reviewing the documentation of the analyses prepared to support damages resulting from the issues, 3) drafting the claim elements for presentation to the agency or other contractor, 4) working with counsel to bridge the link between quantum and entitlement, and 5) applying techniques for claim resolution.

I have been engaged in dispute, regulatory, and profit maximization matters on behalf of organizations in more than thirty different countries and have led teams in applying compliance review procedures for statutory, regulatory and defense industry initiative compliance. I have served as an arbitrator and mediator on domestic and international dispute matters. I have provided expert witness testimony on a variety of matters for both government agencies and contractors. Prior to its acquisition by FTI, I was a Partner in KPMG's Forensic and Litigation Services practice where I was responsible for the firm's national public contract litigation services practice. During my industry career, I held key management positions, including senior corporate auditor, controller and chief financial officer, in manufacturing organizations, including those involved in aerospace, defense, electronics, capital goods, mining and other industries.

My attached resume provides more details about my qualifications.

## III. SOURCES OF INFORMATION

In reaching my opinion I have reviewed and relied upon various deposition transcripts, interrogatories and answers, and other documents and related correspondence as set forth below:

- Contract No. TRN-C-00-03-0054-00 ('the contract") between SSA Marine and the United States Agency for International Development ("USAID"), dated April 8, 2003, and related modifications;
- SSA Marine's Complaint, dated April 22, 2005;
- The United States' Answer to the Complaint, dated August 17, 2005;
- SSA Marine's Claim, dated July 26, 2004

- Expert Report of Christopher C. Morton
- Transcript of the Deposition of Robert E. Watters, witness for SSA Marine, pursuant to Rule 30(b)(6);
- Transcript of the Deposition of Anne Quinlan of USAID;
- Transcript of the Deposition of John Abood of USAID;
- Declaration of Anne Quinlan of USAID (Attachment II to this report)
- Documents received through discovery from SSA Marine;
- Documents received through discovery from USAID;
- Documents received through discovery from DCAA;
- DCAA's Revised Audit Report No. 4261-2006S17900001, published May 4, 2006;
- Comparable government / USAID contracts;
- Comparable SSA Marine contracts;
- Department of Defense ("DoD") Form 1547 Weighted Guidelines Method;
- USAID Contract Information Bulletin 84-14 June 11, 1984;
- Defense Federal Acquisition Regulation Supplement ("DFARS"); and
- Related Federal Guidance in 48 Code of Federal Regulation ("FAR"): Title 1, Chapters 1-99.

If additional documentation or information is made available to me during the course of this litigation, I reserve the right to review any such documentation and information and to supplement and/or amend this report and/or my opinion, if necessary.

## IV. SUMMARY OF OPINIONS

It is my opinion that SSA Marine's claim for additional profit of $4,400,004.40 is unsupported and therefore, unreliable as a basis for damages. In addition, the claimed profit

calculation is inconsistent with the profit limitations contained in the federal statutes and regulations including 10 U.S.C. 2306(d) and 41 U.S.C. 254(b), the FAR, and agency guidance.

## V. BACKGROUND

SSA Marine's claim is for additional profit on the contract that would cause the total contract profit to exceed the 10 percent limit on a Cost-Plus-Fixed-Fee ("CPFF") type government contract.[1] SSA Marine claims it is entitled to a market comparable profit calculation for port operations and cites the following *Financing Port Operations* ("FPO") contract clause as contractual support:

> "In the event that USAID directs the contractor to manage and operate the port, start up funds and working capital to begin implementation of the operation plan shall be provided by USAID. Start up capital shall be provided to cover initial facility and equipment replacement and repair as proposed by the contractor and approved by USAID from the port assessment, improvement plan and operational plan. Start up working capital shall be provided to cover initial operation of the port. After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners. USAID shall approve the fee and charge schedule and the level of contractor profit from operations. The contractor shall present USAID with monthly financial statements outlining the costs, revenues and profits from operations. The contractor shall maintain separate bank account(s) and records regarding port costs and revenues under this contract. To the extent that revenues exceed costs and negotiated maximum profit margin or level, USAID shall determine the use of any remaining funds in the port operations account."

[1] 10 U.S.C. 2306(d), 41 U.S.C. 254(b), and 48 CFR Section 15.404-4(c)(4)(i)(C).

SSA Marine's interpretation of the above clause assumes that the clause provides a "second payment provision"[2] in the contract. SSA Marine contends that USAID exercised its authority under Contract Line Item Number ("CLIN") 003 to transfer the port to civilian control on May 21, 2003 thereby implementing the above clause[3]. SSA Marine uses this clause as a basis for entitlement for their $4,400,004.40 claim for additional profit. This figure is based on SSA Marine's "judgmental selection"[4] of $2.20 per ton as a profit rate for the 2,000,002 tons that SSA Marine claims were handled under their port operations management.

## VI. ANALYSIS AND OPINION

### A. The Contractual Arrangement

#### 1. SSA Marine Entered into a Cost Plus Fixed Fee-Level of Effort Type Contract with USAID

This contract is a Cost-Plus-Fixed-Fee Level of Effort type contract, which, as described in 48 Code of Federal Regulation Part 16.306(d)(2), provides for:

> "The term form describes the scope of work in general terms and obligates the contractor to devote a specified level of effort for a stated time period. Under this form, if the performance is considered satisfactory by the Government, the fixed fee is payable at the expiration of the agreed-upon period, upon contractor statement that the level of effort specified in the contract has been expended in performing the contract work. Renewal for further periods of performance is a new acquisition that involves new cost and fee arrangements."

A Cost-Plus-Fixed-Fee type contract is virtually risk-free for a contractor and is appropriate in a situation where costs cannot be accurately estimated. This type of contract allows for the contractor to receive its fixed fee regardless of any cost escalation. Since the contract was a Cost-Plus-Fixed-Fee level of effort type, the fee that SSA Marine was to receive was fixed at the

[2] SSA Marine's claim, p. 6.
[3] SSA Marine's claim, p. 4.
[4] Transcript of the Deposition of Robert E. Watters, pursuant to Rule 30(b)(6), May 31st, 2006, p.46.

time of contract award, and would be paid as long as SSA Marine's performance was satisfactory within the applicable time period.

2. The Contract Called for Three Separate Statements of Work at a Designated Level of Effort as Defined by CLINs 001-003

Following is a summary of the original CLINs for the contract:

- CLIN 001 Port Assessment – SSA Marine was tasked with preparing a port management assessment report evaluating the condition of the Umm Qasr port.
- CLIN 002 Port Improvement Implementation Plan – SSA Marine was tasked with writing a report for the implementation of USAID-approved port improvements.
- CLIN 003 Port Operations – SSA Marine was tasked with managing the Port of Umm Qasr, at the direction of USAID.

A fixed fee of 10 percent was included in the initial contract, and was applied on the estimated cost for performance of the statement of work under the three CLINs mentioned above.

3. Modifications to the Contract Separately Identified Port Operations Expense (Op Ex) and Capital Expense (Cap Ex) as Categories of Work Under the Contract

Contract modification #2,[5] signed on September 30, 2003, partially restructured the contract and added fund allocations for anticipated operating and capital expenses. As part of this contract modification CLIN 003 was divided into three separate CLINs (CLIN 003A, CLIN 003B, CLIN 003C). The original CLIN 003 was renamed CLIN 003A, which included SSA Marine's level of effort costs plus the statutory maximum 10 percent fee, and CLINs 003B and 003C were created for anticipated operating and capital expenses, respectively. These expenses were deemed to be separate categories of costs and were considered "pass-through" costs. Typically the administrative responsibility and risk borne by the contractor for "pass-through" costs are minimal or non-existent. As a result, fee was not added to these new and distinct funding allocations. It was anticipated at the time modification #2 was agreed upon that SSA Marine's level of effort was sufficient to support the additions of scope contained in CLINs

[5] This contract modification was apparently originally labeled modification #1. Modification #3 renamed this modification #2 to distinguish it from the first modification.

