# Transcript of the Testimony of **Charles L. Wilkins**

**Date:** August 1, 2006
**Volume:**

**Case:** SSA Marine, Inc. v. United States of America

Printed On: 8/24/2006

ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -x

SSA MARINE, INC., :

Plaintiff, : Case No. 05-490C

vs. : (Chief Judge Damich)

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - -x

DEPOSITION OF CHARLES L. WILKINS

Washington, DC

Tuesday, August 1, 2006

REPORTED BY:

CARMEN SMITH


360c0fd1-8fec-4295-9b79-785faaee3ba1

Page 2

Deposition of CHARLES L. WILKINS, called for examination pursuant to notice of deposition, on Tuesday, August 1, 2006, in Washington, DC, at the offices of Sher & Blackwell, 1850 M Street Northwest, at 9:58 a.m., before CARMEN SMITH, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

JOHN W. BUTLER, ESQ.
HEATHER M. SPRING, ESQ.
Sher & Blackwell, LLP
1850 M Street, Northwest
Suite 900
Washington, DC 20036
202-463-2516
On behalf of Plaintiff

(continued)

Page 3

APPEARANCES (continued):

THOMAS C. DINACKUS, ESQ.
United States Department of Justice
Commercial Litigation Branch
1100 L Street, Northwest
Washington, DC 20530
On behalf of Defendant
202-307-6289

PETER E. YOUNG, ESQ.
United States Agency for International Development
1300 Pennsylvania Avenue, Northwest
GC/LE Room 6.6-064 RRB
Washington, DC 20523
202-712-4774
On behalf of USAID

Page 4

P R O C E E D I N G S

Whereupon,

CHARLES L. WILKINS

having first been duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BUTLER:

Q Good morning, Mr. Wilkins. My name is John Butler. The law firm here is Sher & Blackwell. With me is my colleague, Heather Spring. We represent SSA Marine in a Contract Disputes Act claim against USAID in connection with SSA's performance of a contract at the port of Umm Qasr, Iraq, starting in 2003.
I'll be asking you a series of questions this morning. If you don't understand my question or if you can't hear me, please let me know. I'll be happy to repeat my question.
A Okay.
Q Could you state your name for the record, please.
A Charles Leon Wilkins.

Page 5

Q Where are you employed?
A I'm employed by FTI Consulting.
Q What's your position with FTI Consulting?
A I'm a senior managing director.
Q What are your responsibilities as senior managing director?
A I am the practice leader -- the national practice leader for the government contract consulting practice, which we typically refer to as public contract services. And in that responsibility, I am responsible to -- for the firm's clients that deal in government contracts of all types, in all different types of goods or services sold to the government by those contractors.
Q Where were you employed before FTI?
A KPMG.
Q What was your position there?
A I was a partner.
Q And what were your responsibilities there?
A Essentially the same. I headed up a national government contract dispute resolution



360c0fd1-8fec-4295-9b79-785faaee3ba1

Page 6

practice for KPMG.
Q Before KPMG where were you employed?
A Ernst & Young.
Q And with respect to the years of employment, how long have you been at FTI?
A Since November of 2003.
Q And then how long were you at KPMG?
A The -- let's see, I joined KPMG in February of 2000, so a little over three years. A little over three years.
Q Then before that how long were you with Ernst & Young?
A Five years.
Q And your position at Ernst & Young was?
A I was a principal at Ernst & Young, in the Los Angeles office, I'm sorry.
Q Did you also deal with government contract issues there?
A Yes.
Q In what capacity?
A I was the co-leader of what they called the western region of a practice that was called

Page 7

government contract services.
Q Is your educational background as stated in the CV provided with your expert report?
A I'm sorry?
Q Is your educational background as stated in your CV?
A Yes, yes.
Q Is there anything to add or subtract from that?
A No.
Q Did you prepare an expert report with respect to a contract claim filed by SSA Marine against USAID?
A Yes, I did.
Q Mr. Wilkins, I'll hand you a document which I'll ask be marked as Wilkins Deposition Exhibit 1.
(Wilkins Exhibit 1 identified.)
BY MR. BUTLER:
Q Mr. Wilkins, is this a copy of the report which you prepared in connection with the SSA claim?
A Yes, it appears to be.

