transfer the port to civilian control on May 21, 2003, thereby implementing the above clause." Do you see that?
A Yes.
Q Is the above clause referenced there the financing port operations clause that is set forth at page 4 of your report?
A Yes.
Q When you state that "SSA contends" that USAID directed SSA to operate the port under CLIN 003, does that indicate that you have some doubt as to whether that direction was actually given?
A It's not a statement of doubt one way or the other. It was simply intending to recap what was said in their claim, in SSA's claim.
Q Does it make any difference to your analysis in your report whether, in fact, USAID directed SSA to operate the port under CLIN 003?
A No, I don't think so. I mean, you know, again, if you look at the nature of the contract, the contract itself is very specific in terms of the type of contract, and the statutes and regulations



are very specific in terms of what that means, from a profit standpoint.
It also is very clear -- the regulations and statutes, I think, are very clear in terms of the contractor's responsibility under a cost-plus-fixed-fee contract. And when I say that, I mean the limitations and/or assumptions of risk that the contractor is subjected to.
So I don't think that that statement would change my opinion about -- that I've stated in the report.
Q Now, on page 6 -- pages, pardon me, 6 and 7, bottom of 6, the top of 7, you talk there about modification 2 to the contract; is that correct?
A Yes.
Q And this goes back to something I think you said a little bit earlier. But on the top of page 7, beginning in the second line, your language reads, in part, "therefore, the 10 percent statutory maximum fee that existed based on the original CLINs 001 through 003 was deemed applicable and appropriate by both USAID and SSA Marine



representatives." Do you see that language?
A Yes.
Q My question to you is, what's the factual basis for your opinion regarding what SSA Marine deemed to be applicable and appropriate?
A They signed the modification.
Q Is there anything else?
A No. They signed the modification. I think if you didn't believe that it was okay and appropriate, you wouldn't have signed the modification.
Q Turning, then, to page 8 of your report -- by the way, just so the record is clear, we've been speaking about CLINs, C-L-I-N-s. Is that an acronym for "contract line item number"?
A Yes.
Q On page 8 of your report, Mr. Wilkins, you make reference starting under numbered item B1 to the FAR, F-A-R. Is that the Federal Acquisition Regulation?
A Yes, it is.
Q And in particular, you make reference to



FAR section 15.404-4; is that correct?
A Yes.
Q Is that FAR section included in the SSA contract?
A Well, that FAR section, I don't know, may or may not be included in SSA's contract. But what that FAR section is talking about is the nature of federal procurement in general, in terms of allocation and assumption of risk and how risk relates to profit.
Q Well, are all FAR sections applicable to every contract, whether they are included in that contract or not?
A Well, if you ask many, perhaps most, people who are experienced in government contracts, they would say to you that all federal contracts are bid under the FAR, but there are then other agencies' supplemental regulations that apply.
I mean, if you understand the way the federal acquisition system works, there's something called a Federal Acquisition Regulation System, which is comprised of the FAR and all the agency

Page 54

supplements.
So if you're doing a federal -- if one is doing a federal procurement, you would expect that the FAR is applicable and perhaps an agency supplement is applicable.
Q Mr. Wilkins, I'll hand you a document that I'll ask to be marked as Deposition Exhibit 3. Take a minute, have a look at that, and then I'll ask you some questions about it.
(Wilkins Exhibit 3 identified.)
BY MR. BUTLER:
Q Just let me know when you've had a chance to look it over.
(Witness reviewed the document.)
A Okay.
Q Mr. Wilkins, I've handed you a document marked at the bottom right FTI 01714. This is a two-page document. Do you recognize this document?
A I do, yes.
Q Is this a series of e-mails back and forth between you and Mr. Dinackus?
A Yes.

Page 55

Q Mr. Wilkins, I'll direct your attention to the second page of the document and on that toward the top, the first full paragraph beginning "we really need to see." Do you see that?
A Yes.
Q Is that text contained in an e-mail from you to Mr. Dinackus?
A I'm sorry, say that again?
Q Is the text to which I have just referred you included in an e-mail from you to Mr. Dinackus?
A Yes, it is.
Q Would you read for us, please, the first couple of sentences of the paragraph I've just indicated?
A The one that starts "we really need"?
Q Yes, sir.
A Yes. "We really need to see the contract and to understand what is contained within the contract relative to structured approach for profit determination. Due to the age of the USAID guideline, the date of the SSA Marine contract, and the current provisions in the FAR, there could be

Page 56

some issues around how the contract is interpreted."
Q With respect to your statement that "there could be some issues around how the contract is interpreted," what did you mean by that?
A Really exactly what it says. I -- without seeing the contract, I didn't know what might have been interpreted by the language of the contract, because I hadn't seen the contract.
Q Is this discussion in the context of the FAR provision that we've just discussed?
A Well, I wasn't sure at that time, because I didn't really know. I didn't know what was in the contract.
Q So what's in the contract does matter?
A Of course what's in the contract matters.
MR. DINACKUS: John, question.
MR. BUTLER: Sure.
MR. DINACKUS: This document doesn't appear to be complete. It looks like on the second page there is, I would guess, at least a third page that was part of the e-mail string.
MR. BUTLER: I can get it.

