IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SSA MARINE, INC., Plaintiff, | ) | |
| vs. | ) | No. 05-490C |
| THE UNITED STATES, Defendant. | ) | |

DEPOSITION OF ROBERT SKAGGS AND STERLING MUNRO

July 19, 2006

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union S2208 North 30th Street, Suite 202

600 UniversTacoma, WA 98403

Suite 2(253) 627-6401

Seattle, WA(253) 383-4884 Fax

(206) 340-scheduling@byersanderson.com

(800) 649-www.byersanderson.com

EXHIBIT 4



58cade0b-fa42-406d-9495-f159b826533c

APPEARANCES

For the Plaintiff:

John W. Butler
Sher & Blackwell
1850 M Street NW
Suite 900
Washington, DC 20036
202.463.2510
202.463.4950 Fax
Jbutler@sherblackwell.com

For the Defendant:

James W. Poirier
U.S. Department of Justice
1100 L Street NW
Washington, DC 20530
202.307.6289
202.514.7965 Fax
James.poirier@usdoj.gov

Also present: Bob Watters



EXAMINATION INDEX



| EXAMINATION BY: | PAGE NO. |
|---|---|
| MR. BUTLER (of Mr. Skaggs) | 4 |
| MR. BUTLER (of Mr. Munro) | 42 |
| MR. POIRIER (of Mr. Munro) | 99 |
| MR. BUTLER (of Mr. Skaggs) | 105 |
| MR. BUTLER (of Mr. Munro) | 110 |



EXHIBIT INDEX



| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| Exhibit No. 1 | 26-page DCAA Report (revised). | 10 |
| Exhibit No. 2 | 4-page e-mail chain, DCAA 01909-12. | 36 |
| Exhibit No. 3 | 2-page e-mail chain, DCAA 01527-28. | 50 |
| Exhibit No. 4 | 2-page e-mail chain, DCAA 00165-66. | 51 |
| Exhibit No. 5 | 1-page e-mail chain, DCAA 01521. | 63 |
| Exhibit No. 6 | 1-page meeting notes from 2/8/06, DCAA 02026. | 68 |
| Exhibit No. 7 | 2-page letter to Ms. Yee from Mr. Pimpong, dated 2/16/06, DCAA 00046. | 94 |
| Exhibit No. 8 | 1-page DCAA exit conference document, dated 4/7/06, DCAA 01497. | 105 |





BE IT REMEMBERED that on Wednesday, July 19, 2006, at 1131 SW Klickitat Way, Seattle, Washington, at 9:10 a.m., before TERILYNN PRITCHARD, CCR, RPR, Notary Public in and for the State of Washington, appeared ROBERT SKAGGS AND STERLING MUNRO, the witnesses herein;

WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

MR. SKAGGS, MR. MUNRO, having been first duly sworn by the Notary, deposed and testified as follows:

EXAMINATION OF MR. SKAGGS

BY MR. BUTLER:

Q Good morning. My name is John Butler. I'm with the law firm of Sher & Blackwell. We represent SSA Marine in a claim that that company has against USAID.

We're taking your deposition today in connection with some audit work that you did with respect to that claim.



Mr. Skaggs, I'll start with you. I'll try not to go back and forth between the two of you. This deposition is being taken pursuant to Rule 30(b)(6) of the Court's rules.

That means each of you has been designated as the person with the best information about certain subjects.

That doesn't mean that my questions will be limited to those subjects, but I'm going to try to direct my questions to you based on the designation that the Department of Justice lawyer has made, and that means, Mr. Skaggs, I'll be asking you primarily about tonnage calculations in your report.

Mr. Munro, the other questions will go to you.

That's generally how we'll try to work it just so you have a road map of where we're going.

I'm going to be asking you a series of questions. If you can't hear me, if you don't understand the question, please tell me you don't understand it. If you don't ask me to ask it again or if you don't tell me that you don't understand, I will assume that you have understood the question.

Do you have any questions as to the procedure before we begin?

A No.





58cade0b-fa42-406d-9495-f159b826533c

Page 6

MR. POIRIER: Counsel, I'd like to say here that I know that the types of boilerplate you've just gone over are pretty standard in the lawyering industry, but nonetheless, we don't agree that there's any presumption that the witnesses have understood your questions, and as far as the scope of your questioning and the consequences of that, that will be a legal issue that will be decided pursuant to the rules and the Court's interpretations of the rules.

It's always a little bit-- in my experience, Rule 30(b)(6) depositions can get a little bit ambiguous in terms of the witness's binding authority and the questions and the scope and so forth.

Let us agree, I hope, that the witnesses will give their understanding to the best of their knowledge, and if it seems convenient and reasonable and any kind of research is appropriate in response to your question, in other words consult with one of their reports or work papers or something like that, we will offer that, since they are not simply supposed to be testifying from their own knowledge but they are supposed to be, in some manner, representing the position of the United States.

I agree it's awkward and perhaps the issues will

Page 7

never turn into anything, but I think that there's probably some issues opening the law about the scope of 30(b)(6) depositions, so we will just leave them open for the time being and hope that we can just get a practical result that everybody's happy with today.

MR. BUTLER: I don't want to have a discussion about the law unless we have to.

I can ask these gentlemen anything that's proper in any deposition. The 30(b)(6) notice is a floor not a ceiling with respect to subject matter.

That said, I don't think we are going to bump up against any of those issues, and I'm sure the gentlemen will respond to the best of their ability as they have sworn they would do.

Did you say that you wanted to make a statement regarding procedure, Mr. Poirier?

