Providing comments would be a different matter.
Q So this description of what the following procedures that you would apply were, that was not for the purpose of ultimately rendering a report. Is that your testimony?
A Rendering a report?
Q I'm trying to understand what you're talking about here, and you've just told me that this providing comments on entitlement wouldn't be an audit opinion; is that correct?
A That's correct.
Q But did you, in your report, provide any comments on entitlement in the end, audit or otherwise?
MR. POIRIER: Objection; vague.
THE WITNESS: I guess I have to agree with Mr. Poirier because I guess there could be numerous things in the report that could be, you know, characterized as a comment on entitlement.
I really don't understand, I guess, what it is you want to know here.
Q (By Mr. Butler) Well, let's turn back to Exhibit No. 3 that we just discussed, and this was your e-mail from January 17, 2006 to Mr. Dinackus.
A Okay.
Q And we talked about the language in the second



paragraph of your note to Mr. Dinackus where you say, "SSA's claim for profit depends on factors outside the scope of audit expertise, such as risk determination and legal questions of entitlement."
What I'm trying to understand is whether, in fact, you provided any information or commentary of any sort to USAID regarding entitlement.
What do you mean by "entitlement" in either Exhibit No. 3 or Exhibit No. 4?
A Well, I use the word "entitlement" as opposed to "quantum."
If we examine a claim-- of course this wasn't an examination, but let's say I had a claim that I was going to audit and render an opinion on, our audit report would include our opinion and our quantification of what we believe, I guess, the quantum of the claim should be.
Entitlement is something that's going to be decided between the parties, in whatever way they choose to determine that, and so we don't address the entitlement issues as part of our audit opinion.
However, we routinely will provide comments that we believe may aid in the settling of the entitlement questions or issues.
When we say "comments," we mean observations,



things we found out.
Q Did you provide any such comments in this case?
A Specifically we didn't-- as I recall-- let me check this here.
We didn't provide a separate section that we titled, "Comments on entitlement," so in that manner, no, but I would imagine that the contents of the report, some of the things in there, I suppose one might use in settling entitlement issues.
We did not actually provide a section or exhibit or attachment and call it "Comments on entitlement."
Q Just to be clear, with respect to entitlement as with respect to all issues in your report, is it correct that you did not provide an audit opinion?
A Correct.
Q Turning your attention back to Exhibit No. 4, at the top of the first page of that exhibit, there is what appears to be an e-mail from Ms. Debbie Yee to Mr. Keith Mullen.
Do you see that?
A Yes.
Q Have you ever seen this e-mail before?
A Yes.
Q In what context did you see it?
A I saw it at work.



Q Did someone forward it to you?
A I think so. I think someone must have, and I would guess that Keith Mullen forwarded it to me.
Q Did he ask you a question about it?
A I don't recall that he specifically asked me a question about it.
Q Well, in the third line of the text of the message, the body of the message, it states, "I just talked to Susan, and she has some significant concerns that we (you, me, and Sterling) need to sit down and discuss before any further effort is performed on this assignment."
Do you see that language?
A Yes, I do.
Q Who is Susan?
A Susan is-- I would say that Susan here is the regional audit manager who is-- in our management chain in our office. That would be Susan. It's Susan Barajas.
Q Who is Debbie Yee?
A The branch manager of the DCAA Seattle branch office.
Q Does Debbie work for Susan?
A Yes.
Q Do you know what the, quote, unquote, "significant concerns" were that were identified in that sentence

Page 58

I just read?
A I believe the significant concerns were the same as in the preceding sentence where it says, at the end of the sentence, "Some steps do not appear to meet the agency criteria for agreed-upon procedures while others need more details."
I believe those were her concerns.
Q Well, there's an indication here that Ms. Yee wanted-- is the reference to Sterling in the third line a reference to you, Mr. Munro?
A I believe it would be, yes.
Q Did you, in fact, sit down with Mr. Mullen and Ms. Yee to discuss the subject matter of this e-mail?
A Yes.
Q When did you do that?
A I don't recall the exact date.
Q Do you recall the meeting?
A I do.
Q Who was at the meeting?
A I think it was myself, Keith Mullen, and Debbie Yee at the meeting.
Q What did you discuss?
A I don't recall everything that we discussed specifically, but I believe we simply discussed the assignment, the procedures that we were talking about

Page 59

doing, and the DCAA internal requirements for determining that what you're going to do is an agreed-upon procedures assignment documenting that you've followed those procedures, et cetera.
Q In the second paragraph of the e-mail we've just been discussing, the paragraph begins, "Some of the concerns still center around whether we should be performing any effort at all."
Do you see that language?
A Yes.
Q Do you recall whether there was a discussion of that topic at the meeting we just discussed?
A I imagine there was, yes.
Q Do you have any recollection regarding the discussion of that topic?
A Not specifically. I do recollect what my thoughts were on that topic.
Q What were your thoughts on that topic?
A My thoughts were that we didn't have anything we could audit. However, I felt that there were things we could do that could help our customer out, meaning USAID, the people who had requested this work from us.
I felt that we should explore those things with USAID, the things we could possibly help them with.

Page 60

Q When you say "help them out," what do you mean by that?
A To assist them in resolving this claim, things within our expertise to resolve this claim, within the realm of accounting and financial data and costs, and that sort of thing.
Q And were those things that you believed you could help with the things that were reflected in your ultimate report?
A Yes.
Q Was it ever made known to you by USAID or Mr. Dinackus that they wished to challenge the claim made by SSA?
A Challenge it? Well, they made a note to us that it was going to court.
I guess we inferred from that that it had been challenged, that the parties were not in agreement.
Is there a specific meaning you have though with "challenge"?
Q No. Did they say to you that-- strike that.
Were you aware that your work would be used by USAID to argue that either they should not pay anything at all to SSA or that they should pay something less than what SSA was claiming?
A Yes.

