IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SSA MARINE, INC., | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-490C |
| v. | ) | (Chief Judge Damich) |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## DECLARATION OF WILLIAM MACLAREN

I, William MacLaren, make the following declaration in accordance with 28 U.S.C. § 1746:

1. I am currently employed by the United States Agency for International Development ("USAID"). I am assigned as the Deputy Comptroller for USAID/Iraq's Office of Financial Management, located in Baghdad. I have been a Deputy Comptroller with USAID from October 20, 2005 to the present. One of my primary responsibilities is serving as a certifying officer for payment of vouchers submitted by contractors to USAID/Iraq. Following review by and approval of a voucher by the Cognizant Technical Officer for the contract and review by a Voucher Examiner in the Office of Financial Management, I review the voucher for accuracy and reasonableness before providing certification for payment. I have worked professionally in the financial management field since 1985 and possess a Masters in Business Administration. Prior to joining USAID in June 2004, I

worked for two years as an auditor for the United States Defense Contract Audit Agency auditing incurred costs under United States Department of Defense contracts. I submit this declaration in support of defendant's motion for partial summary judgment. This declaration is based upon personal knowledge.

2. From March 2003 to December 2003, the USAID/Egypt's Financial Management Office was responsible for making payments under USAID Contract No. TRN-C-00-03-00054-00 ("the Umm Qasr contract" or "contract"). In January 2004, this responsibility was transferred to USAID/Iraq's Financial Management Office and from this date to the present, USAID/Iraq's Financial Management Office has been responsible for making payments under the contract. None of the certifying officers who approved payments to SSA under the contract are presently assigned to USAID/Iraq. However, I have reviewed all records in the possession of USAID/Iraq's Financial Management Office and have determined that, during the contract, SSA submitted vouchers to USAID on a regular basis, stating the costs SSA had incurred performing the contract and seeking reimbursement for those costs, in addition to the payment of a fixed fee. I have reviewed the Office of Financial Management's records and have concluded that, in total, SSA submitted 14 vouchers between July 2003 and December 2005 requesting a total of $13,298,612.81 in costs and fixed fee under the contract. USAID has made 17

payments to SSA under the contract including 14 payments of vouchered costs, two payments of costs disallowed on a previous voucher and one payment of interest on the previously disallowed costs. All payments under the contract were made using this procedure. In total, USAID paid SSA $13,302,649.29, including the reimbursement of $12,860,534.81 in allowable costs, $438,048.00 in fixed fee, and $4,066.48 in interest on the late payment under the contract. Finally, I note that USAID/Iraq's Financial Management Office made a clerical error in processing one payment voucher which resulted in an under payment of $30.00 to SSA.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 13, 2006.

William MacLaren

William MacLaren

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SSA MARINE, INC., | ) |
| Plaintiff, | ) |
| v. | ) No. 05-490C (Chief Judge Damich) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

DECLARATION OF ALVERA REICHERT

I, Alvera Reichert, make the following declaration in accordance with 28 U.S.C. § 1746:

1. I am currently a warranted contracting officer employed by the United States Agency for International Development ("USAID"). I am assigned to USAID/Iraq's Office of Acquisition and Assistance and am located in Baghdad, Iraq. I was assigned as the administrative contracting officer ("ACO") on Contract No. TRN-C-00-03-00054-00 ("the Umm Qasr contract"), from December 2003 to March 2004 and from May 2005 to Present. Pursuant to the Umm Qasr contract, SSA Marine, Inc. ("SSA") operated the Port of Umm Qasr in Iraq from approximately May 23, 2003 to approximately June 30, 2004. As the ACO, I am responsible for the contract administration functions listed in Title 48 Code of Federal Regulations, Federal Acquisition Regulation System, Part 42, Subpart 42.3 (Contract Administration Office Functions) Section 302. I submit this declaration in support of defendant's motion

for partial summary judgment. This declaration is based upon personal knowledge.

2. The Office of Acquisition and Assistance at USAID/Iraq is responsible for administering the Umm Qasr contract. I have checked the Office of Acquisition and Assistance's files and have concluded that USAID has received one claim from SSA with regard to the Umm Qasr contract. That claim addresses extra profit that SSA is seeking with regard to the contract. Based upon my personal involvement as the ACO for the Umm Qasr contract and my review of this Office's files, I conclude that USAID has not received any claim from SSA that addresses the costs of performing the Umm Qasr contract.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 12, 2006.

