IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SSA MARINE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Civil Action No. 05-490C<br>(Chief Judge Damich) |

**PLAINTIFF'S OPPOSITION TO THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND**
**PLAINTIFF'S REQUEST FOR ORAL ARGUMENT**

John W. Butler
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2510 (tel)
(202) 463-4950 (fax)

Of counsel:

Heather M. Spring
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2516 (tel)
(202) 463-4950 (fax)

## TABLE OF CONTENTS

**Page**

QUESTION PRESENTED .......... 2

STATEMENT OF THE CASE .......... 2

SUMMARY OF ARGUMENT .......... 12

ARGUMENT .......... 16

1. The Government Ignores the FPO Clause and Thus Ignores the Plain Language of the Contract; the Government Fails to Give Meaning to All Parts of the Contract. .......... 17

2. The Government's Arguments Are Either Irrelevant or Foreclosed By Controlling Judicial Precedent. .......... 18

   *a. The Contract Label Does Not Control.* .......... 18

   *b. Clauses Associated with the Cost Reimbursement Portions of the Contract Are Irrelevant to the Plain Meaning of the FPO Clause.* .......... 19

   *c. The Government's Breach of the Contract Does Not Change the Contract's Plain Language.* .......... 20

   *d. The FPO Clause is Permissible Under Federal Procurement Law.* .......... 21

   *e. The Government's Interpretation Would Render the Contract Illegal Under Fluor Enterprises.* .......... 25

3. Neither the FAR Nor Federal Acquisition Statutes Apply to the FPO Clause. .......... 28

   *a. The April 2003 Supplemental Appropriations Bill Excluded the Contract From the Procurement Statutes and Regulations.* .......... 29

   *b. The FAR and the Procurement Statutes Do Not Apply To Nonappropriated Funds Contracts.* .......... 30

CONCLUSION .......... 32

# Table of Authorities

Page

**Cases**

*ACE-Federal Reporters, Inc. v. Barram,* 226 F.3d 1329 (Fed. Cir. 2000) ........ 25

*Crown Laundry and Dry Cleaners, Inc. v. United States,* 29 Fed. Cl. 506 (1993) ........ 19

*Fluor Enterprises, Inc. v. United States*, 64 Fed. Cl. 461 (2005) ........ 25, 26, 27

*Furash v. United States*, 252 F.3d 1336 (Fed. Cir. 2001) ........ 32

*Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384; 351 F.2d 972 (1965) ........ 18

*Hunt Construction Group, Inc. v. United States*, 281 F.3d 1369 (Fed. Cir. 2002) ........ 18

*J. Cooper & Associates v. United States*, 53 Fed. Cl. 8 (2002) ........ 25

*Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110 (1954) ........ 23

*Lomas & Nettleton Co. v. United States*, 1 Cl. Ct. 641 (1982) ........ 17

*LSi Serv. Corp. v. United States*, 191 Ct. Cl. 185; 422 F.2d 1334 (1970) ........ 19

*Maintenance Eng'rs v. United States*, 749 F.2d 724 (Fed. Cir. 1984) ........ 19

*PCL Construction Services, Inc. v. United States*, 47 Fed. Cl. 745 (2000) ........ 2

*Rumsfeld v. Freedom NY, Inc*., 329 F.3d 1320 (Fed. Cir. 2003) ........ 20

*Veit & Co., Inc. v. United States*, 56 Fed. Cl. 30 (2003) ........ 17

**Statutes**

10 U.S.C. § 2306 ........ 23

41 U.S.C. § 254 ........ 23, 31

41 U.S.C. § 254(a) ........ 23

41 U.S.C. § 254(b) ........ *passim*

41 U.S.C. § 259(c) ........ 31

41 U.S.C. § 403 .......... 31

41 U.S.C. § 403(16) .......... 15, 31

41 U.S.C. § 405(a) .......... 23

Public Law 108-11 .......... 29

**Regulations** (FAR)

48 C.F.R. § 1.102-4(e) .......... 22, 28

48 C.F.R. § 2.101 .......... 31

48 C.F.R. § 16.102(b) .......... 21, 22

48 C.F.R. §§ 16.401-16.406 .......... 24

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SSA MARINE, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Civil Action No. 05-490C (Chief Judge Damich) |

**PLAINTIFF'S OPPOSITION TO THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**AND**
**PLAINTIFF'S REQUEST FOR ORAL ARGUMENT**

Plaintiff SSA Marine, Inc. ("SSA") respectfully submits this opposition to the Motion for Partial Summary Judgment filed by the government on October 13, 2006. SSA requests oral argument on the motion.

The government seeks an order holding that the contract that is the subject of this Contract Disputes Act case is solely a cost-plus-fixed-fee contract that is subject to a statutory profit cap of ten percent. Because the portion of the contract at issue is not a cost-plus-fixed-fee arrangement, and because the contract and its operative clause are not in any event subject to the FAR or to the statute that generally applies a ten percent cap to cost-plus-fixed-fee contracts, SSA respectfully urges the Court to deny the government's motion and to rule that SSA's profit under the subject contract is not limited to ten percent of the contract cost.

## QUESTION PRESENTED

The government has moved for summary judgment on two questions: (1) whether the contract was a cost-plus-fixed-fee contract, and (2) whether SSA's profit is limited to ten percent of the estimated cost of performance. Government Motion at 1. The government's statement of the first question is imprecise in a way that obscures the central issue in the case. The real question is whether the contract was *solely* a cost-plus-fixed-fee contract. The parties agree that compensation under the contract was at least in part governed by a cost-plus-fixed-fee arrangement. This dispute centers on whether the contract also included an additional, separate compensation mechanism. SSA believes that the relevant question for summary judgment is more properly stated as follows:

1. Whether the compensation arrangement provided for in the "Financing Port Operations" clause of the contract, which provides that contractor operating costs and profit shall be derived from port revenues, should be given effect separate and apart from the cost-plus-fixed-fee provisions in the contract.

## STATEMENT OF THE CASE

"The language of the contract must be given the meaning that would be derived from the contract by a 'reasonably intelligent person acquainted with the contemporaneous circumstances.'" *PCL Construction Services, Inc. v. United States*, 47 Fed. Cl. 745, 784 (2000), *quoting Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 752 (Fed. Cir. 1999). Because the contract at issue is quite unusual, and because it is unusual as a result of the circumstances in which it was negotiated, understanding those circumstances is necessary to understanding the contract.

