# PLAINTIFF'S APPENDIX

# PLAINTIFF'S APPENDIX

## TABLE OF CONTENTS

Transcript of Deposition of John Abood (Excerpts)........................................................... 1

Transcript of Deposition of Anne Quinlan (Excerpts)........................................................ 16

Transcript of Deposition of Ross Wherry (Excerpts) ........................................................ 29

Solicitation # USAID TRN-03-009 (Excerpts)................................................................. 39

SSA Cost Proposal dated Feb. 24, 2003 (Excerpts)........................................................... 42

E-mail from T. Wheelock to C. Hautamaki et al. Dated Aug. 10, 2003................................. 49

Umm Qasr Port Implementation Draft Report (Excerpts).................................................. 51

Letter from D. Flynn to T. Wheelock dated Aug. 12, 2003................................................. 55

Letter from D. Simms to D. Flynn dated Aug. 22, 2003 ..................................................... 60

Letter from D. Flynn to N. Price et al. dated Aug. 28, 2003 ............................................... 62

Letter from D. Flynn to N. Price dated Sept. 2, 2003 ......................................................... 74

E-mail from N. Price to K. Lukins et al. dated Sept. 4, 2003 .............................................. 78

Letter from B. Watters to A. Reichert et al. (via e-mail) dated Dec. 30, 2003......................... 81

Letter from A. Reichert to B. Watters (undated) ............................................................... 84

Connecting Iraq to the World, Nov. 2003 ......................................................................... 86

Text of a Letter from the President to the Speaker of the House of
Representatives (White House Press Release dated March 25, 2003)................................. 88

Public Law 108-11, 117 Stat. 559 (Apr. 16, 2003) (Excerpts) ............................................ 89

Declaration of Robert Watters dated Nov. 8, 2006............................................................. 92

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - -x
SSA MARINE, INC., :
Plaintiff, : No. 05-490C
vs. : (Chief Judge Damich)
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - -x

DEPOSITION OF JOHN ABOOD

Washington, DC
Thursday, May 25, 2006

REPORTED BY:
CARMEN SMITH

Page 10

directly for transportation of FOODAID around the world from the United States to various locations around the world. As part of that responsibility, I would be involved with various detailed issues regarding vessels, ports, congestion, port improvements, et cetera.
Q When did you first become involved with the contract between USAID and SSA for the operation of -- the assessment and operation of the port at Umm Qasr in Iraq?
A I think it was about December of 2002.
Q And were you the person with primary responsibility for drafting that contract?
A No.
Q Who was the person with primary responsibility for drafting the contract?
A The person with primary responsibility would have been the contracting officer, Anne Quinlan.
Q When you say that she had the primary responsibility, I'm trying to understand, who did which tasks? When you say that she had the primary

Page 11

responsibility, what do you mean by that?
A As the agency's contracting officer, responsible for many of those Iraq contracts, including this one involving the port of Umm Qasr, she had primary responsibility for issuing the solicitation, issuing the award, reviewing the work of others and signing the contract.
Q Did she draft the contract, the SSA contract?
A The contract itself was drafted by myself.
Q Did you also draft the request for proposals?
A Yes, I did.
Q And did Ms. Quinlan review your draft of the request for proposals and the draft of the contract?
A Yes, she did.
Q Did she give you comments on those drafts?
A Yes, she did.
Q Were those comments verbal or in writing or both?
A Combination of both.

Page 12

Q I'll hand you a document, Mr. Abood. This on the first page is marked 00324. I would ask that this be marked as Exhibit Number 1.
(Deposition Exhibit 1 identified.)
BY MR. BUTLER:
Q Mr. Abood, I'll ask you to take a look at that document, let me know when you've had a chance to look through it and I'll ask you a couple questions about it.
(Witness reviewed the document.)
MR. BUTLER: If you'll excuse me for one minute while you review that, I'll be right back.
(Witness reviewed the document.)
THE WITNESS: Okay.
BY MR. BUTLER:
Q Mr. Abood, is the document that we've marked as Exhibit Number 1 a copy of the contract between USAID and SSA Marine?
A Yes.
Q Is it correct that the contract is divided generally into three contract line item numbers?
A Yes.

Page 13

Q And are contract line item numbers referred to in the contract as CLINs?
A Correct.
Q Why was the contract structured that way, in three CLINs?
A It was structured that way because there were three basic parts to the project that AID was given to bring vessels -- be able to bring vessels into the port of Umm Qasr. The first part was to assess the port and determine its current condition. Second part was to have our contractor write up a report regarding a potential plan for improving and managing the port, and then third, a potential operation for the port.
Our contractor would be asked to manage the port, provide their level of effort toward the management of the port.
Q And why was an assessment necessary under CLIN 1 of the contract?
A We at USAID, anyway, had very little knowledge of the current condition of the port at Umm Qasr.

Page 14

Q Now, at the time that the contract was awarded, did you know whether or not the contractor would be asked to implement CLIN 3 of the contract?
A We did not know.
Q Mr. Abood, I'll refer you to the same document that I've handed you but page 00334 in the bottom right-hand corner. Do you have that page?
A I have that page.
Q About two-thirds of the way down, do you see a clause entitled "Financing Port Operations"?
A I do.
Q Did you draft that clause?
A Yes, I did.
Q Is that a standard clause that's used in other government contracts?
A No, I wouldn't consider it a standard clause.
Q Was it your idea to put the clause in?
A Yes.
Q Did you use any template for this, or did you just draft this without reference to any other document?

Page 15

A I don't recall a template for this. I recall that I drafted this based upon the idea that at some point in the future perhaps our contractor would be asked to manage the port at Umm Qasr.
Q Mr. Abood, I'll hand you a document, the first page of which is marked USAID 20790, and I will ask that this document be marked as Exhibit 2.
(Deposition Exhibit 2 identified.)
BY MR. BUTLER:
Q Mr. Abood, just let me know when you've had a chance to look through that.
A Okay.
(Witness reviewed the document.)
Okay. I've glanced over the document.
Q Do you recognize the first page of the document, the page marked USAID 20790?
A It appears to be an e-mail from myself to Dana Peterson, copy Anne Quinlan, regarding the scope of work for the port assessment contract.
Q Who was Dana Peterson?
A She worked with the -- with our USAID Asian Near East bureau at the time and was

Page 16

coordinating contract efforts from their perspective in the regional bureau office.
Q Did she report to Ross Wherry?
A I believe she did. I don't know for sure.
Q Did you write this e-mail?
A Yes.
Q I'll ask you to flip back to -- other than the first page, these pages are not numbered. This document, just for the record, was provided to us electronically by Mr. Peter Young of the USAID general counsel's office.
But I'll ask you to flip back to six pages, seven pages into the document, see if you find a page that has a large paragraph blocked in blue type. Do you see that?
A Yes, I see that.
Q And is -- the first words of the paragraph in blue type "financing port operations"?
A Yes.
Q And then there's a large paragraph that follows that; is that correct?
A That's correct.

Page 17

Q And I'll ask you to look back at Deposition Exhibit Number 1 to page 334. We discussed the financing port operations clause that appears on page 334 of Exhibit 1. Is the language at page 334 and the blue language in Deposition Exhibit 2 the same?
A I don't know.
Q Could you take a look and let us know?
(Witness reviewed the document.)
A No, it is not the same.
Q In what way does it differ?
A Finding one particular error in the second line -- or difference in the second line where it says "operate the port." In the case of USAID document 00334 it refers to port in singular. In the case of the highlighted document under USAID 20790 it refers to ports, plural.
Q Do you know why there would be that difference between the draft that was attached to your January 27, 2003 e-mail and the final contract?
A I would suspect that in January -- on January 27, 2003 when I presented a draft scope of




076c1b60-faad-45dc-afcb-ac06b39446d2

Page 34

Did you have any discussions with SSA Marine about the contract prior to the time that the contract was awarded?
A Yes.
Q And with whom did you deal at SSA Marine?
A Principally with Bob Watters.
Q Did you talk to anybody else?
A I may have had discussions with I believe his name is Mark Johnson, a local representative of SSA.
Q But was Mr. Watters your primary contact?
A Yes, he was.
Q And Mr. Watters was based in Seattle; is that correct?
A I believe so.
Q Mr. Abood, I'll hand you a document marked USAID 05152, and I'll ask that this be marked as Exhibit Number 4, I believe it is.
(Deposition Exhibit 4 identified.)
(Witness reviewed the document.)
THE WITNESS: Okay. I've reviewed this.
BY MR. BUTLER:

Page 35

Q Is this one of the documents that you reviewed in preparation for your deposition today?
A I don't recall looking at this one, no.
Q Looking at this document, do you know what this is? Do you recognize this document?
A It seems to be in my handwriting and refers to discussions with SSA and Bob Watters March 18, 2003.
Q Was that shortly before the contract was awarded?
A Well, the document I'm looking at, USAID 00324, has an effective date on it of March 24, 2003, and this document is dated March 18, 2003.
Q Do you recall -- are these your notes from something?
A They appear to be.
Q Do you know if these are notes from a conversation with Bob Watters?
A They appear to document some discussions I had with Bob Watters, yes.
Q Do you know if these discussions were in person or over the phone?

