**From:** Price, Neil

**To:** Kyle Lukins;

**CC:** Chamberlin, Wendy; Natsios, Andrew; Wherry, Ross; Quinlan, Anne; Abood, John; Simms, Deborah; MacLeod, Robert; Thomas Wheelock (E-mail); Hautamaki, Craig; John Gaughan (E-mail); Tom Korologos (E-mail); Iraq Team; Beans, Tim; OFDANET: llucke; Gast, Earl;

**Subject:** RE: Port of Umm Qasr Funding

**Date:** Thursday, September 04, 2003 8:15:16 AM

**Attachments:**

---

Dear Mr. Flynn,

We are in receipt of your letter of September 2, 2003.

Having granted your request to procure additional security services for the Umm Qasr Port noncompetitively, we are surprised by your continued accusations that USAID has failed to respond to your security concerns. We are also disappointed by SSA's continued use of threats and disingenuous arguments to buttress its request for additional funding. These negotiating tactics are counterproductive and hinder our ability to resolve disputed issues consensually.

As I explained in my August 31 letter, SSA's contract is fully-funded to $4.8 million and thus has sufficient un-accrued funds available to initiate the immediate provision by SSA of additional security services. We trust that SSA is now moving expeditiously to acquire these services. Failure to do so could be construed as failure to make progress so as to endanger performance.

We do understand, however, that this expense may create a future shortfall in funding for other services contemplated under the contract. We therefore have and continue to offer additional funding for SSA's contract through Contract Modification 1, both for capital expenditures and for enhanced security. I nevertheless understand that, despite repeated efforts by USAID to obtain SSA's agreement, you have

refused to sign the modification. Thus, to the extent that there are insufficient funds to complete all services contemplated under the contract, including the provision of additional security services, the responsibility rests with SSA, not USAID. Indeed, contrary to the assertion in your letter that "monies are promised, but … never appear," SSA has to date refused the additional funds offered by USAID.

I understand that SSA may be using its refusal to sign Modification 1 and its threat to stop work as leverage to obtain USAID's agreement to allow it to profit from fees paid by Umm Qasr Port customers. However, we cannot presently allow SSA to profit from Port operations. Section B.2 of the contract is unambiguous that this is a cost plus fixed fee type contract. SSA's "profit" has thus been established firmly under Section B of the contract and cannot be supplemented by Port operation fees. It is only after the Umm Qasr Port is fully operational, and there is agreement that SSA will provide additional services beyond those contemplated under the contract, that USAID could consider allowing SSA to retain Umm Qasr profits. No such agreement has yet been reached, nor will such agreement likely ever be reached as CPA has informally informed USAID that it will not consider a request for profits from a port operator under present circumstances. The Port is not fully operational and will not become so without the capital expenditures provided for through Contract Modification 1.

If SSA cannot handle the acquisition of the capital equipment necessary to make the Umm Qasr Port fully operational, USAID is willing to modify the contract and itself accept that responsibility. Thus, we propose a revised Contract Modification 1 that provides funding for enhanced security at the Umm Qasr Port and for CLIN 004. The currently Proposed CLIN 005 would be eliminated. This is a matter we hoped to discuss with you next week and hope you will reconsider our suggestion to set a date for a face to face meeting.

USAID's commitment to reconstruction of the Umm Qasr Port and good faith dealing with SSA has been demonstrated by its willingness to compromise on key matters of contention. It is now time for SSA to demonstrate its commitment and good

faith.

Neil G. Price
Supervisory Contracting Officer
USAID/Iraq

-----Original Message-----
From: Kyle Lukins [mailto:kyle.lukins@carrix.com]
Sent: Tuesday, September 02, 2003 3:13 PM
To: Price, Neil
Cc: Chamberlin, Wendy; Natsios, Andrew; Wherry, Ross; Quinlan, Anne; Abood, John; Simms, Deborah; MacLeod, Robert; Thomas Wheelock (E-mail); Hautamaki, Craig; John Gaughan (E-mail); Tom Korologos (E-mail); Iraq Team
Subject: Port of Umm Qasr Funding

Please see the attached letter from Dan Flynn. Mr. Gaughan, please forward this message to Mr. Trent. Mr. Price, please forward this message to Mr. Lucke. Thank you.

