IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SSA MARINE, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Civil Action No. 05-490C
(Chief Judge Damich)

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Court of Federal Claims Rule 56(h), Plaintiff SSA Marine, Inc. ("SSA") hereby submits the following proposed findings of uncontroverted fact.

**The Solicitation**

1. In the fall and winter of 2002, the United States Agency for International Development ("USAID") began working on contingency plans for the reconstruction of Iraq in the event of a U.S military operation in that country. Those plans included reconstruction and/or operation of the port of Umm Qasr. *See* Pl. App. 29a-32 (Wherry Tr. at 10-13); *see also* Pl. App. 2 (Abood Tr. at 10).[1]

2. John Abood, under the supervision of Anne Quinlan, was responsible for drafting the solicitation for reconstruction and operation of the port. *See* Pl. App. 2 (Abood Tr. at 10-11).

3. On or about February 12, 2003, USAID issued a request for proposals under Port Solicitation No.TRN-03-009. Pl. App. 39.

[1] Transcript references herein relate to the following: Transcript of the Deposition of John Abood taken May 25, 2006 ("Abood Tr."); Transcript of the Deposition of Anne Quinlan taken May 23, 2006 ("Quinlan Tr."),Transcript of the Deposition of Ross Wherry taken Apr. 20, 2006 ("Wherry Tr."). "Pl. App." refers to Plaintiff's Appendix, filed contemporaneously with these proposed findings of fact.

4. The port solicitation, and contract as awarded, divided contract work into three contract line items or "CLINs." CLIN 001 called for the preparation of a port management assessment. CLIN 002 involved planning the implementation of port management improvements. CLIN 003 anticipated the direct operation and management of the port on an as-needed basis.

5. The solicitation and the contract as awarded included the following clause:

> Financing Port Operations: In the event that USAID directs the contractor to manage and operate the port, start up funds and working capital to begin implementation of the operation plan shall be provided by USAID. Start up capital shall be provided to cover initial facility and equipment replacement and repair as proposed by the contractor and approved by USAID from the port assessment, improvement plan and operational plan. Start up working capital shall be provided to cover initial operation of the port. After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners. USAID shall approve the fee and charge schedule and the level of contractor profit from operations. The contractor shall present USAID with monthly financial statements outlining the costs, revenues and profits from operations. The contractor shall maintain separate bank account(s) and records regarding port costs and revenues under this contract. To the extent that revenues exceed costs and negotiated maximum profit margin or level, USAID shall determine the use of any remaining funds in the port operation accounts.

*See* Joint Preliminary Status Report filed by the parties on October 11, 2005 ("JPSR"), Ex. 3 (Contract Section C.III.3).

6. Mr. Abood drafted the clause set forth above, referred to herein as the Financing Port Operations clause or FPO clause. *See* Pl. App. 3 *(*Abood Tr. at 14). Use of the FPO clause was approved by Anne Quinlan (the contracting officer) as well as Ross Wherry (the Director of the Office of Iraq Affairs at USAID). *See* Pl. App. 38 (Wherry Tr., Ex. 1).

7. During the course of obtaining approval to use the clause, Mr. Abood stated that:

> My recommendation continues to be that we permit these contractors (port and airport) to operate as they do in the commercial world – Charge carriers reasonable fees to raise working capital funds, and profit. Our contract will cover management salaries, per

> diem, travel, overhead, etc. and initial start-up mobilization and working capital requirements. Given the costs covered by the USAID contract, the fees they charge should be very reasonable.

Pl. App. 15 (Abood Tr., Ex. 7).

8. At the time the clause was drafted by Mr. Abood he was not aware of any policy to avoid the use of non-appropriated funds to finance Iraq contracts. Pl. App. 8 (Abood Tr. at 55).

9. At the time the solicitation was drafted, it was not known whether it would be necessary to implement CLIN 003. *See* Pl. App. 3 (Abood Tr. at 14). It was also impossible to estimate the costs that would be associated with operating the port. *See* JPSR at 6.

10. During the planning period and prior to award the conditions of the port were unknown to USAID. The Director of the Office of Iraq Affairs at USAID, Ross Wherry, stated that:

> We didn't know what it might look like, and we didn't know what kind of a port would be left. We weren't sure who was to be – if it would be destroyed, if there would be infrastructure left there. We didn't know anything about the labor force. All of the – the details of how one manages a port were opaque to us at that point.

