IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SSA MARINE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 05-490C |
| v. | ) | (Chief Judge Damich) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to RCFC 56, defendant respectfully replies as follows to plaintiff's ("SSA's") opposition to our motion for partial summary judgment.

INTRODUCTION

SSA's cost plus contract with the Government provided for SSA to operate a seaport in Iraq. PPFUF 4.[1] The "Financing Port Operations" provision provided for SSA to charge shippers Government-approved rates for use of the port and, when directed, use the revenues to finance the port operation costs, including SSA's negotiated maximum profit, in a manner similar to commercial operations. DPFUF 9; PPFUF 5. When no additional maximum profit figure was negotiated during the term of the contract, SSA submitted a claim for $4,400,004.40 (above what it had already received), well in excess of ten percent of SSA's

[1] "MPSJ __" refers to our motion for partial summary judgment. "Opp. __" refers to SSA's opposition brief. "Pl. App. __" refers to the appendix attached to SSA's opposition. "DPFUF __" refers to defendant's proposed findings of uncontroverted fact, filed with our motion for partial summary judgment. "PPFUF __" refers to SSA's proposed findings of uncontroverted fact. "Compl. ¶ __" refers to SSA's complaint.

total costs incurred. Opp. 10-12; DPFUF 16, 17; PPFUF 38. The Government's position is that, even if the additional contract costs incurred during port operations entitle SSA to additional profits, the maximum profit amount is statutorily limited to ten percent of total contract costs, or approximately $1,330,264. DPFUF 17, 20; Compl. 4. Accordingly, our motion for partial summary judgment seeks a limited ruling that the contract was a cost-plus-fixed-fee type contract ("cost plus"), and additionally that the maximum amount that SSA can recover as profit (or "fee") is subject to a statutory limitation on the amount of fee recoverable under a cost plus contract. MPSJ 1, 10.

If we prevail, the scope of this case will be significantly narrowed, and may obviate the need for a trial altogether. If we do not prevail, then the entire amount of SSA's $4,400,004 claim will need to be adjudicated at trial to determine the appropriate profit/fee amount, if any, above the amount that SSA has already received.

## ARGUMENT

### I. SSA's Opposition Relies Almost Entirely Upon Irrelevant Extrinsic Evidence

In our motion for partial summary judgment, we presented a single discrete legal issue to the Court: Whether SSA's contract

is a cost plus contract.[2] [3] Resolution of that issue is a straightforward matter and requires only that the Court analyze the terms of the contract itself under the basic rules of contract interpretation. Hol-Gar Manufacturing Corp. v. United States, 169 Ct. Cl. 384, 390, 351 F.2d 972 (1965). In our motion, we restricted our argument almost exclusively to the terms of the contract itself and the statutory and regulatory provisions that dictate the nature of Government contracts (none of which contemplate the type of contract SSA suggests). MPSJ 1-10.

In response to our motion, however, without arguing that any of the contract terms are ambiguous (indeed, arguing that the contract is not ambiguous and not susceptible to more than one reasonable interpretation (Opp. 12)), SSA presents a series of extrinsic facts that are at best tangential, but are, in reality, legally irrelevant to the question before the Court. Opp. 12-16. The issue in our motion should not be clouded. It is a simple matter of determining, within the parameters of Government contract law, whether the contract contains the "two-part payment structure" that SSA claims.

---

[2] If SSA's contract is a cost plus contract then the maximum profit that can be negotiated is ten percent. 41 U.S.C. § 254(b); 10 U.S.C. § 2306(d).

[3] In response to SSA's argument that the contract contains a "two-part compensation structure," we acknowledge that the issue before the Court is whether SSA's contract was entirely cost plus.

It is black letter that a contract is interpreted according to its plain meaning without resort to extrinsic evidence, which is only consulted if and when ambiguities are identified by the Court. Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)(en banc); McAbee Construction, Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). "'[T]he plain meaning of the contract is binding upon the court unless the contract by its very terms is inherently ambiguous.'" Neal & Co. v. United States, 19 Cl. Ct. 463, 471 n.4 (1990), aff'd, 945 F.2d 385 (Fed. Cir. 1991) (quoting Opalack v. United States, 5 Cl. Ct. 349, 359 (1984)); accord Community Heating & Plumbing Co. v. Kelso, 987 F.2d 1575, 1578 (Fed. Cir. 1993). "Wherever possible, words of a contract should be given their ordinary and common meaning." Hills Material Co. v. Rice, 982 F.2d 514, 516 (Fed. Cir. 1992) (citing Hol-Gar Manufacturing Corp. v. United States, 169 Ct. Cl. 384, 390, 351 F.2d 972 (1965)). The mere fact that the parties disagree upon the meaning of contract terms, as here, does not render the language ambiguous. Bishop Engineering Co. v. United States, 180 Ct. Cl. 411, 416 (1967); Neal & Co. v. United States, 19 Cl. Ct. 463, 471 (1990).