003B and 003C. In other words, SSA Marine would not incur any additional level of effort to fulfill their obligations to perform CLINs 003B and 003C; therefore, the 10 percent statutory maximum fee that existed based upon the original CLINs 001-003 was deemed applicable and appropriate by both USAID and SSA Marine representatives. The contract value and funding profile for modification #2 and subsequent modifications are shown in Attachment 1.

4. USAID has a Customary Practice that no Fee is Paid on Some Pass-Through Costs

I reviewed the declaration provided by Anne Quinlan regarding the customary practice by USAID of not paying fee and Capital expenditures that qualify as "pass-through" costs.[6]

From my experience in government contracts, I know that pass-through costs – costs incurred to fulfill certain requirements under a contract, but that involve minimal or no additional level of effort by the contractor – are fairly common on government contracts. Frequently, a small handling fee or premium is charged on some government contracts to allow the contractor to recover minimal fees associated with their efforts to procure various items and systems on behalf of the US Government. Another approach sometimes used by contractors is to develop an abated or reduced overhead rate (typically involving procurement personnel) that applies only to these pass through purchases. However, under this contract,[7] SSA Marine received a provision for the reimbursement of a 10 percent indirect cost on significant portions[8] of the contract. Therefore, the costs associated with the nominal use of SSA Marine's procurement system was provided for under the terms of the contract.

5. SSA Marine had an Opportunity to Negotiate Additional Fee in CLIN 003A, at the Time of the Modification for 003B and 003C, if their Level of Effort Costs were Expected to Increase

Initially, SSA Marine proposed additional fee for CLIN 003B, but this fee was excluded as a result of negotiations between SSA Marine and USAID representatives. On the other hand, additional fee for CLIN 003C was never proposed by SSA Marine. The parties

[6] Declaration of Anne Quinlan of USAID (Attachment II to this report).
[7] Modification #6.
[8] This excludes the wages of Longshoreman and related fringe benefits.

agreed that the contract's current level of effort was adequate to handle the additional requirements of CLINs 003B and 003C. SSA Marine accepted and signed modification #2 thereby acknowledging no additional fee in the contract.

6. Conclusion

Based upon the analysis and review described above it is my conclusion that no additional fee was expected by SSA Marine at modification #2, and that SSA Marine had no reasonable expectations of increasing their level of effort costs to perform the scope of work under modification #2. Moreover, it was consistent with USAID's customary practice to not include additional fee on Capital Expenditures pass-through costs. Therefore, adding no additional fixed fee under the contract was appropriate.

B. SSA Marine's Claim for Additional Revenue is Unsupported

1. Federal Statutes and Regulations Require that Profit be Linked to Risk

The level of profit that a contractor earns typically relates to the amount of risk the contractor assumes. The FAR states that, "determination of contract type should be closely related to the risks involved in timely, cost-effective, and efficient performance period. This factor should compensate contractors proportionately for assuming greater cost risks."[9] Though pricing and contract structures used by the US Government can differ notably from a commercial contract, the underlying concept of profit determination for a government contract is very straightforward. A contractor is afforded an opportunity to earn profit based largely on the risks assumed by the contractor. The more risks assumed by the contractor (i.e. defined broadly as the ability to manage contract costs), the more opportunity for greater profit margin.

Relative to profit/fee determination on government contracts, multiple federal guidelines exist for government contractors to use during proposal development and subsequent negotiations. For example, the FAR states that, "structured approaches…for determining profit or fee pre-negotiation objectives provide a discipline for ensuring that all relevant factors are considered."[10] This structured approach points out that a very uniform and well thought out

[9] 48 CFR Section 15.404-4(d)(1)(ii)(A).
[10] 48 CFR Section 15.404-4(b)(1).

approach is taken to determine the appropriate government contract type. Government contracting officials typically assess the contractor risks associated with contract performance and negotiate a reasonable profit rate based upon the contractor's assumption of risk.

The DoD Weighted Guidelines Method, which is contained in the DoD FAR Supplement ("DFARS"), applies a profit factor based upon the amount of risk assumed by the contractor. The guidelines state, "this profit factor addresses the contracts' degree of risk in fulfilling the contract requirements. The factor consists of two parts: (1) technical – uncertainties of performance (2) management/cost control – the degree of management effort necessary – (i) To ensure that contract requirements are met; and (ii) To reduce and control costs."[11] This DoD weighted guidelines method assigns weights to risk factors and apportions appropriate profits to those risk factors as shown below:

Table 1: DoD Weighted Guidelines Method

| Contractor Risk Factors | Assigned Weightings | Assigned Values | Base | Profit Objective |
|---|---|---|---|---|
| Technical | (1) | (2) | | |
| Management/Cost Control | (1) | (2) | | |
| Performance Risk | | (3) | (4) | (5) |

(1) Assign a weight (percentage) to each element according to its input to the total performance risk. The total of the two weights equals 100 percent.
(2) Select an assigned profit percentage value for each factor based on the criteria defined in the regulation.
(3) Compute by multiplying each factors assigned weight by the assigned values and summing the results of each factor.
(4) Total contract costs, excluding facilities capital cost of money.
(5) Profit percentage based on (1) the standard designated range should apply to most contracts (Normal Value of 5% in the Designated Range of 3 to 7 percent; or (2) for the technical incentive factor for acquisitions that include development, production, or application of innovative new technologies (Normal Value of 9% in the Designated Range of 7 to 11 percent.

The Structured Approach from USAID, which is somewhat dated but still in use today,[12] also provides direct guidance on the profit versus risk concept for profit/fee determination. Specifically, this approach requires the contracting officer to "evaluate and assign a fee/profit percentage objective or target to the factors for Contractor Effort, for the contractor's assumption of Contract Cost Risk, and for Special Factors."[13] The aforementioned

[11] DFARS 215.404-71-2(a).
[12] Declaration of Anne Quinlan of USAID (Attachment II to this report).
[13] USAID's Contract Information Bulletin 84-14, dated June 11, 1984 (Exhibit A to Attachment II to this report).

regulations and guidelines underscore the important relationship that exists between profit and risk in government contracts as shown below:

Table 2: USAID's Structured Approach Methodology

| A | B | C | D | E |
|---|---|---|---|---|
| Fee/Profit Evaluation Factors | Measurement Base (Dollars) | Fee/Profit Weight Ranges | Contracting Officer Assigned Target Weights | Target Fee/Profit Dollars (B × D) |
| Contractor Effort<br>(a) Direct Labor<br>(b) Subcontracting<br>(c) Other Direct Costs<br>(d) Indirect Costs | <br>$ ____________<br>$ ____________<br>$ ____________<br>$ ____________ | <br>5 to 15%<br>1 to 5%<br>1 to 5%<br>4 to 8% | <br>___%<br>___%<br>___%<br>___% | <br>$ ____________<br>$ ____________<br>$ ____________<br>$ ____________ |
| Contractor Cost Risk<br>(a) CPFF Contract<br>(b) FFP[14] Contract | <br>$ ____________<br>$ ____________ | <br>$ ____________<br>$ ____________ | <br>$ ____________<br>$ ____________ | <br>$ ____________<br>$ ____________ |

2. SSA Marine's Profit Rate of $2.20 per Ton is Unsupported

SSA Marine reviewed the profit per ton on eight of its other port operations contracts in place during 2002 and 2003 and used a "judgmental"[15] methodology to select $2.20 per ton as an appropriate profit. SSA Marine has stated that this figure was at the "low end"[16] of its comparable contracts. Additions were then made to this "low end" profit estimate for: (1) the additional services SSA Marine provided under the contract, (2) the markup attributable to an international contract, (3) the hardship associated with performing a contract in Iraq, and (4) the hardship associated with performing a contract in a war environment.[17] The result of this pricing process was the aforementioned $2.20 per ton figure. Further, SSA Marine provided Christopher C. Morton's expert report attesting to the industry reasonableness of a profit of $2.20 per ton.