Page 8

Q Since you issued your report on June 8, 2006, have you reviewed any additional documents or received any additional information related to the subject matter of your report?
A Yes, I have received some transcripts of depositions of different people which I have reviewed.
Q Which deposition transcripts were those?
A The ones that I remember offhand are Mr. Watters. I received transcripts of, I believe, two DCAA auditors.
Q Would those be of Mr. Robert Skaggs and Mr. Sterling Monroe?
A Yes.
Q Were there any other deposition transcripts that you reviewed?
A None that I can think of after the report.
Q Did you review the transcript of Fergus Moran?
A I believe so, yes.
Q And did you review the transcript of Dan Flynn from SSA?

Page 9

A I believe so.
Q And with respect to Mr. Watters's deposition, there have been two depositions of Mr. Watters. The additional transcript that you reviewed -- let me back up.
In your report, you make reference to the deposition transcript from Mr. Watters's 30(b)(6) deposition.
A Yes.
Q The additional transcript that you've just referred to, is that the 30(b)(6) deposition or the transcript of a later deposition?
A I think that was a later deposition.
Q Other than those deposition transcripts, have you received any additional information relevant to your report?
A Not that I'm aware of, no additional information, no.
Q As a result of your review of the deposition transcripts, would you change anything in your report or in your opinion?
A No.

Page 10

MR. DINACKUS: You know, actually, I don't believe that Mr. Wilkins has seen the depositions from, I guess it was, last week because we did those just on a normal turnaround and we haven't received them yet. But he did see Mr. Watters's 30(b)(6) deposition.
MR. BUTLER: Okay. Fair enough.
BY MR. BUTLER:
Q Setting aside what you have seen since you issued the report, have any of your opinions expressed in the report changed in any way since June 8, 2006?
A No.
Q Who asked you to prepare the report?
A Mr. Dinackus.
Q Who drafted the report?
A I along with two of my colleagues.
Q Which two colleagues were those?
A One of them was Mr. Joe Higgins, who is a managing director in our office, on my team. And the other was Rob McDonald, who is a director on my team.

Page 11

Q Describe Mr. Higgins's experience, please.
A Early on with DCAA. Early on -- Mr. Higgins is about late 50s, so "early on" is probably back in his 20s or early 30s. After that career, I know he spent some time with two of the then Big 8 firms in a practice similar to what we are in at FTI.
He then went on to become CFO at I believe there were four or five different companies and joined us at FTI earlier this year.
Q What's Mr. McDonald's background?
A Mr. McDonald had an early career as a Marine Corps officer, went to work for KPMG in their what was then called KPMG Consulting. He left KPMG and became a part of Enron. And with the demise of Enron, he came back to D.C. And I'm not remembering the name of the firm that he started working with, but he joined us at FTI just shortly after November of 2003.
Q Are you aware of any civil or criminal legal actions brought against Mr. McDonald in connection with his employment at Enron?

Page 12

A No, I'm not aware of any. And as far as I know, there has been none.
Q Among the three of you, who had the primary responsibility for preparing the report?
A Well, I did. That's my responsibility.
Q Who did the majority of the work in preparing the report?
A By "work" do you mean the drafting of the report, or is there some other context?
Q Well, I mean generally -- let's take it a different way. Describe to me how FTI went about creating the report.
A The typical approach that we use on any engagement is work is obviously under a leader, in this case me. I allocate or delegate that work to the different members of the team, depending upon their level of experience and the nature of the case, and we perform analyses as a team.
Some people do more legwork, in terms of weeding through information and documentation, to get down to the core issues. As the leader of the team, I would orchestrate where I think the review

Page 13

or analysis should go and in which direction.
And as we pulled together information and start to put thoughts down on report format, I oversee how that report is going to be constructed. Others may write different parts of the report initially. I then have the ultimate responsibility of taking that initial writing and converting it to what I feel is my report.
Q Now, in the case of the SSA report, which tasks did you delegate to Mr. Higgins?
A Joe was kind of delegated the liaison between me and Mr. McDonald. In other words, he was almost like a secondary -- in fact, maybe the primary reviewer of anything that was written by Mr. McDonald as the report goes before it got to me.
He was also responsible for working with Mr. McDonald in understanding information that may have been deduced from the documentation and deposition transcripts and so forth and determining the relevance of that in terms of how it was going to be structured in the report.
Q Is Mr. Higgins senior to Mr. McDonald