Page 57

MR. DINACKUS: It's probably not relevant for the questioning. I just wanted to make sure that the record reflects that it does not appear to be complete.
MR. BUTLER: That's fine. Would you like me to grab a copy now so you can --
MR. DINACKUS: I don't think that's necessary.
MR. BUTLER: At our next break. It's in the other room.
MR. DINACKUS: Well, if that would make you happy, you could bring it in. I just wanted to note for the record.
MR. BUTLER: It's whatever makes you happy, Mr. Dinackus.
MR. DINACKUS: -- this doesn't appear to be a complete --
MR. BUTLER: I am jubilant as we sit here.
MR. DINACKUS: -- e-mail string.
BY MR. BUTLER:
Q Mr. Wilkins, turning then back to your report, Deposition Exhibit number 1, I direct your

Page 58

attention to page 9 of that report, please. Do you make reference there to something called the DOD weighted guidelines method?
A Yes.
Q And is that -- is "DOD" the Department of Defense?
A Yes.
Q Was the SSA contract a Department of Defense contract?
A No.
Q Then what is the relevance of the DOD standard to the SSA contract?
A The -- nothing to the SSA contract. The only purpose for this in the report was to demonstrate and provide an example of what the government generally terms as a structured approach to profit determination.
Q Also on page 9 and then continuing on to page 10, you make reference to something called the structured approach from USAID. Do you see that?
A Yes.
Q Was that approach applied to the SSA

Page 59

contract?
A I understand that there was some -- "calculation" is probably not the right term, but some calculation using a template similar to this in evaluating the SSA contract. Whether it was included in the contract itself, I don't know.
Q What's your understanding as to who did that?
A Well, someone in the contracts department of USAID.
Q How did you learn about it?
A I believe I was told that by either Ms. Quinlan or Mr. Abood.
Q Do you recall if they told you when that was done?
A I don't recall that.
Q Do you recall whether they told you whether that calculation was written down anywhere?
A I don't recall that either. I just don't remember the details of the discussion.
Q Did you ever see any written memorialization of that calculation?

Page 60

A I -- I do not think I did. I don't recall, but I don't think so.
Q Does that calculation form in any way the factual basis for your report?
A No.
Q Mr. Wilkins, I'm going to hand you another document. This document is a single-page document that I'll ask be marked as Exhibit Number 4, I believe it is. The document is marked on the bottom right corner FTI 01776.
(Wilkins Exhibit 4 identified.)
BY MR. BUTLER:
Q Have you had a chance to look over that?
A Yes.
Q Do you recognize that document, Mr. Wilkins?
A Yes, I do.
Q Is this an e-mail from you to Mr. Dinackus?
A Yes.
Q Mr. Wilkins, at the beginning of the e-mail, you say "Tom, for the status on Friday, May

Page 61

19, would it be possible to have a face-to-face status rather than a phone call? I would like to go over some sensitive points about where my opinion is right now, and I would rather do that in a discussion rather than a phone call. Here are the four main points I would like to cover."
Number 1 -- these are not numbered, there's a square bullet point next to each one. But the first is "contract interpretation, including fee." The second bullet is "contract modifications." The third bullet is "SSA's asserted damages." The fourth bullet is "interpretation of the FPO provision."
Mr. Wilkins, I'd like to take each one of those four bullet points individually and ask you a series of questions.
With respect to the first bullet point, "contract interpretation, including fee," what was sensitive about that issue?
A This sensitivity that I was expressing at this point is not necessarily -- not necessarily related to each of these bullet issues.

I have been involved in litigation for many, many years, and I -- there is a point at which I am very protective of the people that I'm working with and the people that I'm working on the opposite side of, in terms of their information. That's a credo, if you will, of our firm, that you protect both sides of the litigation matter, regardless of who you're working with.

I tend to reach a point -- and let me preface what I'm going to say by saying that on this matter, we had a practice of touching base, if you will, about every two weeks. Tom would ask us for kind of an update of where we were in terms of our analysis and so forth. He would update us on anything that was coming out of, you know, sessions, maybe perhaps with you or with the judge or others, that might be relevant to the work that we were doing. So we were all kind of making sure that we were communicating.

As I say, there comes a point in time where we are in our analysis where we get outside of general discussions about things and we start



getting down to more specific discussions about things. When I reach that point, I prefer to bring our discussions to a more controlled environment rather than on the telephone, where other people could tap in, where you might be on a conference voice box and other people could hear. That's what this is really referring to.

I just don't like to have what I term sensitive discussions in an environment where I think other people could overhear or link into our discussion.

Q Now, did you, in fact, have a face-to-face discussion shortly after this e-mail was sent?

A Yes, we did.

Q And with respect to -- I understand what you've said about reaching a certain point in the process. With respect to this particular process, what was it about where you were that made those sensitivity concerns come to the fore at this time?

A Well, I was starting to formulate opinions and conclusions about what I was looking at, and part of what I was attempting to do with -- in this



meeting, and as I said here, I was asking that people from the USAID be involved and specifically Anne Quinlan.