MR. POIRIER: I just want to note for the record what's obvious to everyone in the room, and that is I'm not there. I'm participating by telephone.

I will make my objections as routine as I possibly can. As I mentioned to the witnesses and to you earlier, I will often object if I think a question is vague or if I think it is compound, assumes certain things. This is not intended to

Page 8

discourage any answers by the witnesses.

I doubt very much that there will be any basis to direct any witness not to answer today.

I only ask that I get some feedback if the court reporter thinks that I'm too loud or too soft, and I would ask the witnesses to try to pause, and I know it's easy to forget, but try to pause after the questions in order for me to get my objections on the record, if I have one.

MR. BUTLER: Mr. Poirier, your discussion of the possibility of instructing the witness not to answer prompts me to just get one more thing on the record.

Mr. Dinackus has waived any claim to attorney-client or work product privilege with respect to his office's communications with these two gentlemen.

Did he make you aware of that?

MR. POIRIER: I've seen the exhibits that you have here, and I'm not going to assert any privilege with regard to any of these exhibits.

MR. BUTLER: Well, it goes to testimony as well.

I wanted to make sure that you are aware of the agreement that Mr. Dinackus and I have reached.

Page 9

There is an e-mail, I believe, from Thursday afternoon from him to me saying that he will not object on that basis.

MR. POIRIER: Well, let's go forward. I don't anticipate any problem.

MR. BUTLER: You should check with him before he leaves if you have any question about that.

If that takes care of the preliminaries, then we'll be begin with the main event.

Q (By Mr. Butler) Mr. Skaggs, will you state your name for the record?
A Robert Skaggs.
Q Who do you work for?
A Defense Contract Audit Agency.
Q Is the Defense Contract Audit Agency also referred to as DCAA?
A It is.
Q What's your position at DCAA?
A I'm an auditor.
Q Did you help to prepare a DCAA report regarding SSA Marine's operation of the Port of Umm Qasr, Iraq under a contract with USAID?
A Yes, I did.
Q And what was your role in preparing that report?
A I did the tonnage.

Page 10

Q When you say you "did the tonnage," what does that mean?
A Did all the work regarding the tonnage as far as calculating how much was claimed and how much they invoiced.
(Exhibit No. 1 marked for identification.)
Q (By Mr. Butler) Mr. Skaggs, I am going to hand you a document that we will mark as Exhibit No. 1.
MR. BUTLER: Mr. Poirier, Exhibit No. 1 is the Defense Contract Audit Agency Report (revised) dated April 14th, 2006.
Q (By Mr. Butler) Mr. Skaggs, the report that I've just handed you, is that a copy of the report that DCAA produced?
A Yes.
Q Is that an audit report, Mr. Skaggs?
A No. This is a report on agreed-upon procedures.
Q What's the difference between agreed-upon procedures and an audit?
A An audit will offer an opinion. Agreed-upon procedures will just perform procedures.
Q The title "agreed-upon procedures," suggests that somebody agrees upon the procedures.

Page 11

Who in this instance agreed upon the procedures that were to be followed?
A USAID and DCAA.
Q What are the practical implications of the distinction between an audit and agreed-upon procedures?
MR. POIRIER: Objection; vague.
THE WITNESS: I don't understand.
Q (By Mr. Butler) What's the difference between the two?
A Between an audit--
Q And agreed-upon procedures.
A Like I said, an audit, we give an opinion on subject matter. We go through and do a detailed analysis on a lot of things.
Agreed-upon procedures, we agree upon procedures and we go and perform those procedures.
Q As a result of those procedures then, you do not offer any opinion?
A No. We state the facts.
Q Why would you use one procedure rather than the other?
A Well, there's certain information that some people need to get at, so if they agree upon that procedure, we go get that information, and we present it.

Page 12

Q Well, did USAID or the Department of Justice originally ask you to do an audit?
A I believe so.
Q Do you know why you didn't do an audit?
A I don't.
Q Did you have any conversations with anyone regarding choosing agreed-upon procedures versus an audit?
A I do not.
Q Okay. Just so that I understand the difference, if you would, turn to the second page of this document, and there's no page number on this.
There's a cover page and then there's the second page, which is not marked, and then the third page is marked "Page 2."
This difference between agreed-upon procedures and--
MR. POIRIER: Counsel, sorry to interrupt. Could we agree to mark the second page Page 1 and a half just so we have something to refer to it by?
MR. BUTLER: Absolutely.
We'll call the first page the cover page, and then the second page is Page 1 and a half.
Q (By Mr. Butler) On Page 1 and a half, Mr. Skaggs, three lines down from the top, do you see the

Page 13

language that says, "We applied agreed-upon procedures"?
A Yes.
Q Does that reflect the distinction that you have just explained to me between agreed-upon procedures and an audit?
A Yes.
Q And at the bottom of that paragraph, if you look at the final sentence of that paragraph, does that say "The purpose of our engagement was to perform the agreed-upon procedures to support"-- does that read, "The purpose of our engagement was to perform the agreed-upon procedures to SSA's support for its claimed tonnage and profit rates"?
A Yes.
Q Does that also reflect the difference between agreed-upon procedures and an audit?
A No.
Q Is that an indication then that this was not an agreed-upon procedures report?
A Well, it states that it's agreed-upon procedures, but it doesn't necessarily say what it entails, and that goes down in the scope--
Q All I'm trying to do, Mr. Skaggs, is be absolutely clear that this is only an agreed-upon procedures





58cade0b-fa42-406d-9495-f159b826533c

Page 14

report.
Is that your testimony?
A Yes.
Q Okay. Now, on that same page, in the middle of the page, there's a capitalized heading that says, "Scope of application of agreed-upon procedures."
Do you see that?
A Yes.
Q And the last sentence of that paragraph immediately below that heading reads, in part, "Consequently, DCAA makes no representation regarding the sufficiency of the procedures described below."
Do you see that?
A Yes.
Q What was the purpose of that statement?
A That's to make it clear that we're not offering any opinion.
Q Does it also indicate that you did not choose the procedures?
A Personally?
Q DCAA.
A Yeah.
Q I don't understand your answer.
Is your answer-- the question is: Is it correct that DCAA did not choose the procedures?