Page 61

Q And how was that made clear to you?
A Well, I would say it was clear to us in the context of the audit request. It was made known to us when we were discussing with them, "What are the circumstances here?"
They explained to us that a claim had been submitted, that the government had turned it down. In fact, I think that was even in the documents that were initially given to us, along with the request, to audit.
There were subsequent discussions with them where they said-- to boil it down, "It's a disagreement. It's going to go to court."
Obviously that means the parties are opposing each other.
It was just simply-- you know they're asking us for an audit to help them with their position. People are asking us for an audit to assist them in arriving at their position of how they're going to try to settle this or argue it.
Q Did the fact that USAID wished to eliminate or reduce the claim made by SSA have any impact on how you went about your work?
A How we went about our work, no, I don't think so.
Q Did it have any impact on the way in which you





58cade0b-fa42-406d-9495-f159b826533c

Page 62

presented your findings?
A No.
Q So despite the fact that USAID was your customer-- and you testified that you wished to help your customer, correct?
A Yes.
Q Is your testimony that your desire to help your customer in no way was reflected in the way in which you presented your findings?
A Well, we presented our findings in a way we believed would be helpful to our customer in doing what they needed to do to try to settle the claim.
To that extent, knowing what-- discussing with them and arriving at procedures that would be helpful to them and that sort of thing, yes, but that's kind of part of what we did, discuss with them what they would like us to do, what could we do for them, and "Would it be helpful to you to do this, to do that?"
Yes, that is, I guess, the nature of our discussions with them on how we tailored our procedures and reporting accordingly.
MR. BUTLER: Just for the record, Mr. Bob Watters has rejoined us.
MR. POIRIER: Counsel, can we take a break?

Page 63

(Recess 10:53 to 11:00 a.m.)
(Exhibit No. 5 marked for identification.)

Q (By Mr. Butler) Mr. Munro, I am going to hand you a document marked as Exhibit No. 5. This is DCAA 01521. It's a one-page document. At the top there's an e-mail notation "Sent Friday January 6th, 2006, 10:45 a.m."
Mr. Munro, I will ask you to look at the bottom half of Exhibit No. 5.
Is that an e-mail that you sent?
A Yes.
Q And this was an e-mail from you to Mr. Alumbaugh, Mr. Young, and Mr. Dinackus?
A Yes.
Q And did you copy Mr. Mullen and Mr. Skaggs on that e-mail?
A Yes.
Q Mr. Munro, in the first paragraph of your e-mail you state, "Because this is an unusual engagement, we want to be certain that we have accurately described the procedures that we are mutually agreeing upon."
Is that correct?
A Yes.

Page 64

Q When you described this as an "unusual engagement," what did you mean?
A What I recall that I meant there is usually we're not asked to audit a claim for an additional profit, and I think that's what I meant by "unusual."
Q In the second paragraph of that e-mail in the third sentence you say, "We would like to conduct another teleconference to go over the draft acknowledgement and the procedures, discuss what we have found so far, and communicate the concerns that we believe are relevant to this engagement."
Do you recall which concerns you wished to communicate?
A Well, that I can bring to mind now, the concerns at that time were that we communicate to them clearly that what we're going to do was not an audit and that the resulting report was not going to be an audit report, would not contain an opinion, and that the sufficiency of the procedures we were going to do for their purposes would be their responsibility.
I believe that was one of the concerns.
I believe at the time another concern we had was the time schedule seemed to me to be very compressed, and so I wanted to voice that concern as well.
Q Do you recall any other concerns that you had?

Page 65

A I don't at this time, no.
Q Did USAID or Mr. Dinackus press you to express an audit opinion?
A Once we discussed and explained it to them, no, they did not.
Q Did they discuss initially that they preferred to have an audit opinion?
A I believe so, yes.
Q Do you know why they had that preference?
A As I recall, they felt an audit report with an opinion on it would be a stronger document for them to have.
Q But as we discussed earlier, you decided that in this case it was not possible to provide an audit report; is that correct?
A That was my view of what we could do here, yes.
Q When you--
A DCAA decided, yes, if that's the meaning of the question.
Q That is the meaning of the question.
A Okay, yeah.
Q And is it also correct that DCAA decided that it could not provide an audit for the reasons that were reflected in the exhibits that we have discussed previously?

Page 66

A Mr. Butler, could you repeat the question again?
Q Let's be more specific.
In Exhibit No. 3-- this is your January 17th, 2006 e-mail to Mr. Dinackus, Mr. Alumbaugh and Mr. Young.
You indicated that "SSA's claim for profit depends on factors outside the scope of audit expertise such as risk determination and legal questions of entitlement."
Is that one of the reasons that DCAA chose not to provide an audit opinion?
A Yes. I think that pretty much says it all there in that sentence.
Q Okay. With respect to Exhibit No. 5 that we were just looking at, and this is a one-page exhibit, you make reference in your e-mail at the bottom of the page, you say, "As we discussed on November 28th."
Do you see that?
A Yes.
Q Do you recall what that reference was to?
Was there a conference call or a meeting on the 28th?
A I think we had a meeting-- a teleconference with USAID.
Q Do you recall who participated in that

Page 67

teleconference?
A I believe it was myself, Keith Mullen, Mr. Alumbaugh, Mr. Young, and Mr. Dinackus. I believe those were the participants.
Q What did you discuss?
A We discussed the engagement and the procedures that we can do or would do or should do.
Q Do you recall any more specifically what was discussed?
A No.
Q Is there anything that you haven't already told me about that teleconference that you remember?
A Not at this time, no. I think I've told you pretty much everything.
Q There is a reference just below that. You say, "We would like to conduct another teleconference to go over the draft acknowledgment and procedures."
Do you see that?
A Yes.
Q Did you hold a later teleconference?
A I believe we held a teleconference with them after this date. I don't recall whether we held a teleconference specifically that I'm referring to or asking for here, but I would recollect that the next teleconference we had with them or the next

Page 68

teleconference we had with USAID or Mr. Dinackus, we would have talked about the draft acknowledgment and procedures, et cetera.
Q Do you have any recollection of what was discussed at that later teleconference?
A Not specifically, no.
Q Do you have any general recollection?
A None, other than what I just told you.
(Exhibit No. 6 marked for identification.)