Alvera Reichert

Alvera Reichert

Sher & Blackwell
ATTORNEYS AT LAW
Suite 900 • 1850 M Street, N.W. • Washington, D.C. 20036
Telephone: 202.463.2500 • Facsimile: 202.463.4950 • www.sherblackwell.com
A LIMITED LIABILITY PARTNERSHIP

Writer's Direct Dial:
(202) 463-2510/2516

July 26, 2004

**Via Electronic & Express Mail**

Tad Findeison
Contracting Officer
USAID Iraq Mission
APO AE 09316
Baghdad, Iraq

Re: Contract No. TRN-C-00-03-00054-00
CONTRACT DISPUTES ACT CLAIM

Dear Mr. Findeison:

We are writing on behalf of our client SSA Marine, Inc. ("SSA") for purposes of submitting a formal claim under the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, for $4,400,004.40 plus interest. The claimed amounts are due and owing to SSA under Contract No. TRN-C-00-03-00054-00 ("the Contract") as a result of the Agency for International Development's ("USAID") failure to comply with the terms of Section C.III.3 of the Contract. Specifically, USAID failed to comply with the funding provisions set forth in the clause entitled "Financing Port Operations." Pursuant to the explicit terms of this clause, USAID was required to provide start up funds and working capital for the port. Once the port was operational and able to generate revenue, certain aspects of the Contract—port operation costs and contractor profit—were to be funded from the port revenues. USAID, however, refused to provide working capital and refused to permit the use of port revenues as required by the Contract. Although USAID ultimately reimbursed port operation costs through other means, it never approved contractor profit as required by the Contract. As a result, although SSA has fully and successfully performed the Contract under extremely difficult conditions, it has not received full and fair compensation for its services.[1]

[1] Although USAID ultimately reimbursed SSA for port operation costs, the Contract clearly did not anticipate that SSA would have to front the money for those costs in the first place. The Contract clearly provided for USAID to provide start up capital for the initial costs and for later costs to be funded through port revenues. Instead SSA was forced to advance the money, resulting in a situation where SSA was essentially providing USAID with an interest free loan. Although USAID is liable to SSA for the costs associated with providing this funding, including interest on the amounts advanced, for the sake of narrowing the issues and simplifying the claim, SSA has chosen not to include those damages in this claim.

There are no other prerequisites to SSA receiving an agreed upon profit from those revenues.

Even if we assume for the sake of argument that USAID's interpretation of the provision had any merit (which it does not), SSA did provide additional services not contemplated when the Contract was executed. The Contract anticipated that SSA would only operate the port on an emergency, short term basis. (See Section C.III.3, quoted above at part I.B). Instead, SSA operated the port for more than a year. Control of the port was transferred to SSA on May 21, 2003. (See Ex. 2 & Ex. 3) and was transferred to the Iraqi Port Authority in stages commencing on May 29, 2004, and continuing until completion of the Contract on June 30, 2004. At no time during this period did USAID advise SSA to cease operations under CLIN 003. Such long term management went far beyond what was originally anticipated by the Contract.

Further, the Contract anticipated that SSA would manage the port solely to facilitate the movement of humanitarian goods and reconstruction materials and supplies into Iraq. (*See* E-Mail message from Deborah Simms to John Walsh dated June 12, 2003, Ex. 14). SSA was, however, ordered to open the port to commercial operations as well. (*See* Ex. 15). These operations accordingly also constituted additional services performed by SSA to serve Umm Qasr.

3. *Profit was mandatory, not payable only at the contracting officer's discretion.*

The terms of the Financing Port Operations clause are mandatory, not discretionary. The clause states that:

> . . . contractor profits <u>shall</u> be obtained from fees and charges to carriers and cargo owners. USAID <u>shall approve</u> . . . the level of contractor profit from operations . . .

Section C.III.3. (emphasis added). Thus, the Contracting Officer's statement that: "USAID would <u>consider</u> paying SSA additional profit, <u>perhaps</u> paid from port revenues" (emphasis added) is in direct conflict with the plain language of the Contract. SSA proposed a reasonable level of profit to be earned on a fixed-price, per tonnage basis. (*See* Ex. 5). The reasonableness of the proposed $2.20 per ton profit level was never challenged. As such, the Contracting Officer was obligated to approve the profit. Its failure to do so was a breach of the Contract resulting in significant financial loss to SSA.

4. *Payment of profit under the FPO Clause would not result in a violation of the statutory requirement that profit not exceed 10% of the total contract price.*

As discussed above, the profit due under the FPO clause is separate from the CPFF portion of the Contract. The profit relates to aspects of work that were not covered by the cost estimates and resulting fixed fees. Since the profit due is not related to the CPFF portion of the Contract, the 10% limit is not applicable. Even if it

fixed fee, would have been significantly higher than the $3 million/$300,000 reflected in the proposal. In fact, the amount of any cost estimate that covered all of the planned-for port operations would almost certainly have been even higher than the actual costs of $14 million, given the uncertainties at the outset as well as the fact that USAID, for its own reasons, decided after operations began not to modernize or equip the port as originally intended.

**III. Conclusion**

For all of the above reasons, SSA respectfully requests the Contracting Officer to issue a final decision that SSA is entitled to payment of $4,400,004.40, plus interest (*See* Exs. 5 & 16—setting forth the rate per ton and total tonnage).

Sincerely,

John W. Butler
Heather M. Spring
Sher & Blackwell, LLP
1850 M Street, N.W.
Suite 900
Washington, D.C. 20036

*Counsel for SSA Marine, Inc.*

cc: Anne Quinlan
John Abood
(Via E-mail & Courier)