The contract was part of the United States humanitarian and infrastructure rebuilding effort associated with its invasion of Iraq in early 2003. Under the contract, SSA was obligated to complete three classes of work if requested to do so under the contract. Each of the three stages of the contract was described in a separate contract line item, or "CLIN." CLIN 001 required SSA to conduct an assessment of the Iraqi port of Umm Qasr. This was to be done very quickly – in approximately two weeks. CLIN 002, also to be performed quickly, required SSA to create a plan, consistent with the CLIN 001 assessment, to implement necessary port improvements. The plan was to include "a detailed work plan, together with the details, personnel requirements, material needs and specifications, implementation method, training needs, and budget for the work to be undertaken." CLIN 003 required SSA, in the event that USAID so directed, to manage and operate the port. The contract provided that "[t]he contractor shall be prepared to accept this task within four weeks of contract inception." JPSR,[1] Ex. 3 (Contract Section C.III.3). Between the time the contract was signed in late March of 2003 and mid-May of that year, SSA satisfactorily completed CLINs 001 and 002. In May of 2003, USAID directed SSA to take over management and operation of the port. SSA did so, and successfully operated the port until June of 2004. Defendant's Proposed Findings of Uncontroverted Fact, ¶ 15.

The contract for assessment and operation of the Port of Umm Qasr was negotiated during a short period in February and March of 2003. At the time of the negotiations, neither USAID nor SSA knew what conditions the contractor would find at the port after the commencement of military operations by the United States and its allies.

[1] "JPSR" refers to the Joint Preliminary Status Report filed by the parties on October 11, 2005. Citations to "JPSR, Ex." are to the Exhibits to the JPSR.

*See* JPSR at 6, ¶ h.4 (facts not in dispute) ("It was not possible to accurately estimate the total costs for operating the port pursuant to CLIN 003 at the time the parties entered into the contract."). Because conditions were unknown, it was not possible to determine before contract award what actions and improvements would be necessary in order to open the port to vessel traffic and to accommodate the transfer of cargo from vessels to trucks and trains that would deliver the goods inland. It was precisely because of this lack of information regarding contemporaneous conditions that CLINs 001 and 002 of the contract called, respectively, for the contractor to evaluate the port and to create a plan to bring it to an acceptable level of productivity.

The lack of knowledge regarding the operating conditions at the port also made it impossible to determine in advance what tasks and costs would be involved in the event that USAID activated CLIN 003 and directed SSA to operate the port. That inability to predict the nature and scope of the work gave rise to the unique contract provision that is at the heart of this dispute. Because of the uncertainty, and because the government wished to provide an incentive for companies with the requisite experience, expertise, and management capability to respond to the solicitation, USAID placed two compensation provisions in the contract with respect to the CLIN 003 work. *See* Pl. App. 4, 7 (Abood Tr. at 36-37, 49).[2]

The first CLIN 003 payment mechanism is the one on which the government solely focuses in its brief. That mechanism was a cost-plus-fixed-fee provision that covered only the man-hours that the contractor proposed for a basic complement of in-

[2] "Abood Tr." refers to the transcript of the May 25, 2006, deposition of Mr. John Abood of USAID. Mr. Abood drafted the SSA contract. Pl. App. 2 (Abood Tr. at 11).

house management and operational personnel (twelve individuals in all) that it described in its proposal. That cost reimbursement mechanism in CLIN 003 did not, however, address any costs beyond the proposed in-house man-hour costs.[3] It did not, for example, address any subcontracted stevedore, clerking, security, administrative, or other labor, skilled or unskilled, that would be necessary to actually move cargo over the port. Similarly, the cost reimbursement and associated fixed fee provision in CLIN 003 did not address costs for equipment, dredging, buildings, office supplies and computers, water, fuel, electricity, cargo cranes, repairs to wharves and docks, etc. associated with the required CLIN 003 work. *See* JPSR at Ex. 3 for a complete list of CLIN 003 tasks. Tasks associated with all of those operations and infrastructure components were contemplated in the description of work under CLIN 003, but no cost items for those tasks were included in the limited cost-plus-fixed-fee provision in CLIN 003. The reason for that omission was simple; it was impossible to estimate such costs before the contract was awarded and before the contractor arrived at the port and conducted its assessment and prepared it operations plan.

Because it was not possible to estimate costs beyond a very limited portion of the labor requirement, the solicitation and the contract included a second payment clause for CLIN 003 work. This was the “Financing Port Operations” or “FPO” clause, under which plaintiff has made its claim for profit. This provision, which the government sets forth in its proposed findings of uncontroverted fact, but which it inexplicably does not discuss in its brief, reads as follows:

[3] The man-hour related costs included wages, fringe benefits, as well as per man monthly allowances for food, housing, vehicles and travel. *See* Pl. App. 43-46.

> Financing Port Operations: In the event that USAID directs the contractor to manage and operate the port, start up funds and working capital to begin implementation of the operation plan shall be provided by USAID. Start up capital shall be provided to cover initial facility and equipment replacement and repair as proposed by the contractor and approved by USAID from the port assessment, improvement plan and operational plan. Start up working capital shall be provided to cover initial operation of the port. After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners. USAID shall approve the fee and charge schedule and the level of contractor profit from operations. The contractor shall present USAID with monthly financial statements outlining the costs, revenues and profits from operations. The contractor shall maintain separate bank account(s) and records regarding port costs and revenues under this contract. To the extent that revenues exceed costs and negotiated maximum profit margin or level, USAID shall determine the use of any remaining funds in the port operation accounts.

SSA understood that the FPO clause provided a payment mechanism and a source of profit that was separate and distinct from the limited fixed fee associated with the CLIN 003 in-house man-hour costs.[4] That understanding was derived from the clause itself and from USAID's contemporaneous explanation of the meaning of that clause. Section L.8 of the solicitation ("Instructions for the Preparation of the Cost Proposal") included the following instruction to offerors with respect to the FPO clause:

> **Part 7 Operations Financing Plan** (prime) – The offeror shall submit include [sic] a statement of your agreement with the CLIN 003 operations financing plan -- USAID will provide start up financing, working capital and operating working capital, overhead and profit for the contractor covering initial start-up costs, and the contractor shall generate future port working capital, overhead and profit from port fees and charges.

Pl. App. 41. In response to this request for a statement of agreement with the two-part compensation structure in CLIN 003, SSA submitted the following:

> SSA agrees with this concept based on the following:

[4] *See* Pl. App. 92 (Watters Decl. at ¶ 6); *see also* Pl. App. 4, 7 (Abood Tr. at 36-37, 49).

- USAID continues to pay for SSA staff costs
- USAID and SSA mutually agree to a business plan outlining forecasted volumes, revenues and costs to agree on the tariffs and profits.
- If there is a 10% or greater drop off in cargo vs. the mutually agreed to forecasts, then USAID and SSA will renegotiate tariff rates to bring the actual P/L more in line with the originally agreed to business plan numbers.
- SSA is not responsible for capex purchases of any equipment nor will the purchase of any equipment, financed and paid for out of working capital be required to go against SSA's balance sheet.