Page 36

A I don't recall.
Q Mr. Abood, there are five numbers down the left margin of the page. Under item number 2, could you read that to us just to make sure that we're able to read your handwriting?
A Yes. Item number 2 on document USAID 05152 reads "fixed fee, 10 percent in contract." Then there's an arrow pointing to a subnote that reads "possibility of additional profit via operations, tariffs and fees -- approved by USAID."
Q Do you recall the discussion that you were memorializing in the language that follows the arrow?
A Yes.
Q What was the nature of that discussion with Mr. Watters?
A The nature of that discussion involved whether or not additional profit and fee might be derived from SSA running the port from a commercial standpoint.
Q Now, is that profit in addition to the 10 percent fixed fee that's referenced in the first

Page 37

part of item 2 of your notes?
A Yes, that profit would be in addition to the 10 percent fixed fee that is referenced in the notes associated with additional risks and efforts and work taken on by SSA outside of our contract.
Q When you say "outside of our contract," do you mean that that would be work that would not be in any way covered by the contract between USAID and SSA?
A No.
Q What do you mean, then?
A It means that the government was providing SSA with a 10 percent fee associated with the level of effort and other direct costs that they were applying to this contract effort. If the government made a decision to permit SSA to go beyond the contract and operate the port in a more commercial manner, then, consistent with SSA's bringing more resources, additional capability, taking more risk under a more commercial venture, there may be some profit in their taking that additional risk and providing their own resources, funding, financing,

Page 38

labor, capital, et cetera, to the port operations.
Q Now, was that concept that you've just described to me having to do with more commercial operations, was that concept memorialized in the contract that was ultimately awarded to SSA?
A Yes.
Q And was that concept memorialized in the financing port operations clause that appears on page 00334 of Exhibit 1, which is the contract there?
A Yes. Broadly speaking, the financing port operation brought that concept into the contract.
Q Is there any other place in the contract that addresses that concept?
A Without looking at the contract in detail, I don't know of any other area where that might be provided. Perhaps within some of the language in the contract it's --
Q Well, take your time and have a look and let me know if there's any other place in the contract that addresses that concept.
(Witness reviewed the document.)

Page 39

A No, it wouldn't appear that there's any other section that covers that particular concept.
Q Okay. Now, a moment ago you spoke of -- and don't let me mischaracterize your testimony, I want to make this straight. But am I correct that you spoke of activities that SSA might undertake that were outside of the contract?
A Yes.
Q And what sorts of activities would those be?
A They might involve bringing their own labor to the port, might involve bringing their own funding and financing to the port.
Q Let me stop you there with respect to funding and financing. Isn't -- doesn't the financing port operations clause address funding? For example, doesn't it say "start-up working capital shall be provided to cover initial operation of the port"?
A Yes, but in response to your question, you asked whether or not -- you asked what other things SSA might bring to port operations. And the

Page 40

response to that is, as I said, they might bring their own labor, they might bring their own funding and financing, they might bring their own capital, they might bring their own equipment, they might bring other things to bear on port operations and improvements, consistent with a more commercial venture.
Q And with respect to those types of things, I'm looking at language in the middle of the financing port operations clause that reads, "After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners." Do you see that language?
A Yes.
Q And was that the anticipated mechanism for the contractor bringing additional funds to the task?
A The answer is that this particular clause within the contract, financing port operations clause, was a broadly stated concept of perhaps

Page 41

permitting the contractor, whoever that might be, allowing them to operate the port on a more commercial level or basis.
Q Let me stop you there, if I may, just to clarify that statement. When you say "a more commercial basis," does that mean collecting fees from port users and using those fees to pay for port operations?
A Correct.
Q Now, that sentence that I just -- I'm sorry, I stopped you in the middle of your answer. Was there anything else that you wanted to say about that?
A No.
Q In the sentence that I read to you, there's a reference to -- in addition to expenses being obtained from fees and charges, it says that contractor profits shall be obtained from fees and charges to carriers and cargo owners; is that correct?
A In the event that USAID directed the contractor to take on a more commercially oriented

Page 42

effort at the port of Umm Qasr, then perhaps profits might be paid for from that more commercial operation.
Q And where does it say that in the contract?
A I'm referring to the financing port operation clause.
Q Where does it say that if the contractor takes on more commercial-type operations then perhaps USAID might approve a profit? Where does it say that?
A The financing port operations clause reads, "in the event that USAID directs the contractor to manage and operate the port, start-up funds and working capital to begin implementation of the operation plan shall be provided by USAID."
Q I see that. I was asking where the language was that you -- that corresponds to the answer to the last question.
A If your question is --
Q What's the reference -- my question is, where is the reference to commercial operations and

Page 43

where is the reference to the idea that USAID perhaps might approve profit?
A Speaking as the drafter of this language, the intent here was that if USAID decided to allow the contractor to operate in a more commercial manner, then this clause would present the broad format for those more commercial operations, citing such things within the financing port operation clause, tariff fees and schedules, port working capital, capital improvement project funding, revenue derived from tariffs and perhaps even some profit associated with the more commercial operations by our contractor.
Q Is there any language in the financing port operations clause that we have not discussed that expresses the intent that you had as the drafter?
A My intent as the drafter is --
Q I'll ask you to answer my question first. Is there any language that we have not discussed in the financing port operations clause that expresses your intent as the drafter?

Page 44

A Yes.
Q Would you please point me to that?
A The clause as a whole describes a more commercially-oriented view of how port operations and capital projects might be financed outside of this particular contract. The clause as a whole describes an effort to derive revenue from an approved tariff schedule and apply that revenue in a very commercial sense toward port operations and capital improvement projects. So that instead of the government providing appropriated funds for port operations and appropriated funds for capital improvement projects, the financing port operation clause described a commercial process through the approval of a tariff, the development of revenues under that tariff and the use of those revenues for port operations and capital improvement projects.
So the entire clause, as it's written, had this commercial-type venture as its heart and soul.
Q Now, in addition to revenues that would be or could be derived from port operations, were there also appropriated funds used to pay for part of this

Page 45

contract?
A Port operations and capital improvements and all aspects of this contract were financed from appropriated funds, as far as I'm aware.
Q So there were appropriated funds that were used for this contract?
A Correct.
Q Was SSA instructed by USAID to perform under CLIN 003, direct port operation and management?
A Yes.
Q Mr. Abood, let me give you another document, switch gears here. This document on the first page is marked USAID 00093, and I'll ask that this be marked as Exhibit Number 5.
(Deposition Exhibit 5 identified.)
BY MR. BUTLER:
Q Take a moment, Mr. Abood, and review that if you would.
MR. DINACKUS: John, I've got an extra page here. It's probably the last one. That's okay. Yeah, it is.

MR. BUTLER: Is it?
MR. DINACKUS: Yes.
(Witness reviewed the document.)
BY MR. BUTLER:
Q And Mr. Abood, just so we don't keep you here all day -- and you're welcome to look at as much of this document as you like before you answer any questions, but --
A Thank you.
Q -- I intend to ask you in particular about page 00123 and I think probably no other page.
(Witness reviewed the document.)
A Okay. I've glanced through the document.
Q Thank you. I would direct your attention -- well, let me ask you first, do you recognize this document?
A I recognize it as it appears to be the proposal from SSA presented or dated February 19, 2003 to the U.S. Agency for International Development, in response to our solicitation TRN-03-009.
Q Would you have -- did you review this



proposal? Did you review SSA's proposal in the course of the award process for the contract?
A Yes.
Q Do you know if Anne Quinlan reviewed this proposal in the course of the award process for the SSA contract?
A She may have reviewed aspects of it, but I doubt if she reviewed it with the level of detail and looked at it in detail as I did.
Q And would that have been because you were the person primarily negotiating with SSA between the time they made their proposal and the time that final award was made?
A That's correct.
Q Turning your attention, then, to document page 00123 of that document.
A I have it.
Q In particular, then, turning your attention to the bottom part of the text -- well, let me ask you this first. At the top of the page, do you see where it says "Part 6, Profit"?
A Yes.