Kyle B. Lukins
Vice President - General Counsel
SSA Marine, Inc.
1131 SW Klickitat Way
Seattle, Washington 98134
(206) 654-3547
(206) 682-0197 (fax)
(206) 409-7574 (cell)
kyle.lukins@ssamarine.com

<<Neil Price USAID 9.2.03.pdf>>

**From:** Bob Watters
**To:** "AReichert@usaid.gov";
**CC:** "Wheelock, Tom (Iraq/ENGO)"; MacLeod, Robert (Iraq/ PRO); chautamaki@usaid.gov; "aquinlan@usaid.gov"; Dan Flynn; Kyle Lukins; Mark Johnson; Fergus Moran; Scott Heimberger; "Butler, John";
**Subject:** The "Financing Port operations clause in CLIN 003
**Date:** Tuesday, December 30, 2003 2:52:45 PM
**Attachments:** Reichert Profit Letter 123003 .doc

---

Dear Ms. Reichert........please see the attached letter relevant to this clause in our contract.

Thank you

Bob Watters
Vice-President
Managing Director - Asia

SSAMarine
A Carrix Enterprise

1131 SW Klickitat Way
Seattle Washington
98134

800/422-3505 tel
206/623-0179 fax

December 30, 2003

Ms. Alvera Reichert
Iraq Contracting Officer
USAID

Dear Ms. Reichert :

By letter dated November 27, 2003, Mr. James D. Goodwin directed SSA to transfer the sum of US $300,000 (three hundred thousand U.S. dollars) from the port operating revenue account to IPA. That transfer is in process (or by now has been completed) in accordance with USAID's instructions.

USAID's only contractual authority to issue funds transfer instructions is found in the "Financing Port Operations" clause in CLIN 003 of the contract. That clause provides in relevant part as follows:

> After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners. <u>USAID shall approve the fee and charge schedule and the level of contractor profit from operations</u>. The contractor shall present USAID with monthly financial statements outlining the costs, revenues, and profits from operations. The contractor shall maintain separate bank account(s) and records regarding port costs and revenues under this contract. <u>To the extent that revenues exceed costs and negotiated maximum profit margin or level, USAID shall determine the use of any remaining funds in the port operation accounts</u>. (emphasis added)

With respect to the underlined language in the passage above, we note that USAID determinations regarding use of funds are to occur only with respect to funds that are <u>excess</u> to the contractor's operating expenses and profit, which are also to be paid from revenues. On numerous occasions USAID has instructed SSA not to use port revenues to pay for operating expenses, advising instead that payments would be made through appropriated funds. In addition, despite SSA's proposal in mid-August of this year of an operating profit of $2.20 per metric ton, USAID has to date not approved any profit figure as required by the contract.

In light of the foregoing, SSA is complying with the transfer request because USAID has represented to us that the funds transferred are to be used by IPA for specific port operating costs (i.e., fuel and guards) that might otherwise fall to SSA. We note, however, that our request that USAID fulfill its contractual obligation to agree upon a reasonable profit figure remains pending. In the event that USAID does not provide its

SSAMarine
A Carrix Enterprise

1131 SW Klickitat Way
Seattle Washington
98134

800/422-3505 tel
206/623-0179 fax

agreement for that profit figure and allow payment of same retroactive to the date that SSA assumed operating responsibility for the port, SSA hereby explicitly reserves the right to file a claim under the Disputes clause of the contract and the Contract Disputes Act. In addition to any other compensation or equitable relief that might be available, SSA expressly and without limitation reserves the right to payment of a reasonable profit for all cargo handled after SSA was directed to manage port operations, plus pre- and post-award interest for such amounts, dating in each case from the date that the invoice was issued for the relevant service. SSA also expressly reserves the right to claim interest on all monies that it has forwarded to USAID for port expenses that would have been directly and immediately reimbursable from port revenues but for USAID's express instructions that SSA was not to use those funds for such purposes.