Pl. App. 33 (Wherry Tr. at 45).

11. John Abood testified that the FPO clause was intended to provide for:

> . . . a more commercially-oriented view of how port operations and capital projects might be financed outside of this particular contract. The clause as a whole describes an effort to derive revenue from an approved tariff schedule and apply that revenue in a very commercial sense toward port operations and capital improvement projects. So that instead of the government providing appropriated funds for capital improvement projects, the financing port operation clause described a commercial process through the approval of a tariff, the development of revenues under that tariff and the use of those revenues for port operations and capital improvement projects.
>
> So the entire clause, as it's written, has this commercial–type venture as its heart and soul.

Pl. App. 6 (Abood Tr. at 44).

12. The establishment of a contract for port operations was considered urgent, and there was pressure on USAID to award the port contract. Anne Quinlan testified that: "there was pressure on us from the President of the United States to get the contracts awarded, ultimately." Pl. App. 18 (Quinlan Tr. at 10); *see also* Pl. App. 17-18, 23, 24, 34-35 (Quinlan Tr. at 9-12, Exs. 1 & 2; Wherry Tr. at 48-49).

**The Negotiations**

13. SSA was one of the contractors contacted by USAID about the solicitation. SSA submitted a proposal in response to the solicitation on or about February 19, 2003. USAID determined that SSA was in the competitive range and entered into negotiations with the company.

14. All negotiations were conducted by John Abood. Anne Quinlan did not engage in any negotiations with SSA and did not review SSA's proposal. Pl. App. 17, 21-22 (Quinlan Tr. at 6-8, 64-67).

15. At the time the proposal was submitted it was not possible to estimate all the costs of port operations under CLIN 003. The initial proposal included estimated costs and provided a fixed fee for CLINs 001 and 002 as well as limited items within CLIN 003. All other items for CLIN 003 were to be estimated in the CLIN 002 Implementation Plan. Pl. App. 43-46.

16. SSA initially sought to include a significant fixed fee in its proposal so that it would be guaranteed a reasonable profit. SSA had discussions with Mr. Abood about the fixed fee and profit issue. *See* Pl. App. 4-5, 10 (Abood Tr. at 35-38, Ex. 4). Following these discussions, SSA agreed to limit the established fixed fee to 10% of the CLIN 003 limited costs (i.e., man-hour related costs for twelve employees) that could be estimated in advance, with the

understanding that SSA would be able to earn profit from port operations under the FPO clause if SSA was directed to operate the port. SSA submitted a revised proposal incorporating these changes.

17. During negotiations, Mr. Abood advised the contracting officer, Anne Quinlan, that "I believe [SSA] might accept the 10% fixed fee, with the understanding that future profits may be developed through future operations." Pl. App. 11 (Abood Tr., Ex. 6).

18. The solicitation required offerors to specifically confirm agreement with the CLIN 003 financing mechanism set forth in the FPO Clause. Pl. App. 41.

19. SSA's proposal stated that it agreed to the "Financing Port Operations" clause of the contract "based on the following:"

- USAID continues to pay for SSA staff costs
- USAID and SSA mutually agree to a business plan outlining forecasted volumes, revenues and costs to agree on the tariffs and profits.
- If there is a 10% or greater drop off in cargo vs. the mutually agreed to forecasts, then USAID and SSA will renegotiate tariff rates to bring the actual P/L more in line with the originally agreed to business plan numbers.
- SSA is not responsible for capex purchases of any equipment nor will the purchase of any equipment, financed and paid for out of working capital, be required to go against SSA's balance sheet.

Pl. App. 48.

20. SSA's proposal also stated its understanding that the fixed fee set forth therein was separate from the profit to be earned on port operations:

> SSA is willing to accept this 10% of total project cost profit figure for CLIN 003 provided SSA and USAID can come to a mutual agreement on:
>
> 1. SSA being able to generate profit from CLIN 003 operations, and
> 2. the form and or amount of profit SSA can make on operations associated with CLIN 003. (e.g. the form to be either on a per ton handled basis, flat fee or other mutually agreed to form)

Pl. App. 47.