Instead of discussing the plain meaning of the contract provisions at issue, or proposing any ambiguity that necessitates the resort to extrinsic evidence, SSA instead provides more than 90 appendix pages, only three of which are from the contract

itself. Pl. App. 39-77. The remaining documents, and factual assertions in SSA's 38 proposed findings of uncontroverted fact that SSA's proffered documents allegedly support, are simply irrelevant. Instead, because the contract language is patently clear, the Court need not wade into the incomplete and convoluted background offered by SSA and, instead, simply determine the form of the contract according to the contract's plain meaning.

## II. SSA's Contract Was Expressly A Cost Plus Fixed Fee Contract And The FPO Clause Did Not Create A "Two-Part Compensation Structure"

As we demonstrated in our motion, the entire contract was cost plus, and SSA was to be paid (and was in fact paid) entirely on a cost plus basis. DPFUF 3, 4, 7, 10. This undisputed fact was clearly denominated as such in Section B of the contract. DPFUF 3; see also DPFUF 4, 8, 10. Furthermore, the contract included several provisions that are mandatory for cost plus contracts, and are not included in fixed price contracts. Id.

SSA attempts to evade this clear fact by arguing that "labels" are not determinative in establishing the contract type (Opp. 18-19), which is not disputed but misses our point. Our motion does not rely simply or solely upon the "label" for SSA's contract (although the "label" of cost plus contract is, in and of itself, indicative that the parties agreed to a cost plus contract). We also included a detailed discussion of the terms of the contract itself, and those terms clearly define its operation as a cost plus contract. DPFUF 3-10. In the simplest

terms, the contract clearly provided that SSA would perform certain tasks up to a defined level of effort and be reimbursed for its incurred cost plus a fixed fee that was agreed upon at contract formation. Although SSA finds fault with the fact that our opening motion did not include a detailed discussion of the FPO clause (Opp. 17-18), as explained below, that is because the FPO clause is an operational clause regarding how the port would be operated in the future, and not relevant in determining whether the contract is cost plus, and is only relevant to SSA's argument for a "two-part compensation structure." Indeed, whether SSA was entitled to negotiate additional fee upon the incurrence of additional costs during commercial-type port operations under the FPO clause is an entirely separate, and subsequent, question to whether the contract between SSA and USAID is cost plus, and is not before the Court at this time.

In its opposition, SSA attempts to split the contract by CLIN, conceding that CLINs 001 and 002 were, in fact, cost plus CLINs, but asserting that CLIN 003 contained a "two-part compensation structure," one part of which permitted the recovery of an apparently-unrestricted amount profit <u>in addition</u> to a "negotiated maximum" fixed fee. Opp. 5. SSA suggests that CLIN 003 tasks (generally operating and maintaining the port) were to be paid according to two categories of costs, with the "first" group in CLIN 003 ("in-house man-hours") being paid upon a cost plus basis and a second, undefined, group of costs, to be paid

according to the "FPO" clause which SSA suggests provides an entirely different payment structure than the in-house man-hours, and one that provides for an unrestricted recovery of profit/fee. Br. 6-7.

First, the premise of this argument, that different CLIN 003 tasks were assigned to different compensation structures, is unfounded. The contract did not segregate port operation/maintenance tasks at all and provided instead, at section B.2, "Contract Type and Contract Services":

> This is a Cost Reimbursement (CPFF) Level of Effort term contract. For the consideration set forth below, the contractor shall provide the services, deliverables or outputs described in Section C [CLINs 001, 002, and 003] . . .

Section C provides extensive lists of the services to be provided up to the level of effort threshold, including under CLIN 003 all of the activities SSA claims were not contemplated to be paid upon a cost-plus basis. See JPSR Ex. 3 pages 9-11. SSA is correct that specific costs for many items were not included in the estimates in the statement of work, partially because these costs were unknown (a fact that plays large in SSA's opposition), but the contract explicitly stated that these activities were part of the cost plus contract. Id. Without the contractual foundation that SSA alleges (that CLIN 003 was divided into two separate groups of tasks for purposes of payment), SSA's argument for a "two-part compensation structure" collapses, its argument against the "label" of the contract fails, and our motion should

be granted.