SSA Marine failed to adequately explain its selection of its eight comparable contracts. A detailed description of the similarities between the comparables and the Umm Qasr contract was not provided nor was any real explanation as to the criteria used to select the contracts. It is therefore unclear whether there are any real similarities to the Umm Qasr

[14] Firm Fixed Price Contract.
[15] DCAA Revised Audit Report No. 4261-2006S17900001, p.2.
[16] Transcript of the Deposition of Robert E. Watters, pursuant to Rule 30(b)(6), May 31st, 2006, p. 51.
[17] Transcript of the Deposition of Robert E. Watters, pursuant to Rule 30(b)(6), May 31st, 2006, p. 53.

contract. According to DCAA's analysis of the revenue per ton received at the port compared, $2.20 per ton would be equivalent to a profit margin range (profit per ton/revenue per ton) of 7.27 percent to 157.13 percent.[18] $2.20 per ton would represent a ton weighted average of 66.4 percent[19] in profit margin, far more than the statutory 10 percent for a CPFF contract.[20]

Further, with respect to comparable contracts, Watters 30b6 testimony differs from information provided in the DCAA's revised audit report. Specifics include:

- Watters' testimony is that, of the eight contracts selected as comparable to the Umm Qasr contract, one of those was a cost plus contract. (Transcript of the Deposition of Robert E. Watters, pursuant to Rule 30(b)(6), May 31st, 2006, p. 35). DCAA's report states that none of the comparable contracts were cost contracts. They were all fixed rate. (DCAA Revised Audit Report No. 4261-2006S17900001, p. 13 & 14)

- Watters' testimony is that, of the eight contracts selected as comparable to the Umm Qasr contract, two included port assessment effort. (Transcript of the Deposition of Robert E. Watters, pursuant to Rule 30(b)(6), May 31st, 2006, p. 41). DCAA's report states that none of the comparable contracts included port assessments. (DCAA Revised Audit Report No. 4261-2006S17900001, p. 13 & 14)

- Watters' testimony is that, of the eight contracts selected as comparable to the Umm Qasr contract, three included direct operation of terminals. (Transcript of the Deposition of Robert E. Watters, pursuant to Rule 30(b)(6), May 31st, 2006, p. 42). DCAA's report states that none of the comparable contracts

[18] DCAA Revised Audit Report No. 4261-2006S17900001, p. 20.
[19] This profit margin represents a ton weighted average profit margin for the five types of cargo based upon SSA Marine's claimed profit per ton. Tonnage came from DCAA Audit Report No. 4261-2006S17900001, dated April 14, 2006, p. 20.
[20] The 66.4% is Profit/Sales whereas the 10% CPFF limit is Profit/Cost. The 10% would be significantly less if calculated as Profit/Sales.

called for direct operation of their respective ports. ((DCAA Revised Audit Report No. 4261-2006S17900001, p. 13 & 14)[21]

- Watters' testimony is that, of the eight contracts selected as comparable to the Umm Qasr contract, two included direct and indirect costs, and one included only direct costs. (Transcript of the Deposition of Robert E. Watters, pursuant to Rule 30(b)(6), May 31st, 2006, p. 13). DCAA's report states that the average profit rate for the comparable contracts was calculated without considering indirect costs, thus overstating the profit margin. (DCAA Revised Audit Report No. 4261-2006S17900001, p. 13 & 14)[22]

Two of the premiums included in SSA Marine's calculations appear to be redundant issues since the contract was in Iraq thereby making the contract international. A premium for the services taking place in Iraq separate from the international and war-like environment premiums is not valid. Therefore, these two items should only have been marked up once, not twice.

Separately, SSA Marine did not adequately document its efforts to arrive at the $2.20 per ton figure and Robert Watters offered no explanation as to how the $2.20 was arithmetically calculated. According to Robert Watters, calculations were made on scratch paper and then discarded.[23] No valid support for the base range and premiums were provided by SSA Marine. I would have expected SSA Marine to document the methodology used to prepare its claim and to retain these documents in the event of a dispute. Documenting the assumptions, rationale, and basis for the quantum analysis is a critical part of substantiating the value and credibility of a claim. The lack of supporting documentation and/or the inability to review the methodology used by SSA Marine greatly reduces the relevance and reliance of their claim.

Christopher C. Morton's expert report has several flaws and omissions. First, he states his opinion that a profit rate of $2.20 per ton is reasonable when compared to industry

---

[21] The preceding points come from the DCAA Audit Report No. 4261-2006S17900001, dated April 14, 2006, p. 13-14.
[22] DCAA Revised Audit Report No. 4261-2006S17900001, p. 2.
[23] Transcript of the Deposition of Robert E. Watters, pursuant to Rule 30(b)(6), May 31st, 2006, p. 47.

standards for similar services throughout the world.[24] Even though this may be the case for commercial contracts, this is not necessarily the case in government contracts. Under a Cost-Plus-Fixed-Fee government contract, there is no risk of escalating costs to a contractor because a commitment to reimburse the contractor for allocable, allowable, and reasonable costs is made by the US Government. It is therefore meaningless to compare a fixed-price-per-ton contract, as Mr. Morton suggests in his expert report, to SSA Marine's Cost-Plus-Fixed-Fee government contract. This critical profit and risk tradeoff distinction is ignored by Mr. Morton. Second, I would have expected Mr. Morton to opine on the validity of SSA Marine's claim calculation methodology yet he fails to comment on the process used by SSA Marine to arrive at $2.20 per ton. Finally, Mr. Morton's report does not address the adequacy of SSA Marine's claimed tonnage amount. The entire report focuses on the irrelevant argument of a justified profit figure of $2.20 per ton.

Mr. Morton's experience and credentials indicate that he has no experience in government contracting. His expert report may therefore, prove valid when dealing with *commercial* port operations contracts, but is not relevant to a government contract dispute.

Lastly, SSA Marine was unable to provide detailed support and calculations for the methodology used to arrive at the $2.20 per ton; therefore, I was unable to recalculate and examine the reasonableness of their specific calculations beyond what I have stated above. SSA Marine's use of $2.20 per ton is unsupported and unreliable as a basis for damage determination.

3. SSA Marine's Tonnage Included in their Claim is Not Supported

According to SSA Marine's claim, 2,000,002 tons were moved through the port during the time period from April 2003 to June 2004. The Defense Contract Audit Agency ("DCAA") audited SSA Marine's claim on behalf of the USAID. I reviewed the DCAA's audit report and related work papers and determined that the DCAA was unable to reconcile the amount of tonnage claimed, 2,000,002 tons, to SSA Marine's books and records for all five (5) of the types of cargo moved through the port: Roll-On Roll-Off ("Ro-Ro"), World Food Program

[24] Report on SSA Marine Contract, Christopher C. Morton, p. 1.

("WFP"), Project Cargo, Containers, and dhows. Therefore, in my opinion the claim of 2,000,002 tons is unsupported and therefore, unreliable and unreasonable.