within FTI?
A Yes.
Q Referring to Deposition Exhibit 1, your report, on pages 2 and 3 of that report, you list a great number of documents that you indicated you reviewed in the course of preparing your report. Did you personally review all of those documents?
A I did, yes.
Q And in addition to you, who else reviewed those documents?
A I think each of those people would have reviewed them.
Q In describing your typical process in preparing a report, you indicated that you would determine what analysis was appropriate at the outset; is that correct?
A Analysis in a broad sense, yes.
Q And then would you provide instructions to the people working with you as to specific tasks to put that framework in place?
A Yes. And again, tasks in a broad sense.
Q In this case, what were your instructions



to Mr. Higgins?
A Well, it's hard to describe, you know, specific instructions because the review of documentation in the development of a report is a dynamic process, and we are giving instructions and feedback coming back and forth continuously during the string of the report.
But the general instructions -- and I would probably qualify "instructions" a little bit in terms of we are all professionals and we all know our business. So it's more sitting down and having a discussion about what we believe, in this case what I believe, the issues are in this case, what kind of information that we have or are getting and where I think our focus should be in terms of reviewing that information and then how I think the report should be structured.
Q Now, once you received the assignment or the engagement from Mr. Dinackus, how did you go about deciding what issues were relevant to the case?
A Essentially two ways. I had a -- you



know, an initial meeting with Mr. Dinackus and members of the USAID in which we discussed what the case was about.
Q May I stop you there for a second? Before we lose the thread, describe for me, please, the initial meeting with Mr. Dinackus and USAID.
A Describe in what way?
Q When did it occur? Where did it occur? Who attended the meeting? What was discussed?
A When it occurred, I don't know the exact date. It was early in the process of the engagement. And typically, as those kinds of meetings go, what they are is kind of a briefing for us, the consulting team, to get a better feel for what the issues are in the case.
Q Do you recall where that meeting took place?
A There was an initial meeting at our offices, FTI offices.
Q Do you recall who attended both from FTI and from the Government?
A Yeah, I believe myself, and I believe



Mr. Higgins was there. I know Mr. McDonald was there. Mr. Dinackus was there. I think Mr. Young was there, and there was one other person. I can't recall who that was.
Q Was Anne Quinlan there?
A Anne Quinlan was not there.
Q Was John Abood there?
A He was not there.
Q Was the other person an attorney, do you know?
A Yes, I believe so.
Q Describe for me the substance of the conversations that you had at that meeting.
A Well, if I could state it in kind of general terms, it was essentially a verbal recap of the complaint. You know, this is what the issues are, you know, here are the assertions of SSA. We talked a little bit about the views of the agency, USAID.
Q What were the views of the agency as expressed to you?
A Well, none of them were expressed in terms




360c0fd1-8fec-4295-9b79-785faaee3ba1

of this is -- I mean, I don't think anybody in the room at that point in time was prepared to discuss specifically or explicitly what the agency's views were. But it was just like the agency's practice is this, you know, and much of that is captured in my report.
Q When you say "the agency's practice is this," in what context do you say that?
A Well, for example, when you talk about -- when the issue of profit was raised, there was a brief discussion about the agency employing a practice of using the structured approach.
We discussed the issues of the type of contract, being a cost-plus-fixed-fee contract. We discussed the fact that there was a statutory prohibition or a limitation on the profit on a fixed-price -- on a cost-plus-fixed-fee contract. Those kind of general things.
Q Do you recall -- strike that.
Do you recall whether you had a discussion of the financing port operations clause in the contract?



A Yes.
Q And when I say "the financing port operations clause," is that the language that's set forth as a quotation on page 4 of your report?
A Yes, that's the clause.
Q Describe for me, please, the conversation that you had at the USAID meeting about the financing port operations clause.
A Yeah, it was really nothing more than, I would say, introducing us, the FTI team, to that language in the contract. We didn't talk about necessarily what it meant. No one tried to interpret it during that meeting. It was really just an introduction of saying this is -- and I'm not trying to say the exact characterization of it, but this is substantially what SSA is relying on as a basis for their claim that's been asserted.
Q Mr. Wilkins, do you have any experience in the maritime industry?
A Give me a little more on what you mean by "the maritime industry."
Q Well, the maritime industry for the