I wanted to, you know, essentially kind of do a quality control, if you will, on where I was. I wanted to make sure that there was nothing that they were aware of that I hadn't seen or considered or had access to, including, you know, Anne Quinlan. I wanted to talk with her. I wanted to understand what her role was in all of this and whether anything that I was seeing and opinions that I was forming was contradictory to where she was or whether anything that she had been involved in might have changed my opinion.

Q Who was at the meeting that was held after this exchange of e-mails?

A Well, let's see. If I can try to remember that explicit meeting, it was probably Mr. McDonald from my team. I believe at that meeting we had another gentleman named Obaid Kazmi, O-b-a-i-d K-a-z-m-i -- he's one of our senior consultants who is assisting Mr. McDonald -- and myself from FTI.



Tom was there, of course. I believe John Abood was there and Anne Quinlan was there. And I can't remember whether Peter was there or not, but there was someone that was there from USAID. And that, I think, was it.

Q Okay. Taking each of these bullet points one by one, then, starting with "contract interpretation, including fee," do you recall the nature of the conversation at that meeting regarding that issue?

A I think that if you link that item and the last item, "interpretation of the FPO provision," together, I think what we did is had a general discussion during which I said this is where I am, in terms of what I've seen, and then I basically was asking questions, is there anything that I am not aware of, is there anybody who has any input that I haven't seen or should see or something like that.

My recollection is that at that point in time, where I was in terms of an opinion during that meeting is consistent with what I've written in the report.





360c0fd1-8fec-4295-9b79-785faaee3ba1

Page 66

Q Did anyone speak up and indicate that they had any different understanding?
A No. My recollection is we had a lot of discussion, there was a lot of exchange back and forth about the evolution of the FPO clause, for example, and it getting into the contract and some discussion, perhaps a negotiation between USAID people and SSA people, about not specifically related to the clause but not excluding the clause, the contract in general.
But I didn't hear anything during our discussion there that caused me to say oops, I better go back and rethink where I'm heading on this.
Q With respect to the discussion about how the clause made its way into the contract and the negotiations with USAID, which of the USAID personnel spoke to that issue?
A John Abood and Anne Quinlan. John probably spoke more about it than Anne.
Q What did Mr. Abood say?
A Well, he was the drafter of the clause, I

Page 67

think, substantially the drafter of the clause. And, you know, I don't know. We just talked about the process that he went through, you know, as best I can remember.
I don't recall specifically what he said about it because I was more listening to -- you know, I'm listening to figure out whether there's anything that -- in any of the words that he says that caused me to say oops, wait a minute, I'm -- there's something I don't like here. I didn't hear that. So --
Q Did Mr. Abood say anything about why he put that clause in the contract?
A No, I don't recall that being discussed.
Q Did Ms. Quinlan say anything about why the clause was put in the contract?
A I don't remember that either.
Q Why was -- you've linked the issues of contract interpretation and interpretation of the FPO clause, and I assume that's -- is it correct that you've linked the two because they're both interpretation issues?

Page 68

A And because they both involve potential fee. I mean, you know, it's the whole profit issue.
Q And that contract interpretation exercise, was that important to putting together your report?
A Interpretation -- if I define "interpretation" as contract type and what it means and so forth, yes, it was important to the report.
Q Was there anything that came out of this meeting that changed your thinking about your report in progress?
A No.
Q Mr. Wilkins, if you would, I'll get you to turn back to your report, which was Exhibit 1, and let's look at page 10 of that report, please. And I'm looking, Mr. Wilkins, at the bottom half of the page under numbered item 2. Do you see that?
A Yes.
Q Does this discussion involve how SSA arrived at its proposed $2.20 per ton figure?
A Yes.
Q And does it also involve in that context SSA's selection of certain contracts that it used as

Page 69

source of comparison to the USAID contract?
A Yes.
Q In that -- in the bottom paragraph on page 10, starting three lines from the bottom, your report reads "a detailed description of the similarities between the comparables and the Umm Qasr contract was not provided, nor was any real explanation as to the criteria used to select the contracts." Do you see that?
A Yes.
Q And do you believe that that's still an accurate statement?
A I do, yes.
Q What was the basis of your statement that SSA did not provide a detailed description of the similarities between the comparable contracts and the Umm Qasr contract?
A I didn't really see one.
Q Did you see anything that indicated differences between the comparable contracts and the Umm Qasr contract?
A Well, I -- yes. I mean, if you go on

further in that report -- or in that section, moving on to page 11, and I recap some of the things that were identified in the DCAA's report.

Q Let's take a look at the DCAA report then. Mr. Wilkins, I'm handing you a document that we'll mark as Exhibit 5, I believe it is. And I'll represent to you that this is a copy of the DCAA report as it was sent to us. Take a look at that and see if that's the same document that you reviewed.

(Wilkins Exhibit 5 identified.)

THE WITNESS: Yeah, I've skimmed it. It looks like the same report.