Page 15

MR. POIRIER: Objection; lack of personal knowledge.
Q (By Mr. Butler) Mr. Skaggs, you may answer if you have knowledge of that.
THE WITNESS: I didn't hear your question, Jim .
Q (By Mr. Butler) He's not asking questions, he's making an objection.
A Yeah, it says we didn't choose the procedures.
Q Do you have personal knowledge of who did--
MR. POIRIER: Ms. Court reporter, are you able to clearly hear what I'm saying?
REPORTER: Yes.
Q (By Mr. Butler) Mr. Skaggs, do you know who chose the procedures?
A Between my supervisor and USAID, as far as I know.
Q Do you know specifically what people were involved in agreeing upon the procedures?
A I'm pretty sure Tom Dinackus was involved.
Q Were you involved in any conversation with Mr. Dinackus regarding the scope of the agreed-upon procedures?
A No.
Q Just to be clear, when we talk about agreed-upon procedures, is it correct that your testimony earlier

Page 16

was that the procedures are agreed upon by DCAA and, in this case, the Department of Justice?
MR. POIRIER: Objection; compound.
THE WITNESS: As far as I know.
Q (By Mr. Butler) Okay. But SSA Marine did not agree to the procedures; is that correct?
A I don't think so.
Q Looking again at this page that we're calling 1.5, toward the bottom of that page do you see seven bullet points?
A Yes.
Q Is that the list of agreed-upon procedures that DCAA applied in this case?
A Yes.
Q And what is the first agreed-upon procedure in that list?
A Do you want me to read it?
Q Please.
A "We reconciled a sample of SSA's claimed tonnage process through the Port of Umm Qasr to SSA's books and records and reported our findings."
Q Was this the procedure that you had primary responsibility for?
A Yes.
Q How did you go about reconciling SSA's claimed

Page 17

tonnage process through the Port of Umm Qasr?
A I looked at their report for the tonnage that they were claiming, and they had it divided up into segments based on types of cargo.
Based on the type of cargo, I went and asked for some invoices that showed the tonnage on there and calculated that or just added it up and compared it.
Q Compared it to what?
A To the report.
Q What are the two things that you compared?
A Their tonnage claimed and their tonnage reported.
Q And those were the only criteria that you looked at in determining whether the-- let me rephrase that.
What was the purpose in doing that comparison?
A It was to see if their tonnage added up correctly.
Q What do you mean "added up correctly"?
A If they claim 2 million two tons, then we want to look at the invoices and make sure that most of those tonnages went along with that.
Q And these were invoices that were sent to the customers?
A Yes.
Q Mr. Skaggs, I will ask you to look at the bottom of Page 3 of Exhibit No. 1 and the top of Page 4.
Take a minute to review that, and then I'll ask





58cade0b-fa42-406d-9495-f159b826533c

Page 18

you a series of questions about that.
A (Witness complies.)
Q Does the paragraph at the bottom of Page 3 and at the top of Page 4 describe in more detail the methodology that you used to compare SSA's claimed tonnage to some other standard?
A Yes.
Q Can you describe the procedures that are reflected in that text?
A Should I just read it?
Q No. What I'm getting to is this: I understand this text as describing a situation or a set of procedures whereby DCAA compared SSA's invoice tonnages to the amounts of money that they collected from customers with respect to those invoiced amounts. Is that a correct understanding of your procedure?
A Correct.
Q What was the purpose of-- what was the reasoning behind using the amounts of money collected as a figure for comparison against the claimed tonnages?
A Because we didn't get original invoices.
Q Did you get copies of the original invoices?
A Yes.
Q Did you have any reason to believe that the copies that you received were not exact copies of the

Page 19

original invoices?
A As an auditor I have to have-- that's speculation, so if I don't receive anything original, I have to have somebody to kind of prove that it is.
Q Well, were-- I'll ask you to answer my question.
Did you have any reason to believe that the copies that you were given were not accurate copies of the originals?
A Yes.
Q What was the reason for that?
A Because they were just copies that were made on documents and spreadsheets.
Q Did you have any reason, other than the fact that they were just copies, to think that they were not accurate copies?
A No.
Q What's the rationale behind using money collected as a proxy for tonnages moved?
A You can match the amounts paid to the amounts that were invoiced.
Q Do people always pay all of their bills?
A For the most part.
Q Do you have any idea whether customers at the Port of Umm Qasr usually paid their bills?
A No.