Q (By Mr. Butler) Mr. Munro, I am handing you a document, a single-page document marked DCAA 02026 marked as Exhibit No. 6.
Mr. Munro, do you recognize this document?
A Yes, I do.
Q In the lower right-hand corner there is a box that says, "auditor" and "date," and across from "auditor" it says, "SSM."
Are those your initials?"
A Yes.
Q Did you draft this document?
A Yes.
Q Tell us, please, what this is.
A I believe it is, as titled above, excluding-- if you

Page 69

can overlook the typo in the heading there, which is pretty darn embarrassing, I believe it's notes from a meeting on February 8th, 2006.
Q Do you recall who was at that meeting?
A I believe I was at that meeting and Robert Skaggs, and I believe Bob Watters was at that meeting, and John Aldaya may have been at that meeting.
Q What was the purpose of that meeting?
A The purpose of that meeting was to go over information and data and whatnot that SSA Marine provided to us in response to a request for data and information that we had made on January 10th of 2006.
Q Is the italicized language towards the top of the page a restatement of the request that you made to SSA?
A Yes, I believe so.
Q And then the nonitalicized block paragraph immediately below that that begins, "SSA provided CFY 2002, 2003," what is that nonitalicized paragraph?
A Those would be my notes on what we received and sort of a summation of the explanation we received from SSA.
Q The second sentence of that paragraph reads, "The financial statements include operations such as warehousing, trucking, and IT services (selling





58cade0b-fa42-406d-9495-f159b826533c

in-house developed software to third parties) as well as stevedoring operations, so that affects comparability."
When you noted that that affected comparability, what did you mean?
A I believe what I wrote there was a summary of what SSA Marine told us when they provided the financial statements.
Q In your report did you rely upon company-wide financial statements to reach some of your presented findings?
A Mr. Butler, I have difficulty with the word "rely," since all we did was gather information and do some procedures on it and report or set it out in our report, so we made no-- we didn't indicate whether we really were relying on anything.
I would say we used it. I guess that's what I can say there.
Q Let's look back at Exhibit No. 1, which is your report, and, in particular, I would ask you to begin on Page 12.
Under No. 1, "Summary of findings," are there findings with respect to S SA's operating profit percentages and the operating percentages of its parent company?



A Yes.
Q So is it fair to say that you set forth company-wide profit percentages as part of your report?
A It would be fair to say we presented the information from financial statements that SSA Marine gave to us. SSA marine represented those to be company-wide information. That would be fair to say.
Q Did you express any opinion as to whether-- in your report did you express any opinion as to whether it would be either appropriate or inappropriate for any person reading the report to attach significance to these company-wide figures?
A I would say no.
Q Is it your intention in the report that someone reading the report, in fact, attach significance to these company-wide figures?
A No. It's not our intention to tell people what to think in response to it. We're simply reporting what we found and leave it up to the user of the report, our customer, the person who requests this, to draw their own significance and use it in the way that they believe they should use it.
Q Does that mean that the interpretation of the report is entirely up to the user?
A Interpretation of the report? I guess to the extent



that any reader of any report would interpret it in a certain way, yes.
Q Did SSA advise you that they did not believe that it was appropriate to look at company-wide profit margins in the context of this exercise?
A I don't recall whether they told us anything about whether it would be appropriate or not.
I do recall the comments we were given, as shown on Exhibit No. 6, that we spoke about just now about things included in there that affects comparability.
Q When you say "affects comparability," what do you mean?
A That was not my statement. I was simply summarizing here what SSA Marine told us.
Q Did Mr. Watters or anybody else at SSA Marine advise you that the overall profit margins for SSA and for its parent company were not representative of its typical profit margins with respect to stevedoring and marine terminal operations?
MR. POIRIER: Could you read back that question, please?
(Question on Page 72, Line 15-19 read by the reporter.)

MR. POIRIER: Objection; vague. There's



an "it" in there that I have no idea what it's referring to.
MR. BUTLER: Read back the question, and please listen carefully and answer if you understand the question.
(Question on Page 72, Line 15-19 read by the reporter.)

MR. POIRIER: Same objection--
MR. BUTLER: I understand your objection. Please answer the question.
MR. POIRIER: Let me make the objection for the record.
There's a reference to two different companies, apparently, SSA and the parent company, and then of it not being representative of it, and I can't tell which of the two or some third party is being referred to.
It's an incomprehensible question.
THE WITNESS: I don't recall anyone telling me specifically that something was appropriate or not appropriate.
Q (By Mr. Butler) Set aside the issue of appropriateness.
Did Mr. Watters or anybody else at SSA tell you

that the overall profit margins for Carrix and for SSA were not reflective of SSA's profit margins with respect to stevedoring and terminal operations?
A I don't recall specifically, but it's indicated to me that based on Exhibit No. 6, that we were told that the comparability is affected by these operations being included, and so that tells me that they told us this, that these things are included, and that that affects the comparability.
Beyond that, I don't recall anything else specific that we were told as far as comparability of information.
Q Is that question about comparability reflected anywhere in your report?
A To my knowledge, I don't think it is.
Maybe it is; maybe it's not.
Q Why don't you take a look and see if you can find it.
A Mr. Butler, I don't see anything referenced there.
Q Is it standard practice when a company to which agreed-upon procedures are being applied raises a question about methodology, to note that question in the report?
A Well, if there's a question about methodology or any sort of objection to findings or that sort of thing, we ask for those comments at the exit conference.