Pl. App. 48 (SSA Proposal at Part 7, page 1).

In addition, SSA expressed its pre-award understanding of the relationship of the FPO clause to overall profit under the contract by responding to a statement regarding profit in the solicitation (also contained in section L.8):

> **Part 6 Profit** (prime/subcontractors) – The offeror and each major subcontractor shall include the profit/fee proposed for this effort.

Pl. App. 41. SSA's response reads:

> SSA is willing to accept this 10% of total project cost profit figure for CLIN 003 provided SSA and USAID can come to a mutual agreement on:
>
> 1. SSA being able to generate profit from CLIN 003 operations, and
> 2. the form and or amount of profit SSA can make on operations associated with CLIN 003. (e.g. the form to be either on a per ton handled basis, flat fee or other mutually agreed to form)

Pl. App. 47 (SSA Proposal at Part 6, page 1).

USAID did not indicate, in writing or otherwise, any disagreement with SSA's statements in its proposal regarding the meaning of the FPO clause and the availability of CLIN 003 profit from operational revenues. In at least one internal electronic mail message, the contracting officer appears to have understood the contract the same way that SSA did; that is, the contract provided for profit from CLIN 003 operations separate from the limited fixed fee associated with in-house man-hour costs for twelve people.

Anne Quinlan, the original contracting officer, summarized her understanding of how the FPO clause came to be and what it meant in an electronic mail message to John Abood, the USAID drafter of the contract. Ms. Quinlan, making reference to language from the FPO clause that read "USAID shall approve the fee and charge schedule and the level of contractor profit from operations," said:

> John, I need your input on this. I knew that the quoted language was going to get us in trouble. If they are going to take us to disputes, I'm not sure how we will fare. *I know you put it in to get them to sign the contract but it certainly gives the impression that we were acknowledging that there would probably be profit associated with the port fees.*

Pl. App. 28 (Quinlan Tr., Ex. 12) (emphasis added).

Following SSA's submission of its proposal and negotiation of various parts of its cost submission, USAID awarded the contract to SSA. The FPO clause in the awarded contract is the same as the FPO clause in the solicitation. After SSA was directed to assume control of port operations on or about May 23, 2003, SSA began making expenditures necessary for port operations (purchase of fuel, water, vehicles, office supplies, communications equipment, etc.). SSA requested that start-up funds and working capital be provided by USAID as provided in the CLIN 003 FPO clause. Because of increased security threats following the departure of the British Army unit that had been garrisoned at the port, SSA also requested authority to contract for security guards. After repeated SSA requests that such funds be provided, USAID advised SSA that such funds would not be advanced as provided for in the FPO clause. Instead, USAID took the position that funds expended would be reimbursed after the fact. The USAID contracting officer further advised SSA that no such reimbursements would be provided until and unless SSA executed a modification to the contract allocating more

obligated funds to the contract.[5] Despite the fact that the modification simply added money to the contract and could have been issued unilaterally, USAID conditioned reimbursement for outstanding costs incurred by SSA on SSA's execution of the modification. The modification (and all subsequent modifications, which also served only to add money to the contract) included the statement that: "Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remain unchanged and in full force and effect." *See* JPSR, Exs. 5-8. The FPO clause was never amended, and no modification made any reference to the FPO clause.

In the summer of 2003, once operations had begun and a tariff was established setting the rates to be charged to the customers of the Port of Umm Qasr, SSA began collecting fees and charges as provided in that publicly available tariff. After revenues began to flow, in addition to continuing to seek permission to use revenues to pay

---

[5] *See* August 22, 2003, letter from Deborah Simms, Contracting Officer, to Daniel Flynn of SSA (Pl. App. 60-61):

> Please note that until Modification No.1 is signed, SSA will not be reimbursed for any costs incurred under CLIN 004 – Port Operation Expenses, or CLIN 005 – Capital Projects. Given that SSA does not presently have funds in its contract to subcontract for additional security guard services, the execution of the modification will be necessary to provide such funds.
>
> Finally, USAID has informed SSA on several occasions that it cannot unilaterally use revenues generated from the Umm Qasr Port. Any decision on the use [sic] Port revenues must be made jointly between the U.S. government and the Iraqi Port of [sic] Authority. Therefore, SSA cannot use port revenues to pay for additional security.

The references to "CLIN 004" and "CLIN 005" relate to proposed CLIN changes that were not adopted. All funding was added to CLIN 003. *See* JPSR, Exs. 6-8.

operating expenses (which requests were all denied by USAID),[6] SSA requested that USAID meet with SSA to establish an appropriate profit amount as contemplated by the FPO. After an August 1, 2003, meeting on the subject of the appropriate profit level under the FPO, USAID personnel in Iraq requested that SSA provide a profit proposal.

---

[6] It appears that USAID's refusal to honor the FPO clause arose from a change in internal policy that occurred after the contract was awarded. That changed policy, which was apparently conveyed verbally among staff, was that USAID would not use nonappropriated funds to pay USAID contractors. Mr. Abood of USAID explained the policy shift during his deposition:

Q Mr. Abood, at the time that the contract was awarded, were you aware of any policy of the United States government to use only appropriated funds with respect to contracts in Iraq?

A No.

Q After the time that the contract was awarded, up until the present, did you become aware of any policy of the United States government to only use appropriated funds to pay for contracts in Iraq?

A I'm not aware of the specific statutes or regulations that might implement such a policy, but I've been told there is such a policy.

Q Who told you about the policy?

A I don't recall.

Q Do you recall when you were told?

A My recollection is it would have been about the time of what I believe we're calling modification number 2 under the contract.

* * *

Q And what was the substance of what was conveyed to you?

A The substance of it was that USAID could not authorize a contractor to use funds generated through a commercial operation to pay for government contract expenses.

Q Did you understand that that policy would prevent the implementation of the financing port operations clause in CLIN 003 of the SSA contract?

A Yes.

Pl. App. 8 (Abood Tr. at 55-57); s*ee also* Pl. App. 20 (Transcript of May 23, 2006, deposition of Anne Quinlan ("Quinlan Tr.") at 55-57) (describing USAID policy shift against using commercially collected funds after contract award).

SSA provided that proposal by letter dated August 12, 2003, from Dan Flynn, SSA Senior Vice President, to Mr. Tom Wheelock of USAID. In an electronic mail message dated September 4, 2003, USAID rejected SSA's request to set a profit level under the FPO clause. Pl. App. 79. SSA reiterated its request in a September 10, 2003, meeting in Washington, D.C. Its request was verbally refused by USAID. *See* Pl. App. 26 (Quinlan Tr., Ex. 8). SSA reiterated its request that an appropriate profit level be approved in a letter dated December 30, 2003. Pl. App. 82-83. That request was rejected in writing in an undated letter from Alvera Reichert of USAID to Bob Watters of SSA. Pl. App. 84-85. SSA filed a certified claim with the contracting officer on July 26, 2004. JPSR Ex. 1. That claim was denied on November 29, 2004. JPSR Ex. 2. The action in this Court was filed on April 22, 2005.