Q And part 6, what would that have referred to? Would that -- is this in response to part 6 of the solicitation?
A I don't know.
Q Okay. Do you understand that this -- or is it your understanding that this document constitutes generally SSA's response to the request for proposals?
A It appears to, yes.
Q Looking down, then, under the heading "CLIN 003," do you see that?
A I see that.
Q And there's a single line that says, "SSA's profit for CLIN 003 is $354,148"; is that correct?
A That's how it reads.
Q And then below that it says, "SSA is willing to accept this 10 percent of total project cost profit figure for CLIN 003, provided SSA and USAID can come to a mutual agreement on: 1) SSA being able to generate profit from CLIN 003 operations and 2) the form or amount of profit SSA



can make on operations associated with CLIN 003 (EG the form to be either on a per-ton handled basis, flat fee or other mutually agreed-to form)."
Do you see that language, Mr. Abood?
A Yes, I do.
Q Turning your attention back, then, to Exhibit Number 4, your handwritten notes from your conversation with Mr. Watters on March 18, 2003.
A Yes, I have that, USAID 05152.
Q My question for you is, is the language that I've just read to you from document 00123 related to the same subject matter as item number 2 on docket 05152?
A Yes, I believe there's a relationship.
Q And is the relationship that this was a discussion regarding the possibility of profit separate from the 10 percent fixed fee?
A Yes.
Q Mr. Abood, I'll give you document marked USAID 13240, which I'll ask to be marked as Exhibit Number 6.
(Deposition Exhibit 6 identified.)







076c1b60-faad-45dc-afcb-ac06b39446d2

Page 54

BY MR. BUTLER:
Q And I'm only going to ask you about the first page of this, but as before, you may look at as much of it as you would like.
(Witness reviewed the document.)
A Okay. I've glanced over document USAID 01335.
Q Can you tell us what that document is, Mr. Abood?
A It seems to be an exchange of e-mails between the USAID Washington office and our field representatives in Iraq.
Q With respect to the first e-mail message on the page, is that an e-mail from you to Deborah Simms?
A Yes.
Q Who is Deborah Simms?
A She was one of our contract specialists in Iraq at the time period of June 24, 2003.
Q Do you recall what you were trying to convey to her in this e-mail? In other words, what was the purpose of the e-mail?

Page 55

A Well, I would leave the e-mail to speak for itself.
Q Did you write the e-mail?
A Yes.
Q Is the information that you conveyed to her consistent with your understanding of the contract at the time?
A At the time, yes.
Q Mr. Abood, at the time that the contract was awarded, were you aware of any policy of the United States government to use only appropriated funds with respect to contracts in Iraq?
A No.
Q After the time that the contract was awarded, up until the present, did you become aware of any policy of the United States government to only use appropriated funds to pay for contracts in Iraq?
A I'm not aware of the specific statutes or regulations that might implement such a policy, but I've been told there is such a policy.
Q Who told you about the policy?

Page 56

A I don't recall.
Q Do you recall when you were told?
A My recollection is it would have been about the time of what I believe we're calling modification number 2 under the contract.
Q You're referring to the SSA contract now?
A The SSA contract, yes.
Q And did the -- do you remember who told you about the policy?
A No.
Q Did the discussion of the policy come up in the context of modification number 2 to the contract?
A My recollection is that it came up after the contract was awarded and before modification 2 was signed.
Q Did it come up only -- in your experience, only in connection with the SSA contract?
A My recollection is that, indeed, it only came up with respect to the SSA contract in my experience.
Q And what was the substance of what was

Page 57

conveyed to you?
A The substance of it was that USAID could not authorize a contractor to use funds generated through a commercial operation to pay for government contract expenses.
Q Did you understand that that policy would prevent the implementation of the financing port operations clause in CLIN 003 of the SSA contract?
A Yes.
Q At the very beginning of our discussion today, you told me that you had spoken briefly with Anne Quinlan about her deposition; is that correct?
A That's correct.
Q And if I recall, you said something to the effect that she said it wasn't as bad as she thought it would be; is that correct?
A That's basically correct.
Q Did she say why it wasn't as bad as she thought it would be?
A She mentioned something about it didn't take as long as she thought it would, and she mentioned something about it wasn't as contentious




076c1b60-faad-45dc-afcb-ac06b39446d2

Page 58

as she thought it might be.
Q Did she make reference to any e-mails that were discussed at her deposition?
A No.
MR. BUTLER: I'd like to take a three-minute recess, or if anyone else wants five minutes, and then we'll come back and finish up.
(Recess.)
BY MR. BUTLER:
Q Mr. Abood, I'll remind you you are still under oath.
A Thank you.
Q We'll try to wrap up quickly here. During the break we had a short discussion between counsel about a document that we've been trying to track down. I'd like to ask you a couple of questions with respect to that before we wrap up.
A Okay.
Q The question is this. Are you aware of any estimate of contract cost for the seaport contract -- any independent estimate of cost that the government created? And just to be clear, I'm

Page 59

not talking about the proposals or estimates that potential contractors gave you. What I'm asking for is whether there is any document that reflects the government's independent estimate of what it would cost to -- what this contract would cost.
A I do not recall any such estimate.
Q Do you recall if, whether written down or not, any such estimate was ever made?
A I do not recall any such estimate.
Q You didn't make any such estimate?
A I don't recall preparing any, no.
MR. BUTLER: Subject, then, to possibility of redirect, in the event that your counsel asks you any questions, that's all we have. Thank you very much.
MR. DINACKUS: Can we go off the record for one second?
(Discussion off the record.)
MR. DINACKUS: Nothing from us.
MR. BUTLER: With that, then, this will close this deposition.
I thank you for your assistance this

Page 60

morning.
THE WITNESS: You're welcome.
(Whereupon, at 11:50 a.m., the deposition was concluded.)

Page 61

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

X

Subscribed and sworn to before me this day of , 20 .

X
Notary Public

My commission expires: .







076c1b60-faad-45dc-afcb-ac06b39446d2

1100 hours 3/18/03

SSA - Bob Walters Negotiations

New/Revised proposal consistent with Discussions:

1 $64 per hour
2 Fixed Fee 10% in contract
↳ Possibility of additional profit via operations tariffs and fees - approved by USAID
③ Category of ODCs to cover expenses not previously proposed but allocable to the contract
④ Post Differential in addition to Danger Pay for CLIN 001 + 002 (20%)
⑤ 20% Post Differential on CLIN 003 vs 25% Hardship Pay

DEPOSITION EXHIBIT 4 Abood 5-25-06 PENGAD 800-631-6989

**Young, Peter(GC/LE)**

**From:** Abood, John
**Sent:** Wednesday, March 19, 2003 2:19 PM
**To:** Quinlan, Anne; Wherry, Ross
**Cc:** Peterson, Dana; Stone, Denise; Sampler, Donald; Chamberlin, Wendy
**Subject:** RE: Iraq - Port Administration Contract Mobilization

Negotiations continued with the potential port contractor SSA this morning. The VP (Bob Watters) is traveling today and is not able to submit the revised proposal today. Based upon our discussions, they are preparing the revised proposal today and it will be submitted to USAID on 3/20. They did not tell me directly, but I believe they might accept the 10% fixed fee, with the understanding that future profits may be developed through future operations. I will let you know what happens.

John Abood
M/OP/TC

-----Original Message-----
**From:** Quinlan, Anne
**Sent:** Wed, Mar 19, 2003 12:12 PM
**To:** Wherry, Ross
**Cc:** Peterson, Dana; Stone, Denise; Abood, John; Sampler, Donald; Chamberlin, Wendy
**Subject:** RE: Iraq - Port Administration Contract Mobilization

Ross, I'm not really sure what you mean in the second paragraph of your e-mail.

Regarding the status of the seaport contract, John Abood said that he is waiting for the proposed awardee to submit a revised proposal today and, when he receives that, he'll know if they are going to accept the statuatory fee limit of 10%. He thinks they are willing to agree to the ES-06 salary limitation but he's not sure if they are willing to come down to 10% for their fee. I should know by the end of today if it's a go or not. If he can reach agreement with them on the fee, then it will be awarded tomorrow or Friday. If they can't reach agreement, we have to consider our other option which is to go back to the lower scored contractor and negotiate with them. Hopefully that won't be necessary.

Anne Quinlan
Division Chief, M/OP/EER
USAID Office of Procurement
Tel. 202-712-4614
Fax 202-216-3396
E-mail: <aquinlan@usaid.gov>

-----Original Message-----
**From:** **Wherry, Ross**
**Sent:** Wed, Mar 19, 2003 7:28 AM
**To:** Quinlan, Anne
**Cc:** Peterson, Dana; Stone, Denise; Abood, John; Sampler, Donald; Chamberlin, Wendy
**Subject:** RE: Iraq - Port Administration Contract Mobilization

DEPOSITION EXHIBIT 6 Abood 5-25-06 PENGAD 800-631-6989

Anne,

If this contract negotiation is going to be lengthy, we need to reduce the expectation of when we can be able to perform. I realize that it is impossible to say in advance when the negotiation might bear fruit, and that there are statutory limits. However, if we're not going to be able to get this contractor (or others) moving in a timely manner in

relation to the immovable requirements in theater; then I have to take the problem up the chain and get the bad news out sooner than later.