We look forward to your prompt agreement to our conservative proposal for allowable operating profit.

Sincerely,

Bob Watters
Vice President
Managing Director – Asia

Cc: T. Wheelock
B. MacLeod
C. Hautemaki
A. Quinlan
D. Flynn
K. Lukins
M. Johnson
F. Moran
S. Heimberger
J. Butler

**U.S. Agency for International Development**
**Contracting Office**
Iraq Mission
CPA (USAID)
APO AE 09335

USAID Ref: CO-SSA-04-016

Bob Watters
Vice President and Managing Director-Asia
Stevedoring Services of America (SSA)
1131 SW Klickitat Way
Seattle, WA 98134

Subject: Port Operations

Ref: December 30, 2003 Watters/Reichert SSA Letter

Dear Mr. Watters:

We have reviewed your December 30, 2003 letter requesting USAID approval for SSA Marine ("SSA") to retain as profit a portion of the revenue generated by the operation of the Umm Qasr Port.

As we stated in a September 4, 2003 electronic message to Mr. Daniel J. Flynn, Senior Vice President of SSA, Section B.2 of SSA's contract with USAID is clear that the contract is a "cost plus, fixed fee" agreement. Under this type of arrangement, SSA's profit is firmly established in the contract at the statutory maximum rate of 10% and cannot be supplemented unless SSA provides services over and above those contemplated under the contract.

We understand that the intent of the "Financing Port Operations" section of the contract to which you refer in your letter is that, in the event SSA supplies additional services supporting the operation of the Umm Qasr Port, USAID would consider paying SSA additional profit, perhaps paid from port revenues. Since SSA has to date not provided such additional services under the contract, USAID cannot agree to additional profit under the contract, whether paid with appropriated funds or port tariff revenues. Indeed, not only would such approval be inconsistent

DEF EXHIBIT
EXHIBIT
123
Watters

USAID 02055

with the terms of the contract, it would result in a violation of the statutory requirement that the profit on "cost plus, fixed fee" arrangements not exceed 10% of the total contract price.

We understand your disappointment with our position, but it is clear that SSA is not entitled to retain a portion of the Umm Qasr Port revenues as profits.

Sincerely,

Alvera Reichert
Contracting Officer

cc: Robert Macleod, CTO
Anne Quinlan, M/OP
John Abood, M/OP
John Groarke, RLA

# Connecting Iraq to the World

## Transportation Rehabilitation

November 2003

### Challenges:

Though the transportation infrastructure sustained minimal damage during the recent conflict, it was severely neglected under the Hussein regime. The deterioration was due to lack of investment and maintenance over the past two decades. The challenge is to restore the transportation in order to effectively provide assistance and restore normal transportation services to the Iraqi people.

Effective humanitarian assistance and reconstruction requires functional airports, seaports, roads, bridges, and railroads.

### Goals:

USAID's transportation infrastructure projects support Iraqi and Coalition Provisional Authority (CPA) priorities in facilitating the movement of passengers and goods quickly and effectively.

To meet these goals USAID is:

• Preparing two international airports—in Baghdad and Basrah—for the resumption of commercial traffic.

• Rehabilitating the port at Umm Qasr to handle modern shipping operations

• Repairing bridges and roads which are critical to moving people and equipment and ultimately restoring commerce throughout the country.

• Repairing sections of railroad to ensure bulk grain and freight movement to key locations.