21. The contract was awarded to SSA on or about April 4, 2003, with an effective date of March 24, 2003. Answer at ¶ 6.

**Contract Performance**

22. SSA sent personnel to begin work on CLINs 001 and 002 on or around April 4, 2003. Answer at ¶ 11.

23. SSA completed the Port Assessment and Implementation Plan as required by CLINs 001 and 002. The Implementation Plan estimated the total amount of costs required to make the port fully operational at $164,832,000. Pl. App. 51-54.

24. On May 21, 2003, SSA was directed to proceed with CLIN 003 and take over management and operation of the port. Answer at ¶ 11.

25. With the agreement of the Coalition Provisional Authority ("CPA") and the Iraqi Port Authority ("IPA"), USAID approved the fee and charge schedule (the tariff) to be employed at the port. *See* JPSR at 7.

26. USAID otherwise failed to implement the FPO clause. USAID did not provide working capital for start up operations, did not permit revenues to be used to fund port operations, and did not approve a level of contractor profit from port operations. JPSR at 7; Answer at ¶ 16.

27. SSA requested implementation of the FPO clause on multiple occasions. *See, e.g.*, Pl. App. 55-56, 64, 66-67, 75, 82-83.

28. At a meeting in Iraq in August of 2003, USAID asked SSA for a proposal for a profit rate under the FPO clause. *See* Pl. App. 50.

29. On August 12, 2003, SSA proposed a profit rate of $2.20 per ton of cargo moved through the port. Answer at ¶ 15; *see also* Pl. App. 55-59.

30. On September 4, 2003, USAID rejected the profit proposal. Pl. App. 78-80.

31. On September 10, 2003, a meeting was held in Washington, D.C. to discuss implementation of the FPO clause. At the meeting, USAID verbally refused to approve a level of profit under that clause. *See* Pl. App. 26 (Quinlan Tr., Ex. 8).

32. In December 2003, SSA again reserved its rights to profit under the FPO clause. Pl. App. 81-83. USAID responded that SSA was not entitled to profit from port operations. Pl. App. 84-85.

33. Mr. Abood testified that implementation of the FPO clause was prevented by a USAID policy to avoid the use of non-appropriated funds to finance contract operations in Iraq. Mr. Abood was not aware of any such policy at the time he drafted the clause and Mr. Abood was not aware of any "specific statutes or regulations that might implement such a policy." Pl. App. 8 (Abood Tr. at 55).

34. Ms. Quinlan testified that:

> Eventually what happened is at the time the contract was awarded and, I guess shortly thereafter, there was this problem throughout Iraq, the issue of spending Iraqi money and that that wasn't really a good idea. The U.S. government changed their position.
>
> And so they told us no, we've got to pay out of the USAID's appropriated funds. Because they were already concerned about the issue of being held accountable for managing Iraqi monies, [sic] appropriated monies.

Pl. App. 20 (Quinlan Tr. at 55-56).

35. The funds that were used for the contract came from the Iraq Relief and Reconstruction Fund provided for by the Supplemental Appropriations Act passed in April of 2003, Pub. L. No. 108-11, 117 Stat. 559 (2003) (Pl. App. 89-91). Pl. App. 36-37 (Wherry Tr. at 66-67).

36. Instead of implementing the FPO clause, USAID executed modifications to the contract to add appropriated funds. After SSA began operations in Iraq, USAID required SSA to execute those modifications before USAID would reimburse SSA for monies expended by SSA in support of operations. *See, e.g.,* Pl. App. 61.

37. The modifications did not provide for any fixed fee associated with the appropriated funds added to the contract and did not modify the FPO clause. JPSR Exs. 5 – 8.

38. SSA collected $18,742,948.73 in port revenues. $12,807,084.83 of that amount was distributed at USAID's direction to the Development Fund for Iraq. $5,935,863.90, plus accrued interest, remains in a segregated, interest-bearing account established by SSA pending resolution of this litigation. Port revenues exceed the total costs of the SSA/USAID contract by $5,440,299.44. Pl. App. 92-93 (Declaration of Robert Watters at ¶ 14).

Respectfully submitted,

/s/ John W. Butler

John W. Butler
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2510 (tel)
(202) 463-4950 (fax)

Of counsel:

Heather M. Spring
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2516 (tel)
(202) 463-4950 (fax)

Dated: November 9, 2006