In addition to being irrelevant, SSA's reliance upon (a) its purported "understanding" of the FPO clause prior to contract formation; (b) the "negotiations" between the parties; and (c) the "contract performance" facts as asserted by SSA (PPFUF 6-38), is fundamentally misplaced because neither the contract as a whole, nor the FPO clause in isolation, support SSA's argument in any way. There simply is no description anywhere in the contract that CLIN 003 operates with a "two-part compensation structure" or that the cost plus payment method that is described for CLIN 003 is limited to a certain sub-group of CLIN 003 tasks. DPFUF 9.

Nor does the FPO clause itself describe or support the creation of a second, and entirely different, compensation structure for the port operations, and certainly not a cost plus fixed fee plus unrestricted profit compensation scheme, something that is entirely unheard of in Government procurement even when, as SSA argues, the costs are "difficult to estimate" prior to contract formation.[4] Instead, the FPO clause provides only a description of the source of the funds that will be used by SSA

[4] SSA offers no case-precedent for the "two-part compensation structure" that it advocates, and we are aware of none. In fact, the very justification for use of a cost plus contract at all (rather than firm fixed price) is that the costs are difficult to estimate up front. See 48 C.F.R. §§ 16.101(b), 16.301-2, 16.301-3, 16.306(a). Thus, the cost plus structure itself accounts for the uncertainty that SSA uses to justify its suggestion of a novel two-part compensation scheme.

to perform its port operation tasks. PPFUF 5. As the FPO provision's title makes clear, it describes the financing of the port operations, not the amount of payment to SSA for its work under the contract. Id. SSA's argument to the contrary is wishful thinking. SSA argues that:

> The language of the FPO clause is both plain and mandatory. It states that: "*After port operations begin,* working capital for labor, facilities and equipment operation and maintenance, port overhead and *contractor profits shall be obtained from fees and charges to carriers and cargo owners*. *USAID shall approve* the fee and charge schedule and *the level of contractor profit* from operations."

Opp. 12. This is an entirely accurate quote from the FPO clause, but it clearly does not provide a different level or form of profit for SSA, and instead only describes the source of the funds that will be used for "labor, facilities and equipment operation and maintenance, port overhead and contractor profits."

With regard to amount of SSA's profit, which is not the issue here, the FPO clause expressly provides that "[t]o the extent that revenues exceed costs and negotiated maximum profit margin or level, USAID shall determine the use of any remaining funds in the port operation accounts." Id. This clearly means that SSA's profit under the FPO clause is subject to the "negotiated maximum profit" which is the same as the "fixed fee" that applies to the contract as a whole, and certainly not an unlimited "profit" that is governed only by the amount of revenues generated by the port. Needless to say, this provision

does not set up a "second" compensation structure, but simply provides that SSA's profit/fee will be negotiated. The fact that the FPO clause contains the words "maximum profit" also supports our entire argument – that the contract was cost plus, subject to a statutory maximum fee.

Moreover, SSA's suggestion that the FPO clause entitles it to a "profit" in addition to the contract's "fee" is refuted by the simple fact that the FPO clause does not discuss items of fee and profit or two items of profit, only one, which it calls "profit."[5]

Finally, given the absence of a formula for adjusting the fee based on target costs, the contract cannot be an incentive contract as SSA suggests. Such a formula is required by FAR 16.402-1 and 16.405-1.

In short, SSA's argument that the FPO clause sets up a "two-part compensation structure" is utterly unsupported in the four corners of the contract. Nor is any portion of the FPO clause so ambiguous as to justify reference to the extrinsic evidence upon which SSA relies (almost exclusively) to support its opposition

---

[5] For example: ". . . working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners." "USAID shall approve the fee and charge schedule and the level of contractor profit from operations." "The contractor shall present USAID with monthly financial statements outlining the costs, revenues and profits from operations." PPFUF 5. The use of the word "fees and charges" in the FPO clause refers to the fees that SSA charges to users of the port, not to the "fixed fee" that SSA would earn under the contract. PPFUF 5

to our motion. PPFUF 1-3, 6-35, 38. Instead, the fact that the contact is entirely cost plus is expressly and unambiguously set forth in the contract, repeatedly and most notably in Section B.2, which is entitled "Contract Type And Contract Services," and identifies the contract as "a Cost Reimbursement(CPFF) Level of Effort term contract" and references all three CLINs without drawing any distinction between them. DPFUF 3.