The DCAA report points out several major faults in SSA Marine's calculation. First, according to the DCAA Report, in some cases SSA Marine based the tonnage figure for Ro-Ro, WFP, and Project Cargo on a "professional estimate"[25] which was made by the SSA Program Manager at the Port of Umm Qasr and not on any valid historical sample. Second, SSA Marine based the total container tonnage claimed on the number of containers moved[26] instead of actual tons per container. Third, SSA Marine based the dhow tonnage on a "professional estimate" of 500 tons per "vessel call."[27] According to the DCAA dhows are "small, privately owned country boats…with limited cargo…capable of carrying only a certain amount of weight." According to the DCAA, SSA Marine decided that it was easiest to estimate each shipment as 500 tons. DCAA was unable to verify any information related to the amount of tonnage, if any, actually received from these dhows. The lack of supporting records and real market pricing support as well as the liberal use of "professional estimates" calls the whole calculation into question.

In my opinion SSA Marine failed to maintain proper accountability for the tonnage that flowed through the port, and could not support their estimate of 2,000,002 tons in their claim. This value, used as a basis for profit determination, can not be verified and therefore is unreliable as a basis for claim development.

4. SSA Marine's Fee, if Awarded in Accordance with Their Claim, Would Significantly Exceed the Statutory Maximum for a Cost Plus Fixed Fee Contract

If SSA Marine's claim for $4,400,004.40 in fee were to be awarded, when added to the current fixed fee of $438,048, the contract profit margin on the contract would grow to

[25] DCAA Revised Audit Report No. 4261-2006S17900001, dated April 14, 2006, p. 3 to 7.
[26] Based on an estimate of 14 tons per move as per the DCAA Audit Report No. 4261-2006S17900001, dated April 14, 2006, p. 8.
[27] DCAA Revised Audit Report No. 4261-2006S17900001, dated April 14, 2006, p. 10.

33.8 percent[28], total fee divided by contract costs of $14,318,985. This is far in excess of the 10 percent statutory limit;[29] and the limit in the Federal Acquisition Regulation.[30]

### C. If SSA Marine was Damaged at all, The Maximum Range by Which they Could be Damaged is $ 144,343 to $ 888,815

The FPO clause states "…the extent that revenues exceed costs and negotiated maximum profit margin or level…" This language might arguably promote a potential discussion that SSA Marine is entitled to some alternative fee related to Port Operations. If an alternative fee were appropriate it may be calculated as a specified percentage, possibly on the entire value of CLINS 003B and 003C. However, any such alternative fee cannot exceed the statutory maximum of 10 percent on a cost plus fixed fee contract.

If a possible minimum range of profit under this alternative fee scenario were 10 percent on the increase to CLIN 003A because CLIN 003A is for "level of effort," the damage figure would be approximately $144,342.60.[31] The maximum range under this assumption would be 10 percent on the total incremental cost added to the contract through various modifications, or $888,814.76[32].

The total profit on the contract currently is approximately 3.2 percent of estimated costs. Though this margin is below the 10 percent statutory maximum cap for a Cost-Plus-Fixed-Fee government contract, the SkyLink contract had very similar terms (including an FPO-type clause) as previously mentioned, and the total fixed fee was also approximately 3.2 percent. Under the assumption that SSA Marine deserves a similar profit margin for its port operations services, similar to the SkyLink contract, which was for comparable services and terms, their damages would be $0 because the contract is correctly priced as is.

## VII. OPINION AND CONCLUSION

[28] ($4,400,004.40 + $438,048) / $14,318,985.
[29] 10 U.S.C. 2306(b) and 41 U.S.C. 254(b).
[30] 48 CFR Section 15.404-4(d)(1)(ii)(A).
[31] Based on 10 percent of the additional contract value and funding provided to CLIN 003A of $1,443,426.
[32] Based on 10 percent of the actual costs claimed against the contract of $13,268,862.76, less the profit already earned of $438,048.

My opinion is that SSA Maine's claim for $4,400,004.40 in additional profit under the contract with the United States Agency for International Development for the Assessment, Improvement, and Operation of the Port of Umm Qasr, Iraq is unreasonable and unsupported. The manner in which this claim was calculated is inconsistent with government contract pricing practices. Moreover, the claim is not supported by SSA Marine's accounting records. The entire comparative pricing analysis by SSA Marine of other SSA Marine port services contracts is not relevant because unlike their comparative contracts, SSA Marine effectively *assumes no risk* with the contract in dispute. Profits paid to contractors under government contracts are based on the risks assumed by the contractor. In the case of a Cost-Plus-Fixed-Fee type contract, contractor cost risk is eliminated provided that their costs are reasonable, allowable, and allocable.

## VIII. COMPENSATION

FTI is compensated on this engagement at hourly rates that range from $150 to $525.

Charles L. Wilkins
*Senior Managing Director*
Forensic and Litigation Consulting

FTI Consulting, Inc.
1201 I (Eye) Street NW
Washington, DC 20005

Dated: June 8, 2006

# Charles Wilkins, CPA

Senior Managing Director – Forensic Services

charles.wilkins@fticonsulting.com

1201 Eye Street, NW
Suite 400
Washington D.C. 20005
Tel: (202) 312-9100
Fax: (202) 312-9101

**Education and Certifications:**

Certified Public Accountant, licensed in California, Virginia and the District of Columbia.

Executive Program (M.B.A.), University of California

BA, LaSalle University (Unaccredited)

BA, California State University

**Professional Associations:**

Member, AICPA

Associate Member, American Bar Association, Public Contract, Business Law and General Practice sections

Member, California Society of CPAs
Member, National Contract Management Association

Mr. Wilkins is a Senior Managing Director in FTI's Forensic Practice in Washington DC. His primary areas of expertise are public contract dispute resolution and avoidance, construction claims and litigation and commercial dispute resolution. Mr. Wilkins has more than 35 years of experience involving public contracts from both inside the aerospace and defense industry and as professional advisor. He has been engaged to provide consultation and his professional opinion in commercial litigation matters as well.

During his industry career he held key management positions, including senior corporate auditor, controller and chief financial officer, in manufacturing organizations, including those involved in aerospace, defense, electronics, capital goods, mining and other industries. During his professional consulting career, Mr. Wilkins has assisted most of the larger defense contractors in the United States, and has served other large and small commercial and government contract clients in a wide array of services including litigation and dispute resolution, industry advisory and expression of his professional opinions, and on regulatory and corporate compliance and profit maximization matters.

## Dispute Advisory Services Experience

- Led a team in structuring the bases for claims of approximately $60 million on the International Space Station Program relative to cost increases and schedule overruns caused by constructive and directed changes to the scope of work of a major subcontractor. His work included planning and orchestrating the development of cost and schedule analyses, and other analysis required to validate the increased costs resulting from the action or inaction of the prime contractor.

- Designated to provide his professional opinion on industry and damages issues in a purchase price dispute between two major defense contractors involving a disputed purchase price of approximately $80 million. On this engagement, Mr. Wilkins lead a team to collect, organize, review and analyze relevant documentation to determine areas where the purchase price agreement had been violated, resulting in an increased purchase price. Mr. Wilkins worked with counsel to clarify complex accounting concepts involving accounting reserves, work in process cost accountability, profit booking, defense industry practices and other areas. In addition, Mr. Wilkins orchestrated the calculation of damages resulting from the dispute.