purposes of this would include marine terminal operations -- let's start with that. Do you have any experience in marine terminal operations?
A No, I do not.
Q Do you have any experience in stevedoring operations?
A No, I do not.
Q Do you have any experience in land side cargo handling operations?
A No.
Q Do you have any experience in marine port security?
A No.
Q Did you speak with any SSA personnel in preparing your report?
A No, I did not. Just through the transcripts.
Q Did you speak with anyone at USAID who had firsthand knowledge of what SSA Marine did on a day-to-day basis at the port of Umm Qasr?
A I'm a little unclear on what you mean by "the day-to-day operations." I think my report



indicates the people from USAID that I spoke with through depositions.
Q Well, when you say you spoke with people -- I'm now asking about people that you spoke with at USAID.
A Right.
Q And the question is, did you speak with anyone from USAID that had firsthand knowledge of the day-to-day operations at the port?
A Well, and again, I don't know what you mean by "day-to-day operations."
Q I mean what happened on the ground. The sun comes up, everyone gets up and goes to work. What do they do?
A Well, if you're asking me if I spoke with anyone who was in Iraq, the answer is probably no. But just because they weren't in Iraq doesn't necessarily mean they didn't have familiarity with day-to-day operations. So I'm a little unclear.
Q Was there anyone at USAID that you spoke to that had familiarity with the day-to-day operations in Iraq?

Page 22

A I think my answer is the same.
Q I'm not sure I understood your answer the first time. Could you tell me again?
A Again, you can have familiarity without being physically at the location. So --
Q Is there anyone with whom you spoke at USAID that you believe had familiarity with the day-to-day operations at the port?
A Again, I'm not trying to avoid or evade your question, but isn't that a relative question? I mean, they may think they have day-to-day experience in what was happening and I may not, or vice versa.
Q Let's take both situations then. Did you speak with anyone at USAID who indicated to you that they had day-to-day familiarity with the operations at the port?
A Well, and again, you know, that's a very difficult question to answer, because they may not have physically been there, but they have an understanding of what's going on on a day-to-day basis.

Page 23

Q Did anyone at USAID, whether they had physically been at the port or not, with whom you spoke indicate that they had a day-to-day knowledge of what was going on at the port?
A I just don't know how to answer your question any differently than I have.
Q Mr. Wilkins, it's not a trick question.
A I understand.
Q I'm trying to get at the factual basis for your report. It's a report about a contract that was performed in Iraq, and I'm simply trying to find out who you spoke with at USAID who had knowledge of what was going on in Iraq, whether that knowledge was direct or indirect.
So I'm asking you for the names of the people with whom you spoke at AID that you believe had that knowledge.
A Well, the names of the people that I spoke with from USAID was Anne Quinlan, John Abood and the attorneys that I mentioned earlier that were in the initial meeting and who were in subsequent meetings, not every one in every meeting. Whether they had

Page 24

day-to-day knowledge about what was going on in Iraq or not is what I'm confused on by your question.
Q Did you ever have a conversation with Anne Quinlan regarding the day-to-day operations of the port at Umm Qasr?
A No, not specifically about the day-to-day operations.
Q Did you ever have a conversation with John Abood about the day-to-day operations of the port at Umm Qasr?
A No. And I would qualify both those answers in terms of saying nothing detailed about what was going on every day, but in general terms, about what was happening there, I think they talked about that.
Q Let's separate them starting, then, first with Ms. Quinlan. What conversations did you have with Ms. Quinlan regarding the general operations of the port?
A The what operations?
Q The general operations at the port.
A It was, in fact, more general in nature in

Page 25

that she talked about the fact of essentially kind of a recap of what the statement of work was in the contract.
Q Did she ever relate the statement of work in the contract to what was actually happening at the port?
A No, we didn't talk about it in that context.
Q In the context of your conversations with Mr. Abood, did you discuss with him generally what was going on on the ground in Iraq?
A And again, it was more in the same context as the Anne Quinlan discussion. In general terms, what was happening there was whether it was consistent with what was called out in the contract.
Q And did either Mr. Abood or Ms. Quinlan provide you with their view of whether what was happening on the ground was consistent with the contract?
A Yeah. I don't think either of them indicated that there was anything going on that was inconsistent with what was required in the contract.