BY MR. BUTLER:

Q And it is correct, is it not, that on page 3 of your report, you identified this report as one of the documents that you reviewed in preparing your report? Look at the middle of that list. It's somewhere towards the middle.

A Yes. Okay.

Q Is Exhibit 5 that I just handed to you the report that you're referring to on page 3 of your



expert report that is described "DCAA's revised audit report number," and there's a very long number, "published May 4, 2006"?

A Yes. The only thing that I'm just a little puzzled by right now as we're sitting here is the report has April 14, 2006 on it, and my report says published May 4, 2006.

MR. DINACKUS: I can address that. The April 14, 2006 date is the date of the initial audit report, not the revised report. When DCAA was going to do the revised report, I specifically asked them to put a new date on it to reflect when the revised report was published, but they did not do so.

But when I turned this report over to Mr. Butler, I believe I included the e-mail, which was used to transmit this report to me. That e-mail explained the revisions that were made, and the date of the e-mail is the date that I received the revised report.

MR. BUTLER: That's all correct. And I think what that means is if we can just clarify for the record that -- and Mr. Dinackus, correct me if



I'm wrong, because I expect that you provided these documents to Mr. Wilkins.

But the document with the May 4 date that is referenced on page 3 of Mr. Wilkins's report is, in fact, the same document as Exhibit 5 that I've just handed him; is that correct?

MR. DINACKUS: Yes, that should be the case. And if you look at this report, on the first page of Wilkins Exhibit 5 under the heading it does say "revised." If you look at the subsequent page at the upper left-hand corner, it has the report number and again "revised." So we know if we're looking at the revised report or the original report.

BY MR. BUTLER:

Q And Mr. Wilkins, did you review this DCAA report in the course of preparing your expert report?

A Yes.

Q And Mr. Wilkins, just a point of clarification. On page 3 of your report, you refer to this DCAA document as a revised audit report. Do



you see that?

A Yes.

Q Do you understand that DCAA conducted an audit with respect to this contract?

A Well, I understand that DCAA technically did an agreed-upon-procedures report. But a DCAA audit report is essentially a term of art in the government contract business. When DCAA issues a report, everyone refers to it as an audit report, because they're an audit agency.

And I understand, you know, there could be some subtle differences between an agreed-upon-procedures -- applying agreed upon procedures and applying audit procedures, there could be some differences.

Q Well, let's look at the DCAA report, then, for a moment. I'd ask you to look at page 2 -- numbered page 2 of the DCAA report. It's the third page of the document I've handed you. At the top of that page there's a short paragraph which I'll read for the record.

"This report pertains only to the





360c0fd1-8fec-4295-9b79-785faaee3ba1

Page 74

performance of agreed upon procedures as listed and identified in the paragraph above concerning SSA's claim under USAID contract number TRN-C-00-03-00054-00. We were not engaged to and did not perform an examination, the object of which would be an expression of an opinion on the subject matter of this report. Accordingly, we do not express such an opinion." Do you see that discussion?
A Yes.
Q Does that reflect the difference that you were alluding to with respect to agreed upon procedures versus an audit?
A Basically, yes. An audit is designed for the auditor to draw a conclusion and express an opinion about a -- typically about a financial document or report or a transaction, whereas agreed upon procedures is more what we would typically refer to as a findings report. It doesn't necessarily report -- draw a conclusion and report and state an opinion. It reports findings in terms of exceptions and things like that.

Page 75

Q And in your mind, is there any difference in terms of a report's value as a factual basis between an audit report and an agreed-upon-procedures report?
A Well, it would certainly depend upon what the nature and use of the audit or agreed-upon-procedures report is. If you go back to the basic definition of an audit, you know, we accountants think of an audit as applying procedures for the auditor to reach a point, to express an opinion mostly about a financial statement. That's the true audit.
I mean, some in our profession would argue that there is no audit unless it's that. Everything else is agreed upon procedures.
Now, within DCAA, they have certain -- I'm going to put this in a general sense of reviews, where they apply review procedures, that are standardized. They do these all the time.
For example, looking at doing an incurred-cost audit, for example, is a great example. They do those all the time. They have

Page 76

what we accountants call audit programs, and they refer to them as audit programs. They are predetermined steps of how you're going to go through and do certain types of reviews.
Everything else that's not under one of those predetermined audit programs is, by definition, termed an agreed-upon-procedures review. That doesn't mean that they do any less than they do under an audit, but it just says that they are not going to render or express an opinion. They're only going to express the results of their work and the findings.
Q Did you have any conversations with any DCAA personnel in the course of preparing your report?
A I didn't personally talk to DCAA. I think one of my team members spoke with one or two of the DCAA people.
Q Do you know which of your team members spoke with them?
A Mr. McDonald.
Q Did he recount to you the content of any

Page 77

of his discussions with the DCAA people?
A Only insofar as they relate to what's the findings that are expressed in the report. I mean, we --
Q Which report, your report or the DCAA report?
A The DCAA report.
Q That's a pretty -- I mean, it's all findings, is it not?
A It's all findings, yes.
Q With respect to, then, the findings in the DCAA report, what did Mr. McDonald tell you about his conversations with DCAA personnel?
A Really -- you know, really nothing more than confirming what they had -- what they did, what DCAA did, and confirming what they stated in their report. He -- his discussion, I know, was not one of trying to reconstruct procedures that DCAA went through. It was really nothing more than just confirming verbally this is your report and these are the findings that you ended up with.
Q Did Mr. McDonald relate to you any