Page 20

Q Just so that I understand then, the reasoning behind your methodology of comparing dollars received to tonnages invoiced is that matching the two will give you a better idea of the tons actually moved. Is that correct?
A Yes.
Q Did you use that methodology for all of the cargo types, except for the cargo carried by dhows?
A I did.
Q Who came up with the idea of using revenues actually collected as a proxy for tons moved?
A That was agreed upon between me and my supervisor.
Q Who is your supervisor?
A Keith Mullen.
Q Was there any discussion with Mr. Dinackus or anyone at USAID regarding choice of that procedure?
A Not that I'm aware of.
Q What's your professional opinion of the appropriateness of that method?
A I think it's fair.
Q Have you ever used that method in any other agreed-upon procedures report that you've put together?
A No.
Q Have you ever used that procedure in any other audit

Page 21

report that you've put together?
A No.
Q How many agreed-upon procedure reports have you done in your career?
A This is my second.
Q How many audit reports have you done in your career?
A 25 to 30.
Q Would your view about the appropriateness of using accounts paid as the measuring device change if you knew that SSA Marine did not have responsibility for accounts receivable?
A Can you repeat that?
Q Would your view of the appropriateness of using accounts paid as the measuring device change if you became aware that SSA Marine did not have responsibility for collecting accounts receivable?
A No.
Q Why not?
A Because I had no idea who was responsible for collecting anything.
Q Let's back up. I'm just trying to understand your methodology.
You've told me that you think it's reasonable to use amounts collected as a proxy for tonnages moved. Is that your testimony?

A Yes.
Q And the reason that you think that that's reasonable is that you think that there is a direct correlation between amounts paid and tonnages moved.
Is that also correct?
A Yes.
Q Then how can it be that if the person being audited, the company being audited, has no responsibility for collecting accounts receivable, that that proxy has a direct relationship to the tonnages moved?
A I don't know.
Q You don't know, but this is the methodology that you used to compare the tonnage figures for all of the classes of cargo, except dhows; is that correct?
A Yes.
Q And your answer to my question of why it doesn't matter if the company being examined does not have accounts receivable responsibility is "I don't know."
Is that your testimony?
MR. POIRIER: Objection; asked and answered.
Q (By Mr. Butler) Is that your testimony?
A Yeah.
Q Mr. Skaggs, let me direct your attention again to the bottom of Page 3 of the report.



In the paragraph at the bottom of that page, the second sentence reads as follows, "For the samples selected, we requested original invoices from SSA and was informed that the original invoices had been left in the custody of the port authority for the purposes of collecting on accounts receivable."
Do you see that language?
A Yes.
Q Does that reflect your understanding of what actually happened?
A Yes.
Q My question to you is: If there were still account receivables open, doesn't that mean that the revenues received have to be less than the amounts billed?
A Not necessarily, not for all of them or at least I would assume not for all of them.
Q Well, do you have any idea how many open accounts there were?
A No.
Q Do you have any idea of the dollar figures of the open accounts?
A No.
Q Did you make any inquiry as to the number of open accounts?
A No.



Q Did you make any inquiry as to the dollar amount of the open accounts?
A No.
Q Did anyone at USAID, the Department of Justice or FTI Consulting suggest to you or tell you that they preferred for your analysis to reflect some sort of discrepancy in SSA's tonnage figures?
A No.
Q Let's look back again at Page 3 of the agreed-upon procedures report.
On the top of Page 3 there's a chart.
Do you see that?
A Yes.
Q What does that table depict? What information were you expressing in that chart?
A The first column, "total tonnage claimed," is the total tonnage that SSA is claiming.
The next column, "Percentage of total tonnage"--
Q When you say "percentage of total tonnage," those percentages reflect what percentage of the total tonnage claim that classification of cargo represents; is that correct?
A Yes.
Q In other words, it says, "Ro-ro."
What does "ro-ro" stand for?



A Roll on, roll off.
Q What is the nature of roll-on cargo?
A Vehicles basically.
Q And for ro-ro cargo then, if I'm reading this correctly, that cargo made up 9.08 percent of the total claimed; is that correct?
A Correct.
Q Please continue in terms of explaining this to us.
A The next column for tonnage invoiced are the tonnages that we received off of the invoices based on our sample, and the tonnage claimed is the tonnage claimed that we were able to verify off the invoices.
Q Now, the heading, "DCAA sample," that spreads across the two columns in the middle of the chart; is that correct?
A Yes.
Q The reference to a sample, does that indicate that DCAA did not look at all of the invoices that reflected tonnage claimed?
A Correct.
Q What was the reason for doing a sample?
A It's almost impossible to try to look at 2 million two tons, so you look at what's material and what has the most amount of tonnages, and we went with that.
Q Okay. Mr. Skaggs, I want to ask you to disregard the

row marked "dhows" for now, if you would.
What would be the result in the two columns that appear under the heading "DCAA sample," if you backed dhows out of the equation?
In other words, the question that I'm asking you is: Setting aside dhows, what are the results of your audit with respect to the relationship between tonnage invoiced and tonnage claimed?
MR. POIRIER: Objection; vague.
Counsel, please ask one question at a time. I understand you're probably trying to be helpful here, but it's better just to withdraw the first question if you want to reformulate it. It makes the record a little clearer.
MR. BUTLER: Thank you, Counsel.
Q (By Mr. Butler) Mr. Skaggs, my question to you is: If you back dhows out of these two columns, what is the relationship between the total under the "tonnage invoiced" column to the total under the "tonnage claimed" column?
A There would be a difference of approximately 20,000 tons.
Q No. Let's take this in pieces then.
Do you see the rows for "ro-ro," "WFP," "project cargo" and "containers"?