If we're given comments there, then we will incorporate them into the report.
If we don't receive comments there, then typically we won't incorporate any comments that "I'm objecting to this finding or this methodology" in the report.
Q You didn't answer my question.
My question is: Within DCAA is it standard operating procedure to reflect in a report the subject company's objections to the methodology?
A If they are expressed to us at the conclusion of the audit or given to us when we hold the exit conference and when they-- if they give us a response to audit findings, anything like that, then yes, it is standard procedure to put that in the report.
Q With respect to this exercise-- strike that.
With respect to exit conferences generally, is it standard procedure for DCAA to provide a draft copy of the report to the subject company prior to the exit conference?
A Not in all cases.
Q In which cases is it done and in which cases is it not done?
A In general, if you have an engagement that you've done that supports, for example, a negotiation,



something that's to be settled, and some of the data in there may be speculative or whatnot, and it serves to support the government's negotiation position, then DCAA will typically not provide the report to the entity being audited unless the people who requested the audit from us specifically give us permission to do so.
In that case, in lieu of providing-- this may be more than you asked for, but in lieu of providing that, we will discuss the factual things that we found, things of a factual nature.
In other cases we do provide a copy of the report. This is most typically when we have, for example, an audit of incurred costs where we perform an annual audit of incurred costs for a contractor that has cost reimbursable contracts where they annually submit a-- basically a statement of what their costs are that are incurred on those contracts, a summation of their incorrect costs and calculations and their cost rates and et cetera, and we will go in and audit that.
Since those are all costs that are in the past, incurred, reported on the books, it's all factual, and we provide a copy-- a draft copy of the audit report for comment before issuing our report.



In general, that pretty much covers it there.
Q With respect to the SSA report, was it your understanding that the report would, in fact, be provided to SSA once it was completed?
A Me? No, because I was actually not-- I was out of town when the-- during the wrap-up phrase of things, when the exit conference was held and the audit report was issued.
Q Was it understood within DCAA that the report, in this instance, would, in fact, be provided to SSA?
A I don't know the answer to that, to tell you the truth now. I don't know.
Q Was a formal exit conference held with respect to the SSA report?
A It is my understanding that it was. I wasn't there-- I don't think I was there-- no, I believe I was out of town when the actual exit was held.
I know I was out of town during that period of time.
Q You are not aware of the circumstances surrounding what you're calling an exit conference, are you?
A Some of the circumstances.
Q Are you aware that what you're calling the exit conference was arranged the day of the conference and lasted for approximately one hour?





58cade0b-fa42-406d-9495-f159b826533c

A I was probably aware of that at some point.
Q Mr. Munro, speaking generally, for diversified companies-- do you know what I mean when I say "diversified company"?
A That could mean many things--
Q What does the phrase mean to you?
A "Diversified company" could mean-- well, it could mean many things. Maybe their stock portfolio has lots of diversification--
Q Let me define it for you then.
I'm going to ask you some questions about--
MR. POIRIER: Counsel, I have an eye condition I need to address here.
(Pause in the proceedings.)
Q (By Mr. Butler) Mr. Munro, I am going to define for you a term I will use in a series of questions.
The term is "diversified company," and I mean a company whose business includes a number of lines of business; for example, a company that provides software services and programs as well as warehousing as well as rail transportation as well as trucking transportation as well as stevedoring operations.
Do you understand my definition?
A Yes.



Q Under that definition, do you understand SSA to be a diversified company?
A SSA Marine represented to us that they are in different lines of business, such as the ones I believe you described.
Q Do you have any reason to believe that that representation is not accurate?
A I have no reason to believe that.
Q In general, with respect to diversified companies, is it your experience that some of the operations of such companies are more profitable than others?
A Yes.
Q Did you make any attempt to determine the relative profitability of SSA's various lines of business?
A No.
Q Why not?
A It was not one of the procedures that we did.
Q Does that mean that the report provides no information regarding the relative profitability of SSA's various lines of business?
A No information? There's profitability information in there on-- based on some more detailed data we retained.
It's later in the report, so I can't say--
Q What's the nature of that information that you're



talking about?
A It's the information that's contained in what's called Exhibit B and narrowly starts on Page 17, and the data we present is on 18 and continues on 19.
Q And what types of business activity are described there?
A Well, the type of activity described here is cargo volume, revenue costs on SSA's other commercial work.
Q What's the nature of that commercial work?
A There's cargo handling at ports.
Q And is that the sole activity reflected there?
A Well, to my knowledge it is.
Q Is there anything in the report that discusses the relative profitability of that line of business versus any of SSA's other lines of business?
A I don't think there is, no.
Q Mr. Munro, as long as we have the report in front of us, Exhibit No. 1, I would ask you to turn to Pages 13 and 14 of that report.
Do you see subsection B, "Comparison contracts," about halfway down the page?
A Yes.
Q And below that is there a chart?
A Yes.
Q And on Page 14 is there another chart?



A Yes.
Q Please tell me what these charts represent.
A This is information provided to us by SSA Marine on their other work that they represented to us to be commercial contracts, commercial work.
The work described there-- this is contracts or work or sites, I guess, locations, that are included in their claim documents that SSA Marine submitted to the government as part of the supporting rationale for their claim.
We asked them some additional questions, asked for some additional information, which we then presented in here.
We also presented here information on the USAID contract.
Q In these two charts do you compare the services required under the USAID contract to the services required under the other SSA contracts that were used for comparison purposes?
A We show the information side by side, and if that's what you mean by "comparison," then yes.
Q Did any of the comparison contracts require SSA to perform the same scope of services as SSA was required to perform under the USAID contract?
A Well, not entirely, no, as I recall here, and I think

there's information here on scope.
There were some similarities, but there were also some dissimilarities.
Q Did the Umm Qasr contract require more services than the comparison contract or fewer services?
A Mr. Butler, I'm not sure I could give you a definitive answer on that, just as me looking at the information here. It appears that the services were different, and to the extent that they're different, maybe they're more, but I'm not an expert on every facet of what SSA Marine does on their other work-- in this work, so to say it's more or less, I couldn't say.
Q Is there anybody on the DCAA team, that worked on this report, that analyzed-- strike that.
Is there anybody on the DCAA team, that worked on this report, that compared the scope of work at Umm Qasr under the USAID contract to the scope of work performed by SSA under other contracts?
A Anybody on the DCAA team that compared it to these contracts? Is that what you mean?
I think I was the only one that was actually working with this information.
Q What I'm trying to get to is this: We have two charts that indicate that some things were done at



Umm Qasr that were not done under other contracts; is that correct?
A Yes.
Q What I'm trying to ascertain is whether there's any information within the knowledge of anyone on the DCAA team that goes beyond what's represented in these charts.
MR. POIRIER: Objection; vague.
Q (By Mr. Butler) I don't know how to be any more specific.
I'm looking at two charts that summarize certain findings--
MR. POIRIER: You don't need to argue. The witness will answer if he can, and we can just go forward.
MR. BUTLER: I think you're right that the record needs to be clear on this.
Q (By Mr. Butler) Mr. Munro, other than the information that is presented on the charts on Pages 13 and 14, is there any other information in the possession of anyone on the DCAA team, that worked on this project, with respect to comparability of the scope of work at Umm Qasr versus any other SSA contract?
MR. POIRIER: Objection; vague.