Throughout the term of the contract, SSA satisfactorily performed all of its duties under the contract, and maintained a high level of operations at the port. In a November 2003 USAID document entitled "Connecting Iraq to the World," USAID set forth the following accomplishments under the heading "Seaports":

- Port reopened to commercial traffic June 17; and first passenger vessel arrived July 16 – exceeding goals for the use of the port and restoration of these services.
- Major dredging activities are now complete and port is able to handle deep-draft ships at all 21 berths.
- Power and grain facilities operational, enabling the storage and distribution of humanitarian supplies.
- *Interim port tariffs were approved and applied on June 20, providing a revenue stream for the financial sustainability for port operations*.

Pl. App. 86-87 (emphasis added).

During the course of the contract, SSA collected $18,742,948.73 in port revenues. $12,807,084.83 of that amount was distributed at USAID's direction to the Development

Fund for Iraq. $5,935,863.90, plus accrued interest, remains in a segregated, interest bearing account established by SSA pending resolution of this litigation. Pl. App. 93 (Watters Decl. ¶ 14). Port revenues exceed the total costs of the SSA/USAID contract by $5,440,299. Although the profit amount claimed by SSA is based on a per ton figure that SSA proposed in August of 2003, three months after it was ordered to operate the port under CLIN 003, the amount that SSA claims, $4,400,004.40, is on the same order of magnitude as, but one million dollars less than, the difference between port revenues and the total costs incurred under the contract.

## SUMMARY OF ARGUMENT

The plain language of the contract must govern in the absence of an ambiguity, and the contract must be read so that all parts are given effect. The government ignores both of these fundamental canons of contract construction. The government focuses solely on the cost-plus-fixed-fee portion of CLIN 003 of the contract. Beyond setting forth the text of the FPO clause in its proposed statement of uncontroverted facts, the government does not acknowledge, much less discuss, the plain language of the FPO clause.

The language of the FPO clause is both plain and mandatory. It states that: "*After port operations begin,* working capital for labor, facilities and equipment operation and maintenance, port overhead and *contractor profits shall be obtained from fees and charges to carriers and cargo owners*. *USAID shall approve* the fee and charge schedule and *the level of contractor profit* from operations." Defendant's Proposed Findings of Uncontroverted Fact at ¶ 9 (emphasis added). Despite the plain language of the contract – language that the solicitation expressly required the contractor to confirm its acceptance

of in writing – the government refused to approve a profit level as required by the contract. Because the government has failed in its motion even to acknowledge the plain language of the FPO clause, it is not possible for the government to prevail on its motion. No contract case can be decided as a matter of law in favor of a movant that fails to address the plain language of the contract at issue.

The government's single argument in support of its motion is that CLIN 003 is solely a cost-plus-fixed-fee contract, and that profit is therefore limited by statute to ten percent of the total estimated cost of the contract. That argument fails for numerous reasons, some of which are inherent in the government's argument, and some of which are entirely unrelated to the argument made by the government.

First, the government argues that the fact that the contract is labeled as "a Cost Reimbursement (CPFF) Level of Effort term contract" is determinative. The government entirely fails, however, to acknowledge or address controlling case law that holds that determination of contract type is a legal issue to be decided by the court, and that the label given to a contract is not determinative.

Second, the government admits, as it must, that a negotiated contract "'may be of any type <u>or combination of types</u> that will promote the government's interest.'" Government Motion at 6-7 (underscoring in original). Notwithstanding that admission, however, the government offers three reasons why it believes that the cost reimbursement contract type was used to the exclusion of, rather than in combination with, the incentive arrangement in the FPO clause. First, the government argues that various contract clauses that were included are consistent with a cost-plus-fixed-fee contract. That proves nothing, however, because the parties agree that the contract was at least in part a cost-

plus-fixed-fee contract. The presence of clauses consistent with that undisputed point says nothing about whether there was also another payment mechanism involved – the mechanism set forth in the FPO clause.

Second, the government argues that "the entire contract was performed upon a cost reimbursement basis." Government Motion at 8. This is nothing more than an admission that the government breached the contract. The only reason that the government paid SSA for port operations in arrears on a reimbursement basis is that the government refused to implement the FPO clause, under which it was to provide "start up" funds and allow SSA to pay operating costs out of port revenues. To say that the government can unilaterally change the nature of the contract by administering it in a manner that is inconsistent with its plain terms is absurd.

Finally, the government posits that SSA might argue that the contract is a "'cost-plus-fixed-fee-plus-profit' contract." Government Motion at 8. The government then attacks that straw man by urging that there is no such type of contract. In fact, SSA does not make the argument that the government posits, so the discussion is irrelevant. Contrary to the government's muted suggestion that there is no recognized type of government contract in the FAR that approximates the structure of the FPO clause, the fact is that multiple incentive contract types under FAR Subpart 16.4 are consistent with the FPO clause. In any event, the law is clear that a contract does not need to fit perfectly into a recognized category in order to be enforceable. Both federal statutes and Supreme Court case law support the proposition that any contract that is not prohibited is permissible. There is no prohibition on the compensation mechanism set forth in the FPO clause.

In addition to the reasons why the government's arguments fail on their own terms, there are additional reasons why the government's motion must be denied. First, the reason the government argues that the contract is solely a cost-plus-fixed-fee contract is to bring the contract within the ten percent profit cap applicable to such contracts under 41 U.S.C. § 254(b). That section, however, does not apply to the FPO clause. Title 41 of the United States Code defines "acquisition" as "the process of acquiring, *with appropriated funds*, by contract for purchase or lease, property or services . . . ." 41 U.S.C. § 403(16) (emphasis added). The FPO clause expressly provides that costs and profits are to be paid from port revenues, which are not appropriated funds. In any event, this contract is covered by the broad waiver of contracting and other laws contained in the first supplemental appropriations bill passed to fund the Iraq war and reconstruction effort. Public Law 108-11 provides with respect to funds to be used by USAID and other agencies to fund reconstruction contracts, including contracts entered into before that spending measure was passed by Congress, that such funds may be expended "notwithstanding any other provisions of law. . . ." Accordingly, neither the FAR nor 41 U.S.C. § 254(b) applies to this contract. Because all of the government's arguments are based on either FAR or statutory provisions, all of those arguments would be without merit even if they did not fail on their own terms.