We have "notwithstanding" authority on the funding of these contracts. How can we make use of it so that $300,000 or $400,000 doesn't get in the way of a foreign policy imperative?

Ross Wherry
Senior Reconstruction Advisor
Asia and Near East Bureau
Agency for International Development

-----Original Message-----
**From:** Abood, John
**Sent:** Tuesday, March 18, 2003 7:27 PM
**To:** 'Bob Watters'
**Cc:** Quinlan, Anne; Peterson, Dana; Wherry, Ross; Stone, Denise
**Subject:** RE: Iraq - Port Administration Contract Mobilization

Bob -
We should recognize that there are going to be some aspects to this Level of Effort contract that were not anticipated by you or us. First, we should wrap up the negotiations and finalize the contract. Second, should there be additional work required, the government will negotiate amendments to the contract.

I look forward to your revised cost proposal based upon our discussions. In addition, we can pursue the matter of a profit margin or incentive fee derived from the operation of the port.

John Abood
USAID

-----Original Message-----
**From:** Bob Watters [SMTP:bwatters@ssofa.com]
**Sent:** Tue, Mar 18, 2003 3:54 PM
**To:** jabood@usaid.gov
**Subject:** Fw: Iraq - Port Administration Contract Mobilization

John....we have received this from Ross Wherry. How will this training and these costs work with what we are doing on the contract side relative to "level of effort" or man hours in Kuwait/Iraq?

Please advise.

Thanks

Bob

---

Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)

-----Original Message-----
From: Fergus Moran <FMoran@ssofa.com>
To: 'Wherry, Ross' <RWherry@usaid.gov>
CC: Sampler, Donald <dsampler@usaid.gov>; Abood, John <JAbood@usaid.gov>; OFDANET: llucke <llucke@ofda.net>; Ferguson, Jack <JFerguson@usaid.gov>; Bob Watters <bwatters@ssofa.com>
Sent: Tue Mar 18 11:20:49 2003
Subject: RE: Iraq - Port Administration Contract Mobilization

Receipt acknowledged.

-----Original Message-----
From: Wherry, Ross [mailto:RWherry@usaid.gov]
Sent: Tuesday, March 18, 2003 5:17 AM
To: Fergus Moran
Cc: Sampler, Donald; Abood, John; OFDANET: llucke; Ferguson, Jack

Subject: Iraq - Port Administration Contract Mobilization

Good morning, Fergus,

Further to our conversations in Washington on Thursday and Friday last week, and the pre-award authorization that you have been issued from our Procurement Office, I have made the following arrangements for the mobilization of your assessment team to Kuwait.

-- Larry Sampler is to be your usual Washington contact for technical and implementation matters. I've filled in for him during his absence, but he will be your contact beginning Wednesday March 19.

-- Chem-Bio training. Larry has arranged for SSA to have send five people to Ft Benning, (near Colombus) Georgia, for three days of chem-bio training beginning on Sunday March 23. The remaining 9 members of your assessment team are scheduled to receive this training beginning on Sunday, March 30. The Army is developing costs for this training, which includes furnishing a full suit of personal protective gear, including gas mask, of the same level of protection given to US employees now resident in Kuwait. The Army is developing the cost of this training, which will be billed to your contract.

-- Passports and visas. I have in my possession only your passport. I need the remaining 13 passports, applications, and photos soonest so that visa issuance does not become an obstacle.

-- Washington in-briefing. The first five persons trained at Ft Benning should travel to Washington DC on Wednesday, March 26, to begin detailed discussions with food and other logistical personnel on March 27. These personnel will link up with the second training group on April 2 for immediate deployment into theater.

-- Deployment travel. SSA should make and hold commercial air reservations for 14 persons from Washington to Dubai for departure on April 2. USAID will advise you on the availability of either military airlift or USAID chartered aircraft into Kuwait in the event that commercial air is not available. USAID will provide you with appropriate USG travel clearances to enter Kuwait. Please advise your estimated air cargo requirements for diving equipment and other accompanied baggage so that we can ensure appropriate space available. It is SSA's responsibility to be in contact with Jack Ferguson or his designee at USAID Kuwait to coordinate lodging and support for the SSA team.

-- Preliminary port assessment. USAID requires that the team that spends March 23-April 2 in Washington, deliver to Larry Sampler prior to the April 2 departure, three written products, each subject to revision based on the assessment on the ground:

;; an estimate of the potential for increasing the efficiency of the port over a six-month period and the procedures and equipment likely to be required to make those increases in efficiency. USAID will use this preliminary estimate to guide its logistical planning.

;; a description of the tasks that will be undertaken by the port administrator, including but not limited to channel pilots, traffic coordination in the Gulf, ship unloading, warehousing, despatch of cargo by truck, customs/entry procedures, collection and accounting of fees assessed to carriers or consignees. USAID will use this description to inform a variety of audiences on the complexity of the port operations and to help manage expectations of the port's role in freight handling.

;; a statement of information and logistical requirements by the assessment team when they arrive in the field. This document will be used as the basis for negotiation of logistical support until SSA's own vehicles etc arrive, as well as ensuring that appropriate contacts can be expeditiously established with civil and military information sources.

Kindly acknowledge this email to all addressees.

Ross Wherry



PL. APP. 13

USAID 13242

Senior Reconstruction Advisor

Asia and Near East Bureau

Agency for International Development

## Young, Peter(GC/LE)

**From:** Abood, John
**Sent:** Wednesday, February 05, 2003 1:19 PM
**To:** Quinlan, Anne
**Subject:** RE: Schedule for Pre-Bid Conference

Yes

-----Original Message-----
**From:** Quinlan, Anne
**Sent:** Wed, Feb 05, 2003 1:18 PM
**To:** Abood, John
**Subject:** FW: Schedule for Pre-Bid Conference

John, can we meet on these RFP's at 2:45 today?

-----Original Message-----
**From:** Abood, John
**Sent:** Wed, Feb 05, 2003 9:20 AM
**To:** Quinlan, Anne; Peterson, Dana
**Cc:** Stone, Denise; Goldman, Robert
**Subject:** RE: Schedule for Pre-Bid Conference

Anne:
I informed Dana (via email and voicemail) that I did not have any information whether or not previous USAID contracts for airport management and operations included language that permitted the contractor to raise working capital via carrier fees and charges. I have not had an opportunity to research this matter.

My recommendation continues to be that we permit these contractors (port and airport) to operate as they do in the commercial world – Charge carriers reasonable fees to raise working capital funds, and profit. Our contract will cover management salaries, per diem, travel, overhead, etc. and initial start-up, mobilization and working capital requirements. Given the costs covered by the USAID contract, the fees they charge should be very reasonable.

John

-----Original Message-----
**From:** Quinlan, Anne
**Sent:** Tue, Feb 04, 2003 6:42 PM
**To:** Abood, John
**Subject:** FW: Schedule for Pre-Bid Conference

John, are you aware that Dana is waiting on this information from you? I am taking the RFP's home tonight and plan to read them so I can get them back to you in the morning.

-----Original Message-----
**From:** Peterson, Dana
**Sent:** Tue, Feb 04, 2003 12:55 PM
**To:** Quinlan, Anne

PENGAD 800-631-6989 DEPOSITION EXHIBIT 7 Abood 5-25-06

USAID 21373



PL. APP. 15

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - -x
SSA MARINE, INC., :
Plaintiff, : No. 05-490C
vs. : (Chief Judge Damich)
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - -x

DEPOSITION OF ANNE QUINLAN

Washington, DC
Tuesday, May 23, 2006

REPORTED BY:
ERIN AVERY, RPR

Page 6

Q And what other responsibilities as a contracting officer?
A Well the contracting officer is responsible for negotiating and awarding contracts at a fair and reasonable price.
Q Did you negotiate the SSA contract?
A I participated in the negotiations. John Abood was the primary individual doing the negotiations, and I worked with him. I oversaw everything he did.
Q So were you responsible for the final language of the RFP?
A Yes.
Q Are you responsible for the final language in the contract as awarded?
A Yes.
Q Did you have direct discussions with any representatives of SSA Marine prior to the award of the contract?
A Yes, I did.
Q Please describe those for us.
A There was -- well -- oh, prior to the

Page 7

award?
Q Yes.
A I'm trying to remember if there was any occasion where I met with them. John Abood certainly did discuss and negotiate the contract with them.
Q My question would include both telephone conversations, face-to-face meetings and written or electronic communications.
A Right. I can't say with certainty, but I believe there was a meeting we had once before the contract was awarded.
Q Do you recall who that was with?
A Not offhand really.
Q Do you recall roughly when it would have been?
A No, I'm afraid I don't.
Q Do you recall where it would have been?
A If it had been anywhere, it would have been at USAID at that time.
Q Do you recall what the subject matter of that meeting was?