*Terminal C at Baghdad International Airport has been refurbished and repaired as part of a $17.5 million project to rebuild Iraqi airports in Baghdad, Basrah and Mosul. The airport has the capacity to handle 7.5 million passengers a day. (USAID photograph)*




*Over 3.8 million cubic meters of mud – the size of a football field 23 stories high – have been dredged from the Umm Qasr port channel. Humanitarian relief shipments, along with commercial traffic, are now able to enter the port to provide much needed relief and stimulate economic activity. (USAID photograph)*

### Progress includes:

Airports:

• Over 500 military and NGO flights since July have arrived and departed smoothly at Baghdad International Airport. Passengers are processed by CPA immigration, baggage, and customs personnel.

• Completed significant amount of infrastructure work at Baghdad International Airport (BIAP) and Basrah International Airport (BIA).

Seaports:

• Port reopened to commercial traffic June 17; and first passenger vessel arrived July 16—exceeding goals for the use of the port and restoration of these services.

• Major dredging activities are now complete and port is able to handle deep-draft ships at all 21 berths.

• Power and grain facilities operational, enabling the storage and distribution of humanitarian supplies.

• Interim port tariffs were approved and applied on June 20, providing a revenue stream for the financial sustainability for port operations.

Sector Snapshot

**Working in close cooperation with the Coalition Provisional Authority to improve the lives of the Iraqi people, USAID is devoting substantial resources throughout the country to restore critical infrastructure, support the delivery of healthcare and education services, expand economic opportunities, and improve governance.**



ClaimTab10

Sector Snapshot

# Improving Transportation



*One of many sites in Iraq. Repairs have begun on the damaged Khazir River bridge on the route from Mosul to Kirkuk and on the Al Mat and Tikrit bridges as well. (USAID photograph)*

Bridges:

• Construction of a 1.5-kilometer, four-lane bypass for the damaged Al-Mat Bridge west of Baghdad was completed in September. Over 3000 trucks a day use the bypass. The new bridge is to be completed by February 2004.

• In order to reconnect Baghdad to key northern cities, demolition of irreparable sections of two key bridges was completed and new construction has commenced. Khazir bridge is scheduled for completion in January 2004, and the Tikrit bridge in May 2004.



*Iraqi workers are unloading humanitarian relief food that will be transported from the port at Umm Qasr, along the rehabilitated section of the railroad. (USAID photograph)*

## Progress cont'd:

Railroad:

• Rehabilitating a 72 km (45 miles) section of track from Umm Qasr to Shuiaba Junctions (near Basrah) to assist in transporting critical relief supplies.

### Iraq Surface Transportation




*The Al mat bypass and the Highway 10 blockage removal are completed and three other major bridge repair work is on schedule in order to reconnect Baghdad to the major northern cities.*

**Over 500,000 MT of cargo has been shipped through Umm Qasr Port since May 22, 2003.**

Case 1:05-cv-00490-TCW Document 34-5 Filed 11/09/2006 Page 11 of 16

THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
March 25, 2003

# Text of a Letter from the President to the Speaker of the House of Representatives

Dear Mr. Speaker:

On October 16, 2002, I signed into law the "Authorization for Use of Military Force Against Iraq Resolution of 2002" (Public Law 107-243). After condemning Saddam Hussein's continued possession of chemical and biological weapons, obstruction of inspections, and brutal repression of the Iraqi people, the Congress affirmed, "Iraq poses a continuing threat to the national security of the United States and international peace and security of the Persian Gulf region and remains in material and unacceptable breach of its international obligations."

Subsequent to enactment of Public Law 107-243, the United Nations Security Council unanimously agreed to Resolution 1441 offering Iraq one final chance to disarm. After more than a decade of deceit and defiance, the regime, yet again, failed to "fully and unconditionally" comply. Iraq continues to pose a grave danger to global peace and security. The United States and our allies must seek to disarm Iraq and liberate the Iraqi people, and we will prevail.