III. SSA's Tangential Arguments Are Unavailing

In the absence of clear contractual language establishing the "two part compensation structure" upon which SSA's case rests, SSA offers several tangential arguments in its attempt to oppose our motion. As stated above, to the extent that SSA's arguments are based upon extrinsic evidence, and virtually all of them are, they are inapposite. Nevertheless, we briefly respond as follows.

SSA argues that "the Government's breach of the contract does not change the contract's plain language," in response the fact that "the entire contract was performed upon a cost reimbursement basis." Opp. 21. Of course, this fact is not meant to be determinative of the form of the contract, inasmuch as it is not directly related to the terms of the contract itself and, as such, is extrinsic evidence as well. Nevertheless, SSA's suggestion that the Government "breached" the contract is so far outside the scope of our motion that it does not warrant a response. Whether the Government "breached" the contract by

reimbursing costs vouchered by SSA would not even be germane in the event that SSA avoids summary judgment here because the operative issue is and will always be to what level of profit is SSA entitled.

Next, SSA states that "to the extent that the government is arguing that the FPO clause is not a contract type described in the FAR, and is therefore unenforceable, the government is wrong." Opp. 22. SSA allocates several pages to "responding" to this point, which is not an argument we made in the first place. Opp. 22-25. Our point is that not that a "two part compensation structure" would be unenforceable under the FAR, it is that SSA's contract (including the FPO clause) does not contain a "two part compensation structure" and that such a contract type is not specifically described in the FAR either. Instead, SSA's contract contains a single compensation structure, cost plus, which is a type that is specifically described in both the FAR and in SSA's contract.

SSA argues that "the Government's interpretation would render the contract illegal under Fluor Enterprises, Inc. v. United States, 64 Fed. Cl. 461 (2005), even suggesting that "[t]he parallel with the SSA contract is almost exact." Opp. 25, 27. In fact, there is no parallel between Flour and this case because Flour found that the an entire "A/E portion" of Flour's contract was void because of the Government's inability to provide bidders with a pre-contract estimate of the total project

cost prior to contract execution. Id. at 492. Nothing of the sort occurred here and we assume that SSA is not arguing that its entire contract is void and SSA is entitled to a *quantum meruit* recovery (as the Court ordered in Flour), inasmuch as a *quantum meruit* recovery would more approximate our position than SSA's. Id. at 496 (contractor entitled to "the value to the government of the benefits the contractor conferred"). Flour did not remotely suggest that establishing a "two part compensation structure" for the payment of profit would cure an otherwise void contract, and only opined that, in the circumstances present in Flour, that the Government's needs could have been appropriately met by using multiple contracts (not "payment structures"), instead of one. Id. at 491.

Finally, SSA argues that "assuming *arguendo* that the government were correct that the SSA contract was solely a cost-plus-fixed-fee contract, it would not be subject to a ten percent profit cap" because of the language of Public Law 108-11, an emergency wartime appropriations bill which provides, "most importantly" according to SSA, that "funds appropriated under this heading shall be available notwithstanding any other provision of law . . . ." Opp. 29. SSA also suggests that contracts funded by non-appropriated funds are not subject to the FAR, which is the source of the ten percent fee cap that we believe applies to SSA's contract. Opp. 30-32.

First, this argument does not respond to our motion in that

it appears to concede our position that SSA's entire contract was cost plus. Second, the language in the statute that appropriated funds "will be available notwithstanding any other provision of law" hardly suggests that the FAR profit cap cannot apply, as though "funds . . . shall be available" equates to "unlimited profit." Third, SSA's arguments that appear to suggest that its contract was not a "procurement," "acquisition," or "contract" (Opp. 31), which are all defined as involving the expenditure of appropriated funds, is strange when contrasted with SSA's argument a page earlier which relies upon a statutory exemption for use of appropriated funds. Opp. 30. In any event, SSA's distinction between appropriated and non-appropriated funds is without force in light of the plain words of the FPO clause itself, which provides that port operations will be funded both from appropriated and non-appropriated funds.

## CONCLUSION

For the reasons set forth above and in our opening motion, the Court should grant defendant's motion for partial summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Bryant G. Snee
BRYANT G. SNEE
Assistant Director

s/Brian S. Smith
BRIAN S. SMITH
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, DC 20530
Tele: (202) 616-0391
Fax: (202) 353-7988

Attorneys for Defendant

OF COUNSEL:

JOHN B. ALUMBAUGH
PETER E. YOUNG
U.S. Agency for International Development

January 5, 2007

NOTICE OF FILING

I hereby certify that on January 5, 2007, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Brian S. Smith