- Worked with counsel who represented one of the two major defense contractors in the A-12 aircraft multi-billion dollar litigation against the Department of Defense. He was responsible for the development of the termination settlement proposal for his client, and determined the financial statement cost impact of the threatened termination for default. Later in the litigation, he was responsible for overseeing a team to determine the basis for



© FTI Consulting, Inc., 2003. All rights reserved.

the initial proposals for the two prime contractors. This assignment included reviewing relevant documentation and conducting interviews with all personnel who had a significant role in the development of the initial cost proposals, including senior level executives who reviewed and ultimately approved the proposals for submission to the Government. He presented the results of this assignment to counsel for both prime contractors, and to the special master assigned to mediate an additional dispute between the prime contractors.

- Conducted a review of a claims-processor HCFA contractor's cost collection and billing practices and procedures to determine their compliance with then-existing laws and regulations. On this engagement, Mr. Wilkins' team applied compliance review procedures to determine whether the company's practices and procedures resulted in over billing the Government. Following the analytical portion of the engagement, Mr. Wilkins conducted compliance training sessions with client personnel to familiarize them with compliance requirements on HCFA contracts, the Federal Acquisition Regulation and Cost Accounting Standards. Mr. Wilkins has been engaged on several of these type engagements with various healthcare organizations.

- Led several teams in developing the impact of alleged violations by major pharmaceutical firms of the Veterans Health Care Act of 1992 under the voluntary disclosure program. Collectively these matters involved several million dollars in potential damages. The analyses included determining the correct federal average manufacturer's price and the federal ceiling price on covered drugs, and quantifying the amount of damages under the price adjustment and price reduction clauses. Mr. Wilkins participated in the strategy sessions with Veterans Administration representatives and counsel to determine how the analyses were to be prepared. He also assisted in negotiating final settlements on these matters. Mr. Wilkins has been engaged in various similar matters involving calculations for FAMP, NFAMP and AWP by contractors.

- Led a team to calculate damages by an international tool manufacturer for alleged violations of the small business acquisition rules. This engagement involved collection and analysis of sales order data from several distributor sales locations. A damage analysis was developed under the voluntary disclosure program to estimate the cost impact to the Government of the practices employed by the company. In addition, recommendations were developed through outside counsel to strengthen the company's operating policies and training for its employees. Mr. Wilkins assisted in negotiations with Government representatives and resolved the matter at less than $1 million.

- Led an engagement to examine the purchasing system of a major NASA contractor after allegations by NASA auditors that the purchasing system was deficient in its construction


© FTI Consulting, Inc., 2003. All rights reserved.

and that certain company representatives had violated the integrity of the purchasing system. Mr. Wilkins' team evaluated the purchasing system and successfully proved that NASA auditors mischaracterized many aspects of their audit results and considered little by way of materiality during their audit. Mr. Wilkins was asked to debrief the head of NASA and her executives on his findings and recommendations. The matter was negotiated to a successful end for the contractor.

- Worked with counsel in defense of a company chief financial officer accused of criminal wrongdoing based upon alleged false manufacturing information which was included in invoices submitted to Government representatives for payment. Mr. Wilkins' knowledge of the defense industry practices and procedures played a key role in the strategy used by counsel in defending against the charges. The defendant was cleared of all charges.

- Led several multi-discipline, multi-location teams in the implementation or evaluation of major management and accounting systems for defense contractors. Such systems include MRP I and MRP II, BAAN and SAP, and smaller systems such as JAMIS, Xerox, and others. These engagements typically include evaluation of aerospace and defense industry practices and procedures and the integration of new system requirements with regulatory requirements and the legacy systems.

- Engaged to review and assist in the development of service rates within the telecommunications, utilities and oil and gas industries. He has reviewed the basis for subsidized utility rates and has examined the allocation of costs upon which rates are determined.

- Led a team of multi-discipline specialists in performing an evaluation of the site characterization study for the planned Yucca Mountain Nuclear Repository. The team was engaged by a special master, hired by the Department of Energy in response to claims by the general public and others that the DOE had, and continued to violate public policy, and that the project was seriously mismanaged and over budget. Mr. Wilkins' team reviewed relevant documentation, conducted interviews with Yucca Mountain site representatives and senior DOE officials, and held public meetings to hear the public outcry. At the conclusion of the evaluation, Mr. Wilkins' team conducted public hearings and debriefings at several locations throughout the United States, including Washington, DC, Las Vegas, NV and Salt Lake City, UT to disclose the nature of their findings. Recommendations were submitted to senior DOE officials and members of Congress, and a final written report was distributed.


© FTI Consulting, Inc., 2003. All rights reserved.

- Developed a $50 million claim for a major defense subcontractor on the wing assembly for the C-17 aircraft program. His team evaluated documents, conducted interviews with client representatives and performed appropriate analyses, including a cost and schedule analysis, to determine the impact of changed work and delay and disruption claims. Mr. Wilkins has performed similar work on construction claims, shipbuilding claims and satellite and rocket/missile claims.

- Performed a technical evaluation of the closure plan for the Rocky Flats Nuclear Facility. In this capacity, Mr. Wilkins reviewed the conclusions and recommendations set forth by a closure team to determine the likelihood of a successful closure. Mr. Wilkins was one of the approval authorities for the final written report on this facility closure.

- Engaged as an industry expert to provide testimony on a dispute involving a NASA prime contractor, subcontractor relationship. Allegations in the matter involved the theft of trade secrets from the subcontractor by the prime contractor, with damages estimated to be $20-40 million. Mr. Wilkins provided insight to the prime contractor's counsel into standard aerospace & defense industry practice, specifically NASA procurement procedures. The matter was settled favorably for the prime contractor.

- Led the team to analyze the impact of alleged cost violations by a major defense contractor on the DIVAD Gun Ship Project. This matter led to approximately $70 million of damages alleged by Government representatives through the Department of Justice against the company, and led to criminal charges and the dismissal of several key executives of the contractor. Mr. Wilkins' analyses dealt with the company's operating practices and whether they were consistent with standard industry practices. While Mr. Wilkins was not designated in this matter, he worked to prepare the designated expert. The matter was resolved favorably for the company and charges were dropped against the senior executives, with formal apologies issued by the Justice Department.

- Engaged to develop a lost profits damage analysis for an electronic manufacturer over a dispute involving the headsets for fast food chain drive-up windows. The suit alleged that the sales forecast provided by a fast food chain was false and led to the headset manufacturer aggressively building more inventory and finished product than could be sold. Mr. Wilkins developed a damage model and provided assistance to counsel for the client. The matter was resolved favorably for the client.

- Engaged on a number of matters involving new ship construction and ship repair. Issues involved cost allowability, allocation and recovery, as well as special handling of costs


© FTI Consulting, Inc., 2003. All rights reserved.

under unusual circumstances that ultimately involved the construction of advance agreements, which Mr. Wilkins orchestrated the development and negotiation of.

- Engaged on various construction matters to validate cost realism, assert claims for cost overruns, delays and changed site conditions, and provided his professional opinions on financial issues on these dispute matters.

- Engaged to provide a financial cost analysis to assist in the mediation of a contractor partnership dispute. Issues involved partner investment, ongoing work distribution, interim and final distribution of profits and compliance issues involving government procurement regulations. Mr. Wilkins assisted the mediator in formulating an approach that was accepted by the parties. Mr. Wilkins assisted the partners in understanding their responsibilities under government contracts.

- Led teams in applying compliance review procedures for statutory, regulatory and defense industry initiative compliance. He has performed these engagements on several large contractors.

- Evaluated the contractor's performance on a large weapons system defense contract to determine whether the contractor had a basis to assert a claim against the United States Government for cost overrun on the program. The evaluation included all control aspects of the contractor's business and general compliance procedures to determine if the contractor had performed in accordance with federal procurement practices, laws and regulations.