Page 26

Q Do you have any knowledge of what the operating conditions were at the port in Iraq while SSA was there?
A I have a general knowledge of what the operating conditions were.
Q Describe what you know to me, please.
A Well, I spent some time pursuing contracts in Iraq myself on behalf of FTI, and I spent some time with a number of Iraqi ministers of different disciplines, transportation, defense, banking, several of those.
And I had an opportunity to speak one on one with each of them back in 2004, and I also had an opportunity to speak with several representatives from the Coalition Provision Authority also in 2004.
Q If I may stop you just for a moment. Do you recall when in 2004 you had those various conversations?
A I believe it was in, I want to say, July of 2004, but I'm not absolutely sure of that date.
Q What was the nature of those conversations?

Page 27

A Well, again, it was in relation to an effort by the CPA, the Coalition Provision Authority, sorry, and the Iraqi ministers at the time to try to find people who could provide goods or services in support of the Iraq restructure.
And I took on a task from FTI to see if I could figure out a way for us to get involved in some of the Iraqi business.
So I went to London for a week. There was a big forum there where many, many, many, if not all, of the Iraqi ministers at the time were present. And several members of the CPA were there. Contractors from all over the world were there, and we all had an opportunity to schedule meetings with the various ministers.
I was fortunate and had an opportunity -- I believe I met with six or seven of the Iraqi ministers, two or three members of the CPA, and then I had some side meetings with other contractors.
But in the context of all of that, it was a combination of understanding the conditions in Iraq. And again, each of the ministers spoke about

Page 28

their particular area of expertise. So I had an opportunity to get a pretty good feel for the total business and cultural conditions of the country at the time, the port being one of them, the airport being another, the banking system being another one, just the general -- you put it in the context of, say, government services, all the kinds of things that we see around D.C., how those things were -- the current condition of them and what the plan was to try to make them better, to try to bring them back alive.
The legal system. Part of what we looked at was trying to help the Iraqi people reinstall a legal system in the country, because it had totally fallen apart. So it was just a total, you know, countrywide evaluation, if you will.
Q In the context of those discussions, do you recall any specific discussions about the condition of the seaport at Umm Qasr?
A Well, I mean, I don't recall anything specific. I know that the country itself was in, you know, total disarray. So --

Page 29

Q Let me ask it this way. Is there -- was there any knowledge that you gained as a result of those conversations that in any way forms the basis of the report that you filed?
A No, I don't think so.
Q I see that you have a folio in front of you marked "Iraq Procurement 2004, Meet the Buyers."
A Yeah.
Q Is that from the meeting that you described?
A It is, yes. I didn't realize I had picked up that one, but yes.
Q It's very appropriate. Did FTI end up entering into any contracts for work in Iraq?
A We did not, not directly in Iraq. We've been in an ancillary role with some people who are doing business in Iraq, but we're not directly involved there.
Q Are you in the role as a subcontractor in other cases?
A No, mostly as an advisor.
Q Mr. Wilkins, I'd ask you to take a look at

Page 30

page 7 of your report. And in particular under numbered item 4, in the second paragraph there, the last sentence of that paragraph reads "therefore, the costs associated with the nominal use of SSA Marine's procurement system was provided for under the terms of the contract." Is that correct?
A Yes, it is.
Q My question to you is, what is the factual basis for your assertion that the use of SSA Marine's procurement system was provided for under the terms of the contract?
A I think you have to read the entire paragraph, because the entire paragraph talks about the fact that if there are what I term pass-through costs being incurred, meaning that the --
Q Well, let's stop for a minute, then, and although this is a little tedious, I think it's important. Let's put that paragraph into the record, separate from the exhibit.
The second paragraph under numbered section 4 on page 7 of Exhibit 1 reads "from my experience in government contracts, I know that

Page 31

pass-through costs -- costs incurred to fulfill certain requirements under a contract, but that involve minimal or no additional level of effort by the contractor -- are fairly common on government contracts. Frequently, a small handling fee or premium is charged on some government contracts to allow the contractor to recover minimal fees associated with their efforts to procure various items and systems on behalf of the U.S. Government.
"Another approach sometimes used by contractors is to develop an abated or reduced overhead rate (typically involving procurement personnel) that applies only to these pass-through purchases. However, under this contract, SSA Marine received a provision for the reimbursement of a 10 percent indirect cost on significant portions of the contract.
"Therefore, the costs associated with the nominal use of SSA Marine's procurement system was provided for under the terms of the contract."
Did I misstate anything in reading that, Mr. Wilkins?