360c0fd1-8fec-4295-9b79-785faaee3ba1

conversations that he may have had with DCAA regarding the issue of whether DCAA would conduct an audit versus agreed upon procedures?
A No, they didn't go into that.
Q Okay. I'd like to go back to the thing we started with before we got sidetracked about the difference between an audit and agreed upon procedures. Turning -- just to sort of reorient the discussion, I'm turning back to page 10 of your expert report, Mr. Wilkins.
A Okay.
Q And at the bottom, we had begun by identifying a statement that you made which reads "a detailed description of the similarities between the comparables and the Umm Qasr contract was not provided, nor was any real explanation as to the criteria used to select the contracts." Do you remember that discussion?
A Yes.
Q Mr. Wilkins, turning back now side by side, turning back to the DCAA report, I'd ask you to look at pages 13 and 14. Do you have those pages



there?
A Yes.
Q And starting on the bottom -- well, do you see in the middle of page 13 a heading "b. Comparison Contracts"?
A Yes.
Q Under that is there a table that tabulates the services provided under the Umm Qasr contract as well as the services provided under the comparable contracts provided by SSA?
A Well, yes. You said the Umm Qasr contract. I assume the column that's headed "USAID" is the Umm Qasr contract. If that's the case, yes.
Q And then looking at pages 15 through 17, do those pages contain a list of the tasks under each of the comparable contracts that SSA provided?
A Appears to be.
Q Did you review those as part of your work on your audit report -- I'm sorry, on your expert report?
A Yes.
Q Mr. Wilkins, I'd like to hand you a



document which we'll mark as Exhibit Number 6.
(Wilkins Exhibit 6 identified.)
BY MR. BUTLER:
Q Let me know when you've had a chance to look at that.
(Witness reviewed the document.)
A Okay.
Q Mr. Wilkins, this is a four-page document, first page of which is marked FTI 01137. I would direct your attention -- well, let's look at the first page first, at the bottom. Do you see an e-mail there from Rob McDonald to Tom Dinackus with a copy to you and to others?
A Are you on FTI 01140?
Q 37, sir.
A Oh, I'm sorry. I went to the back. Okay.
Q Looking at the e-mail at the bottom half of the page, it appears to be an e-mail from Mr. McDonald to Mr. Dinackus with a copy to you and a number of other people. Do you see that?
A Yes.
Q Do you recall this e-mail?



A Vaguely, yes.
Q Okay. I'll ask you to take a look at the top of the next page, 01138, and the first full sentence there reads "the comparable contracts are referenced in a 1/31/06 letter from Bob Watters to Sterling Monroe," and then there's some page number references there.
Do you know whether you ever saw the January 31, '06 letter from Mr. Watters? And before you answer that question, I'll hand you Exhibit Number 7.
(Wilkins Exhibit 7 identified.)
BY MR. BUTLER:
Q The copies didn't come out so well, but this document is marked at the bottom right DCAA 02019 through 02024. And those are the pages referenced in the sentence that we just read from the e-mail from Mr. McDonald.
A Right.
Q Do you recall seeing Mr. Watters's letter?
A Yes.
Q And what does Mr. Watters's letter consist

of? What does he discuss there?
A Well, he's essentially providing the information that was -- that ended up in the DCAA's report, and it's related to, as he terms it here, questions relative to representative profit contracts.
Q And then does he go through and provide a list of tasks for each of the comparable contracts that he used in putting together the $2.20 figure?
A He puts together a list of contracts. I can only assume -- because I don't see anything in here that specifically says it, but I can only assume that these are the contracts that he used to put together the $2.20.
Q Is that the assumption that you proceeded under when you were preparing your report?
A The assumption that I proceeded under when I prepared the report was that this information was not provided when they put together the claim. This information was provided as a result of a question by DCAA.
And my point in the report is that if you



assert a claim, you should support the claim with all the relevant information and link it together and tie it together in support of your claim, not as a result of the question by DCAA or anybody else.
Q Well, let me ask you, since you've made this temporal distinction, given the information that exists today, do you believe that SSA as of today has provided an adequate explanation for the choice of the comparables?
A It -- my answer to you would be it doesn't meet what I would expect to be a supportive reference of these eight contracts to what's included in the claim. It's great information and it's a great starting point, but I would expect there to be a lot more linking of why these eight contracts were selected, a little more detail about -- maybe not necessarily detail in terms of table format as the DCAA put it together in their report, but once you have that table, why is it that this contract or the third contract or the eighth contract are comparable to Umm Qasr? And then tying all of that together in terms of what it all means



in getting to whatever numbers or values you're using in the claim.
Q What's the nature of the specific information that you would add to the information that's already in the record?
A It might not be adding more information. It might be putting it in the right context of what it means in terms of support for something that I'm requesting.
Q So I'm just trying to understand your statement on page 10 of your report that we began with. And there you said "a detailed description of the similarities between the comparables and the Umm Qasr contract was not provided, nor was any real explanation as to the criteria used to select the contracts."
A Right -- I'm sorry.
Q I'm just trying to understand that statement in the context of what you've just said. Is it then not a question of raw information but rather a question of analysis that you're speaking to in this sentence?