A Yes.
Q Do you see the column marked "tonnage invoiced"?
A Yes.
Q Would you please add up the four numbers in that column?
A Well, would still be 784.
Q And that's because there's nothing listed there for dhows; is that correct?
A Correct.
Q Okay. Let's go over to the column marked "tonnage claimed."
Do you see that?
A Yes.
Q If you back out dhows, what is the difference between the total number that appears there now and what that number would be if you back out that dhows?
A 388,981.
Q And what would the total be after you subtract out the 397,600 tons for dhows?
A 8,619.
Q I'm asking you to subtract 397,600 from 1,173,427.
What's the result of that calculation?
A 775,827.
Q And is that number more or less than the total for tonnage invoiced in your chart?



A That amount is less.
Q So that means that disregarding dhows, that the tonnage claimed by SSA is less than the tonnage invoiced; is that correct?
A Yes.
Q Turning back to the bottom of that same Page 3, do you see the language under Subsection 1C that says, "We judgmentally selected a sample of invoices"?
A Yes.
Q Now, is that language "we judgmentally selected" repeated on Pages 5, 7, and 8 of the report?
A Yes.
Q What does it mean to judgmentally select something?
A Means we can decide what we're going to look at as opposed to-- you have a judgmental sample and then a random sample.
Q And what's the difference between the two?
A Random sample, everything has an equal chance of being chosen. Judgmental sample, we can decide what we want to look at.
Q Is judgmental selection or a judgmental sample, is that a term of art in the auditing world?
A Yes.
Q And when is that approach typically used as opposed to a random sample approach?



A Based on materiality, how much effort needs to be involved, amount of time or resources.
Q Just so that I understand, because I don't understand your answer, does that mean that you would be more likely to use a judgmental sample when resources are limited?
A Sometimes.
Q Well, if your answer is "sometimes," now I truly don't understand.
You told me a moment ago that the reason for using one rather than the other is the availability of time and resources.
Is that correct?
A It's one of the factors.
Q What are the other factors?
A Materiality.
Q What does that mean?
A If it's-- how important it is.
Q How important what is?
A The amounts.
Q Do you mean the sample size?
A No, the universe, what's included in the universe.
Basically the universe would be the 2 million two tons.
Q And why in this instance did you choose certain

Page 30

examples to analyze rather than other examples?
A There were many ships that were moved through this port. Some of these ships had small cargo volumes, others had very large ones.
Q Did you tend to use the ships that had large cargo volumes?
A Yes.
Q And what was the basis for that decision?
A It provides more coverage.
Q Now, does the process of using a judgmental selection have a positive or a negative connotation or is it a neutral connotation in the audit world?
A Well, in a random sample you can take that result and apply it to the entire population whereas if you're doing a judgmental sample, you take that result and just report it. You can't apply it.
Q When you say "you can't apply it," does that mean that the results of an analysis using a judgmental sample do not have any meaning outside of the sample?
A What do you mean?
Q Your testimony, as I understood it, was that with a random sample, you could apply your results to a broader universe of similar data.
Is that correct?
A Yes.

Page 31

Q And I took it from your distinction that you could not do that with a judgmental sample.
Is that correct?
A Right.
Q If you cannot extrapolate from a judgmental sample to a larger universe, doesn't that necessarily mean that you cannot apply the results of your analysis on a judgmental sample to a larger body of data?
A Yes.
Q Is it correct that the single largest category of cargo handled at the Port of Umm Qasr was World Food Program cargo?
A Yes.
Q Is that reflected in your chart on Page 3 as WFP?
A Yes.
Q Is it also correct that for that cargo classification, that the tonnage claimed is less than the tonnage invoiced?
A Yes.
Q Do you know why the tonnage claimed was less than the tonnage invoiced?
A No. The numbers were different. Why they were different, I don't know.
Q Did you make any inquiry as to-- in order to try to determine how it could be that the amount claimed is

Page 32

less than the amount invoiced?
A Well, because we're only doing procedures here. We didn't go into detail such as that.
We weren't doing an audit, so we weren't trying to give any particular reason for why things were different.
Q So getting back to this audit versus procedures, is it correct that with respect to an agreed-upon procedures exercise, that you simply take the numbers that you're presented with and--
A Present them.
Q So this is more of a calculation exercise than it is an exercise of applying your professional expertise to a set of numbers.
Is that correct?
A Yes.
Q Now, I'm going to ask you to look also on Page 3 under numbered Section 1A, "Summary of findings," and there's a notation there that says, "Based on our agreed-upon procedures, we found that the claimed cargo tonnage for the ro-ro portion of the total tonnage did not reconcile to SSA's books and records."
Do you see that?
A Yes.

Page 33

Q And I'll ask you to look at Pages 5, 6, 7, and 10 of the report.
A (Witness complies.)
Q On Page 5 under 2A, "Summary of findings," is there also language that says, with respect to the cargo at issue there, "We found that the claimed cargo tonnage for the WFP portion of the total tonnage did not reconcile to SSA's books and records"?
A Yes.
Q And on Page 6 under 3A, is there similar language regarding "total tonnage did not reconcile to SSA's books and records"?
A Yes.
Q And then again on Page 7 on the bottom under 4A, does that same language reappear "total tonnage did not reconcile"?
A Yes.
Q And then finally on Page 10 under 5A, again, does that same language, "the claimed tonnage did not reconcile," does that appear there as well?
A Yes.
Q What does the language "did not reconcile" mean in this context?
A That means we looked at the claimed amount of tonnage and compared that with the invoiced amount of



58cade0b-fa42-406d-9495-f159b826533c

Page 34

tonnage, and they didn't reconcile.
Q When you say "they didn't reconcile," does that mean they weren't exactly the same?
A Yes.
Q In some cases was the claimed tonnage greater than the invoiced tonnage?
A In some cases.
Q In some cases was the claimed tonnage less than the invoiced tonnage?
A Yes.
Q And as we discussed a moment ago, is it the case that setting aside the issue of dhows, that with respect to the other four categories of cargo combined, that the claimed tonnage was less than the invoiced tonnage?
A Yes.
Q I would like to talk for a moment about containerized cargo, and I will refer you generally-- this is discussed at Pages 7 through 10 of the report.
Is this a class of cargo for which the tonnage claimed was less than the tonnage invoiced?
A Yes.
Q Do you know the reason for that difference?
A No.
(Recess 9:51 to 9:59 a.m.)