THE WITNESS: I believe we presented what we have here.
Q (By Mr. Butler) Is there anything that you didn't present?
A This is summarized.
I think the gist or the meaning or everything we have is presented here.
Q And with respect to this subject matter, were you the primary staff person that worked on this issue?
A Yes.
Q Did anyone else work on this issue?
A Not to the extent of the auditor actually working, you know putting it together and that sort of thing, no. As far as work with it, if you mean like subsequent supervisory review and that sort of thing, then Keith Mullen did that supervisory review.
To the extent there was any further management review, then Debbie Yee, the branch manager, Susan Barajas, the regional audit manager, I presume they reviewed the work and/or information presented in the report as part of their review.
I don't know if that's what you mean by "work with it."
I was the one that obtained the information and put it into the chart here and here.



Q To your knowledge did any of those management personnel make any changes to the charts that you put together?
A I don't recall that, no.
Q Mr. Munro, with respect to each of these charts, is it correct that the seventh row is profit per ton?
A Profit per ton, yes.
Q And then for each of the contracts, other than the USAID contract, there is a number provided; is that correct?
A Yes.
Q And for those comparison contracts, is it your understanding that SSA computed profit as the difference between revenues and direct cost?
I'll give you a hint, if you look at the bottom text on Page 14--
A Note 3?
Q Yes.
A Your question was do I understand the profit to be the difference between revenues and direct costs, and the answer is yes.
Q I want to turn back to something that you brought to my attention a minute ago.
I would like to turn to Page 17 of the report.
A Okay.

Page 86

Q Now, the columns that we've just been talking about dealt, in part, with comparing services under the various contracts, correct?
A Yes.
Q In addition to that comparison, did you also set forth data with respect to SSA's profit under contracts, other than the USAID contract?
A In the tables on Page 18 and 19, there is data presented there that we have headed up as profit/loss.
Q And how did you arrive at these figures?
A They contained accounting data from SSA Marine, and we subtracted direct costs and revenue and came up with a profit loss before G&A and then applied a G&A, general administrative expense, and that was just an estimated calculation on our part, using information from SSA's financial statements, and--
Q What was the estimated G&A percentage that you applied?
A 36.8 percent.
Q Are you aware of the percentage G&A that SSA Marine was allowed under its USAID contract?
A I don't recall the specific rate that was allowed, but I am aware there was a ceiling on it, and what comes to mind is ten percent.

Page 87

Q Is that ten percent figure reflected on Page 24 of the report?
A Yes, it is.
Q And is 36.8 percent the same thing as ten percent?
A It is not.
Q I would like to direct your attention to the bottom of Page 20, please.
A (Witness complies.)
Q There is a table at the bottom of Page 20.
Can you tell us what information this table sets forth?
A Mr. Butler, I need to refer to my own copy of the report that's marked up here because-- this section here actually Robert Skaggs produced, and so this isn't mine.
Q Are you familiar with the methodology that was used here?
A I don't recall it offhand. I could ascertain it, I guess, here.
Q Well, I think then probably we have another issue that we need to talk to Mr. Skaggs about.
I suppose we'll do both of these together with him.
A Can I interject?
THE WITNESS: Mr. Poirier, is it all

Page 88

right if I ask Robert a question or would you prefer I do not?
MR. POIRIER: You can because you're representing the United States, but if you want to ask the question-- and it's in response to one of the questions that's been posed by Mr. Butler, right?
THE WITNESS: Yes. In fact, it relates to my response to one of Mr. Butler's questions.
MR. POIRIER: To that extent.
Mr. Butler gets to ask the questions--
MR. BUTLER: I have no objection so long as it's on the record.
THE WITNESS: Robert, is that right? Does that sound right to you, this was something you did?
MR. SKAGGS: Yes.
THE WITNESS: That's the question, and Robert answered "Yes."
Q (By Mr. Butler) Thanks for that clarification.
You made reference to a copy of the report that you have?
A Yes.
Q Does that have some notes on it?
A That has notes on it that I made not today but earlier.

Page 89

Q May I see that, please?
A Well, just a moment.
The only reason I'm doing this is because if it has anything on it that-- like let's say I wrote on the back of it notes about some other audit for some other company--
Q I understand.
THE WITNESS: Mr. Poirier, I would like to let you know what the notes are that are on here.
Is that okay or am I screwing up here?
MR. POIRIER: That's fine. Let the counsel see the notes. When it's my turn to ask questions, I will ask you a question, and you can explain your notes.
MR. BUTLER: What I would suggest is let's take a ten-minute break, let me take a look at this and see if I have any questions of Mr. Munro with respect to the notes on his copy or whether I have any other questions, and if not, then I have two areas that have been identified as being within Mr. Skaggs' expertise, and I would like to finish up by asking him just a few more questions, and then we'll be done.
Does that make sense?
MR. POIRIER: Yes.





58cade0b-fa42-406d-9495-f159b826533c

(Recess 11:56 to 12:05 p.m.)