Finally, the government's argument that the SSA contract is solely a cost-plus-fixed-fee contract would make that contract illegal under the reasoning of *Fluor Enterprises, Inc. v. United States*, 64 Fed. Cl. 461 (2005), because it was not possible to estimate total contract costs prior to award. In contrast, SSA's reading of the contract would fulfill the *Fluor* suggestion that bifurcation of the contract to deal separately with

definite and indefinite tasks would have cured the illegality found in that case. Because contracts are to be read to avoid invalidity if the language of the contract reasonably supports an enforceable reading, the plain language reading must be preferred on this basis as well.

In sum, the government's position ignores the plain language of the contract, reads a key clause out of the contract, offers an impossibly narrow reading of available contract flexibility under the FAR, fails to recognize that the FAR and the ten percent statutory profit cap do not apply to this contract in any case, and posits a contract interpretation that would render the contract illegal under a recent decision of this Court. SSA's reading, on the other hand, implements the plain language of the contract and the shared understanding of the parties at the time of award, and does not require the Court to entertain interpretations that could lead to questions about the legality of the contract. For all of these reasons, the government's motion must be denied, and the Court should enter a ruling stating that the contract is not subject to a ten percent limitation on profit.

## ARGUMENT[7]

The contract between SSA and USAID represented a flexible approach to a fluid and indefinite set of requirements. The contract was executed just as the United States commenced military operations in Iraq in early 2003. At the time the contract was awarded, the government knew that opening the port of Umm Qasr was critical to the movement of humanitarian and reconstruction supplies into the country, but it had very

[7] The government's motion for partial summary judgment does not raise any novel issues with respect to the proper standard for summary judgment, and SSA agrees that the government's memorandum (p. 5-6) generally describes the proper approach to summary judgment.

little information about the physical condition of the port, what equipment was available or its state of repair, or what supporting services and port labor would be available after the initial phase of military operations. In response to the combination of an urgent need to have a qualified contractor on the ground immediately and an inability to tell that contractor what it would have to do when it arrived in Iraq, USAID's procurement officers structured a contract that employed a cost-plus-fixed-fee structure where estimates were possible and the commercial, incentive fee structure of the FPO clause where estimates were not possible.

### 1. The Government Ignores the FPO Clause and Thus Ignores the Plain Language of the Contract; the Government Fails to Give Meaning to All Parts of the Contract.

SSA's profit claim is based on the FPO clause, which expressly states that, "[a]fter port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and *contractor profits shall be obtained from fees and charges to carriers and cargo owners*." "Shall" is the language of command, *see Lomas & Nettleton Co. v. United States*, 1 Cl. Ct. 641, 644 (1982), leaving no ambiguity on the point that SSA was to receive profits from port operations.[8] Only the precise amount was left open, and USAID was tasked with approving that amount once operations commenced. The government says absolutely nothing about this plain contractual mandate that the contractor receive profit from operational revenues (as distinct from the appropriated funds under which the limited in-house man-hour amount

---

[8] Even if there were ambiguity, which there is not, it would be construed against the government as the drafter of the contract, because SSA's interpretation was reasonable and relied upon. *See Veit & Co., Inc. v. United States*, 56 Fed. Cl. 30, 35 (2003); *see also* Pl. App. 2, 3 (Abood Tr. at 11, 14) (confirming that Mr. Abood drafted the contract and, particularly, the FPO clause).

was to be paid under the cost-plus-fixed-fee portion of CLIN 003). As such, the government both fails to address the plain meaning of the contract, *see Hunt Construction Group, Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002), and also fails to offer an interpretation that does not leave a portion of the contract (the FPO clause) "useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous. . . ." *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 395; 351 F.2d 972, 979 (1965). SSA is aware of no instance in which a movant has prevailed on summary judgment in a contract case where the movant has offered absolutely no explanation of the meaning of the contract provision that is at the heart of the case.

**2. The Government's Arguments are Either Irrelevant or Foreclosed by Controlling Judicial Precedent.**

The government's complete failure to address the contract language that is at the heart of the case is fatal to its motion for the reasons stated above. However, because SSA understands that the purpose of this round of briefing is to determine conclusively whether there is a ten percent cap applicable to the profit that the contractor may earn under the contract, and to provide a complete record, we discuss below the infirmities of the arguments that the government *does* offer in support of its motion.

*a. The Contract Label Does Not Control.*

The government's first argument for the proposition that the contract was solely a cost-plus-fixed-fee contract is that "[i]t was clearly denominated as such in Section B." Government Motion at 6. The government is correct that the contract stated that it was "a Cost Reimbursement (CPFF) Level of Effort term contract." JPSR, Ex. 3 (Contract at B.2). The government is not correct, however, in arguing that that label is determinative. The case law in the Federal Circuit is clear that "[d]etermination of the type of contract is

a matter of law – not controlled by a label in the contract." *Maintenance Eng'rs v. United States*, 749 F.2d 724, 726 n.3 (Fed. Cir. 1984); *see also LSi Serv. Corp. v. United States*, 191 Ct. Cl. 185, 188; 422 F.2d 1334, 1336 (1970) ("Neither the heading of the contract, nor its description in a Government audit report is sufficient to change the nature and legal import of the provisions of the contract itself."); *Crown Laundry and Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506, 515 (1993) ("the court is not bound by the name or label given to a contract"). Where, as here, there is a compensation clause that is on its face of a different type than that described in the contract's label, the actual language of that differing clause must be examined to determine the contract type or combination of contract types.

*b. Clauses Associated with the Cost Reimbursement Portions of the Contract Are Irrelevant to the Plain Meaning of the FPO Clause.*

The government's second argument is that there are clauses in the contract that are consistent with the cost-plus-fixed-fee contract type. Government Motion at 6-7. The government is factually correct, but the existence of those clauses does nothing to support its legal position. The parties agree that some portions of the contract use a cost-plus-fixed-fee model (i.e., CLIN 001, CLIN 002, and that part of CLIN 003 that addresses SSA's in-house staff costs). Accordingly, one would expect the contract to contain clauses appropriate to that type of contract. The presence of those clauses, however, says absolutely nothing about the issue before the Court, which is whether there is also another payment mechanism included in CLIN 003.

*c. The Government's Breach of the Contract Does Not Change the Contract's Plain Language.*

The government's third argument is that "the entire contract was performed upon a cost reimbursement basis." Government Motion at 8.[9] This argument is as audacious as it is incorrect. The government is arguing nothing less (and nothing more) than that its own breach changed the nature of the contract as awarded. The FPO clause is unambiguous that the government was to provide start-up capital to SSA in advance (not on a reimbursement basis), and that after operations were under way SSA was to pay for operating costs with, and obtain profits from, revenues on a rolling basis. The government refused to honor that arrangement, and instead told SSA that it would only be paid in arrears after SSA had incurred the expenses for which the contract required the government to provide funds in advance.[10] Accordingly, the only reason that the "contract was performed on a cost reimbursement basis" was that that was the only basis on which SSA could manage to get paid anything at all.