Page 8

A Not offhand, no.
Q How about upon further reflection?
A I can't say with certainty no, huh-uh.
Q Do you have any general idea?
A With certainty, I'd have to say I don't remember. I don't know.
Q Well, with certainty, or otherwise, do you have any general idea of what the subject matter of the meeting was?
A Well, I'm not even certain if I actually met them face to face prior to the award of the contract, that's the problem I'm having is I'm not even sure with certainty that I actually met with them. John Abood met with them on several occasions.
Q Did Mr. Abood report to you with respect to his meetings?
A Right, yes.
Q Can you describe to me, please, the conversations and communications that you had with Mr. Abood regarding the negotiation of this contract prior to its award?

Page 9

A I mean, I can't give you details. I don't remember details about it, but John Abood and I certainly discussed it on several occasions prior to the award of the contract.
Q Ms. Quinlan, was there any urgency associated with getting the Umm Qasr contract in place?
A Oh, there was urgency, yes, in getting all eight contracts in place, definitely.
Q Was there any particular urgency -- when you say all eight contracts, do you mean all eight contracts related to the conflict in Iraq?
A Yeah, just to give you a little bit of background, we awarded agency contracts in 2003, and I had been asked to manage the award of all eight of them. I was only a contracting officer over this one, but I actually had to work with the contracting officers on all the others too, at the same time. And that's why I'm having some difficulty remembering particulars because it was a very crazy time then.
Q Who was pressing you to get the seaport




ccf624cc-62a0-4fb8-9bd7-bac73fedb598

Page 10

contract done?
A Who was pressing me? The Asian Near East Bureau who was tasked with running their program.
Q Who runs the Asian Near East bureau?
A Who runs it now?
Q Who ran it then?
A At that time it was Wendy Chamberlain.
Q So Ms. Chamberlain was pushing you to get the contracts done?
A No, I can't say she was. I mean, I actually talked directly with Ross Wherry and Dana Peterson. I never talked directly with Wendy in terms of the urgency of the contract, no. I mean, there was pressure on us from the President of the United States to get the contracts awarded, ultimately.
Q How was that pressure communicated to you?
A To me, how was it communicated to me? Just the fact that by the time the conflict was over, we needed to have certain services up and running.
Q Who said to you the President wants this

Page 11

done?
A Oh, no one said that exactly to me the President wants it done, but it was clear that the White House did want it done because we couldn't fall on our faces with regard to getting the country up and running.
Q Ms. Quinlan, I'll hand you a document marked USAID 20746 and I'll ask the reporter to mark this as Exhibit 1, please.
(Quinlan Exhibit 1 identified.)
BY MR. BUTLER:
Q Ms. Quinlan, I'll just give you a minute to look that over, once you've had a chance to do that, let me know and I'll ask you a question or two.
(Witness reviewed the document.)
A Okay.
Q With respect to the -- well, first of all, do you recognize this document?
A I have vague recollection of it, yes.
Q Can you describe what the -- there appear to be two e-mail messages on this document; is that

Page 12

correct?
A Right.
Q And are they both copied to you?
A Right.
Q With respect to the bottom e-mail message, could you just read for the record, please, the first couple of sentences in that message?
A Sure. "John, I just heard from Wendy that you had both of the subject contracts before you were authorized to move to the Iraq RMT. I apologize for having to do this, but these actions have become critical to the White House and Andrew and everyone in between."
Q And who was the author of that e-mail?
A Tim Beans, who was the head of the office of procurement at that time.
Q So you -- he would have been -- Mr. Beans would have been your supervisor?
A Not directly.
Q But indirectly?
A Indirectly, right.
Q And do you recall having received this

Page 13

e-mail that you were copied on?
A Very vaguely. Honestly, like I said, there was so much going on at that time and so many e-mails, it sounds vaguely familiar.
Q Is this consistent, though, with your understanding of the pressure from the White House to get the contracts done?
A Sure, all eight of them.
Q And what's the date on the e-mail from Mr. Beans to Mr. Abood?
A March 20th.
Q Is that 2003?
A Yes.
Q Ms. Quinlan, I'll hand you a separate document marked USAID 05151. Do you recognize that document?
A That one I do, yes.
Q Could you tell us what it is, please?
A It's a note from me to John Abood.
Q And what's the date on that document?
A March 20th.
Q Is that also 2003?

Page 18

this document, please. I draw your attention to about halfway down the page there's an item marked Number 20. Do you see that?
A Yes, uh-huh.
Q And do you see -- could you read for us, please, next to subitem A what the description next to subitem A is?
A Detailed budget estimate in support of line items.
Q And is there an X in the box next to subitem A?
A Yes.
Q Are you aware whether a detailed budget estimate in support of the line items was created for this contract?
A Offhand, I can't say. I don't remember.
Q Did you ever see such a document?
A I don't remember if I did or didn't.
Q As the contracting officer, do you review the MAARD before its issued?
A I look at the MAARD in order to make sure the funding is there before I actually award a

Page 19

contract.
Q When you say that the funding is there, what does that mean?
A That there's sufficient funds to get the contract started.
Q And as part of your review, do you typically look to see -- I'm not talking about this contract, I'm talking about your typical practice, do you look to see whether there's a budget estimate with the MAARD?
A I don't focus on that as much as the contract specialist does.
Q Who's the contract specialist with respect to the SSA contract?
A John Abood.
Q Is it your responsibility to make sure that the government has an accurate estimate of costs before you award a contract?
A Yeah.
Q How did you determine what your estimated costs were for the entire operation of the Port of Umm Qasr under this contract without any cost

Page 20

estimate?
A There was some sort of a budget estimate. What I don't know is if it was actually attached to the MAARD or not.
Q Could you describe for me what that budget estimate looked like?
A Honestly, I don't remember, but normally, there are labor hours on there, labor categories, estimated -- other direct costs, like travel or per diems or whatever.
Q Wasn't part of the SSA contract -- wasn't one of the items under the SSA contract that they were supposed to do was to put together an implementation plan that would spell out what the cost for operating the port would be?
A They were to do an assessment.
Q And what was the purpose of that assessment?
A To find out not so much the cost of their labor, but to find out what type of repairs have to be done to the port in order to get it up and running.

Page 21

Q Was that assessment with respect to repairs and so forth then going to be used by AID to determine how much money to spend in the port?
A No. As far as I know or remember, that sort of thing was handled by Bechtel, the actual repairs to the port were going to be done by another contractor, not by SSA themselves.
Q Did SSA's -- was SSA's assessment to include any provision with respect to the costs associated with operating the port beyond the cost for SSA personnel?
A I don't know.
Q You don't know?
A Right now, no, I don't know.
Q Did you know at the time?
A Probably, yeah.
Q But you have no memory of this now?
A Not at all. As I told you, those months were very crazy and I was overseeing a lot of contracts, so, no, I have no recollection.
Q Can you tell us, please, what a memorandum of negotiation, is?







ccf624cc-62a0-4fb8-9bd7-bac73fedb598

Page 54

to know is whether you have any memory of what you understood this contract language to mean at the time that the contract was executed as opposed to what you may think it means to do. I'm asking if you have any memory of what you knew then.
A Well, if you're getting at the issue of additional profit --
Q No.
A There was never any intention of awarding additional profit to the contractor because --
Q You're not answering my question. My question is, with respect to the language that we have just discussed, do you have any memory of what you intended the language to mean at the time that the contract was executed?
A Yes.
Q What did you think --
A It's what I just mentioned.
Q Let me ask the question so we know what we're talking about.
A Okay.
Q What, at the time the contract was entered

Page 55

into, what was your intention with respect to the sentence that I've just read to you?
A At that point in time, we were thinking that we would use the revenue that was collected from ships that came in to port in order to reimburse SSA.
Q You say to reimburse SSA. Would that be for SSA's costs under the contract?
A Right.
Q Doesn't it also say that those funds will be used to pay contractor profits?
A Yeah, right. We were just considering using -- at that point in time, we were considering using the revenues collected in order to pay SSA's costs as opposed to using USAID-appropriated funds.
Q Didn't you, in fact, pay SSA everything that you paid them out of appropriated funds?
A Right. Eventually what happened is at the time the contract was awarded and, I guess shortly thereafter, there was this problem throughout Iraq, the issue of spending Iraqi money and that that wasn't a really good idea. The U.S. government

Page 56

changed their position.
And so they told us no, we've got to pay out of the USAID's appropriated funds. Because they were already concerned about the issue of being held accountable for managing Iraqi monies, appropriated monies.
Q Do you recall when that guidance came to you?
A No, I don't.
Q Do you recall from what source that guidance came to you?
A No.
Q Do you recall who told you about that guidance?
A Let me think. No, not exactly, I don't.
Q Based on the presence of this clause in the contract, is it correct to say that at the time you executed the contract, you weren't aware of any U.S. guidance that prohibited the use of Iraqi funds?
A At the time that we were awarded the contract?