Today, I submit a request for 2003 supplemental appropriations to support Department of Defense operations in Iraq and to strengthen the capabilities of our friends and allies who will share the burden of military and stabilization activities. Disarming and liberating Iraq is a first step. This request also provides immediate humanitarian relief, support for reconstruction, and the development of a free-market democracy in Iraq. Finally, the request will enhance the safety and well-being of Americans at home and abroad with investments managed by the Department of State, the Department of Homeland Security, and other agencies.

This request reflects urgent and essential requirements. Much of the funding has been requested with flexible authorities. This flexibility will ensure requirements can be immediately addressed as they arise despite the unpredictable scope, duration, and intensity of operations. I ask the Congress to appropriate the funds as requested, and promptly send the bill to me for signature. I urge the Congress to refrain from attaching items not directly related to the emergency at hand.

This supplemental request provides essential support to help guarantee the success and safety of our men and women in uniform, to help enhance the security of America and her citizens, and to estab-lish an Iraqi nation, free, prospering and at peace with its neighbors.

Sincerely,

GEORGE W. BUSH

###

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2003/03/20030325-3.html

CLICK HERE TO PRINT

**PL. APP. 88**

Public Law 108–11
108th Congress

# An Act

Making emergency wartime supplemental appropriations for the fiscal year 2003, and for other purposes.

Apr. 16, 2003
[H.R. 1559]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the fiscal year ending September 30, 2003, and for other purposes, namely:

Emergency Wartime Supplemental Appropriations Act, 2003.

## TITLE I—WAR-RELATED APPROPRIATIONS

## CHAPTER 1

## DEPARTMENT OF AGRICULTURE

### Agricultural Research Service

#### BUILDINGS AND FACILITIES

For an additional amount for "Buildings and Facilities", $110,000,000, to remain available until expended.

### Public Law 480 Title II Grants

#### (INCLUDING TRANSFER OF FUNDS)

For additional expenses during the current fiscal year, not otherwise recoverable, and unrecovered prior years' costs, including interest thereon, under the Agricultural Trade Development and Assistance Act of 1954, $369,000,000, to remain available until expended, for commodities supplied in connection with dispositions abroad under title II of said Act: *Provided,* That from this amount, to the maximum extent possible, funding shall be restored to the previously approved fiscal year 2003 programs under section 204(a)(2) of the Agricultural Trade Development and Assistance Act of 1954: *Provided further,* That of the funds provided under this heading, the Secretary of Agriculture shall transfer to the Commodity Credit Corporation $69,000,000 to acquire a quantity of commodities for use in administering the Bill Emerson Humanitarian Trust: *Provided further,* That the authority contained in 7 U.S.C. 1736f–1(c)(4) shall not apply during fiscal year 2003 for any release of commodities after the date of enactment of this Act.

INTERNATIONAL DISASTER ASSISTANCE

For an additional amount for "International Disaster Assistance", $143,800,000, to remain available until expended: *Provided*, That amounts made available pursuant to section 492(b) of the Foreign Assistance Act of 1961 for the purpose of addressing relief and rehabilitation needs in Iraq, prior to enactment of this Act, shall be in addition to the amount that may be obligated in any fiscal year under that section: *Provided further,* That during the remainder of fiscal year 2003 the authority referenced in the preceding proviso may not be utilized unless written notice has been provided to the Committees on Appropriations not less than 5 days prior to the exercise of such authority.

OPERATING EXPENSES OF THE UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT

For an additional amount for "Operating Expenses of the United States Agency for International Development", $24,500,000, of which not less than $3,500,000 may be transferred to and merged with "Operating Expenses of the United States Agency for International Development Office of Inspector General" for financial and program audits of the Iraq Relief and Reconstruction Fund and other assistance for Iraq.