- Reviewed the company's accounting and controls to determine the basis for significant cost overruns on a major simulator project. The engagement included a complete schedule analysis of the program aspects and a complete cost evaluation of the incurred costs. The evaluation was focused to determine the causes of increased cost and extended performance schedule.

- Engaged to evaluate the causes of launch failures on unmanned launch vehicles to determine whether the manufacturer had a basis for cost recovery due to causation outside of their control. Evaluation included total review of the rocket programs and practices to evaluate performance criteria.



© FTI Consulting, Inc., 2003. All rights reserved.

- Evaluated this operation of a United States Defense Contractor to determine if actions of their Government buying agency were the cause of increased cost and extended schedule on this major program. The review incorporated an exhaustive schedule analysis of the performance of all parties and disclosed the causation for schedule and cost increases.

- Served as an arbitrator and mediator on domestic and international dispute matters including a joint venture of a radar project, construction training projects and others.

- Mr. Wilkins has been engaged in dispute, regulatory and profit maximization matters with organizations in more than 30 different countries.

### International Engagements

- **Tel Aviv, Israel, Ministry of Defense** – Performed a procurement study for the Israeli Ministry of Defense relative to procurement practices for Israeli products being sold to United States Defense Contractors through Foreign Military Sales initiatives. Engagement involved evaluation of the Ministry procurement practices and recommendations that would cause these practices to be more in agreement with United States Federal Procurement practices.

- **Tel Aviv, Israel, Defense Contractor** – Conducted an evaluation of an Israeli contractor's operations as a subcontractor to a United States defense contractor to ensure that business practices employed by the Israeli contractor were in agreement with contractual requirements and met United States procurement requirements.

- **Sao Paulo, Brazil, Capital Equipment Manufacturer** – Conducted an evaluation of the needs of a Brazilian subsidiary of a large United States contractor to determine whether manufacturing and sales practices were in agreement with the corporation's overall business strategy. Drafted and implemented a manufacturing/sales agreement between the subsidiary and the parent organization.

- **San Juan, Puerto Rico, Electronic Equipment Manufacturer** – Conducted evaluations of various subsidiaries of a large electronic manufacturer's federal contract facilities to detect fraudulent conduct by its employees and subcontractor/suppliers and to evaluate the internal controls and compliance systems and procedures.

- **Mexico City, Mexico, Capital Equipment Manufacturer** – Evaluated the practices and procedures of a large United States government contractor to verify compliance with United



© FTI Consulting, Inc., 2003. All rights reserved.

States federal procurement regulations. This valuation involved all aspects of the manufacturers operations, including its electronic accounting systems and other management and accounting systems.

- **Paris, France, Joint Venture Defense Contractor** – Served as lead arbitrator on a dispute between a United States government contractor and a French federal contractor in a Franco-American Joint Venture organized to take advantage of evolving global radar systems markets.
- **Paris, France, Electronic Component Manufacturer** – Performed a compliance review of this defense component of a large United States defense contractor to determine compliance with United States procurement rules and regulations. Also served to assess compliance with French procurement regulations.
- **Stuttgart, Germany, Electronic Component Manufacturer** – Performed a compliance review of this defense component of a large United States defense contractor to determine compliance with United States procurement rules and regulations.
- **Cairo, Egypt, Defense Subcontractor to U.S. Corporation** – Reviewed the practices of this subcontractor to a United States defense contractor to determine if their procedures were consistent with pricing practices that led to award of a subcontract.
- **Montreal, Canada, Defense Aircraft Manufacturer** – Evaluated this manufacturer's operations to determine if the management and accounting system provided a basis for claims assertion due to cost overruns created by customer demands. The evaluation also was to determine if the cost accounting was done in accordance with United States procurement regulations.
- **Stockholm, Sweden/Oslo Norway, Rail System Manufacturer** – Evaluated this manufacturer's operations to determine if the management and accounting system provided a basis for asserting a claim for changed work by a United States Federal Corporation. The evaluation included review of the internal control systems of this multi-divisional organization.
- **Moscow, Russia, Federal Grantee Evaluation** – Evaluated the practices and procedures employed by a United States Grantee to develop a Security & Exchange Commission in Russia through funds provided by the United States Agency for International Development.
- **Hillend Scotland, Electronic Equipment Manufacturer** - Performed a compliance review of this defense component of a large United States defense contractor to determine compliance with United States procurement rules and regulations.


© FTI Consulting, Inc., 2003. All rights reserved.

- **Sydney, Melbourne, Australia, Electronic Equipment Manufacturer** - Performed a compliance review of this defense component of a large United States defense contractor to determine compliance with United States procurement rules and regulations.
- **Den Haag, Holland, Equipment Manufacturer** – Reviewed this operation of a Holland subcontractor to determine their compliance with United States federal procurement laws and regulations as a subcontractor to a major U.S. government contractor.
- **Zug, Switzerland, Defense Subcontractor** – Evaluated pricing issues on this component manufacturer to assess compliance with U.S. laws and regulations. The organization was a subcontractor for a large defense contractor.
- **London, England, Major Satellite Manufacturer** – Evaluated a claim by this satellite manufacturer for recovery of costs due to an alleged satellite failure caused by a United States satellite subcontractor.
- **London, England, United States Military Truck Manufacturer** – Worked with the contractor to strategize on extended their manufacturing capabilities into Europe. Assessed all legal and business implications of extended their operations into Europe from the United States.

## Publications

- “Defense Contract Audit Agency Access to Contractor "Reserves" Used for Financial Statements Revenue Recognition Purposes“ - William H. Murphy and Charles L. Wilkins, Public Contract Law Journal, 1994 (Vol. 23, No.4)
- Public Contract Flowdown Provisions, Mandatory and Recommended, Federal Acquisition Regulation Defense Federal Acquisition Regulation Supplement, January 1996
- “Cost Allowability Issues: Unallowable Cost Penalties; Cost Recoverability; Costs in Defense of Fraud Proceedings”, American Bar Association - Fall 1994, The Tempest of Fraud or Much to Do About Nothin?, Published by the Section of Public Contract Law - American Bar Association
- “To Claim, or Not to Claim?*That is the Question”* Professional Fees in the Preparation of Demands for Payment, NCMA World Congress, 1996, National Contract Management Association
- “Government Contractor Training Course”, A Practical Guide to Government Contracting

  Honolulu, Hawaii Training Program, September 12, 1996

  Los Angeles, California Training Program, December 16, 1996

  St. Louis, Missouri Training Program, February 18, 1997


© FTI Consulting, Inc., 2003. All rights reserved.

- "State and Local Government Contracting - The California Experience" - by Charles L. Wilkins and Cheryl M. Johnson
- Co-Sponsored by the American Bar Association, Public Contract Law Section Federal Bar Association, Beverly Hills Chapter; National Contract Management Association, San Fernando Valley Chapter (1997e)
- "Understanding the Truth in Negotiations Act in Federal Procurement", Charles L. Wilkins, December 1998
- Federal Publications Course, "Government Contract Law" - Supplemental Handout to the Government Contract Guidebook, Charles L. Wilkins, December 1999
- "The Magic Circle – A Guide to Understanding Government Contract Accounting Systems", Charles L. Wilkins, Copyright 2005

**Expert Testimony**

- Aerojet - General Corporation v. U.S. Government
- Frank B. Ensign v. Fujitsu Systems, Inc. and Fujitsu of America, Inc.
- U.S. Government v. Sundstrand Power Systems
- Titan Systems, Inc. v. Computer Associates International
- Perceptronics, Inc. v. Simtech
- United States of America, ex rel., Taxpayers Against Fraud, Klaus Kirchoff, and Max Kellingsworth v. Teledyne Industries, Inc. Teledyne Systems
- United States of America v. Western Electric Company, Inc. and American Telephone and Telegraph Company
- Clean-up Technology, Inc. v. Freight Terminals, Inc., a Georgia Corporation; Premier Resources, Inc., a California Corporation
- SYS v. Gray, Cary, Ames & Frye, et al.
- Bid Protest of PRC (B-260788.1) and TRW (B-260788.2)
- Bid Protest of Aetna (B-254397, 15,16)
- Louis E. Garcia, Inc. v. Corona, Balistreri et al.
- SYS v. Gray, Cary, Ames & Frye, et al.
- J. P. Richards Construction v. City of Oxnard
- Milpower Source, Inc. v. Science Applications International Corp.
- ABB Daimler-Benz Transportation, Inc. and L.K. Comstock & Co., Inc. v. National Railroad Passenger Corporation, and New Jersey Transit Corporation v. Federal Insurance Company Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Company.