Page 32

A No, you did not.
Q Is it correct that this paragraph is talking about how contractors are compensated for the use of their procurement systems?
A Yes, that's fair to say.
Q And do you have any knowledge of how SSA went about procuring goods and services in Iraq in order to operate the port of Umm Qasr?
A You mean specifically, as you termed earlier, day to day how they did it?
Q Yes.
A No.
Q Is it correct that the assumption in the paragraph that we've just read into the record is that for what you deemed pass-through costs, there is only a nominal effort by the contractor?
A Ask me that again. I didn't quite understand you.
Q Is it correct that one of the underlying assumptions of the statement in the paragraph that we have just read is that for what you deem or what you call pass-through costs, there is only a nominal

Page 33

effort on the part of the contractor?
A That is a correct assumption, and it's -- it's typical in the industry, government contract industry. And you have to think about it in terms of contractors have systems and procedures and practices and staff and so forth already set up. And what happens when they're asked to buy an nth item, they simply are adding, in the context of the task that these staff are already undertaking, one additional item or series of items. I'm not trying to minimize it.
As a general rule, if additional people are required or if additional resources are required, they're minimal to the overall already-established resources that are dedicated to the function, in this case procurement.
Q Do you know what SSA's procurement process was in Iraq?
A I don't know it in detail, no.
Q Do you know how much of their man-hour effort was spent on procuring goods and services to run the port?

Page 34

A No, I didn't go to that level of detail.
Q Do you know what goods and services SSA, in fact, procured in order to operate the port?
A Not specifically, no.
Q And then I'll return to my original question. Given that you have testified that you don't know what procurement efforts SSA took under the contract, what is the factual basis for your statement that "the nominal use of SSA Marine's procurement system was provided for under the terms of the contract"?
A Yes, twofold. One is my experience with contractors doing the kind of purchases and acquisitions and under a general purchasing process, purchasing system, as I have described earlier.
And secondly, it seems to me that SSA had an opportunity, if they felt that what was agreed to in the modification to this contract that added what I've described in this paragraph 4 to the contract, if they felt it was not sufficient, they could have not agreed to it.
Q With respect to your reference to general

Page 35

procurement systems, do you have any basis to provide an opinion as to whether the procurement environment with respect to SSA's contract was similar to or different from what you find in the usual government contract?
A Well, recognize that I've been involved in thousands of contracts, hundreds of different kinds of products and services.
Q And are they all the same?
A They are not all the same. More than 30 or so different countries that I've been involved in with contractors all over the world, and the process isn't materially different.
I mean, you buy things and you use people and resources to buy them. And as you add additional items to your list of things to buy, you may have to increase or decrease resources, whether it be people or other resources. But the systems are not materially different.
Q Are the commercial circumstances under which a contractor might have to procure goods and services materially different from contract to

Page 36

contract? And what I mean by that is, would you expect to have the same difficulties procuring pencils in Washington, D.C. as you would procuring jet fuel in Kazakhstan?
A No, you wouldn't expect that those are going to be -- you would expect that there would be some differences in that. But the point is that the process of carrying out the procurement activities themselves are not materially different. You go through the same kind of things to procure pencils as you do jet fuel or airplanes.
Q Do you know what steps SSA went through in Iraq to procure goods and services for the operation of the port?
A I don't know the specific steps.
Q Now, Mr. Wilkins, we were talking about, and you used the term, pass-through costs; is that correct?
A Yes.
Q And on page 7 also of your report, the page that we were just looking at, you make reference to a declaration from Anne Quinlan

Page 37

regarding so-called pass-through costs; is that correct?
A Yes.
Q Now, is Ms. Quinlan's declaration provided specifically to support FTI's efforts in this case?
A Well, I guess I can't really answer that on behalf of Ms. Quinlan, but she did write her declaration to describe for me, to help me understand, the USAID's view of pass-through costs.
Q Does Ms. Quinlan's declaration say anything about the application of the concept of pass-through costs to the SSA contract?
A Why don't we look at Ms. Quinlan's declaration?
Q Let's.
A So if I just look at Ms. Quinlan's declaration, the first paragraph is essentially one that talks about her role in USAID and the fact that she prepared the declaration to provide information to me or us at FTI.
The second paragraph talks about the responsibility that she had and her general