A It's more -- I'm going to divide it into two parts. Originally, it was a question of analysis in terms of the information wasn't provided with the claim and was provided only after it was requested from DCAA.
But today, as I see it, today it goes to whether the relevance of that information to the claim is there.
Why did they select eight contracts and not 15, or four? Why did they select those eight contracts? What is it about each of those eight contracts that makes them comparable to Umm Qasr? How did they arrive at the conclusion from those eight contracts as to the value they are including as part of the Umm Qasr claim?
That's the linking that isn't there. Those are the kind of things that I would look for if I were preparing a claim or evaluating a claim, which I've done many, many, many times on both.
Q Did FTI assist the Government in preparing for Bob Watters's 30(b)(6) deposition?
A We may have had an opportunity to opine on

Page 86

the -- "opine," keep in context, to provide input to Mr. Dinackus on the outline that he was using to depose Mr. Watters.
Q And did you, in fact, participate in that deposition by telephone?
A I believe that is the one I participated in by phone.
Q Did you have an opportunity during any of the breaks in that deposition to speak with Mr. Dinackus by telephone?
A Let's see, I think I recall -- I think I only recall one break during which -- it may have been toward the end of the deposition, where Mr. Dinackus asked me specifically did I have any other points that I thought should be covered.
Q And did you raise any other point?
A I did not.
MR. BUTLER: I'd like to take another short break, if we may.
(Recess.)
BY MR. BUTLER:
Q Back on the record. Mr. Wilkins, during

Page 87

the break did you have a discussion with counsel?
A We had a brief discussion.
Q Did it relate to this deposition today?
A Yes.
Q What were the contents of that discussion, please?
A Just going over questions and prior answers that I had given based upon your questions.
Q Which questions?
A I don't know that I can say specifically which questions.
Q Pick one.
A Type of contract.
Q And what was the nature of the discussion about the questions regarding the type of contract?
A Just general discussions about the nature of fee, profit on cost-plus or fixed-price contracts.
Q Was your discussion a substantive discussion about government contract law, or was it a discussion about the answers that you were giving in this deposition?

Page 88

A It was a general discussion about contracts in general, not specifically about the questions you've asked me on this -- in this deposition.
Q Okay. Mr. Wilkins, how much has FTI billed the Government for FTI's services to date?
A Ordinarily I would have been prepared to answer that question, but I must admit, I don't know.
Q Let me try to help you with a document that we'll mark as Exhibit Number 8. And the information that may be of use to you in jogging your memory is on the second page of this.
(Wilkins Exhibit 8 identified.)
THE WITNESS: You know, I'm sorry, I was reading when you made your last statement.
BY MR. BUTLER:
Q Oh, I said the information that might help you jog your memory on that question is on the second page of this document.
A Oh, okay. Great. Thank you.
(Witness reviewed the document.)

Page 89

Okay.
Q Mr. Wilkins, Exhibit 8 consists of two pages, the first of which is marked FTI 01800. I'll direct your attention to the second page. In the middle of that page, there appears to be an e-mail from Mr. McDonald to you regarding fees on the SSA matter. Is that, in fact, what that e-mail is?
A Yes.
Q Does that e-mail refresh your recollection as to how much you have billed the Government for your services on this project?
A As of May 30, these numbers refresh my memory, yes.
Q Okay. And do you have any idea -- it appears that there's a budget of $250,000; is that correct?
A I think that's right, yes.
Q Mr. McDonald says "we probably will need to request budget growth. What do you think?"
Is "budget growth" an increase in price?
A Well, in the context of what he's saying here, it's an increase in the budget. The price is

Page 90

determined by how much time we spent.
Q Okay. But it would be an increase -- is he referring to an increase in the budget of $250,000?
A Yes.
Q Do you know if the budget has been increased?
A I don't recall as we sit here now.
MR. BUTLER: Subject to redirect, that's all I have.
MR. DINACKUS: Okay. We will have a couple questions.

EXAMINATION

BY MR. DINACKUS:
Q Mr. Wilkins, you were questioned by Mr. Butler with regard to employees of USAID who you have spoken to with regard to the matters that are involved in this engagement, and I think you identified Ms. Quinlan and Mr. Abood. Did anyone else at FTI have communications with any other USAID employees?
A Yes.