Page 35

Q (By Mr. Butler) Mr. Skaggs, before we broke, we started to look at container cargo.
On Page 8 of the report there's a statement that Mr. Moran arrived at an average container weight of 14 tons per 20 foot equivalent unit; is that correct?
A Yes.
Q Who is Mr. Moran?
A He was the port manager over there in Iraq.
Q Is that Fergus Moran of SSA Marine?
A Yes.
Q Is a 20-foot equivalent unit abbreviated "TEU"?
A Yes.
Q On Page 8, I'll direct your attention to the second paragraph from the bottom of the page, and in particular the final sentence of that paragraph, which states, "There is no documentation to support or refute his estimate of 14 tons per TEU container."
Do you see that?
A Yes.
Q Did you do any research to try to corroborate that 14 tons per TEU as an accurate figure?
A I asked him if he was able to provide anything that came up with 14 tons.
Q And what was his response?
A I was basing it on his professional judgment.

Page 36

Q Did Mr. Moran send you an e-mail telling you that 17 tons per TEU was the international standard?
A He may have.
(Exhibit No. 2 marked for identification.)

Q (By Mr. Butler) Let me hand you a document marked DCAA 01909. There are four pages in this packet. This is Exhibit No. 2.
Mr. Skaggs, do you recognize this e-mail?
A Yes.
Q In the message at the top of the page on the first page, is there language from Mr. Moran indicating that there is an internationally accepted average of 17 tons?
A I see that.
Q Did you take that information into account as you put together your report?
A No.
Q Why not?
A I don't know about ships and moving cargo, so there's no way to prove that 17 tons is an accepted average.
Q Was there anybody working on that report that did know anything about ships or cargo?
A Probably not.

Page 37

Q Again, with respect to containers, did SSA claim any tonnage for handling empty containers?
A It was reported.
Q Did they make a claim based on empty containers?
A No.
Q Do you understand how SSA arrived at its tonnage figures for containerized cargo?
A Yes.
Q And was that based on their conversion of TEUs to tons and then doing a multiplication?
A Yes.
Q Do you have any reason to believe that SSA's tonnage figures are not accurate for any of the classes of cargo covered by your report?
A Not really.
Q Mr. Skaggs, we talked earlier, briefly, about dhows in the context of the table on Page 3.
Do you recall that?
A Yeah, I recall.
Q We backed dhows out of that because there was a zero figure for dhow tonnages.
What is a dhow?
A It's a small wooden country boat.
Q Have you ever seen one?
A I've seen a picture.

Page 38

Q Do you have any knowledge of the tonnage that such boats are capable of carrying?
A Not direct knowledge.
Q Do you have indirect knowledge?
A Well, by looking at the picture I can kind of draw my own conclusions.
Q And what conclusions did you draw from looking at the picture?
A Probably wouldn't be able to handle 500 tons.
Q And what do you base that on?
A The size of the boat.
Q And what expertise do you have in gauging a tonnage capacity of a boat based on its size?
A I'm not an expert at all.
Q Do you know how long the average dhows were?
A No.
Q Do you know what their under-deck cubic foot capacity is?
A No.
Q Do you know what their on-deck cubic capacity is?
A No.
Q Do you know what their displacement is?
A No.
Q What was your process for determining then, based on looking at a picture, how much you thought they could

Page 39

carry?
A Well, picturing 500 tons in my mind and featuring a little boat where maybe two people can fit on it is kind of--
Q You think the dhows involved here are boats that only two people could fit on?
A Probably not, but I didn't see one.
Q Did Mr. Moran provide you a written explanation for how he estimated the dhow tonnages?
A No.
Q He didn't?
A Not a written; we talked about it.
Q I'll direct your attention back to Exhibit No. 2. This is the document marked DCAA 01909.
Do you see that?
A Yes.
Q I'll ask you to look at the e-mail that begins on the-- in the middle of the first page.
Is that an e-mail from Fergus Moran to you dated February 7th, 2006?
A Yes.
Q And is there a description in No.-- Item No. 1 regarding his estimate of dhow tonnages?
A Yes.
Q And in that description does he explain that his

Page 40

estimate of 500 tons is judged to be conservative and based on his experience?
A Yes.
Q And who has more experience with dhows, Mr. Moran or you?
A I would say Mr. Moran does.
Q Looking at the first page of that set of documents, Mr. Skaggs, do you see-- it's the second e-mail message on the first page, a message from you to Fergus Moran.
Do you see that?
A Yes.
Q Did you send that e-mail?
A Yes.
Q Does the first line say, "Thank you, Fergus. This helps tremendously"?
A Yes.
Q Did you follow up after this e-mail with Mr. Moran with any further questions regarding the estimate of the dhow tonnages?
A I don't believe so.
Q You do not believe so?
A Right.
MR. BUTLER: Mr. Skaggs, that's all I have for you unless Mr. Poirier would like to explore

Page 41

anything further.
I would ask you to stay on the off chance that I have questions that it turns out Mr. Munro cannot answer but he thinks you might be able to answer.
MR. POIRIER: I think we should have some measure of courtesy here for the witness.
Why don't you ask some questions of the second witness to try to identify the various scopes you're interested in and see if you can determine whether Mr. Skaggs has any other things that you want to ask him about and then ask him at that point.
MR. BUTLER: That will take longer than asking the questions.
It sounds like a sensible solution, but I can't imagine how to implement it then.
MR. POIRIER: I think if you're done with Mr. Skaggs, then you should let him go.
MR. BUTLER: I'll do that conditionally.
We are not going to close the record with respect to Mr. Skaggs, if you insist on doing it that way. I reserve the right to re-call him, and we'll hold the record open until I'm done with Mr. Munro.
Otherwise, he's free to stay.
MR. POIRIER: You can only reserve a right if you have it.