Q (By Mr. Butler) Mr. Munro, I have a couple more questions.
We talked a minute ago about the charts on Pages 18 and 19 of the report, correct?
A Yes.
Q On Page 18, this is a profit and loss matrix with respect to breakbulk cargo, correct?
A Yes.
Q And is it your understanding that the scope of services rendered with respect to this sample of breakbulk operations was stevedoring only?
A I do recall that SSA Marine told us and described to us, in general terms, the services provided with breakbulk operations, but I don't recall specifically now whether that's what it was, breakbulk only or involved stevedoring--
Q I'm not talking about breakbulk in general. I'm talking about the sample of breakbulk locations that are summarized in the table on Page 18.
Do you recall what SSA Marine told you about the scope of services provided at the location summarized on Page 18?
A I don't recall that they described the scope of



services provided at each of these locations.
Q Did you ask?
A Yes, not specifically though about each of these locations, but what is-- in general, what is the scope of breakbulk services, we asked that.
Q Do you know what "breakbulk" is?
A I'm recalling now that breakbulk is-- as I recall now, it is stuff other than what's in containers. If it's not containerized, it's breakbulk.
I think that's what the main difference was.
Q Is that in any way a description of a service?
A What do you mean now?
Q You just told me what breakbulk is. Is your definition of breakbulk in any way a description of a service that is provided with respect to cargo?
A No.
Q So do you have any idea what services were provided with respect to the breakbulk cargo described on Page 18?
A The breakbulk services, as I understand, had to do with just handling cargo that was not in containers, in general.
Q Do you have any idea of the scope of handling that was involved with respect to the locations identified on Page 18?



A As I recall right now, I don't have a specific recollection of what the services are.
I believe it was handling the cargo-- getting it off the ships and putting it into warehouses or loading it onto trucks or doing whatever it took to transfer cargo off a ship to-- not to its ultimate destination but either to vehicles taking it somewhere or warehouses where it was going to be held for pick up or transportation or doing the reverse in the case of getting the cargo from there to the ships.
Q Are you familiar with the term "first point of rest"?
A No, I'm not.
Q With respect to Page 19, are the figures there-- do the figures there relate to containerized cargo?
A The figures there relate to-- specifically it relates to locations in the data that was provided to us that was marked as "container."
For example, the first item there in the accounting report that we were provided, this first item, Birth 54-55-LA, in that accounting report that SSA Marine provided us, it would have associated with that caption-- there's a field in there that said what sort of operation it was, and this one said, "container," and so it went into this table if it



said "container."
Q Is it your understanding that the revenue figures represented on Page 19 relate to the service of lifting containers on and off of ships?
A That is my understanding, yes.
Q And that those revenues are limited to the service of lifting containers on or off of ships; is that correct?
A I couldn't say myself whether it's limited to that.
It seems to me there were some other things that did happen or could happen, depending on the specific situation, the specific location.
I think that was, in fact, the case with any of this work that's depicted here on 19 and on the previous page, 18.
The exact scope could vary, depending on the customers' needs.
Q Do you have any work papers, notes or other documentation reflecting the scope of services provided with respect to the cargo summarized on Pages 18 and 19?
A No, not to the specific scopes of services provided on each of these.
Q Mr. Munro, how much did DCAA charge USAID for applying the agreed-upon procedures to the SSA





58cade0b-fa42-406d-9495-f159b826533c

Page 94

materials?
A Mr. Butler, I'm not sure I'm allowed to disclose that.
I don't want to be-- I want to answer your question fully, but since that has to do with financial operations of my agency, I honestly don't think I can disclose that to you.
I can look into that and get an answer to you though.
Q That won't be necessary.
Do you know how much--
A Offhand, I don't.
I can get my hands on that information though.
(Exhibit No. 7 marked for identification.)
Q (By Mr. Butler) Mr. Munro, I'm handing you a document that's marked DCAA 00046, and this is Exhibit No. 7.
Go ahead and take a look at that.
A (Witness complies.)
Q Mr. Munro, if you would, take a look at the second page of this document. Take a look at the first paragraph on the top of that page.
A (Witness complies.)

Page 95

Q Is the audit cost for this project reflected there?
A Well, again, I don't feel comfortable--
Q Mr. Munro, you are here under a legal process and you are under oath--
MR. POIRIER: Let's keep our tone of voice in a casual tone.
Q (By Mr. Butler) Mr. Munro, you are here under the legal process, and you are under oath.
I am asking you--
MR. POIRIER: Counsel, motion to strike. We'll have no hectoring and we'll have no lectures.
If you have a question, ask the question. Do not confront the witness.
MR. BUTLER: Counsel, I'm trying to ask a question. I've asked it four times. I have not gotten an answer. I'm going to try one more time.
MR. POIRIER: Ask your question.
Q (By Mr. Butler) Mr. Munro how much did USAID pay DCAA to conduct the agreed-upon procedures exercise with respect to the SSA contract?
MR. POIRIER: Objection; lack of personal knowledge.
THE WITNESS: Mr. Butler, I do wish to answer your question completely and fully. However, I don't believe that I have the authorization to--

Page 96

even knowing that I have this document in front of me, and I'm not trying to be confrontational or anything like that, but I just know that there are restrictions on discussing an internal matter of Defense Contract Audit Agency or any part of the department of defense, and that's the only reason.
I want to cover my butt by not suddenly discussing internal details of this much and this much and this much.
I honestly think it's probably no problem, but I really hesitate to--
MR. POIRIER: Send us a letter asking for that information.
MR. BUTLER: No. I was going to make a suggestion.
The only objection that you have made, Counsel, is that Mr. Munro lacks personal knowledge.
Mr. Munro has indicated he knows the answer to the question, so there is no proper objection pending.
I could require Mr. Munro to answer this question. You have not directed him not to answer the question, and I don't understand that you will.
That said, I understand the sensitivity of Mr. Munro's position. I don't want to put him in a

Page 97

position where he feels as though he is doing something that is inconsistent with his employment agreement, so what I would ask you to do is this: Either make it clear that Mr. Munro will answer the question now or provide me your undertaking on the record that you will provide us a stipulation that we may use in court within the next seven days of the charges that were made by DCAA to USAID for this matter.
MR. POIRIER: Send a letter asking for the information. We'll either respond with the information or with support for some proposition that the information is privileged.
MR. BUTLER: Are you asserting a privilege now?
MR. POIRIER: I don't know if it's privileged or not. I am not handling this case, and I haven't made any inquiries.
I am defending this deposition as a courtesy because you were very concerned to keep to the schedule, and Mr. Dinackus was required, because of the nature of a protest, to attend a hearing in court this afternoon.
I don't see there is going to be a problem here. Just send us a letter asking for the information. We





58cade0b-fa42-406d-9495-f159b826533c

Page 98

will either send you the information or send you support for the proposition that it's privileged.