Once it became clear that USAID would not honor its contractual obligations under the FPO clause, SSA was faced with two bad choices. It could accept such payment as was offered in arrears and continue to argue for correct implementation of the contract as written, or it could declare a breach and refuse to perform. It chose the

[9] Despite some suggestion early in the case that it might do so, *see* JPSR at 9-10, the government does not argue that any of the modifications to the contract are relevant to the contract type. As noted above, the modifications simply added obligated funds to the contract, which the government could have done through unilateral modifications. As also discussed above, however, the government conditioned reimbursement for amounts already expended on SSA's execution of those modifications. That sort of coercion is, for the record, illegal, *see Rumsfeld v. Freedom NY, Inc*., 329 F.3d 1320 (Fed. Cir. 2003), but it is not relevant to any issue before the Court. In any event, no contract modification in any way affected the FPO clause.

[10] See Pl. App. 61 & 26 (Quinlan Tr., Ex. 8). For the reason for USAID's about-face, *see* n.6, *supra*, and accompanying text.

former, because choosing the latter would have meant—in addition to walking out on the United States and the Iraqi people at a particularly bad time—that SSA would have violated the disputes clause in the contract, FAR Clause 52.233-1, "Disputes, Alternate 1 (Dec. 1991)." That clause provides that "[t]he Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under or relating to the contract, and comply with any decision of the Contracting Officer." SSA followed the only course that was legally available to it. SSA's acceptance of payment under terms other than those provided for in the contract does not now provide the government a basis to argue that the contract as awarded was somehow different than its plain language indicates. SSA was obligated to perform, and was merely mitigating its damages by taking what was offered, under continuous protest.[11]

*d. The FPO Clause is Permissible Under Federal Procurement Law.*

The government admits, as it must, that "[c]ontracts negotiated under part 15 may be of any type or combination of types that will promote the Government's interest. . . ." 48 C.F.R. § 16.102(b); *see* Government Motion at 6-7. The government goes on to argue, however (at 8), that "SSA may assert that CLIN 003 was some sort of 'cost-plus-fixed-fee-plus-profit' contract," and that "[t]he FAR does not provide for such a contract type." SSA asserts nothing of the sort, so it is of no relevance whether or not the FAR would permit such a contract type.

What SSA *has* consistently maintained is that the contract incorporates two types of compensation structures with respect to the CLIN 003 operations. *See* JPSR, Ex. 1

[11] SSA's demands that the contract be performed as written were continuous throughout the course of the contract. *See, e.g.*, Pl. App. 55-56, 66-68, 75, 82-83.

(Claim at 6-7). The first compensation vehicle, as the parties agree, is a cost-plus-fixed-fee mechanism. As discussed above and as is clear from the contract, that provision in CLIN 003 covered compensation for the man-hours provided by SSA management staff in Iraq. The cost-plus-fixed-fee portion of CLIN 003 did not address all of the other costs associated with CLIN 003 operation of the port, because those costs were not susceptible of estimation at the time the contract was awarded. Because it was impossible to address all activities and costs at the time of award, a second mechanism – the FPO clause – was also included in CLIN 003.

To the extent that the government is arguing that the FPO clause is not a contract type described in the FAR, and is therefore unenforceable, the government is wrong. The reasons why the government is wrong are many.

First, it is necessary to be precise (even if the government is not) about what is and is not prohibited by the FAR. The government seems to suggest (at 8), although it never explicitly says so, that the FPO clause is impermissible on the grounds that it is not of a type found in the FAR, and the FAR states that "[c]ontract types not described in this regulation shall not be used, except by deviation." 48 C.F.R. § 16.102(b). A number of factors are relevant to determining the meaning of that provision. First, the reference to "this regulation" by its terms applies to the entire FAR, not just part 16. Accordingly, particularly since the title of section 16.102 is "Policies," it is proper to read that section in conjunction with other FAR sections that set forth procurement policies.

48 C.F.R. §1.102-4(e) provides as follows:

> The FAR outlines procurement policies and procedures that are used by members of the Acquisition Team. If a policy or procedure, or a particular strategy or practice, is in the best interest of the Government and is not specifically addressed in the FAR, nor prohibited by law

> (statute or case law), Executive order or other regulation, Government members of the Team should not assume it is prohibited. Rather, absence of direction should be interpreted as permitting the Team to innovative [sic] and use sound business judgment that is otherwise consistent with law and within the limits of their authority. Contracting officers should take the lead in encouraging business process innovations and ensuring that business decisions are sound.

That FAR language is consistent with the language at 41 U.S.C. § 254, upon which the government relies for its argument that the FPO clause is subject to a ten percent cap on profit. That section provides that "[e]xcept as provided in subsection (b) of this section, contracts awarded after using procedures other than sealed-bid procedures *may be of any type which in the opinion of the agency head will promote the best interests of the government*." 41 U.S.C. § 254(a) (emphasis added).[12] To the extent that the language in 48 C.F.R. § 16.102(b) could be read as being more restrictive than the statute, the FAR must give way, because 41 U.S.C. § 405(a) provides that FAR provisions must be adopted "with due regard for applicable laws." The statutory provision allowing any contract type that is not prohibited is also consistent with Supreme Court precedent. Construing the predecessor statute to current 10 U.S.C. § 2306, which is the military equivalent of 41 U.S.C. § 254, the Court held that "[w]here there is no prohibition of a particular type of contract and no direction to use a particular type, the contracting officers are free to follow business practices." *Kern-Limerick, Inc. v. Scurlock*, 347 U.S. 110, 116 (1954).

The USAID procurement officer who drafted and negotiated the contract (John Abood), with the full concurrence of the signing contracting officer (Anne Quinlan),

---

[12] 41 U.S.C. § 254(b) contains a prohibition on cost-plus-a-percentage-of-cost contracts and sets profit limits for cost-plus-fixed-fee contracts.

followed these FAR, statutory, and judicial policies to the letter.[13] At his deposition, Mr. Abood described the thinking behind the FPO clause this way:

> The clause as a whole describes a more commercially-oriented view of how port operations and capital projects might be financed outside of this particular contract. The clause as a whole describes an effort to derive revenue from an approved tariff schedule and apply that revenue in a very commercial sense toward port operations and capital improvement projects. So that instead of the government providing appropriated funds for port operations and appropriated funds for capital improvement projects, the financing port operation clause described a commercial process through the approval of a tariff, the development of revenues under that tariff and the use of those revenues for port operations and capital improvement projects.
>
> So the entire clause, as it's written, had this commercial-type venture as its heart and soul.