Page 57

Q Yes.
A I wasn't aware of anything, no.
Q Had you been aware of such a prohibition, would you have included this clause in the contract?
A Possibly.
Q Despite the fact that there was a U.S. government directive not to?
A I guess I can only -- I mean, you're asking me to speculate.
Q Well, I don't want to ask you to speculate. Let me just be clear on the record, then, to your knowledge at the time you awarded the contract, is it true that you were not aware of any U.S. government directive not to use Iraqi funds?
A To the best of my recollection, yes.
(Pause.)
Q Have you ever been involved in a contract in which you used nonappropriated funds to pay a contract other than this contract and the airport contract?
A Nonappropriated funds?
Q Nonappropriated funds.

Page 62

labor on SSA's part, they would certainly have the opportunity to discuss additional fee with us.
Q And where in the language that you're reading does it talk about additional labor?
A I don't see it in that paragraph.
Q The understanding that you've just given to me, was that your understanding as of March 19, 2003?
A Yes.
Q And on what did you base that understanding?
A On what did I base that understanding?
Q Yes.
A I based that understanding on the fact that we had given them the maximum fixed fee that was allowable under statute.
Q Are you aware of any discussions that Mr. Abood had with SSA that indicated to SSA that they could derive profits above and beyond and separate from the 10 percent fixed fee?
A Any discussions?
Q That Mr. Abood had with SSA on that

Page 63

subject.
A As to whether he was saying that it would be possible, I don't know. I'm not privy to any conversations like that.
Q Do you know if Mr. Abood had any conversations with SSA on the subject of the availability of profit separate from the 10-percent fixed fee?
A I honestly don't know.
Q Did you have any conversations with Mr. Abood regarding the ability of SSA to obtain profit separate from the 10 percent fixed fee?
A Yes, I did.
Q When did you have those conversations?
A Somewhere around this point in time.
Q Do you recall what was said?
A I recall that SSA was unsatisfied with the 10 percent profit, and I had said well, that's a maximum we can give them, only additional level of effort on their part would allow for additional profit, and that was the extent of it.
Q And do you recall whether you had any

Page 64

e-mail exchanges with Mr. Abood on that subject?
A Well, the one here. I'm mentioning it here, that we were limiting it to 10 percent because of statute, and he's copied on it. And he definitely -- you know, as I think I already said, he definitely brought it to my attention that SSA was not happy being limited to the 10 percent, and I told him very emphatically well, we are limited by statute and that's the most we can give them.
Q Did you have that discussion with SSA prior to execution of the contract?
A You know, I know I made it emphatic. I don't know if I made it emphatic to John to tell SSA or if I actually directly told SSA. But I definitely made it emphatic that we had a statutory limit.
Q Is it correct that you testified earlier that you had reviewed the proposals put in by the offerors for this contract?
A That I what?
Q That you reviewed the proposals submitted by the offerors for the seaport contract.

Page 65

A Know, John Abood reviewed that. I didn't.
Q So you never reviewed the proposals?
A I didn't go through the proposals page by page. John Abood summarized it in the negotiation memorandum. Now, if anything caught my eye in the negotiation memorandum, I may have gone back and looked at the proposal, but I don't know that offhand.
Q But you did not look at the proposal from SSA itself?
A I can't say for sure. Like I said, if I -- when I reviewed the negotiation memorandum, if I had any issues or questions, I may have referred to their proposal. But I can't tell you for sure if I did or did not.
Q Well, Ms. Quinlan, I'm handing you a document -- I don't think we need to mark -- put in all of this as an exhibit. Let's put in that page as an exhibit. Numbered page 2.
(Quinlan Exhibit 10 identified.)
BY MR. BUTLER:
Q Ms. Quinlan, I'd ask that this document be

marked as Deposition Exhibit Number 10. Ms. Quinlan, this --
A If I could ask, who's document is this?
Q This is the document that you certified under oath as being true and correct to the best of your knowledge. This is the answer to the interrogatories that we propounded to USAID during the course of discovery in this case.
And on page number 2, the interrogatory states "identify each USAID employee, representative and/or agent who reviewed proposals submitted under the Solicitation."
Under response it states "the following individuals reviewed the proposals submitted under the Solicitation: John Abood, Dale Gredler, Robert MacLeod, Anne Quinlan, Mark Pickett, Ross Wherry."
A Right.
Q Is it your testimony now that you did not review SSA's proposal?
A No, it depends on what you're calling the actual proposal. I reviewed the negotiation memorandum, and in there, there was cost information



from SSA. Whether I actually looked beyond that into the proposal itself is another issue.
Q I'll hand you a document numbered USAID 093, which I would ask to be marked as Deposition Exhibit 11.
A Okay.
Q Do you recognize this document?
A Yes.
Q What is this document?
A It looks like it is the actual proposal from SSA.
Q Did you review this document prior to the award of the contract to SSA?
A I honestly don't know.
(Quinlan Exhibit 11 identified.)
BY MR. BUTLER:
Q Ms. Quinlan, I'll hand you a document marked USAID 02178 which I'll ask to be marked as Exhibit Number 12.
(Quinlan Exhibit 12 identified.)
(Witness reviewed the document.)
BY MR. BUTLER:



Q And I'll ask you to take a minute and look at both pages of that document.
A Okay.
Q I'll ask you to turn to the second page of that document if you would, it's marked 02179. And down a little bit from the top of the page there's what appears to be an e-mail from you to John Abood. Do you see that?
A Yes, uh-huh.
Q Did you write that e-mail?
A Yes.
Q And is the date of that January 13, 2004?
A Yes, it is.
Q Before we get to that, look at the bottom -- the five lines up from the bottom of that page, if you will. Do you see a notation in the e-mail from Ms. Reichert to you that says the contract noted: "USAID shall approve the fee and charge schedule and the level of contractor profit from operations."
Do you see that language?
A Yes, uh-huh.



Q Going back, then, to your e-mail to Mr. Abood, could you just read us the first paragraph of that e-mail.
A "My response is going to be the same response we provided to SSA.
Q No --
A Oh, mine to John?
"John, I need your input on this. I knew that the quoted language was going to get us in trouble. If they are going to take us to disputes. I'm not sure how we will fare. I know where you put it in to get them to sign the contract but it certainly gives the impression that we were acknowledging that there would probably be profit associated with the port fees."
Q Now, in the --
A Okay.
Q In the second sentence of what you just read, it says "I knew that the quoted language was going to get us in trouble."
Were you referring to quoted language that I just had you read in Ms. Reichert's e-mail below

**Young, Peter(GC/LE)**

**From:** Abood, John
**Sent:** Thursday, March 20, 2003 6:56 PM
**To:** Beans, Tim; Goldman, Robert; Stone, Denise; Farnsworth, Kate
**Cc:** Quinlan, Anne
**Subject:** RE: Seaport and Airport procurements for Iraq

Tim - So much work, so little time.
As agreed when I was assigned to the RMT, I will work on the Port contract until it is finished. I do not have the contractor's revised proposal (that reflects our negotiations) which has been promised for two days. I am promised it tomorrow morning. Once received I will incorporate a budget and level of effort into the contract and it should be ready for signature. I will prepare the balance of the negotiation memo (explaining our negotiations) and submit both to Anne for signature.

John

-----Original Message-----
**From:** Beans, Tim
**Sent:** Thu, Mar 20, 2003 6:23 PM
**To:** Abood, John; Goldman, Robert; Stone, Denise; Farnsworth, Kate
**Cc:** Quinlan, Anne
**Subject:** Seaport and Airport procurements for Iraq

John...I just heard from Wendy that you had both of the subject contracts before you were authorized to move to the Iraq RMT. I apologize for having to do this, but these actions have become critical to the White House and Andrew and everyone in between. I want you to remain on the important RMT but feel we are dead in the water if you do not help get these actions done by COB tomorrow....Even if it is a letter contract just authorizing them to proceed. Anne has assigned Joe and Marcella to the airport procurement but we will need you tomorrow to be here to move these critically important procurements along...by the way, we just took the Basra port this evening so this is even more critical that before. Things are hopping and we need your talents to get us over the hump on these hot, hot actions....All my best...Tim

DEPOSITION EXHIBIT 1 Quinlan
PENGAD 800-631-6989

DEPOSITION EXHIBIT 2 Quinlan PENGAD 800-631-6989

John — 3/20

The ANE Bureau is upset about the seaport + airport contracts not being awarded yet. They said its critical that they are awarded by tomorrow at the latest.

I hope you can devote your whole afternoon to this today so we can move ahead fast. It's really critical.