## OTHER BILATERAL ECONOMIC ASSISTANCE

### FUNDS APPROPRIATED TO THE PRESIDENT

IRAQ RELIEF AND RECONSTRUCTION FUND

(INCLUDING TRANSFERS OF FUNDS)

For necessary expenses for humanitarian assistance in and around Iraq and to carry out the purposes of the Foreign Assistance Act of 1961 for rehabilitation and reconstruction in Iraq, there is appropriated to the President, $2,475,000,000, to remain available until September 30, 2004, including for the costs of: (1) water/sanitation infrastructure; (2) feeding and food distribution; (3) supporting relief efforts related to refugees, internally displaced persons, and vulnerable individuals, including assistance for families of innocent Iraqi civilians who suffer losses as a result of military operations; (4) electricity; (5) healthcare; (6) telecommunications; (7) economic and financial policy; (8) education; (9) transportation; (10) rule of law and governance; (11) humanitarian demining; and (12) agriculture: *Provided*, That these funds shall be apportioned only to the Department of State, the United States Agency for International Development, the Department of the Treasury, the Department of Defense, and the Department of Health and Human Services, as appropriate, for expenses to meet such costs: *Provided further*, That funds appropriated under this heading shall be used to fully reimburse accounts administered by the Department of State, the Department of the Treasury and the United States Agency for International Development, not otherwise reimbursed from funds appropriated by this chapter, for obligations incurred for the purposes provided under this heading prior to enactment of this Act from funds appropriated for foreign operations, export financing, and related programs: *Provided further*, That prior to the initial apportionment of funds made available under this

heading to any agency or department, the President, or his designee, shall consult with the Committees on Appropriations on plans for the use of the funds appropriated under this heading that will be used for assistance for Iraq: *Provided further*, That upon a determination that all or part of the funds transferred from this appropriation are not necessary for the purposes provided herein, such amounts may be transferred back to this appropriation: *Provided further*, That the United States may accept from any person, foreign government, or international organization, and credit to this Fund, any contribution of money for such purposes: *Provided further*, That funds appropriated under this heading shall be available notwithstanding any other provision of law, including section 10 of Public Law 91–672 and section 15 of the State Department Basic Authorities Act of 1956: *Provided further*, That funds appropriated under this heading or transferred under provisions of this chapter or section 632 of the Foreign Assistance Act of 1961 that are made available for assistance for Iraq shall be subject to notification of the Committees on Appropriations, except that notifications shall be transmitted at least 5 days in advance of the obligation of funds.

Notification.

ECONOMIC SUPPORT FUND

For an additional amount for "Economic Support Fund", $2,422,000,000, of which:

Jordan.

(1) not less than $700,000,000 shall be made available for assistance for Jordan;

Egypt.

(2) $300,000,000, to remain available until September 30, 2005, shall be made available only for grants for Egypt: *Provided*, That during the period beginning March 1, 2003, and ending September 30, 2005, loan guarantees may be made to Egypt, the principal amount, any part of which is to be guaranteed, shall not exceed $2,000,000,000: *Provided further,* That the Government of Egypt will incur all the costs, as defined in section 502 of the Federal Credit Reform Act of 1990, as amended, associated with these loan guarantees, including any non-repayment exposure risk: *Provided further,* That all fees associated with these loan guarantees, including subsidy and administrative costs, shall be paid by the Government of Egypt to the Government of the United States: *Provided further,* That funds made available under this paragraph and other funds appropriated to carry out chapter 4 of part II of the Foreign Assistance Act of 1961 and made available for assistance for Egypt may be used by the Government of Egypt to pay such fees to the United States Government: *Provided further,* That such guarantees shall constitute obligations, in accordance with the terms of such guarantees, of the United States and the full faith and credit of the United States is hereby pledged for full payment and performance of such obligations: *Provided further,* That the President shall determine the terms and conditions for issuing the economic assistance authorized by this paragraph and should take into consideration budgetary and economic reforms undertaken by Egypt: *Provided further,* That if the President determines that these terms and conditions have been breached, the President may suspend or terminate the provision of all or part of such economic assistance not yet outlayed under this paragraph;

President.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SSA MARINE, INC., Plaintiff, v. THE UNITED STATES, Defendant. | Civil Action No. 05-490C (Chief Judge Damich) |

## DECLARATION OF ROBERT WATTERS

I, Robert Watters, declare and state as follows:

1. I am Vice President, Managing Director for Asia, for SSA Marine, Inc.

2. I was the person from SSA responsible for preparing the SSA proposal and for negotiating the contract with USAID (USAID Contract # TRN-C-00-03-00054-00).