© FTI Consulting, Inc., 2003. All rights reserved.

- Harry N. Fugate v. Jason Associates Corporation, Paul Nakayama
- Appeal of Armstead and Associates v. United States
- Hughes Aircraft Company and Consolidated Subsidiaries v. Commissioner of Internal Revenue
- Hughes Georgia, Inc. v. United States
- Pacific West Communication Group, Inc. et al. v. California Department of Transportation
- Jalisco Corporation, Inc., et.al. v. Argonaut Insurance Company, et. al.
- Forum Financial Group LLC, et al, v. President and Fellows of Harvard College, et al.
- Astrium, S.A.S and Astrium, Ltd. v. TRW, Inc., Pilkington Optronics, Inc., Corning Netoptix, OFC Corporation, and Optical Filter Corporation
- Stanford Telecomms, Inc. v. ITT Indus, Inc. consolidated with ITT Indus., Inc. v. Alcatel USA, Inc.
- Raytheon Company Securities Litigation – All Actions.
- John Ahn dba Korea Supply Company v. Lockheed Martin Corporation, et. al.


© FTI Consulting, Inc., 2003. All rights reserved.

ATTACHMENT 1:

## SSA Marine
## Contract Funding and Value Analysis - By CLIN

| | Date | Contract (K) Value Cost | Contract (K) Value Fee | Contract (K) Value % of Fee | Contract (K) Value K Value Inc. | Funding Cost | Funding Fee | Funding % of Fee | Total Funding |
|---|---|---|---|---|---|---|---|---|---|
| **CLIN 001:** ***Preparation of Initial Port and Port Management Assessments*** | | | | | | | | | |
| Original Contract/Award | 04/08/2003 | 583,970 | 58,400 | 10.0% | 642,370 | 583,970 | 58,400 | 10.0% | 642,370 |
| Total CLIN 001: | | 583,970 | 58,400 | 10.0% | 642,370 | 583,970 | 58,400 | 10.0% | 642,370 |
| **CLIN 002:** ***Planning Implementation of Port Improvements*** | | | | | | | | | |
| Original Contract/Award | 04/08/2003 | 255,487 | 25,500 | 10.0% | 280,987 | 255,487 | 25,500 | 10.0% | 280,987 |
| Total CLIN 002: | | 255,487 | 25,500 | 10.0% | 280,987 | 255,487 | 25,500 | 10.0% | 280,987 |
| **CLIN 003:** ***Direct Port Operation and Management*** | | | | | | | | | |
| Original Contract/Award | 04/08/2003 | 3,541,480 | 354,148 | 10.0% | 3,895,628 | 1,796,948 | 179,695 | 10.0% | 1,976,643 |
| Modification 001 | 05/24/2003 | | | | | 1,744,532 | 174,453 | 10.0% | 1,918,985 |
| Modification 002 | 09/30/2003 | **(3,541,480)** | **(354,148)** | **10.0%** | **(3,895,628)** | **(3,541,480)** | **(354,148)** | **10.0%** | **(3,895,628)** |
| Total CLIN 003 | | 0 | 0 | | 0 | 0 | 0 | | 0 |
| **CLIN 003A:** ***Direct Port Operation and Management - Level of Effort*** | | | | | | | | | |
| Modification 002 | 09/30/2003 | 3,541,480 | 354,148 | 10.0% | 3,895,628 | 3,541,480 | 354,148 | 10.0% | 3,895,628 |
| Modification 003 | 03/04/2004 | 1,200,000 | | | 1,200,000 | 1,200,000 | | | 1,200,000 |
| Modification 004 | 03/12/2004 | 243,426 | | | 243,426 | 243,426 | | | 243,426 |
| Total CLIN 003A: | | 4,984,906 | 354,148 | 7.1% | 5,339,054 | 4,984,906 | 354,148 | | 5,339,054 |
| **Total CLIN 001 to 003A:** | | **5,824,363** | **438,048** | **7.5%** | **6,262,411** | **5,824,363** | **438,048** | **7.5%** | **6,262,411** |
| **CLIN 003B:** ***Direct Port Operation and Management - Port Operation Expenses*** | | | | | | | | | |
| Modification 002 | 09/30/2003 | 3,818,258 | | | 3,818,258 | 3,000,000 | | | 3,000,000 |
| Modification 003 | 03/04/2004 | 2,100,000 | | | 2,100,000 | 2,100,000 | | | 2,100,000 |
| Modification 004 | 03/12/2004 | 1,483,528 | | | 1,483,528 | 1,483,528 | | | 1,483,528 |
| Total CLIN 003B: | | 7,401,786 | | | 7,401,786 | 6,583,528 | | | 6,583,528 |
| **CLIN 003C:** ***Direct Port Operation and Management - Capital Projects*** | | | | | | | | | |
| Modification 002 | 09/30/2003 | 6,580,000 | | | 6,580,000 | 6,500,000 | | | 6,500,000 |
| Modification 003 | 03/04/2004 | (3,300,000) | | | (3,300,000) | (3,300,000) | | | (3,300,000) |
| Modification 004 | 03/12/2004 | (2,625,211) | | | (2,625,211) | (1,726,954) | | | (1,726,954) |
| Total CLIN 003C: | | 654,789 | | | 654,789 | 1,473,046 | | | 1,473,046 |
| **Contract Totals:** | | **13,880,938** | **438,048** | **3.2%** | **14,318,986** | **13,880,937** | **438,048** | **3.2%** | **14,318,985** |

Attachment II

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **SSA MARINE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 05-490C** |
| **v.** | ) | **(Chief Judge Damich)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

DECLARATION OF ANNE QUINLAN

I, Anne Quinlan, make the following declaration in accordance with 28 U.S.C. § 1746:

1. I am currently a supervisory contracting officer with the United States Agency for International Development ("USAID"). I have been employed by USAID since 1991 and have served in my current position since June 1998. I prepared this declaration to provide information to the Government's expert consultants, FTI Consulting, Inc. ("FTI"). This declaration is based on personal knowledge.

2. I was the individual within the USAID Office of Procurement responsible for overseeing and managing the award of all of the initial Iraq contracts in 2003. My experience includes the award and administration of more than 100 cost reimbursement type contracts that included the types of costs mentioned below.

3. It is the customary practice of USAID, in cost plus fixed fee contracts, to not pay a fee on the costs of capital and for grants awarded by a contractor on behalf of USAID. In addition, it is also customary that subcontract costs or other purchases including operational expenses receive little to no weight in the calculation of profit using USAID's structured approach to profit. This often results in negligible or no fee awarded for these costs. This practice is reflected in calculation of profit for USAID's contracts for activities in Iraq.