360c0fd1-8fec-4295-9b79-785faaee3ba1

Page 38

experience. The third paragraph talks about the customary practice of USAID as it relates to cost-plus-fixed-fee contracts. And it discusses the -- what I will generally characterize, my term, as the position of the USAID to not pay a fee on cost of capital for grants awarded by contractors on behalf of USAID.
She talks about operating expenses, and in the context, I believe, she talks about capital expenditures and the fact that no fee is paid on those expenses.
And then in the fourth paragraph, she talks about the -- what I again would generally characterize as the structured approach profit policy of the USAID.
Q And so I return to my original question, which is this. Does Ms. Quinlan's declaration say anything about the application of the concept of pass-through costs to the SSA Marine contract?
A She doesn't use the term "pass-through cost" in her declaration.
Q Does she say anything about the SSA Marine

Page 39

contract in her declaration?
A She does not mention SSA Marine in her declaration.
Q Does the SSA Marine contract say anything about pass-through costs?
A Does the SSA Marine contract?
Q Say anything about pass-through costs?
A I don't know that that term is used in the contract. I don't know that it isn't, but I don't recall whether it is.
Q Is anything in your report based on the term "pass-through costs" being used in the SSA contract?
A I think, as I point out in my report, I generally talked about those costs as being pass-through costs. It's a general term of art in government contract procurement.
Q So when you use it, you're using it generally but not in reference to any use of that term in the SSA contract; is that correct?
A Well, I was using it in reference to the two line item -- line items of the contract with SSA

Page 40

that included operating expense and capital expense
Q And so when you say "pass-through costs," is it correct, then, that those were the costs that you were talking about?
A Yes, those two categories, specifically on SSA, those two categories.
Q Mr. Wilkins, I'll direct your attention to the top of page 5 of your report. In the very first sentence at the top of that page it reads "SSA Marine's interpretation of the above clause assumes that the clause provides a second payment provision in the contract." Do you see that?
A Yes.
Q Is the reference to "the above clause" a reference to the financing port operations clause that is set forth on page 4 of your report?
A Yes.
Q Do the opinions in your report assume a particular contract interpretation?
A Contract interpretation? That's a little general.
Q Well, you made a statement about what you

Page 41

understand to be SSA Marine's interpretation of the financing port operations clause; correct?
A Okay.
Q And my question to you is, switching now to your report, does your report assume any particular interpretation or view of the contract?
A Well, again, that's a little vague. If you're asking me if I have made an assumption about the type of contract this is, my answer is yes.
Q Let's start with that. And what assumption have you made there?
A That it's a cost-plus-fixed-fee contract.
Q And is that assumption a fundamental foundation on which the report is built?
A Yes.
Q What's the significance of your opinion that this is a cost-plus-fixed-fee contract?
A Well, the significance is that there's -- there are some statutory and regulatory parameters around a cost-plus-fixed-fee contract.
Q Which ones do you think are particularly important for the purposes of this report?

Page 42

A The profit limitation.
Q What is that profit limitation?
A It's 10 percent on a cost-plus-fixed-fee contract. And I should clarify, it's 10 percent of cost on a cost-plus-fixed-fee contract. I should also clarify that it is limited to 10 percent. It can be less than, but it can't be greater than.
Q And are those costs in the 10 percent supposed to be determined at the time of contract award?
A Yes.
Q Would your opinion change if you were to make the assumption that the financing port operations clause sets forth a source of contractor profit that is separate from the CLIN 003 fixed fee?
A Slow that one down and run it by me again.
Q Sure. I'm asking you to change one of your assumptions --
A Sure.
Q -- for the purpose of exploring your methodology and your thought process. And my question is, if you were to assume that the

Page 43

financing port operations clause is, in fact, a contractual source of contractor profit that is separate from the CLIN 003 fixed-fee provision in the contract, would that change your ultimate opinion?
A Well, you're -- what I think -- as I understand your question, you're asking me to assume that this is a different kind of contract than what it says on its face.
Q Well, really what I'm asking you to assume is what you state as SSA Marine's interpretation at the top of page 5, which is why I began with that.
You state that "SSA Marine's interpretation of the above clause assumes that the clause provides a second payment provision in the contract." And essentially, what I'm asking you to do, for the purposes of this discussion, is assume that that is correct.
And if you make that assumption that the financing port operations clause is separate from the fixed-fee provisions and therefore not subject to the 10 percent cap that you have described --