Page 91

Q Please tell us who they were on both sides of the communication.
A I remember Mr. McDonald spending a lot of time pursuing two people at USAID, and I think he ultimately spoke with both of those people. I must say, I have difficulty remembering their names because I didn't speak with them myself.
Q As far as you're aware, is one of those people Alvera Reichert?
A Yes, that's one of them.
Q Was the other person Kathy Hunt?
A That sounds like the other one, yes. I remember it being Kathy, yes.
Q Do you know if Mr. McDonald actually spoke to these people or did he communicate with some other method?
A It's my understanding that he spoke with both of them, and my recollection is that they were very -- fairly brief discussions. I don't recall any -- I wasn't involved and don't recall any of the substance.
Q Okay. Now, I believe you testified that

Page 92

the 10 percent limit on a cost-plus-fixed-fee contract is based on the contract's cost. When in the process is that fee established?
A At the beginning of the process, based upon the cost estimate.
Q So it's based on the cost estimated before they're performed; is that correct?
A That's right, yes.
Q Now, you also talked about CLIN 003. CLIN 003 was not exercised at the time that the contract was awarded. In a situation where one of the contract CLINs is not exercised at the time of contract award, when is the fixed fee on that CLIN typically established?
A It's the customary practice that the fee is based upon when a contract is -- when the CLIN, in this case as a modification, is awarded.
Q Now, in considering the appropriate profit on a government contract, how important is it to consider whether the contract is a fixed-price contract or a cost-reimbursement contract?
A It's very important.

Page 93

Q And why is that the case?
A Because the type of contract usually equates very directly to the risks being assumed by the contractor, and the profit percentage or profit rate is based upon the risk assumed by the contractor as well.
Q And when you say "risk assumed by the contractor," what does that refer to?
A It refers to the level of exposure that a contractor has. We typically -- accountants typically put it in terms of a risk of loss or sustaining a loss in the performance of a program.
Q And does that refer to the fact that on a fixed-price contract, there's a possibility that the contractor will sustain a loss, and by that I mean that the costs that he incurs performing will exceed the contract price that he's paid?
A Yes. And the reason for that is because the fixed-price contract is an agreement on price that is essentially locked in, unless it's modified later on. And it obligates the contractor to perform to the level of whatever product or service



360c0fd1-8fec-4295-9b79-785faaee3ba1

Page 94

that's being provided, regardless of the cost to perform that product or service, they get no additional money unless the contract value is modified -- or is changed through a modification.

Whereas under the cost-type contract, the contractor's obligation is essentially to perform down a path until the funds have been exhausted. Once the funds are exhausted, the contractor has no further obligation to continue work.

Q Now, if you have two contracts that involve providing similar services, one is a fixed-price contract and one is a cost-reimbursement contract, can you use the profit rate earned on the fixed-price contract to determine what is an appropriate profit rate on the cost-reimbursement contract?

A I wouldn't think that would be prudent to do that.

Q And why is that the case?

A Because it goes back to the issue of risk and assumption. By definition, I think, under the fixed-price contract, the contractor has assumed a

Page 95

certain level of risk that might be akin to a higher profit rate, whereas under the cost-plus contract, the contractor's risk is essentially nonexistent.

Q Do you have an understanding as to how the SSA personnel who perform the contract in Iraq were compensated? By that I mean either a salaried person or someone who was paid on an hourly basis, such that they were entitled to overtime?

A How they were compensated? I don't know exactly how they were compensated at SSA, by SSA.

Q Okay. So assume for the sake of my questions that these were salaried people who did not get paid overtime if they were working hours beyond 40 hours a week. Now, based on that assumption -- well, let's put that aside for a second.

Do you have an understanding as to how SSA was reimbursed by USAID with regard to the compensation that it paid to its personnel in Iraq?

A Yes. Under the cost-plus-fixed-fee contract, SSA would have been paid for all of their costs incurred, as long as they met the criteria of

Page 96

reasonable, allocable and allowable.

Q Okay. Now, assuming that the SSA personnel in Iraq were paid on a salaried basis, does that mean that SSA was incurring the same cost for its personnel in Iraq, whether those individuals were working at a leisurely pace for 40 hours a week or at a frantic pace 15 hours a day, seven days a week?

A Your question is whether they were reimbursed for that?

Q Were they getting the same reimbursement under those two different scenarios?

A Yes, they were.

MR. BUTLER: Well, I was just going to object in that I lost the thread of the question during the asking and the interruption. I just wanted the record to be clear.

MR. DINACKUS: Certainly. I can certainly repeat it.

BY MR. DINACKUS:

Q I've asked you to assume that SSA's personnel in Iraq were paid on a salaried basis. In

Page 97

other words, they were paid a salary, they did not get paid overtime if they were working more than 40 hours a week.

So based on that assumption, and let's also assume that SSA was reimbursed by USAID for the compensation expenses that it incurred for its personnel in Iraq. Does that mean that SSA was being reimbursed the same amount by USAID, without regard to whether its personnel in Iraq were working at a leisurely pace for 40 hours a week or at a frantic pace 15 hours a day, seven days a week?

A Yes.

Q And as far as you're aware, the time spent by the SSA personnel in Iraq ordering the pass-through items under CLIN 003, was that included in the reimbursements that SSA received from USAID for the personnel compensation?

A Yes.

MR. DINACKUS: That's it.

MR. BUTLER: Just a couple of follow-up questions on items that you were questioning about.