Page 42

This witness is designated for a 30(b)(6) topic, and if you've exhausted the topic, then you should let the witness know.
MR. BUTLER: I think it's entirely possible that we have, but I won't know that we have until I finish talking to Mr. Munro.
I'm running this deposition, and we're holding the record open with respect to Mr. Skaggs. I do not expect that I need to re-call him, but I reserve that right.
Mr. Skaggs, you are welcome to stay under the conditions I just set forward. You're welcome to go. If something does further come up, we will probably have to contact you by telephone and go through this again.
I don't expect to take more than an hour or so with Mr. Munro, so it's your choice as to whether you stay or go.
I would prefer that you stay.
THE WITNESS: Okay.

EXAMINATION OF MR. MUNRO
BY MR. BUTLER:
Q Good morning, Mr. Munro. What was your role in

Page 43

preparing the SSA report, and by "the SSA report," I'm referring to Exhibit No. 1 of Mr. Skaggs' deposition?
A I performed some of the agreed-upon procedures, and I wrote the portions of the report that relate to the procedures I performed.
Q And which of the procedures did you perform?
We looked earlier at what we've called Page 1.5 of the report, and there are seven bullet points there.
Which of those seven did you work on?
A I'm reading through them.
Q Take your time, please.
A Well, I performed the second bullet.
The third bullet, I obtained the information there. However, Robert and I kind of co-worked on that actually.
The next bullet--
Q Before we leave the third bullet, are you in a position to answer questions regarding the methodology of your implementation of that procedure?
A I believe so. If I'm not, I'll let you know.
Q Go ahead and continue.
A Sure. The fourth bullet, yes, I did that.
The fifth bullet, yes, I did that.

Page 44

The next bullet, yes, I did that.
The seventh and final bullet, yes, I did that.
Q Who gave you your instructions for this exercise?
A Well, there's organizationally your supervisory auditor who gives you instructions to "Go there and do this."
Q Who was that person in this case?
A The supervisory auditor for this assignment was Keith Mullen.
I guess technically or procedurally speaking, it would be Keith Mullen who gave me my instructions on this.
Q Your answer suggests to me I may have asked the wrong question, so let me try a different question.
A Sure.
Q How were the agreed-upon procedures arrived at?
A We coordinated, and I took part in this coordination, with USAID, and Mr. Dinackus was also part of that coordination or discussion on what to do.
Q With whom at USAID did you coordinate?
A Well, going off of memory here, it would be a John Alumbaugh, Peter Young, and there may have been one or two others. Do you need to know exactly?
Q If you know who they are, that's fine. If you don't, we can--

Page 45

A I don't recall offhand, but those-- Mr. Alumbaugh and Young were the primary players of people we talked to, along with Mr. Dinackus.
If there was anyone else, it must not have been as significant or I'm sure I would have remembered.
Q What did those three gentlemen tell you they wanted you to do?
A As I recall, they said, "Do anything you can."
THE WITNESS: Mr. Poirier, please break in if you think things are too vague. Of course I'm sure you will.
MR. POIRIER: Okay.
THE WITNESS: As Robert said, they asked us to do an audit, and we said, "This is what we can do on this situation. We think this might help you. Do you want us to do this?"
Q (By Mr. Butler) What's "this"?
A Verify specific accounting-type information that was in SSA Marine's-- what we would call "claim," in their claim or complaint or whatever it is, the data information they submitted in this claim against the government.
Q Did you tell USAID and Mr. Dinackus that you could not do an audit as they had requested?
A Yes.





58cade0b-fa42-406d-9495-f159b826533c

Page 46

Q What was the nature of the audit that they asked you to do?
A They asked us to perform an audit of SSA Marine's claim against the government. That was the gist of it.
There really wasn't anything, at least not that I recall, in their request beyond that.
Q Did they ask specifically about the $2.20 per ton dollar figure that was part of the claim?
A Either in their written request or in our conversations, they did reference that, the $2.20, yes.
Q So they were interested in having the requested audit to cover that issue as well; is that correct?
A In their request to us, yes, I believe, and we took that to be correct, yes.
Q Why is it that you told them you could not do an audit in this case?
A That was based on our reading of the claim, and it was our understanding, and we stated this to them, that the claim was for additional profit on this contract.
DCAA's expertise is in contract costs, accounting data, financial advisement, that sort of thing, and rendering opinion on those matters.