MR. BUTLER: Mr. Poirier, are you directing the witness not to answer your question?

MR. POIRIER: I am not answering your questions. I just told you what we can do, so you can continue on. If you have a motion to make right now, you can make a motion.

Q (By Mr. Butler) Mr. Munro, are you going to answer my question?

A Not at this time, and I'm sorry.

Q Mr. Munro, as a final discussion, we will return to the issue of how much USAID paid DCAA for conducting this exercise.

That returning to the issue may include re-calling you for the purpose of asking you that question, and to that extent, and that extent only, I'm holding the record of this deposition open.

Do you understand what I've just said?

MR. POIRIER: That is beyond the scope of the deposition notice.

THE WITNESS: I guess as a layperson perhaps I do.

It sounds to me like that means we may need to get together again to ask the question again.

Page 99

Q (By Mr. Butler) If we don't get satisfaction by some other means, and I hope we will.

For now though, I appreciate your time, your cooperation this morning.

A Okay.

MR. POIRIER: Have you released this witness?

MR. BUTLER: Conditionally, as I just said.

MR. POIRIER: Why don't you permit me one or two--

MR. BUTLER: I'm sorry. My apologies.

EXAMINATION OF MR. MUNRO

BY MR. POIRIER:

Q Mr. Munro, would you identify for the record the comments that you had added to your copy of the audit report, and I think it would be appropriate to make a copy of your audit report with those comments and to add that to the record as Exhibit No. 8.

MR. POIRIER: Counsel, are you comfortable with going forward without having that copy made or should we break?

MR. BUTLER: The only notes on that copy

Page 100

are an indication of who was responsible for each of the sections in the report, and that's already been provided to us in the response to the 30(b)(6) deposition, so I don't intend to put the document in the record. I don't think there's anything in his handwritten notes that's relevant to this case, but you're more than welcome to put it in, if you'd like.

MR. POIRIER: Do you think it would confuse the record if he were to refer to Exhibit No. 1 for the page numbers in order to indicate where his notes are?

MR. BUTLER: No, I don't think so, but I don't think it's necessary because the notes are so scant that I don't think it's necessary to put a separate document into the record. I think that would confuse things.

MR. POIRIER: Mr. Munro, take your copy of the audit, and confirm that the page numbers on your copy are the same as to Exhibit No. 1.

THE WITNESS: Yes. In fact, I have them side by side right now, and I'm comparing the page numbering.

If you like, I will tell you what's on each page. It is very brief.

Q (By Mr. Poirier) I want you to tell me the

Page 101

comparable page to Exhibit No. 1 and indicate what the note says.

A Okay. Page 3 I have written where-- the top of the page to the right where it says "Exhibit A," underneath that I wrote in pencil, "Robert."

Page 12, up at the top to the right where it's printed "Exhibit B," underneath that I wrote in pencil, "Sterling except for Note 3.D. on Page 20 is Robert."

Page 20, the middle of the page, it has bold underlines, "D: USAID contract claim profit." Right next to that I wrote in pencil, "Robert."

I have no further notes after that.

Q Do you recall when you made your notes?

A Specifically, no, but just a moment, sir.

I believe I made them about a month ago.

Q And do you recall why you made those notes?

A Yes. I made them so that I would have a quick way of recognizing which sections of the report were mine and which sections were Robert's, and I believe, in fact, I made that prior to a deposition that I attended where Tom Dinackus deposed Bob Watters as just a copy that I could use to follow along with.

Q Do you recall the circumstances under which you got information about profits relevant to the plaintiff





58cade0b-fa42-406d-9495-f159b826533c

Page 102

SSA Marine, Inc.?
A The circumstances under which I obtained information regarding profits of SSA Marine?
Q Yes.
A The circumstances were, and I don't know if this answers your question, it was during this agreed-upon procedures engagement, and it was a situation where we had asked for information, and SSA Marine provided data and information.
Q What person or persons at SSA Marine provided the information?
A Yes.
Q No. What person or persons--
A Oh, what person?
Q Yes.
A With regard to financial statements of SSA Marine and of Carrix, I believe that information was provided to us by Bob Watters and John Aldaya jointly, and with respect to the information that is in Exhibit No. 1 on Page 18 and 19, that information was provided to us by John Aldaya of SSA Marine.
Q Did the information come in the form of documents only or were there oral communications as well?
A That information came in the form of documents.
There was oral communication. However, the

Page 103

information presented in the report, at least in the tables of the report, that was based on the documents.
I guess as far as oral communication, there was oral communication going on all the time, and so I couldn't sit here and say we were silent and just got the documents and worked with them.
Q Did the documents indicate whether various contracts were fixed-priced contracts or cost-reimbursement contracts?
A The documents did not, no.
Q Were there any oral communications concerning whether the documents related to cost-reimbursement contracts or fixed-price contracts or some mix?
A Yes, there was oral conversation on that.
Q Who participated, to your knowledge, in those conversations?
A Myself and Bob Watters.
Q Do you recall the substance of any of those conversations?
A Yes. I asked Bob Watters what contracts, other than the USAID contracts, SSA Marine had that were of a cost type-- cost-reimbursement type nature, and the answer he gave me was that none of their other contracts were of a cost-reimbursement nature. They

Page 104

were all of the nature of fixed-price, fix-rate, which I believe is the term he used.
Q Do you recall when that conversation or conversations occurred?
A It was in January of 2006. The exact date, I don't recall, but I can find that out if you need the exact date.
Q Were the conversations in person or on the telephone?
A Part of the conversation was in person. I believe there may have been a telephone conversation also involved and/or an e-mail-- actually, no. It was-- I actually discussed this with Bob Watters. I believe it was by telephone, and I asked him what the status was of identifying cost-type commercial contracts, and he said that he had discovered that there were not any.
Q In that conversation did he indicate what research he had done in order to reach that determination?
A Not specifically, no.
In general, I believe he indicated very generally that he had looked through and asked around, but I don't recall specifically.
I don't think we specifically discussed what steps he took to ascertain this.
Q Did anyone from SSA Marine ever contradict to you

Page 105

those statements by Mr. Watters?
A Contradict those statements?
Q Regarding the nature of their other contracts.
A No. I believe that was the final word on that from SSA Marine that we got as far as-- because we had the question-- we had asked the question, "Do you have any-- is any of your commercial work cost reimbursable," and I believe that was the final word from SSA Marine in response to that question, that "No," they did not.
MR. POIRIER: No further questions.
MR. BUTLER: I don't have any redirect with respect to those.
Let's turn back to Mr. Skaggs for things that Mr. Munro said Mr. Skaggs participated on.
(Exhibit No. 8 marked for identification.)