Pl. App. 6 (Abood Tr. at 44).

In short, there is nothing in the law that prohibits an arrangement of the sort memorialized by the FPO clause, and the clause is therefore valid and enforceable. In the face of the authorities discussed above, the government's tepid suggestion that somehow the FPO clause is a type of contract unknown to the FAR, and therefore prohibited, must fail. In any event, quite apart from the fact that the government's argument is legally baseless, it is also factually baseless. This is so because the FPO clause fits into the class of "incentive contracts" described at FAR Subpart 16.4, 48 C.F.R. §§ 16.401-16.406.

Section 16.401 provides that incentive contracts are appropriate "when a firm-fixed-price contract is not appropriate and the required supplies or services can be acquired at lower costs and, in certain instances, with improved delivery or technical

[13] Mr. Abood confirmed at his deposition that he was the drafter and negotiator of the contract, and that Ms. Quinlan held ultimate responsibility as the contracting officer. Ms. Quinlan's account was the same. *See* Pl. App. 2 (Abood Tr. at 11); Pl. App. 17, 19 (Quinlan Tr. at 6, 7, 19).

performance, by relating the amount of profit or fee payable under the contract to the contractor's performance." The FPO clause, of course, did precisely that. That clause tasked SSA with running the port as a commercially viable enterprise. If SSA did not provide the necessary services, ships would not call at the port, and there would not be sufficient revenues to cover costs and provide SSA with a profit. The risk of not obtaining any profit under the clause provided SSA with a compelling incentive both to provide "improved . . . technical performance" in order to induce vessels to call the port and also to maintain "lower costs" so as to allow the possibility of profit. The FPO clause falls cleanly into Subpart 16.4, but even if it did not, that would be of no moment, because "[a] contract is not unenforceable merely because it does not fit neatly into a recognized category." *ACE-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed. Cir. 2000); *see also J. Cooper & Assocs. v. United States*, 53 Fed. Cl. 8, 18 (2002).

*e. The Government's Interpretation Would Render the Contract Illegal Under Fluor Enterprises.*

In *Fluor Enterprises, Inc. v. United States*, 64 Fed. Cl. 461 (2005), a judge of this Court found that a cost-plus-fixed-fee contract was illegal because it was impossible to determine at the time of award what the total estimated costs would be, and therefore what a permissible profit level would be under 41 U.S.C. § 254(b). The contract in *Fluor* involved the development and construction of facilities for a nationwide "Next Generation Weather Radar" program. The project included both project planning and construction.

Because of the nature of the project at issue in *Fluor*, it was impossible for the government at the time of contract award to estimate what the total contract cost would be. This inability to estimate was not through any fault of the parties; it was inherent in the open-ended nature of the project:

> [T]he contracting officer was unable to comply with the explicit statutory provision requiring the timely estimate. Indeed, NOAA's failure to establish this timely estimate was the product of inherent impossibility, not oversight or omission. Given the unique circumstances under which Fluor's services were procured, there was no way that NOAA could have reasonably estimated its project costs for the WFO modernization project at the time of entering into this contract.

*Id*. at 491. Having made the determination that it was impossible to have made the necessary total cost estimate at the proper time, the Court held that "[w]ithout the mandatory project estimate, the contracting officer lacked the authority to procure A&E services under § 254(b)." *Id*. at 492. The Court therefore found the contract illegal and void, although the Court did allow for the possibility of recovery on an implied contract theory.

The government here seeks a ruling from this Court that the entire SSA contract was a cost-plus-fixed-fee contract, despite the fact that the government has stipulated that "[i]t was not possible to accurately estimate the total costs for operating the port pursuant to CLIN 003 at the time the parties entered into the contract." JPSR at 6, ¶ h.4 (facts not in dispute); *see also* Pl. App. 2, 9 (Abood Tr. at 13, 58-59); Pl. App. 33 (Wherry Tr. at 45). Ironically, the contract that USAID in fact drafted and awarded, if properly interpreted according to its plain terms, avoids the *Fluor* illegality in precisely the way the *Fluor* Court described NOAA could have gone about structuring its contract to avoid the legal infirmity. The *Fluor* Court described the following permissible approach:

> In this case, NOAA could have avoided the inherent flaw – the inability to establish a timely estimate – in its contract with Fluor for A&E services by bifurcating the procurement of those A&E specific services from Fluor's broader undertaking to assume project development and product management services. Ostensibly, once Fluor had performed those ancillary duties that would define the scope of NOAA's project, the scope of any A&E services needed would have been ascertainable and NOAA

> would have been able to properly procure needed A&E services on a timely estimate of project costs, as § 254(b) requires.

*Fluor*, 64 Fed. Cl. at 491.

The parallel with the SSA contract is almost exact. It was only after the performance of CLINs 001 and 002 of the SSA contract that the parties would have any real idea what the scope of services and attendant costs would be for CLIN 003. The one thing that was known about CLIN 003 was that there would need to be a contingent of experienced port operations managers on site if SSA were asked to operate the port. That requirement, which could be estimated, was placed in CLIN 003 as a cost-plus-fixed-fee provision. The estimated man-hours were used, and the costs and fee associated with that item were paid. That portion worked as designed.

With respect to the tasks and associated costs that could not be estimated at the time of award (the majority of the contract's total costs), the SSA contract dealt with those through the FPO clause. The FPO clause contemplated the use of nonappropriated funds, so, as is discussed in more detail below, it did not implicate 41 U.S.C. § 254(b). Moreover, because SSA's profit under the FPO clause was not tied to a percentage of the cost of performing the contract, but instead was tied to the incentive of operating so as to generate enough efficiently handled business to generate revenues in excess of costs, the FPO clause did not implicate either the prohibition on cost-plus-a-percentage-of-cost contracts or the profit cap applicable to cost-plus-fixed-fee contracts. Having foreseen the problem that arose in *Fluor*, and having successfully avoided it through the sort of innovative contracting called for at 48 C.F.R. § 1.102-4(e), it is ironic that USAID now seeks to convince this Court that the contract is of a type that its procurement officials

would not have had authority to enter into (absent the retroactive statutory waiver of the procurement laws that is addressed immediately below).

### 3. Neither the FAR Nor Federal Acquisition Statutes Apply to the FPO Clause.

The discussion above explains in detail why the government's motion must be denied. CLIN 003 combined a limited cost-plus-fixed-fee component with a larger incentive component that was to be funded with nonappropriated funds. There is no legal prohibition on the use of that combination of contract vehicles, and the contract must be enforced according to its plain terms. There are, however, two more fundamental reasons why there is no ten percent profit cap on the contract. The first is that the supplemental appropriations bill that provided the funding that USAID used for the SSA contract expressly removed all legal constraints from the use of such funds except those included in that appropriations legislation. The second reason is that the FAR provisions and statutory provisions cited by the government in support of the application of a ten percent profit cap do not apply to contract provisions that call for the use of nonappropriated funds, as the FPO clause clearly does. Accordingly, even if the government were correct that the contract was entirely a cost-plus-fixed-fee contract, which by its plain terms it is not, no profit cap would apply.