Anne

**Young, Peter(GC/LE)**

**From:** Quinlan, Anne
**Sent:** Monday, September 15, 2003 7:36 PM
**To:** Lucke, Lewis
**Cc:** Beans, Tim; Bell, Jeffery
**Subject:** RE: Problems with SSA Seaport Contract

Lew, you are correct in saying that USAID does not normally advance capital to firms awarded USAID contracts. We normally expect them to put out funding for anything that we ask them to do. However, in the case of large expenditures of capital in performance of the contract, there are times when an allowance is made to provide funding so a firm will not be out of pocket. This can be done through an advance of funds. I had a similar situation on the Currency Conversion Project with Louis Berger in Afghanistan. They had to lay out large sums of money for large dollar items like renting planes and helicopters and other large, expensive items. In this case, we decided it was easier to pay their invoices with a 24-hour turnaround (instead of 30 days) and that sufficed. We considered advancing the funds for this but, since it was going to be numerous purchases at various times, we decided the fast turnaround worked out better. In the case of the SSA contract, knowing that we might not get any firms who had worked Government contracts before (which is the case), John Abood set up the SOW to read more like the conditions in the commercial world of seaport management.

The SSA contract is not a normal USAID contract. Nor is the airport contract. I don't know if we've ever gotten involved in either type of business before. I do know that neither of our contractors have had US Government contracts before. Since this was such a unique situation for us and since we didn't know if we'd have any firms with previous Government contracts bidding on this (which is the case), we wanted to make the contract appear more similar to what is expected in the industry practice.

I hope this explains the change in normal procedures.

-----Original Message-----
**From:** Lucke, Lewis
**Sent:** Sunday, September 14, 2003 7:26 AM
**To:** Quinlan, Anne
**Cc:** Beans, Tim; Bell, Jeffery
**Subject:** RE: Problems with SSA Seaport Contract

Anne, I read through this again and have one more point to raise:

Every CO here, Deborah included, has insisted for a long while that AID does not advance working capital to contractors and the same goes for SSA. However, I have seen refs to such advances in the text of the contract that sure makes me wonder where the truth is..

How can there be such disconnects between the field's perception and OP? And why has this not be raised before? Why are we suddenly in "breach of contract" ? FYI every firm I have ever heard of that works with/for AID opens a credit line with their bank to operate with no advances, though this Is not my area.

Though not my operational business per se, why is this contract different and why has

DEPOSITION EXHIBIT 8 Quinlan
PENGAD 800-631

PL. APP. 25

there been so much confusion.....??

-----Original Message-----
**From:** Quinlan, Anne
**Sent:** Saturday, September 13, 2003 5:56 AM
**To:** Price, Neil
**Cc:** Lucke, Lewis; Beans, Tim; Bell, Jeffery; Guy, James; MacLeod, Robert; Peterson, Dana; Marburg-Goodman, Jeffrey; Wheelock, Tom; Simms, Deborah; Abood, John
**Subject:** Problems with SSA Seaport Contract

Representatives from OP (including Deborah Simms) and ANE met with SSA on Wednesday afternoon this week. We discussed modification 01 which has not yet been signed. I think we understand SSA's concerns about this mod and will send a revised mod to them for their signature. This mod will also transfer contract administration to USAID/Iraq. However, there were other items which they brought up which caused me some concern.

1. They mentioned that they have incurred operating expenses for which they have not been reimbursed. Their invoice was rejected and they were told that it wouldn't be approved until they signed mod 01. We will hopefully get their concurrence on a revision to mod 01 which will add incremental funding and hope that this item will be taken care of and their invoice will be paid promptly. Given the age of the invoice, it would be best if Cairo were asked to process this particular SSA invoice for payment within a few days of receipt.
2. More seriously though, we were informed that USAID has not provided them with start up funds and working capital which we specifically told them we would in CLIN 003. They said that they have had to borrow capital in order to provide the start up funds and working capital to start port operations as instructed. This means that we are currently in **breach of contract**. They can seek interest on the monies we owe them from the time when the Prompt Payment Act kicked in (30 days after submission of the invoice) to the point when the costs are finally paid. But, more importantly, they plan to walk off the job if this issue is not corrected very quickly. They have been told that the revenue from port operations cannot be used to reimburse them for these costs even though the contract said it would. Tom Wheelock said in an e-mail earlier today that they would be used for that purpose. I don't think it's important if they are paid from the revenues or from other USAID funding. The important thing is that they are paid for these outlays from some source quickly.

They also brought up the issue of profit on port revenues. They said that the clause addressing the financing of port operations specifically allowed for them to receive profit from the revenues. We told them that was not what was intended in this section of the contract. We were just stating that any of the contract's expenses could be reimbursed by port revenues including the profit we owed them from normal operating expenses. I informed them again (as I have in the past during contract negotiations) that we have a statutory limit of 10% on the amount of profit a contractor can receive on cost reimbursement contracts. They said that they will pursue this issue separately via a claim against the Government.

I believe that covers the major issues that were raised at the meeting and our responses. If anyone would like to add anything, please feel free to do so.

DEPOSITION EXHIBIT 12 Quinlan
PENGAD 800-631-6989

## Abood, John

**From:** Abood, John
**Sent:** Wednesday, January 14, 2004 6:16 PM
**To:** Quinlan, Anne
**Cc:** Scherl, Denise
**Subject:** RE: SSA Transition planning

USAID 02178

Anne,
My response is going to be the same response we provided to SSA and the field in the past.

The clause is intended to deal with circumstances that were unknown at the time the contract was awarded. We did not know anything about the condition of the port and whether or not the contractor would be asked to do anything, beyond provide the specific negotiated level of effort to the government. There were many unknowns at the contract award and the clause states the broad parameters for future potential additional contract performance. The clause intends to permit the use of commercial tariff revenue to pay for USAID contract costs. Tariff schedules were approved, but port operations were paid for from direct USAID accounts and other sources of funding. Ultimately, SSA only provided the level of effort originally negotiated in the contract. The level of effort was paid by USAID directly with appropriated funds. Profit on the SSA level of effort (10 percent) was the highest we could approve under the current procurement statutes. Their profit was also paid by USAID directly with appropriated funds.

We needed a broad statement of port working capital funding and that is what the "Financing Port Operations" clause reveals. Start up working capital was provided by the agency. My interpretation of the clause continues as follows:

"After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners." This means that we may obtain funds for these cost elements from port operation (tariff) revenues. It does not mean that the contractor will obtain additional profits under the contract, especially when their level of effort is not increased. Actually, the government provided the working capital with appropriated and other funds, and the tariff revenue was given to the Iraqi Port Authority.

"USAID shall approve the fee and charge schedule and the level of contractor profit from operations." This means that the government will approve the tariff schedule. This means that if the contractor is asked by the government to provide additional level of effort toward port operations, then the government may approve the level of contractor profit from operations. Actually, the contractor was not asked to provide additional level of effort for port operations, and so there is no basis for any additional level of contractor profit associated with port operations. No additional contractor profit is approved by the government.

"To the extent that revenues exceed costs and negotiated maximum profit margin or level, USAID shall determine the use of any remaining funds in the port operation account." This means that USAID will determine the use of any funds available but not used to pay for contract costs and the negotiated maximum profit margin. Since the negotiated maximum profit margin is 10 percent of the level of effort expenses (the maximum permitted by statute) -- and USAID paid for the port working capital from its own appropriated accounts -- USAID decided to turn all of the tariff revenue over to the IPA (I understand).

The clause does not approve any additional level of effort, any additional costs, any additional profit. It establishes that USAID may approve the use of commercial tariff revenues to pay for contract expenses. It establishes that USAID may approve additional level of effort by the contractor for port operations. As it turns out, the Government did not ask the contractor to provide additional level of effort, and the Government provided the working capital for operations. Because the commercial revenue collected from operations was not

used to pay for contract costs, it was given to the IPA (as far as I know).

Anne, do not send this to the field until we have had a chance to discuss and review.

John Abood

-----Original Message-----
From: Quinlan, Anne
Sent: Tuesday, January 13, 2004 7:21 PM
To: Abood, John
Cc: Scherl, Denise
Subject: FW: SSA Transition planning

John, I need your input on this. I knew that the quoted language was going to get us in trouble. If they are going to take us to disputes, I'm not sure how we will fare. I know you put it in to get them to sign the contract but it certainly gives the impression that we were acknowledging that there would probably be profit associated with the port fees.

Can you please give Alvera an explanation of this wording? If it goes to a dispute, we can deal with GC at that point in time.