3. The SSA proposal included estimated costs and fixed fee for CLINs 001, 002, and part of CLIN 003.

4. With respect to CLIN 003 only limited costs associated with the level of effort man-hours could be estimated. We included an estimate for those limited costs and also included a "fixed fee" set at 30 % of those costs.

5. After the proposal was submitted I entered into negotiations with USAID employee John Abood. Mr. Abood requested that SSA limit the fixed fee identified in CLIN 003 to 10% of the costs that were able to be estimated at that time. Complying with that request would have limited the established fixed fee to $354,148.

6. I explained to Mr. Abood that SSA would not pull people from other projects, disrupt those smooth running operations and mobilize the people to Iraq for that small amount of profit. It wasn't worth our time and effort. I further explained we needed to make profit from the operations of the port as USAID had offered in their tender documents and draft contract. Mr. Abood agreed we would have the opportunity to make additional profit from operations under the Financing Port Operations clause in the contract. During our negotiations process, Mr. Abood and I discussed different means of applying the profit element in the Financing Port Operations clause. Although we would have preferred to establish the level of profit up front, we were told that the urgent need to execute the contract did not leave time to set the profit rate before signing. The clause provided for the level of profit to be determined at a later date. We agreed to discuss this topic again, if we were in fact, asked to operate the port under CLIN 003.

7. Once SSA was in Iraq, USAID refused to implement the Financing Port Operations clause. SSA personnel, including me, repeatedly asked for the working capital fund to be set up after SSA was directed to operate the port under CLIN 003.

8. USAID refused to provide the working capital fund and refused to permit SSA to finance port operations with the tariff revenues. Instead, SSA was forced to outlay funds and be reimbursed for expenses after the fact.

9. It was very difficult for SSA to work without these expected sources of funds. In addition, USAID refused to approve expenditures for such essential items as security until SSA agreed to a modification that provided appropriated funds for the contract.

10. SSA personnel, including me, repeatedly requested that USAID approve a level of profit from port operations as required by the contract. The matter was discussed in Iraq at a meeting on August 1, 2003, at which time USAID requested a profit proposal.

11. SSA proposed a profit of $2.20 per ton of cargo moved. That proposal was denied in its entirety. USAID claimed that SSA was limited to the man-hour fixed fee that had been included in the contract, which was based on only the limited costs that were estimated up front. USAID was not willing to give any effect to the Financing Port Operations clause.

12. SSA had expected the contract to operate under the Financing Port Operations clause in a commercial manner, with SSA using port revenues to pay for port operation costs and earning a reasonable profit to the extent any revenues remained. SSA did not expect to finance the operations from its own accounts subject to reimbursement and did not expect to place twelve men on the ground in a war zone for over a year for only $350,000 in potential profit.

13. Once in Iraq, however, SSA was not able to leave for fear of being considered in default and for fear of disrupting coalition operations and the flow of humanitarian aid. Therefore, SSA continued to perform the contract to the best of its ability given the limited resources provided.

14. SSA collected $18,742,948.73 in port revenues. $12,807,084.83 of that amount was distributed at USAID's direction to the Development Fund for Iraq. $5,935,863.90, plus accrued interest, remains in a segregated, interest bearing account established by SSA pending resolution of this litigation. Port revenues exceed the total costs of the SSA/USAID contract by $5,440,299.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Robert Watters

Dated: November 8, 2006