4. Annexed hereto as Exhibit A is a true and correct copy of a document maintained in the records of USAID. This document states the USAID policy for determining profit on government contracts, using a structured approach, pursuant to FAR § 15.404(b). This document was in effect when these contracts were negotiated and remained effective during the total performance period of the SSA contract.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 8, 2006.

Anne Quinlan

ANNE QUINLAN

MEMORANDUM FOR ALL CONTRACTING OFFICERS

JUN 11 1984

TO: Distribution List D-14(LL)

FROM: M/SER/CM, Hugh L. Dwelley

SUBJECT: Guidelines for Negotiating and Justifying the Dollar Amount of the Fixed Fee or Profit Under A.I.D. Cost-Plus-Fixed-Fee and Firm Fixed Priced Contracts for Technical Services Priced on the Basis of Cost Analysis

CONTRACT INFORMATION BULLETIN 84-14

The following guidance is intended for application to new contracts having a total estimated cost or price of $100,000 or more, and to contract amendments which increase or decrease the total estimated cost by $100,000 or more, which are priced on the basis of cost analysis in accordance with the cost principles in Subpart 31-2 of the Federal Acquisition Regulations (FAR).

For each contract in which the fixed fee or profit is negotiated as a separate element of the contract price, such fee or profit is established and justified in the memorandum of negotiation as a dollar amount. In memoranda of negotiation for cost-plus-fixed-fee contracts, the percentage relationship of the negotiated fee dollar amount to the total estimated cost may be included, but only to demonstrate compliance with the statutory fee limitations imposed by 41 U.S.C. 254(b). See FAR Subpart 15.903(d).

Under AID cost-plus-fixed-fee contracts for technical services, and firm fixed price contracts for technical services priced on the basis of cost analysis, the dollar amount of the fee or profit may be negotiated and justified in the memorandum of negotiaton by reference to the fee/profit evaluation factor matrix, attached. In the event that the use of the matrix results in a total fee amount in violation of the statutory fee limitations, the maximum fee shall be the amount allowed by statute.

Use of the matrix requires the contracting officer to evaluate and assign a fee/profit percentage objective or target to the factors for Contractor Effort, for the contractor's assumption of Contract Cost Risk, and for Special Factors. The contracting officer then applies the assigned percentage to the corresponding dollar factor measurement base to arrive at the dollar amount of the target fee/profit assigned to each evaluation factor. The sum for all factors is the total target fee/profit amount. The rationale for the assigned target fee/profit percentages is explained in the memorandum of negotiation. Any difference between the total target fee/profit amount and the negotiated amount is also explained in the memorandum of negotiation.

In assigning target fee/profit percentages, the contracting officer should consider the following evaluation factors and subfactors (See FAR Subpart 15.905-1):

1. Contractor Effort. This factor, which is apart from the contractor's responsibility for contract performance, takes into account what resources are necessary and what the contractor must do to accomplish the work called for in the contract. The evaluation of this factor requires an analysis of the cost content of the proposed contract as follows:

   (a) Direct Labor. Analysis of the contract direct labor should include an evaluation of the comparative quality and level of the talents, skills, and experience of the staff to be employed on the contract work. Consideration should be given to the degree in which unusual or scarce professional talent will be utilized in contrast to supporting personnel.

   (b) Subcontracting. Analysis of subcontracting should include an evaluation of the management and technical skills and efforts necessary for the prime contractor to obtain the subcontracted items. Consideration

-Continued on Reverse-

should be given to the efforts necessary for the prime contractor to select subcontractors and administer subcontracts, including efforts to place subcontracts with small business and small disadvantaged business firms.

(c) Other Direct Cost. Analysis of other direct contract costs should include an evaluation of the management and technical efforts necessary for the contractor to control such costs. Although travel and transportation, subsistence and allowance costs are all included in the base to which the fee/profit percentage is to be applied, they may be considered as standard costs established by regulation or other means substantially outside of the contractor's immediate control. Therefore, special consideration should be given to the extent to which other direct costs, exclusive of those mentioned above, are a significant contributing element of the contract work. Examples may include equipment and commodity purchases, and participant training.

(d) Indirect Costs. Analysis of indirect costs should include an evaluation of how much the general management of the organization will contribute to contract performance and cost control. Special consideration should be given to the contractor's willingness to control contract indirect costs by accepting ceiling indirect cost rates. See CIB 84-11 of May 9, 1984.

2. Contractor Cost Risk. This factor reflects the Government wide policy that contractors bear an equitable share of contract risk, and to compensate them for the assumption of that risk. Consideration should be given to the degree of cost responsibility the contractor assumes as measured by the contract type. A cost-plus-fixed-fee contract, without ceiling indirect cost rates, reflects a minimum assumption of cost responsibility, whereas a similar contract with ceiling overhead rates reflects assumption of varying degrees of cost responsibility. A firm fixed price contract reflects a complete assumption of cost responsibility. Consideration should also be given to the degree of difficulty and location of the contract work, and the cost risks associated with working in less developed countries.

3. Special Factors. A composite percentage weight, within the range of 0 to 10 percent of the sum of the fee/profit dollar amount established for Contractor Effort and for Contract Cost Risk, may be assigned to special factors in arriving at the total fee/profit dollar amount. Examples of special factors may include the extent to which the contractor will finance relatively large mobilization costs under the contract, or will otherwise finance large cash flow requirements during the contract period; evidence of the contractor's active participation in Federal socioeconomic programs (greater profit opportunity should be provided contractors who have displayed unusual initiative in these programs); and evidence of the contractor's good performance on previous AID work.

The fee/profit evaluation matrix may also be used for negotiating and justifying the profit component of the burdened labor rates in indefinite quantity and other ordering contracts for technical services. In this event, such contracts shall be considered to be cost-plus-fixed-fee contracts for the purpose of (i) assigning a profit percentage for the contractor's assumption of Contractor Cost Risk, and (ii) for applying the statutory fee limitations.

ATTACHMENT: Fee/Profit Evaluation Factor Matrix
Clearances:
CM/SD, J.Murphy ________
A-CM/ROD, K.Cunningham ________
CM/COD, M.Darvin ________
A-CM/SOD, J.Johnson ________

-3-

| A<br>Fee/Profit Evaluation Factors | B<br>Measurement Base (Dollars) | C<br>Fee/Profit Weight Ranges (Percent) | D<br>Contracting Officer Assigned Target Weights (Percent) | E<br>Target Fee/Profit Dollars (BxD) | |
|---|---|---|---|---|---|
| No.1. Contractor Effort | Negotiated Dollar Amounts for | | | | |
| (a) direct labor | $xxx | 5 to 15% | x% | $xxx | |
| (b) subcontracting | xxx | 1 to 5% | x% | xxx | |
| (c) other direct costs | xxx | 1 to 5% | x% | xxx | |
| (d) indirect costs | xxx | 4 to 8% | x% | xxx | |
| Total Est. Cost | $xxx | Subtotal Target Fee/Profit Dollars for Contractor Effort | | | $xxx |
| No.2. Contractor Cost Risk | Total Est. Cost | | | | |
| (a) cost-plus-fixed-fee-contract | $xxx | 0 to 2% | x% | $xxx | |
| -or- | -or- | -or- | -or- | -or- | |
| (b) firm fixed price contract | $xxx | 3 to 4% | x% | $xxx | |
| | | Subtotal Target Fee/Profit Dollars for Contract Cost Risk | | | $xxx |
| No.3. Special Factors | Sum of Target Fee/Profit Dollars for Factor Nos. 1 & 2 | 0 to 10% | x% | | |
| | | Subtotal Target Fee/Profit Dollars for Special Factors | | | $xxx |
| | | | TOTAL TARGET FEE/PROFIT DOLLARS | | $xxx |