Page 44

MR. DINACKUS: I'm going to have to object. That's a compound question. I think you're making two assumptions which are not necessarily linked.
BY MR. BUTLER:
Q I'll ask you to answer the question, please. Do you understand the question?
A Were you finished? I'm sorry. Were you finished with the question?
Q Let's start over. I'm asking you to make the assumption that -- and Mr. Dinackus is correct. I'm asking you to make two assumptions at the same time. The first assumption is that the financing port operations clause is separate and distinct from the fixed-fee provisions of the contract. Are you with me so far?
A Yes.
Q The second assumption is that the financing port operations clause as a source of contractor profit is not subject to the 10 percent limitation that you've just described. Are you with me?

Page 45

A Okay. Yes.
Q Making those two assumptions -- if you were to make those two assumptions, would that change your opinion in your report?
A So I understand your question and I understand the two assumptions, the difficulty I have with employing those two assumptions in this context is what you really asked me to do is step out of a cost-plus-fixed-fee contract, because the two don't go together.
So I have to completely devoid myself of cost-plus-fixed-fee contract and now look at a totally different contractual instrument which you have not included in your hypothetical, so I don't know what we're talking about.
Q Well, I'm asking you to make an assumption about the contract language that's in front of you.
A Right.
Q And the assumption that I'm asking you to make is that the financing port operations clause is separate from the fixed-fee provision in the contract. Do you follow me?

A I understand what you're asking, yes.
Q Are you -- do you have an answer? Since you understand what I'm asking you, do you have an answer to my question? Would that change your outcome?
A Well, and my answer is essentially what I just said. I -- you know, you've asked me -- as you know, I get deposed a lot, and I've heard the objection before "incomplete hypothetical." And I never quite understood what it meant, except today I think I understand what it means.
(Laughter.)
You've asked me a set of conditions that have no end to them, and I -- in other words, I'm bounded by -- regardless of whether the FPO clause says what it says or has some other connotation, it's contained in a contractual arrangement, that is a cost-plus-fixed-fee arrangement.
If I step out of that, then I have a whole different arrangement. You haven't told me what that arrangement is. So I can't get to where you want me to get to in terms of the hypothetical



you've asked me to assume.
Q So what you're -- now let me understand you. Are you saying that you can't -- given what you perceive to be the legal structure of this contract, that you are unable to implement my hypothetical that the financing port operations clause is not subject to the 10 percent cap?
A That's right.
Q Is that a fair statement?
A That's a fair statement. Because, you know -- I mean, to get to where you've asked me to move to, I have to make a legal determination as to what is the order of precedence here in terms of interpretation of the contract. Is it the contract type, which is clearly covered in the statutes and regulations, or is it this clause, which is now incorporated in this contract that's covered by statutes and regulations? I can't do that.
Q So does it -- just to wrap this up, and I don't want to belabor it, does that mean before you can do an analysis of a government contract, you have to first determine the contract type?



A Yes, that's a very critical ingredient of doing an analysis of a contract.
Q Switching gears a little bit, Mr. Wilkins --
MR. DINACKUS: Would this be a good time for a break?
MR. BUTLER: Sure, that's fine.
(Recess.)
BY MR. BUTLER:
Q Back on the record.
Mr. Wilkins, I'll direct your attention to your report at pages 7 and 8. You make reference there in a couple of places to modification 2 to the contract; is that correct?
A Yes.
Q Do you recall taking a look at modification 2 in the context of putting together your report?
A Yes.
Q Let me hand you a document, Mr. Wilkins, and we'll ask that this be marked as Deposition Exhibit 2.



(Wilkins Exhibit 2 identified.)
BY MR. BUTLER:
Q I'll ask you, is that a copy of modification 2 as you've referred to in your report?
A It appears to be, yes.
Q Does modification 2 say anything about the financing port operations clause that we discussed a few minutes ago?
A I don't think I see anything in here that refers to that clause.
Q And Mr. Wilkins, I'll direct your attention to the bottom of the second page of this two-page document. Can you read the very last sentence on that document?
A The one that says "except as modified herein, the terms of the contract remain unchanged"?
Q Yes. Mr. Wilkins, I'll direct your attention to page 5 of your report, which is Deposition Exhibit 1. At the top of page 5, the second sentence in the first paragraph reads "SSA Marine contends that USAID exercised its authority under contract line item number ('CLIN') 003 to