FURTHER EXAMINATION

BY MR. BUTLER:
Q Mr. Wilkins, you had an exchange with Mr. Dinackus just now about different types of government contracts; is that correct?
A Yes.
Q And you spoke of cost-plus-fixed-fee contracts and you spoke of fixed-price contracts; is that correct?
A Yes.
Q Are the distinctions between those two types of contracts codified in the FAR?
A Yes.
Q We talked about the FAR earlier, and you talked about the FAR with Mr. Dinackus just now, in the context of risk versus reward, if you would; is that correct?
A Yes.
Q Okay. Mr. Wilkins, I'm handing you a document that we'll mark as Exhibit Number 9.
(Wilkins Exhibit 9 identified.)
BY MR. BUTLER:
Q This is a copy of section 15.404-4 of the



FAR, I'll represent to you. I believe this is current. If there's something that's not, I'm sure you'll let me know.
Does that look familiar to you?
A Yes, it does.
Q Mr. Wilkins, looking at -- did you want another minute to look at that?
A No, no, that's fine.
Q Looking at page 8 of your expert report, you make reference, do you not, to FAR 15.404-4?
A Yes.
Q And when you were talking to Mr. Dinackus just a moment ago, you talked about cost risk; is that correct?
A Yes, cost risk in terms of cost of performance.
Q Is the cost -- is contract cost risk the heading for section 15.404-4(d)(ii) -- I should say two little i's -- on the third page of Exhibit Number 9?
A The FAR is very confusing. I'll accept that as being okay. I know where you are on the



FAR.
Q Okay. And then that's the third page of the document that I've handed you; is that correct?
A Yes.
Q Flip back one page, if you will. Is that (ii) provision, contract cost risk, part of a larger section that's marked "(d) profit-analysis factors"?
A Yes. I went the wrong way when you said flip back. I went back the other way.
Q Do you see that on the second page?
A I do, yes.
Q And under "profit-analysis factors," do you see under subsection (d)(1)(i) "contractor effort"?
A Yes.
Q That reads "this factor measures the complexity of the work and the resources required of the prospective contractor for contract performance."
A Yes.
Q It goes on to read "greater profit opportunities should be provided under contracts



requiring a high degree of professional and managerial skill and to prospective contractors whose skills, facilities and technical assets can be expected to lead to efficient and economical contract performance." Do you see that language?
A Yes.
Q Did that language or did that section play any part in the analysis set forth in your expert report?
A Yes, insofar as, you know, again, you have to go back to the type of contract. Cost-plus-fixed-fee contract, statutory limit is 10 percent. The way that clause that we've just read is interpreted is that the contractor is entitled to a range of profit, again, based upon risk and exposure, but it cannot exceed 10 percent under the cost-plus-fixed-fee contract.
It doesn't have to be 10 percent. If the contractor's risk is essentially, you know, minimal, they could get 2 percent or 3 percent. But as you've pointed out, where it might require certain types of skill, conditions might be a little

Page 102

difficult, they could get up to 10 percent, but not more.

Q So at the end of the day, is it your opinion that the 10 percent limit is what governs the claim that SSA has before USAID?

A It's my opinion that the 10 percent is driven statutorily by the contract type that SSA performed the work under.

MR. BUTLER: That's all, unless you have something further, Mr. Dinackus.

MR. DINACKUS: No, nothing from us.

MR. BUTLER: Mr. Wilkins, thank you very much for your time and your patience this morning.

THE WITNESS: Thank you.

MR. DINACKUS: We will, of course, read and sign.

(Whereupon, at 12:22 p.m., the deposition was concluded.)

Page 103

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

X

Subscribed and sworn to before me this day of , 20 .

X
Notary Public

My commission expires: .

Page 104

CONTENTS


| WITNESS | EXAMINATION |
|---|---|
| CHARLES L. WILKINS | |
| by MR. BUTLER | 4 |
| | 98 |
| by MR. DINACKUS | 90 |


EXHIBITS


| EXHIBIT NUMBER | IDENTIFIED |
|---|---|
| 1 - Expert Report of Charles Wilkins, 32 pages | 7 |
| 2 - Amendment of Solicitation/Modification of Contract, 2 pages | 49 |
| 3 - 3/27/06 e-mail to T. Dinackus from C. Wilkins, 2 pages | 54 |
| 4 - 5/15/06 e-mail to T. Dinackus from C. Wilkins, 1 page | 60 |


(continued)

Page 105

CONTENTS (cont'd):


| EXHIBIT NO. | IDENTIFIED |
|---|---|
| 5 - DCAA Report No. 4261-2006S17900001 Revised, 27 pages | 70 |
| 6 - 5/11/06 e-mail to C. Wilkins and others from R. McDonald, 4 pages | 80 |
| 7 - 1/31/06 letter to S. Monroe from B. Watters, 6 pages | 81 |
| 8 - 6/14/06 e-mail to R. McDonald from J. Higgins, 2 pages | 88 |
| 9 - FAR Part 15.404-4 -- Profit, 4 pages | 98 |






360c0fd1-8fec-4295-9b79-785faaee3ba1