Page 47

A request for profit is outside DCAA's expertise, as far as rendering an opinion.
There was nothing for us to render an opinion on, so there was no audit to do or examination as "audit" is defined. That is why we told them we could not do an audit.
Q And what is the nature of an opinion as a term of art in the auditing world?
What does it mean to give an opinion?
A Specifically for auditing purposes, a report will contain an opinion. It will say, "In our opinion, the contractors"-- in DCAA's case-- I guess I'm being specific here. The contractor's claim or submission or whatever it is, is stated in accordance with-- and then certain criteria, and we also give an opinion on whether the data submitted is adequate for whatever the purpose it is that it was submitted for; for example, for negotiating a settlement, for negotiating a contract price, et cetera.
For DCAA, rendering an opinion is along those lines of that nature.
Q But you did not render an opinion with respect to this matter; is that correct?
A Of the sort I just described to you, that's correct.
This audit report does not contain an opinion on

Page 48

the claim.
Q Did you provide any informal opinion to USAID or Mr. Dinackus regarding the claim that is not reflected in the report?
A Informal opinion, I would say no. I don't think we gave them any opinion.
Now, when we're talking to them, we're talking to them as professional auditors, so I would say no, we didn't give them any opinion formally or informally.
Q Setting aside the concept of an opinion, as we've been discussing it, as an audit term, let's use the word "opinion" in a nonaudit sense, in other words in its common usage, which is "I think X, Y, and Z."
Do you understand the distinction I'm using?
MR. POIRIER: Objection; vague.
THE WITNESS: Sure.
Q (By Mr. Butler) In using the term in that more common sense, did you provide any opinion to Mr. Dinackus or anyone at USAID regarding the profit claim in this case?
A I think I may have, but I don't recall specifically.
Q Do you have any general recollection of what you may have said to them?
MR. POIRIER: Objection; vague.
THE WITNESS: I really don't.

Page 49

Q (By Mr. Butler) Did you say anything to them along the lines of, "I think their claimed amount is too high" or "I think their claimed amount is too low"?
Did you say anything about either of those issues with them?
A I think that's possible, yes.
Q Do you recall what you said to them in that regard?
A I think that-- probably said, "It's high."
Q And why would you have said that?
A Well, in general, I think our view of it would have been or was that SSA Marine probably doesn't have anything coming to them.
They signed a contract for a certain amount of fee, and that's that, and so in that context, asking for additional profit would seem to us to be too high.
Q So that would-- just so that I understand you then, the basis for the direction that you just indicated then would be because of the language of the contract; is that correct?
A Not quite because-- no, simply because they had a contract signed in place that laid out, "This is the amount of fee that is awarded as part of this contract."
Q But your personal feeling that $2.20 per ton claimed





58cade0b-fa42-406d-9495-f159b826533c

Page 50

might have been too high, was that based at all on the amount of the tonnage claimed?
A No, I don't think so.
Q Was it based at all on the $2.20 per ton multiplier that SSA proposed?
A No.
(Exhibit No. 3 marked for identification.)

Q (By Mr. Butler) Mr. Munro, I'm handing you a document that we have marked as Exhibit No. 3. It is marked DCAA 01527.
It is a two-page document. At the top there is an e-mail from Mr. Dinackus to Mr. Munro and others. I will ask you to take a look at this document.
Do you recognize these e-mails?
A Yes.
Q Looking then to the second message on the first page, is that a message from you to Mr. Dinackus and others?
A Yes.
Q And that's dated January 17, 2006; is that correct?
A That's right.
Q In the second paragraph of your message to Mr. Dinackus, do you state there, and I quote, "SSA's

Page 51

claim for profit depends on factors outside the scope of audit expertise, such as risk determination and legal questions of entitlement"?
Is that what it says?
A Yes.
Q Does that statement reflect part of the reason that you declined to give an opinion with respect to this profit claim?
A Yes.
Q And are those the primary reasons that you declined to give an opinion?
A I would say so, yes.
Q Were there any other reasons?
A I think that says it all. It's really outside our expertise.
Q The phrase "legal questions of entitlement," would that include questions of contract interpretation?
A Yes.
(Exhibit No. 4 marked for identification.)

Q (By Mr. Butler) Mr. Munro, I'll hand you another document that is marked at the bottom DCAA 00165.
It appears to be-- at the top there it seems that it was printed off by Mr. Keith Mullen at DCAA, so

Page 52

there's a header to that effect.
This appears to be from Ms. Debbie Yee to Mr. Mullen, and I'll ask you to look at that.
A (Witness complies.)
Q Mr. Munro, if you would, flip to-- well, look at the bottom, if you would, of the first page, which is marked DCAA 00165, and then look at the second page, 00166.
A (Witness complies.)
Q Is there an e-mail message from you to Mr. Alumbaugh and Mr. Young and Mr. Dinackus that begins on the bottom of that first page and continues to the top of the second page?
A Yes.
Q Did you send that e-mail?
A Yes.
Q And this is dated November 30th, 2005; is that correct?
A Yes.
Q Is that pretty early in the process for the SSA project, in terms of the report that we've been talking about today?
A I guess we can call it early, yeah.
Q It was before you-- let me ask it this way: Was this during the stage during which you were still

Page 53

determining the scope of the project?
A Yes.
Q On the second page of this document do you see toward the top there's-- sort of the second paragraph there is five bullet points, if you will?
Do you see that?
A Yes.
Q And the third bullet point reads-- well, let me ask you this: What were those bullet points?
Above that it says, "We will apply the following procedures."
Are the bullet points that follow that statement the procedures that you propose to implement with respect to this project?
A Yes, those are them.
Q The third bullet point, can you tell us what that is, please?
A "Determine basis of SSA's computation of claimed profit rate and provide comments on entitlement."
Q Based on your earlier testimony, my understanding is that in the end you did not provide comments on entitlement.
Is that correct?
A I think earlier I said we didn't offer a professional opinion and provide audit work to that.