FURTHER EXAMINATION OF MR. SKAGGS
BY MR. BUTLER:
Q Mr. Skaggs, I am handing you a document, which is marked DCAA 01497, and this is Exhibit No. 8.
Mr. Skaggs, do you recognize this document?
A Yes.





58cade0b-fa42-406d-9495-f159b826533c

Q Did you prepare this document?
A It is a document of our exit conference.
Q And was that conference held on April 7th, 2006?
A Yes.
Q In advance of that conference, did you provide SSA Marine a draft copy of your report?
A No.
Q Why did you not provide a draft copy prior to the conference?
A We were not going to release a draft copy to SSA.
Q Why were you not going to release a draft copy to SSA?
A That's something my supervisor could discuss with you.
Q Do you know the reason?
A Well, according to what Sterling had said earlier, some things we can disclose and some things we cannot.
Q Do you know the reason why DCAA did not intend to release a draft copy to SSA?
A No.
Q Looking at the first paragraph under the heading, "Notes," do you see that?
A Mm-hm.
Q The third sentence there reads, "We also let them



know that because the report was not finalized, we were unable to share a copy of the full draft report or any notes contained therein."
A Okay.
Q Does that sentence refresh your recollection as to the reason that you did not provide a draft to SSA in advance of the conference?
A Yes.
Q I'll ask the question again then.
Why did you not provide a draft report to SSA in advance of the conference?
A Because it wasn't finalized.
Q When was the report finalized?
A As of the date of issuance, April 14th.
Q So that was one week after this conference; is that correct?
A Yes.
Q Skipping to the fourth paragraph under "Notes"--
MR. POIRIER: May I interject for a moment?
MR. BUTLER: Certainly.
(Pause in the proceedings.)

Q (By Mr. Butler) Mr. Skaggs, I will direct your attention to the fourth paragraph from the top of the



section marked "Notes."
There's a sentence there that reads, "SSA did not agree that we should include the G&A for the company as a whole in the calculation for comparative profit rates."
Do you see that?
A Yes.
Q Do you recall the discussion regarding that issue at the exit conference?
A Vaguely.
Q Tell me what you recall of what SSA said.
A Basically it was something that had to do with the G&A rate, including some other sectors or something like that.
I can't remember.
Q Do you have any other recollection of what was said?
A Not really.
Q "Not really" or "yes" or "no" or--
A No.
Q Mr. Skaggs, I will ask you to turn to Exhibit No. 1, which is the report, and I'll direct your attention first to Page 14, and in particular to Note No. 3, and I discussed this with Mr. Munro, and that note reads, "SSA computed profit is the difference between revenues and direct costs."



Is that a correct statement?
A I don't know because I didn't do this part.
Q Okay. We'll rely on Mr. Munro's testimony with respect to that.
Turn your attention, please, to Page 20 of the report.
A (Witness complies.)
Q Do you see Subsection D there about halfway down the page?
A Yes.
Q Did you do this part?
A Yes.
Q There's a table there on the lower half of Page 20, the last column of which marked "E" is labelled, "Computed profit rate."
Do you see that?
A Yes.
Q Explain to me, please, how you derived the percentage numbers in Column E.
A Well, it wasn't done according to the way you just discussed with the revenues minus direct costs. This was done by taking the invoice amounts that we have on our tables in Exhibit A, taking the tonnages invoiced, and dividing that number into the invoice amount to determine dollars per ton.





58cade0b-fa42-406d-9495-f159b826533c

Page 110

We took SSA's claimed profit rate of $2.20, divided that into the dollars per ton to get a computer profit rate.
Q Did you ever do a similar calculation with respect to the SSA examples that are reflected on Pages 18 and 19 of the report?
A I didn't do any calculations on this part.
Q Are you aware of anybody within the DCAA team that ever ran the same sort of analysis as is depicted on Page 20 against the numbers on Pages 18 and 19?
A I would assume Sterling would have done that, if anybody.
Q Did you ever consider running a computer profit rate analysis of the type depicted on Page 20 against the numbers on Pages 18 and 19?
A No.
MR. BUTLER: Mr. Poirier, I'm kind of getting bounced back and forth.
With your permission, I would like to re-call Mr. Munro for just one more question.

FURTHER EXAMINATION OF MR. MUNRO
BY MR. BUTLER:
Q Mr. Munro, did you run any analysis of the type

Page 111

depicted in the table on Page 20 against the figures on Pages 18 and 19 of the report?
A No.
Q Did you ever consider running such an analysis?
A No.
MR. BUTLER: No further questions.
Mr. Poirier, if you have anything else, the floor is yours, sir.
MR. POIRIER: No further questions.
MR. BUTLER: Subject then to the discussion regarding the open piece of information, which I hope we will be able to resolve, that concludes this deposition.
I thank everyone for their patience and their cooperation.
(Deposition concluded at 12:43 p.m.)
(Signature reserved.)

Page 112

STATE OF WASHINGTON ) I, Terilynn Pritchard, RPR, CRR
) ss CCR # 2047, a duly authorized
County of Pierce ) Notary Public in and for the State of Washington, residing at Auburn, do hereby certify:

That the foregoing deposition of ROBERT SKAGGS AND STERLING MUNRO was taken before me and completed on July 19, 2006, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to Attorney John W. Butler.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 21st day of July, 2006.

Terilynn Pritchard, CCR, RPR
Notary Public in and for the State of Washington, residing at Auburn.