*a. The April 2003 Supplemental Appropriations Bill Excluded the Contract From the Procurement Statutes and Regulations.*

Public Law 108-11, an emergency wartime appropriations bill, was passed by Congress and signed by the President in April of 2003. Chapter 5 of P.L. 108-11, under the heading "Iraq Relief and Reconstruction Fund," provided that "[f]or necessary expenses for humanitarian assistance in and around Iraq and to carry out the purposes of the Foreign Assistance Act of 1961 for rehabilitation and reconstruction in Iraq, there is appropriated to the President, $2,475,000,000, to remain available until September 30, 2004. . . ." The money is earmarked for a number of agencies and departments, including USAID. The legislation also provides that the monies so appropriated may be used to pay for obligations undertaken before the law was passed, stating that "funds appropriated under this heading shall be used to fully reimburse accounts administered by . . . the United States Agency for International Development, not otherwise reimbursed from funds appropriated by this chapter, for obligations incurred for the purposes provided under this heading prior to enactment of this Act from funds appropriated for foreign operations, export financing, and related programs. . . ." Finally, and most important, the law states that "funds appropriated under this heading shall be available *notwithstanding any other provision of law* . . ." (emphasis added). Pl. App. 91. The combination of the retroactive application of the law and its waiver of all other laws (including, necessarily, the procurement laws) means that P.L. 108-11 takes the SSA contract out of the FAR and out of any statutory restrictions on contracting, including 41 U.S.C. § 254(b). Therefore, even assuming *arguendo* that the government were correct that the SSA contract was solely a cost-plus-fixed-fee contract, it would not be subject to a ten percent profit cap.

The President explained the need for immediate action and for the broad statutory waiver in the supplemental appropriations bill when he sent it to the House of Representatives on March 25, 2003:

> This request reflects urgent and essential requirements. Much of the funding has been requested with flexible authorities. This flexibility will ensure requirements can be immediately addressed as they arise despite the unpredictable scope, duration, and intensity of operations. I ask the Congress to appropriate the funds as requested, and promptly send the bill to me for signature. I urge the Congress to refrain from attaching items not directly related to the emergency at hand.

Letter of George W. Bush to the Speaker of the House of Representatives Transmitting a Supplemental Budget Request To Support Military and Humanitarian Operations in Iraq and to Ensure Domestic Safety, March 25, 2003. Pl. App. 88. Mr. Ross Wherry, Director of the Office of Iraq Affairs for USAID, confirmed that monies beyond the initial obligated amount in the contract came from the April 2003 supplemental appropriations bill. Pl. App. 36-37 (Wherry Tr. at 66-67). Accordingly, the contract comes within the "notwithstanding any other provision of law" language of P.L. 108-11, which in turn means that the ten percent profit cap in 41 U.S.C. § 254(b) would not apply to this contract even if it were solely a cost-plus-fixed-fee contract.

*b. The FAR and the Procurement Statutes Do Not Apply To Nonappropriated Funds Contracts.*

Although it is not necessary for the Court to reach the issue in light of the multiple independent grounds discussed above for denying the government's motion, the government's argument for a ten percent profit cap must fail for the additional reason that the FPO clause under which SSA claims profit was plainly designed to use revenues collected from commercial customers, which are just as plainly not appropriated funds.

The FAR does not apply to contracts using nonappropriated funds, because the FAR defines "contract" as "a mutually binding legal relationship obligating the seller to furnish supplies or services (including construction) and the buyer to pay for them. *It includes all types of commitments that obligate the Government to an expenditure of appropriated funds*. . . ." 48 C.F.R. § 2.101 (emphasis added). By the same token, 41 U.S.C. § 403(16) defines "acquisition" as "*the process of acquiring, with appropriated funds*, by contract for purchase or lease, property or services (including construction) that support the missions and goals of an executive agency. . . . " (emphasis added). The appropriated funds limitation is made applicable to 41 U.S.C. § 254 by 41 U.S.C. § 259(c), which incorporates the definition of "procurement" from 41 U.S.C. § 403. That definition is broader than, but includes "acquisition," providing that "[t]he term 'procurement' includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." Because "procurement" as incorporated into section 259 (which applies to section 254) includes "all stages of the process of acquiring," and "acquisition" is defined as "the process of acquiring, with appropriated funds, by contract," the contracts covered by 41 U.S.C. § 254 are necessarily contracts through which goods and services are acquired with appropriated funds. Because the

FPO clause contemplated the use of nonappropriated funds, the 41 U.S.C. § 254(b) ten percent profit cap relied upon by the government is inapplicable for this reason as well.[14]

**CONCLUSION**

The government has misstated the key issue in the case, failed to address or even acknowledge the contract language that controls this dispute, offered arguments that are contradicted by binding precedent, argued that its own breach of the contract proves that the contract was of a type other than that described in the plain language of the breached clause, and offered an interpretation of the contract that would render it illegal. In addition, the government's argument that there is a statutory profit cap applicable to the contract is foreclosed both by appropriations legislation that waives federal procurement law and also by statutory definitions that exclude nonappropriated funds contracts from the claimed statutory profit cap. For each of these independent reasons, SSA respectfully urges this Court to deny the government's motion for partial summary judgment and to enter an order declaring that there is no statutory or regulatory cap on contractor profit under the contract.

Plaintiff requests oral argument on the government's motion for partial summary judgment.

---

[14] A finding that the FPO clause was exempt from procurement statutes and regulations because it did not contemplate the use of appropriated funds would not affect this Court's jurisdiction over the case. Under the test articulated in *Furash v. United States*, 252 F.3d 1336 (Fed. Cir. 2001), it is clear not only that "'under the agency's authorizing legislation Congress could appropriate funds if necessary,'" *id*. at 1339, *quoting L'Enfant Plaza Props., Inc. v. United States*, 668 F.2d 1211, 1212 (Ct. Cl. 1982), but it is clear also that funds were in fact appropriated to USAID under its general budget and also, for this and other Iraq contracts, expressly under P.L. 108-11, discussed above.

Respectfully submitted,

/s/ John W. Butler
John W. Butler
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2510 (tel)
(202) 463-4950 (fax)

Of counsel:

Heather M. Spring
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2516 (tel)
(202) 463-4950 (fax)

Dated: November 9, 2006