-----Original Message-----
From: Reichert, Alvera (Iraq/CO)
Sent: Tuesday, January 13, 2004 8:15 AM
To: Quinlan, Anne
Cc: Abood, John
Subject: FW: SSA Transition planning

Anne,

We need a reading on the SSAM issue (previous letter sent to you, contractor profit from operations) soonest. John Groarke said we'll need Contracts/GC also involved if we think this is headed for a "dispute"-

I've reviewed the files but when CLIN 003 was broken down in Mod 1 eff 5/24/2003-

003A LOE TEC 3,895,628 (it didn't mention fee-but from original contract CLIN 003 Port Operations was Cost 3,541,480; fee=354,148 CPFF=3,895,628)

003 B Port Operations TEC 3,818,258 (no fee was mentioned)

003 C Capital Projects TEC 6,580,000 (no fee was mentioned)

The contract noted : "USAID shall approve the fee and charge schedule and the level of contractor profit from operations."

Port Revenues were not addressed in the above CLINS

There is a neg memo for the basic award but no memos for the mod in 5/2003 so we really need your input and guidance (draft letter) to move forward on this. Thx & regards

Alvera Reichert

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - -x
SSA MARINE, INC., :
Plaintiff, : No. 05-490C
vs. : (Chief Judge Damich)
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - -x

DEPOSITION OF ROSS WHERRY

Washington, DC
Thursday, April 20, 2006

REPORTED BY:
ERIN AVERY, RPR

Q And the e-mail traffic that you reviewed, was that internal USAID traffic?

A It was a mix of internal USAID traffic and an amount of traffic with SSA people, specifically Bob Watters and Fergus Moran.

Q Now, in preparation for your deposition today, did you speak with anyone?

A I spoke with USAID counsel.

Q Did you speak with anyone other than counsel?

A No.

Q When did you first become involved in the Iraq reconstruction process?

A I became involved in the Iraq reconstruction process in September of 2002.

Q If you would, beginning in September of 2002, please describe your role in that reconstruction process.

A For the period September of 2002 through January 16th of 2003, there was a program -- national security classified; I can't discuss the details of it -- to look at the contingencies that

would be required if there were to be an invasion of Iraq. What would the U.S. government be required to do in the aftermath of that invasion?

Q If I may stop you, is that -- is that directive still classified?

A Those materials are still classified.

Q Please continue.

A The requirement that was given to us was that if the -- and I emphasize the "if." If the negotiations with the Iraqi government failed, if the negotiations with the United Nations failed, if it became necessary for the United States to take military action, then what would be the appropriate response after the military action was completed in order to deliver humanitarian assistance and such reconstruction assistance as the President might designate. So my job was to put together contingency plans.

Q Now, for USAID were you the person who was primarily in charge of that effort?

A I was the lead person.

Q And who worked with you?

A I had two assistants. One is Christopher Milligan. The second is Dana Peterson.
Q And what were their roles?
A They worked with me as my assistants. And as the contingency plans took shape and then eventually in January as we went unclassified, they were responsible for managing the teams that actually put together the detailed plans for what USAID might be required to do.
Q Now, did your planning responsibilities include planning for reconstruction and/or operation of seaports?
A The plans that we were putting together -- I'm sorry, yes, they did.
Q And did you put together plans for one seaport or more than one seaport?
A We put together plans for only one seaport.
Q Which port was that?
A That was Umm Qasr, which is the largest viable port on the Persian Gulf coast of Iraq.
Q And why was Umm Qasr chosen as the only

port to focus on?
A Umm Qasr was chosen because that was entirely within Iraqi territory. The port of Basrah was not chosen because it borders -- the other side of the waterway borders Iran.
Q In doing your planning for reconstruction and operation of the port of Umm Qasr, did you work with Anne Quinlan and John Abood?
A I did.
Q In which office are they?
A They're located in the management bureau, the office of procurement.
Q And what's the relationship between Ms. Quinlan and Mr. Abood in terms of their professional positions?
A John is a contracting officer. Anne, I believe, is in a supervisory position. I don't know the exact job titles.
Q So your understanding is that John works for Anne?
A I don't know if he works for her. I know that she is a more senior person than he is.

requirement that we wanted it to be as much a private port as we could do, and therefore the proposers should be considering how they would start from a state-owned -- state-run operation moving towards a privately operated port.

We didn't know what it might look like, and we didn't know what kind of a port would be left. We weren't sure who was to be -- if it would be destroyed, if there would be infrastructure left there. We didn't know anything about the labor force. All of the -- the details of how one manages a port were opaque to us at that point, but we did -- I pushed the -- both the airport contract -- airport bidders and the seaport bidders to consider how would you do this the way that it's done everywhere else in the free world rather than as a state-run monopoly?

Q And did those bidders -- particularly, did SSA indicate to you in any way whether they were comfortable with the idea of this commercial-type model?

A SSA specifically, I don't recall. The

of discussions, I don't recall anything. We did not perceive substantial problems with the RFP. I know that we were concerned -- as it became closer and closer to the time of the eventual invasion and the political situation was deteriorating, we had a concern with all of our contract, not just this one, that we be ready in case we were called upon.

Q Were there people in the administration that were indicating to you that there was an emergency of getting these contracts completed?

A The guidance that we were given was that, yes, if the military goes across the line, you better be able to have your people ready to follow them at the appropriate guidance from the ground commander.

Q And from whom did that guidance come to you?

A That came to me directly from the NSC, from the National Security Council.

Q And from what person?

A The person in charge at that time was Robin Cleveland.

Q So that came directly to you and not through, for example, Wendy Chamberlain?

A In that particular instance, Wendy was in the meeting. Robin was looking at me when she said it.

Q And were you given any instructions by NSC as to whether you had any flexibility in contracting in order to get the job done?

A We had, at that point, explained in general terms that we had to -- to the NSC people that we had used our most flexible contracting mechanism, and we were prepared to do everything that was legal within the way that the U.S. Government buys things.

Q What is your most flexible contract mechanism?

A Cost plus fixed fee. And I believe that that's the eventual contract, I believe, was the cost plus fixed fee.

Q Mr. Wherry, I'll hand you a document that was produced by USAID.

(Wherry Exhibit 3 identified.)

whatever it is they need to cause the project to be successful.

Q You say on the technical side. Are you aware of any problems with the contract administration on the financial side?

A I know that in the summer of 2003, there was a requirement for additional infrastructure. There was not sufficient funds in the contract, and after the appropriate justifications had come in from the field, I was tasked with finding additional funding to help the port continue to start up its activities.

Q How much additional funding did you find?

A The requirement, I believe, was for $6 million.

Q And where did that money come from?

A That money we -- came from the Iraq relief and reconstruction fund, IRRF. We had to -- requested from OMB, and there was a paperwork process in order to justify why we needed additional funds, what we were going to use it for, and then it would be authorized and passed out to the -- it was

authorized. I don't recall whether the funds were placed in the contract by the Washington procurement office or the Baghdad procurement office.

The requirement for me was to make sure that I had the funds authorized through OMB and then made available to the -- to our finance office so they could sign if the funds were available, and then the contracting officer could actually put them into the contract. But I don't know who signed the modification to put the additional money in.

Q Where was the money that was in the Iraqi reconstruction fund? Where did that come from in the first place?

A There was a supplemental appropriation passed, I believe, in the first half of April 2003, $2-1/2 billion which provided the initial funds for the activities carried out by USAID Department of State and the Department of State. That fund was controlled by OMB, and they were the ones that -- to whom we had to go with the justification on why additional funds for one or another contract were required. They were the oversight activity.

**Young, Peter(GC/LE)**

**From:** Milligan, Christopher
**Sent:** Friday, January 17, 2003 5:46 PM
**To:** Quinlan, Anne; Peterson, Dana; Abood, John
**Cc:** Wherry, Ross
**Subject:** RE: Port Administration SOW

Ross and I concur wih the concept of port fees and charges.

Should we include the possibility of civilian airports under this SOW? I will give it read through now.

Cheers, Chris

---Original Message-----
**From:** Quinlan, Anne
**Sent:** Sat 1/18/2003 4:53 AM
**To:** Milligan, Christopher; Peterson, Dana
**Cc:** Wherry, Ross
**Subject:** Port Administration SOW

Here is a revised draft of the port administration contract that John Abood put together. Please review and let us (John Abood and myself) know if it's acceptable.

The attached draft solicitation incorporates the use of port fees and charges to provide the working capital for port operations. The bureau (Milligan) is in favor of the concept, but has not yet responded with a formal OK. Let me know if you have any comments. I gave a copy to Anne.

<< PortUSAIDSolicitation.doc >>

John J. Abood
Contracting Officer
Transportation Branch

Anne Quinlan
Division Chief, M/OP/EER
USAID Office of Procurement
Tel. 202-712-4614
Fax 202-216-3396
E-mail: <aquinlan@usaid.gov>

DEPOSITION EXHIBIT
PENGAD 800-631-6989
Wherry 1
EA 4-20-06

USAID 13250

PL. APP. 38

02/14/2006