# In the United States Court of Federal Claims

No. 05-490C
(Filed: July 31, 2007)

****************************************
**SSA MARINE, INC.,** *
Plaintiff, *
v. *
**THE UNITED STATES,** *
Defendant. *
****************************************

Contracts; 41 U.S.C. § 254(b); motion for partial summary judgment; RCFC 56; whether a contract is entirely cost-plus-fixed-fee.

*John W. Butler*, of Sher & Blackwell, Washington, DC, counsel of record for Plaintiff, with whom was *Heather M. Spring*, of Sher & Blackwell, Washington, DC, of counsel.

*Thomas D. Dinackus*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, counsel of record for Defendant, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Bryant G. Snee*, Assistant Director; with whom were *John B. Alumbaugh* and *Peter E. Young*, U.S. Agency for International Development, Washington, DC, of counsel.

## OPINION

**DAMICH**, Chief Judge.

This government contracts case is before the Court on Defendant's motion for partial summary judgment. At issue is a contract for Plaintiff to operate and manage the port of Umm Qasr following the 2003 invasion of Iraq by the United States and its coalition partners. The Defendant argues that the contract is entirely a cost-plus-fixed-fee contract and, therefore, the fee or profit payable to the contractor by statute cannot exceed ten percent of the estimated cost of performance. Plaintiff counters that the contract was only partially a cost-plus-fixed-fee contract. According to Plaintiff, the contract's "Financing Port Operations" clause entitles it to a profit that may exceed ten percent of the cost of its performance. For the reasons discussed herein, the Defendant's motion is GRANTED.

**BACKGROUND**[1]

The contract in question (the "Contract") was awarded to SSA Marine, Inc. ("SSA") on March 24, 2003, by the U.S. Agency for International Development ("USAID" or "Government") four days after the United States and its coalition partners began their invasion of Iraq. The Contract provided that SSA was "to quickly, effectively and safely complete those tasks essential to assess, improve, maintain, and–if necessary–operate Umm Qasr port in support of humanitarian and reconstruction assistance to the people of Iraq." App. to Def.'s Mot. for Partial Summ. J. ("Def.'s App.") at 2. The Contract was divided into three contract line items ("CLINs"): the first, CLIN 001, regarded Plaintiff's preparation of a port management assessment; the second, CLIN 002, called for the implementation of port management improvements; and the third, CLIN 003, provided that Plaintiff would assume direct operation and management of the port if the Government determined it would be necessary. Compl. ¶ 7. On May 21, 2003, the Government indeed called upon the Plaintiff to commence operation and management of the port under CLIN 003. *Id.* ¶ 11. On or about June 17, 2003, the Government "ordered SSA to open the port to commercial cargo in addition to the humanitarian aid cargo anticipated by the Contract." *Id.* ¶ 13.

The parties agree that CLINs 001 and 002 were negotiated on a cost-plus-fixed-fee basis. *Id.* ¶ 8; Answer ¶ 8. The dispute centers on CLIN 003, regarding operation and management of the port. The Defendant argues that CLIN 003 in its entirety was also negotiated on a cost-plus-fixed-fee basis, while Plaintiff contends that the Contract provided two payment mechanisms for CLIN 003, one a cost-plus-fixed fee provision, the other a provision providing for a negotiated payment derived from port revenues (the Financing Port Operations provision). Because the Defendant will pay SSA no more than on the cost-plus-fixed fee basis, Plaintiff asserts that it was inadequately compensated for its operation and management of the port from May 2003 to June 2004. *See* Compl. ¶¶ 11, 19.

CLIN 003 provides:

> From time to time, and especially in the instance of local or regional conflict, it may be in the interest of the US Government that part or all of the Umm Qasr port be managed directly by the Contractor. The [C]ontractor shall be prepared to accept this task within four weeks of contract inception. As required USAID will facilitate transfer of authority over the port from national or local agencies to the Contractor. It is expected that direct operations of the port will occur only on an emergency basis and that direct operations will continue for an unspecified period of time until a

[1] The recitations that follow do not constitute findings of fact by the Court. Rather, the recited factual elements are taken from the parties' filings and are either undisputed or alleged and assumed to be true for the purposes of the pending motion.

> transition of authority returns control to national or local agencies.

Def.'s App. at 9-11. This provision is not in dispute. The Financing Port Operations ("FPO") clause of the Contract that, for Plaintiff, embodies the second payment clause of CLIN 003 provides:

> In the event that USAID directs the contractor to manage and operate the port, start up funds and working capital to begin implementation of the operation plan shall be provided by USAID. Start up capital shall be provided to cover initial facility and equipment replacement and repair as proposed by the contractor and approved by USAID from the port assessment, improvement plan and operational plan. Start up working capital shall be provided to cover initial operation of the port. *After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners. USAID shall approve the fee and charge schedule and the level of contractor profit from operations.* The contractor shall present USAID with monthly financial statements outlining the costs, revenues and profits from operations. The contractor shall maintain separate bank account(s) and records regarding port costs and revenues under this contract. *To the extent that revenues exceed costs and negotiated maximum profit margin or level*, USAID shall determine the use of any remaining funds in the port operation accounts.

Def.'s App. at 11 (emphases added).

In the summer of 2003, after a tariff was established and the rates to be charged were determined, Plaintiff began collecting fees and charges from carriers and cargo owners in the Port of Umm Qasr pursuant to the FPO clause. During Plaintiff's operation of the port, it collected $18,742,948.73 in revenues, $12,807,084.83 of which was distributed to the Development Fund for Iraq at the direction of the Government.[2] Def.'s Resp. to Pl.'s Proposed Findings of Uncontroverted Fact ("Def.'s Resp. to Pl.'s FF") ¶ 38. From August to December 2003, Plaintiff made three requests to set a profit level based on its reading of the FPO clause, all of which were denied. Pl.'s Opp. at 10-11.

---

[2] The remainder was placed into an interest-bearing escrow account pending resolution of the contractor's claim. Def.'s Resp. to Pl.'s Proposed Findings of Uncontroverted Fact ¶ 38.

Plaintiff was paid $13,302,649.29 under the Contract, which consisted of $12,860,534.81 in allowable costs, $438,048.00 in fixed fee, and $4,066.48 in interest on a late payment. Def.'s Proposed Findings of Uncontroverted Fact ("Def.'s FF") ¶ 17. On July 26, 2004, Plaintiff filed a certified claim with the contracting officer ("CO") in the amount of $4,400,004.40 plus interest for the Government's failure to approve a level of profit based on port revenues. Pl.'s Opp. at 11; Joint Preliminary Status Report ("JPSR") Ex. 1. On November 29, 2004, the CO denied Plaintiff's certified claim. Pl.'s Opp. at 11. On April 22, 2005, Plaintiff filed its complaint in the Court of Federal Claims seeking additional compensation. Its complaint alleges that Defendant breached the Contract by "failing to approve and allow payment of a reasonable profit for work done under CLIN 003 as required" by the FPO clause (Count I). Compl. ¶ 22. Moreover, Plaintiff alleges that the Defendant breached the implied covenant of good faith and fair dealing by failing to "properly fund the contract" and failing to "approve a reasonable profit as required by the terms of the solicitation and as promised during negotiations" (Count II). *Id.* ¶ 25.

The Defendant filed its motion for partial summary judgment on October 13, 2006, solely on the issue of "whether the contract . . . was a cost-plus-fixed-fee contract that was subject to a ten percent limit with regard to the fee or profit paid the contractor." Def.'s Mot. for Partial Summ. J. at 1. In other words, the motion disputes the Plaintiff's contention that the FPO provision created a second payment mechanism for port operations. *See, e.g.,* Def.'s Reply at 6-11. Briefing was completed on January 5, 2007.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the Court of Federal Claims; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The Court's function is not to weigh the evidence, but rather to determine whether there is a genuine issue as to a material fact–that is, one that would change the outcome of the litigation. *Id.* at 248-49. A genuine issue exists if the evidence is such that a reasonable [trier of fact] could find for the nonmoving party. *Id.* at 242. The moving party can meet its burden by demonstrating the absence of issues of material fact or by showing the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party makes this showing, the burden shifts to the non-moving party to present such evidence. *Id.* at 324. The non-moving party must present a foundation for facts sufficient to support a verdict in its favor, with all reasonable inferences resolved in its favor. *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1047 (Fed. Cir. 2000).

### II. Analysis

The issue before the Court is one of contract interpretation. Contract interpretation is a question of law, which may be decided on summary judgment. *Hughes Communications Galaxy,*

*Inc. v. United States*, 998 F.2d 953, 957 (Fed. Cir. 1993); *Blake Constr. Co. v. United States*, 987 F.2d 743, 746 (Fed. Cir. 1993). In particular, "determination of the type of contract the parties entered into is generally a matter of law." *Crown Laundry & Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506, 515 (1993); *Maint. Eng'rs, Inc. v. United States*, 749 F.2d 724, 726 n.3 (Fed. Cir. 1984).

Contract interpretation begins–and sometimes ends–with the plain meaning of the written agreement. *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993). Indeed, where the provisions of an agreement are unambiguous, the Court must give effect to its plain and ordinary meaning and may not resort to extrinsic evidence as an interpretive guide. *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc); *City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994) ("Outside evidence may not be brought in to create an ambiguity where language is clear"); *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988) ("[E]xtrinsic evidence will not be received to change the terms of a contract that is clear on its face"). The contract must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all its parts. *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996). A well-established principle of contract interpretation in the Federal Circuit is as follows:

> [A]n interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous; nor should any provision be construed as being in conflict with another unless no other reasonable interpretation is possible.

*Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972, 979 (Ct. Cl. 1965); *see also United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983) (a court interpreting a contract must give reasonable meaning to all parts of the contract and should not render portions of it meaningless).

### A. The Contract Is Not Ambiguous

The parties do not appear to argue that the Contract language is ambiguous. The Plaintiff's brief does not state that the Contract language is ambiguous; indeed, it seems to accuse the Defendant of suggesting that it is: "The plain language of the contract must govern in the absence of ambiguity, and the contract must be read so that all parts are given effect. The government ignores both of these fundamental canons of construction." Pl.'s Opp. at 12. The Defendant's brief clearly states that "[r]esolution . . . is a straightforward matter and requires only that the Court analyze the terms of the contract itself under the basic rules of contract interpretation." Def.'s Reply at 3. Therefore, in the absence of a clear assertion that the Contract language is ambiguous, the Court will not have recourse to facts extrinsic to the Contract in order to aid it in interpretation.

### B. Contract Language

Although the language is not ambiguous, it is not free of difficulty in interpretation. There is language that clearly indicates that it is a cost-plus-fixed-fee ("CPFF") contract.[3] Part I of the Contract states, under "B.2 CONTRACT TYPE AND CONTRACT SERVICES," the following:

> This is a Cost Reimbursement (CPFF) Level of Effort term contract. For the consideration set forth below, the Contractor shall provide the services, deliverables or outputs described in Section C [Contract Line Items (CLINs) 001, 002, *and 003*] and F in accordance with the performance standards specified in Section F.

Def.'s App. at 3 (emphasis added). The next provision, B.3, is entitled "ESTIMATED COST, *FIXED FEE*, AND OBLIGATED AMOUNT" and provides:

> (c) CLIN 003 Port Operations - The estimated cost for the performance of the work required hereunder, exclusive of *fixed fee* is $3,541,480. The *fixed fee* is $354,148. The estimated *cost plus fixed fee* is $3,895,628.00[.]
>
> (d) Within the estimated cost plus *fixed fee* specified in paragraphs above . . . .

*Id.* (emphases added). Note that the language specifically refers to CLIN 003, the provision in dispute.

Plaintiff, however, does not argue that the Contract is not a CPFF contract; instead, it argues that CLIN 003 has a CPFF provision and "an additional, separate compensation mechanism." Pl.'s Opp. at 2. According to Plaintiff, this mechanism is found in the FPO provision in CLIN 003. This provision has already been set out supra, and the language relied upon by Plaintiff has been emphasized. Two sentences in the FPO provision give the Court pause in hastening to the conclusion that the Contract is solely a CPFF contract:

---

[3] A cost-plus-fixed-fee contract is a species of cost-reimbursement contracts. 48 C.F.R. § 16.306(a) (2006). The FAR provisions provide that there are two types of CPFF contracts: term and completion. *Id.* § 16.306(d). A term contract "describes the scope of the work in general terms and obligates the contractor to devote a specified level of effort for a stated time period." *Id.*

> USAID shall approve the fee and charge schedule *and the level of contractor profit* from operations ("Sentence 1").
>
> To the extent that revenues exceed costs and *negotiated maximum profit margin or level*, USAID shall determine the use of any remaining funds in the port operation accounts ("Sentence 2").

Def.'s App. at 11 (emphases added).

The Court puzzles over the language of these two sentences: Why would USAID have to approve the level of contractor profit from port operations if the Contract already provided that "[t]he fixed fee is $354,148" for CLIN 003 Port Operations? What is the "negotiated maximum profit margin or level"? Has the negotiation taken place or will it be negotiated later?

Unfortunately, Defendant does not focus on Sentence 1 nor on the phrase, "level of contractor profit." Instead, it quotes a larger context of the FPO provision:

> After port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners. USAID shall approve the fee and charge schedule and the level of contractor profit from operations.

*Id.* Defendant concludes that this part of the FPO provision "only describes the *source* of the funds that will be used for 'labor, facilities and equipment operation and maintenance, port overhead and contractor profits.'" Def.'s Reply at 9 (emphasis in original). It seems beyond cavil that the sentence that reads "[a]fter port operations begin, working capital for labor, facilities and equipment operation and maintenance, port overhead and contractor profits shall be obtained from fees and charges to carriers and cargo owners" provides the source of the funds for those activities. But that is not the troublesome sentence. Defendant does not explain why USAID is to approve the level of contractor profit from operations if this has been foreordained by the CPFF contract. As stated above, the Contract must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all its parts.

Regarding Sentence 2, Defendant argues: "This clearly means that SSA's profit under the FPO clause is subject to the 'negotiated maximum profit' which is the same as the 'fixed fee' that applies to the contract as a whole." Def.'s Reply at 9. However, Defendant then undermines this thoroughly reasonable interpretation by stating: "[T]his provision does not set up a 'second' compensation structure, but simply provides that SSA's profit/fee *will be* negotiated." Def.'s Reply at 9-10 (emphasis added). Why will the fixed fee be subject to future negotiation?

Plaintiff's argument based on contract interpretation also focuses on Defendant's "larger context" FPO language quoted above, but does little more than assert that its plain meaning compels the Court to hold that there is a second payment mechanism. But its argument is not exclusive to the text of the FPO. More generally, Plaintiff argues that the CPFF-based cost-reimbursement mechanism in CLIN 003 did not address all the costs associated with port operations, but only "in-house man-hour" costs. Pl.'s Opp. at 6. Therefore, the other costs are encompassed in the other payment mechanism. Plaintiff tries to prove this contention by ranging widely through documents extrinsic to the contract.[4] However, because Plaintiff has not argued that the contract language is ambiguous, the argument must be proved by language in the Contract itself.

The Contract does lend some support to Plaintiff's argument. Although the Contract clearly contains an overall estimated cost for CLIN 003, *see* Def.'s App. at 3, the only *specification of costs* is "B.5 INDIRECT COSTS," dealing with fringe benefits and overhead. *See id.* at 4. The Plaintiff's contention that only in-house man-hour costs were included in the estimated costs is bolstered by Part I, Section C.VII of the Contract, labeled "Personnel," and by "F.2 LEVEL OF EFFORT," where, under CLIN 003, only management personnel are listed. *See id.* at 13, 15. Thus, Plaintiff appears to be correct in stating that the Contract did not address, i.e. specifically mention, *costs* for "any subcontracted stevedore, clerking, security, administrative, or other labor, skilled or unskilled, that would be necessary to actually move cargo over the port." Pl.'s Opp. at 5. Similarly, Plaintiff points out (what appears to be true) that "the cost reimbursement and associated fixed fee provision in CLIN 003 did not address costs for equipment, dredging, buildings, office supplies and computers, water, fuel, electricity, cargo cranes, repairs to wharves and docks, etc." associated with operating the port. *Id.* Plaintiff hammers home its point: "Tasks associated with all of those operations and infrastructure components were contemplated in the description of work under CLIN 003, but no cost items for those tasks were included in the limited cost-plus-fixed-fee provision in CLIN 003." *Id.* In addition, Plaintiff gives a reason for this omission: "[I]t was impossible to estimate such costs before the contract was awarded and before the contractor arrived at the port and conducted its assessment and prepared its operations plan."[5] *Id.* Plaintiff states that the fixed fee part of CLIN 003 is associated with in-house man-hour costs, while the other, unspecified costs and the fees associated with them were to be determined. *Id.* at 6.

---

[4] For example, Plaintiff mentions "house management and operational personnel (twelve individuals in all) that [the Government] described in its *proposal*." Pl.'s Opp. at 4-5 (emphasis added). There is also a reference in Plaintiff's brief to other extrinsic documents, such as an exhibit to the Joint Preliminary Status Report and its Appendix to its brief. *Id.* at 5.

[5] CLIN 003 provides for "Preparedness Planning," which requires the contractor to produce "a prototype plan for the immediate assumption of port management and operations." Def.'s App. at 10. That section also provides that the contractor shall "assume" that it "will be required to provide most, if not all, management elements of port operation." *Id.*

Defendant responds to this argument by noting that the Contract provides in CLIN 003 for a whole host of activities related to operating the port.[6] It argues that port operation/maintenance tasks simply were not segregated for purposes of estimating cost and fixing the fee. Defendant again falls back on the language of "B.2 CONTRACT TYPE AND CONTRACT SERVICES": "This is a Cost Reimbursement (CPFF) Level of Effort term contract. For the consideration set forth below, the Contractor shall provide the services, deliverables or outputs described in Section C [Contract Line Items (CLINs) 001, 002, and 003] . . . ." Def.'s App. at 3. Indeed, this language does seem to be a general statement that the "services, deliverables or outputs" in CLIN 003 are linked to the "B.3 ESTIMATED COST, FIXED FEE, AND OBLIGATED AMOUNT," which does appear to be "the consideration set forth below" and which contains precise amounts for estimated cost and fixed fee for CLIN 003 at (c). Seizing on Plaintiff's assertion that it was impossible to estimate the specific costs of port operations in advance (with which it agrees), Defendant transforms the assertion into an explanation of why the Contract did not contain any *specific* cost estimates.[7] That is, these costs could not be estimated in advance; therefore, they were not set out as specific cost items.

To summarize: At this point, Defendant has not adequately explained the troublesome language in Sentence 1. Although Defendant has introduced some confusion by use of the future tense in commenting on Sentence 2, the Court is persuaded that the plain meaning of "negotiated maximum profit margin or level," as it is in the past tense, means the level of compensation pursuant to Section B.3(c) of the Contract. In addition, at this point, the Plaintiff has failed to persuade the Court that a second compensation scheme is indicated by the lack of specific cost estimates for the various operations entailed in running the port. The Contract is labeled as a CPFF contract. Failure to include specific cost estimates for specific requirements is not necessarily inconsistent with such a contract type. Moreover, as Defendant has argued, it is plausible that, because the specific requirements were not known in advance, the Contract would state the requirements and the costs in general terms.

### C. FAR Provisions

In arguing the Contract in its entirety is a CPFF contract, the Defendant notes that the Contract includes several provisions that are mandatory for cost-reimbursement contracts but are not included in fixed-price contracts. Def.'s Br. at 6. Defendant observes that the Contract incorporated by reference standard clauses on limitation of costs and limitation of funds that are

---

[6] Plaintiff appears to agree, basing its argument on the lack of cost estimates for these activities: "Tasks associated with all of these operations and infrastructure were contemplated in the description of work under CLIN 003 . . . ." Pl.'s Opp. at 5.

[7] "SSA is correct that specific *cost*s for many items were not included in the estimates in the statement of work, partially because these costs were unknown . . . but the contract explicitly stated that these activities were part of the cost plus contract." Def.'s Reply at 7 (emphasis in original).

found in the Federal Acquisition Regulations ("FAR") and that are mandatory for cost-reimbursement contracts. These provisions are not mandatory for fixed-price contracts and would serve no purpose for them. But Plaintiff does not argue that the Contract is a fixed-price contract or that a part of it is fixed-price. *See* Pl.'s Opp. at 12-14. Furthermore, as Plaintiff points out, mandatory cost-reimbursement provisions would naturally appear in contract language where at least part of the contract is CPFF. *Id.* at 19. Defendant counters, however, that the FAR does not contemplate a "cost-plus-fixed-fee-plus-profit" contract type that Plaintiff seems to be arguing for. Def.'s Br. at 8. Finally, Defendant points out that, if the Contract was part fixed fee and part not, then it would be misleading to label it as a CPFF contract, because "the total fee/profit to be received by the contractor would not be 'fixed.'" *Id.*

A contract's label does not determine what kind of contract it is,[8] *see Maintenance Eng'rs*, 749 F.2d at 726 n.3 (Fed. Cir. 1984); *LSi Serv. Corp. v. United States*, 422 F.2d 1334, 1336 (Ct. Cl. 1970), and contracts negotiated under FAR "Part 15–Contracting By Negotiation" may be any type or combination of types that will promote the Government's interest, but "[c]ontract types not described in this regulation shall not be used, except as a deviation . . . ." 48 C.F.R. § 16.102(b). As Plaintiff maintains that the Contract is a CPFF contract and a contract that provides for a profit to be negotiated in the future, it is not inaccurate to label it a cost-plus-fixed-fee-plus-profit ("CPFFPP") contract, as Defendant does.[9] Although the FAR may contemplate a combination of contracts–of the types it recognizes–does it contemplate such a contract as a CPFFPP contract or the combination of a CPFF and a "plus-profit" ("PP") contract ("CPFF/PP")? Plaintiff does not maintain that these types of contracts are recognized, as such, in the FAR. Instead, Plaintiff appears to argue that the Contract is a CPFF contract and an incentive contract described in FAR Subpart 16.4. *See* Pl.'s Opp. at 24. Defendant, however, points out that the FAR requires that incentive contracts require a formula for adjusting the fee based on target costs, which is not present in the Contract. 48 C.F.R. §§ 16.402-1, 16.405-1. Therefore, it cannot be a combination contract of this type.

But if the FAR does not provide for a CPFF and PP combination, does this mean that such a combination contract is forbidden and therefore unenforceable? If such were the case, it would tend to disprove the contention that the Contract was CPFF and PP. Defendant does not develop this point. The Court is unable to find anything in Defendant's brief that clearly states that such a combination is forbidden, except maybe by way of implication from Defendant's assertion that the combination is unknown to the FAR. But Defendant does not nail down that a combination not known to the FAR is forbidden and unenforceable. For example, the need for a

---

[8] Defendant does not dispute this point. Def.'s Reply at 5.

[9] Plaintiff objects to this label as a "straw man"; that is, the Government labels the Contract and then searches for this type of contract in the FAR and finds none. Pl.'s Opp. at 14. Although this may be a true characterization of what the government is doing, the label seems to accurately reflect what Plaintiff is arguing for, namely, a CPFF contract with a "plus profit" provision tacked on.

deviation is not elaborated. The point is further confused by Defendant's statement that "[o]ur point is not that a 'two part compensation structure' would be unenforceable under the FAR...," Def.'s Reply at 12, although perhaps this means that *certain* two-part compensation structures–those provided for by the FAR–are not unenforceable. In short, the Defendant does not clearly explain the interplay between a combination contract not provided for by the FAR and unenforceability. Therefore, the Court accepts that, although the FAR does not provide for a CPFF and PP combination, nothing in the FAR prohibits a contract that is this kind of combination. Nevertheless, the Court is still puzzled why the Contract would be labeled a CPFF contract rather than as a combination contract. Although the label is not determinative, the fact that the label does not reflect the combination contract that the Plaintiff argues for is significant.

### D. The *Fluor* Case

Plaintiff argues that the Contract cannot be a CPFF contract in its entirety because *Fluor Enterprises, Inc. v. United States*, 64 Fed. Cl. 461 (2005) ("Fluor"), held that a CPFF contract, in order to be legal, must determine at the time of award what the total estimated costs would be, so that the permissible profit level could also be determined at that time. In *Fluor*, a contract for architectural and engineering ("A&E") services was held to be illegal, as contrary to 41 U.S.C. § 254, because it did not contain an estimate of project cost at the time the contract was entered into. *Id.* at 491-95. 41 U.S.C. § 254 provides, in relevant part:

> [I]n the case of a cost-plus-a-fixed-fee contract . . . a fee inclusive of the contractor's costs and not in excess of 6 percent of *the estimated cost*, exclusive of fees, as *determined by the agency head at the time of entering into the contract*, of the project to which such fee is applicable is authorized in contracts for architectural or engineering services relating to any public works or utility project . . . .

41 U.S.C. § 254(b) (2000) (emphases added). The statute also contains a similar provision concerning contracts that are not for A&E services: "[I]n the case of a cost-plus-a-fixed-fee contract the fee shall not exceed 10 percent of *the estimated cost of the contract*, exclusive of the fee, *as determined by the agency head at the time of entering into such contract...*" *Id.* (emphasis added).

As noted earlier, Plaintiff asserts that no specific cost items were included in CLIN 003 for tasks associated with port operations and infrastructure because "it was impossible to estimate such costs before the contract was awarded and before the contractor arrived at the port and conducted its assessment and prepared it[s] operation plan." Pl.'s Opp. at 5. It also notes Defendant's agreement that "[i]t was not possible to accurately estimate the total costs for operating the port pursuant to CLIN 003 at the time the parties entered into the contract," which statement was made in the section concerning "relevant material facts that are not in dispute" in the Joint Preliminary Status Report. JPSR at 6.

This is yet another incident where Defendant introduces confusion into its position.[10] In its brief, as mentioned above, Defendant admitted that the cost of specific items were not included in the Contract partially because they were unknown, but Defendant seemed to be arguing that they were included in the total cost estimate for CLIN 003 nonetheless. Def.'s Reply at 7. This position conflicts with the sweeping statement that "[i]t was not possible to accurately estimate the total costs for operating the port pursuant to CLIN 003 at the time the parties entered into the contract." JPSR at 6.

This lack of clarity is quite problematic. On the one hand, if it was impossible to estimate the total costs for operating the port pursuant to CLIN 003, then *Fluor* urges that at least CLIN 003 is illegal as contrary to 41 U.S.C. § 254(b), unless CLIN 003 included a non-CPFF provision, to which the statute would not apply. On the other hand, if it was impossible to estimate the cost of certain items specifically, but it was possible to estimate a total for port operations, then *Fluor* would not apply.

*Fluor*, of course, is not binding precedent, but the opinion is thorough and well-reasoned. But in *Fluor* it appears that there was no cost estimate *at all* at the time the contract was entered into. *See Fluor*, 64 Fed. Cl. at 468 ("NOAA was unable to estimate the project costs. . . ."). Here, there is clearly an estimate of the cost of port operations pursuant to CLIN 003, namely, $3,541,480. Def.'s App. at 3. Furthermore, Defendant admits that it was impossible to "*accurately* estimate" the total costs; Defendant does not state that it was simply, "impossible." In any event, the difference between a CPFF contract with no estimate, as in *Fluor*, and a CPFF contract with clearly a cost estimate (no matter how accurate), as in this case, is enough for this Court to conclude that *Fluor* may be distinguished from this case. Finally, the Contract in this case complies with the policy of 41 U.S.C. § 254(b) as identified in *Fluor* in that it is apparent that the fixed fee is no more than 10 percent of estimated cost. *See id.* at 3.

### E. Other Arguments

In addition to the arguments already discussed, Defendant argues that (1) 41 U.S.C. § 254 caps Plaintiff's profit at 10% and (2) the Contract was performed on a cost-reimbursement basis. However, 41 U.S.C. § 254 applies to CPFF contracts, and Plaintiff maintains that the Contract is a CPFF/PP combination contract. Consequently, the PP part of the Contract would not be limited by the statute.

Regarding performance, this argument introduces facts extrinsic to the Contract. Just as Plaintiff cannot rely on documents and negotiations leading up to the Contract because there has been no assertion that the Contract is ambiguous, for the same reason Defendant cannot rely on facts subsequent to contract formation. Similarly, for purposes of this motion, Plaintiff cannot

---

[10] Recall the Court's discussion, in Section B supra, of the Contract language and Defendant's introduction of a confusing "will" into its discussion of the language of the FPO clause.

raise difficulties in performance that it claims amount to a breach.

**F. Summary and Conclusion**

The Contract language is not ambiguous. The Contract contains many hallmarks of a CPFF contract; indeed, the Contract states explicitly that it is this type of contract. Only one sentence in the FPO seems to support the Plaintiff's contention that there was another payment structure, namely: "USAID shall approve the fee and charge schedule *and the level of contractor profit* from operations."

Although it would be significant if the Defendant had argued that such a combination contract was forbidden by the FAR and unenforceable, the Defendant did not do so. Therefore, the Court presumes that what it calls a CPFF/PP is permissible. Similarly, the Court is persuaded that it would not be illegal, as per *Fluor*, if the entire contract were CPFF.

A review of the Contract language may be helpful. In Part I, Section B.2 CONTRACT TYPE AND CONTRACT SERVICES, the Contract states: "This is a Cost Reimbursement (CPFF) Level of Effort term contract." This section specifically applies to CLIN 003. In Section B.3 ESTIMATED COST, FIXED FEE, AND OBLIGATED AMOUNT, (c) CLIN 003 Port Operations, the Contract states: "The estimated cost plus fixed fee is $3,895,628.00." In Section B.3(d), the Contract states: "Within the estimated cost plus fixed fee specified in the paragraphs above. . . ." There are two sentences in the controversial FPO clause that suggest a non-CPFF, second payment structure. Sentence 2–"[t]o the extent that revenues exceed costs and *negotiated maximum profit margin or level*, USAID shall determine the use of any remaining funds in the port operation accounts" (emphasis added)–is consistent with a CPFF contract, because this Court interprets "negotiated maximum profit margin or level" to mean the level of compensation pursuant to B.3(c) of the Contract. This is the maximum profit margin or level that has been negotiated. Sentence 1– "USAID shall approve the fee and charge schedule *and the level of contractor profit* from operations" (emphasis added)–is also consistent with a CPFF contract. This Court was initially troubled by the suggestion in Sentence 1 that the level of contractor profit was to be determined in the future. This seemed inconsistent with a fixed fee. But as a CPFF level of effort[11] contract, the seeming anomaly is explained by FAR 16.306(d)(2), which, in relevant part, states: "Under this [term][12] form, if the performance is considered satisfactory by the Government, the fixed fee is payable at the expiration of the agreed-upon period, upon contractor statement that the level of effort expended in performing the contract work." Thus, the Government would be called upon to approve the level of contractor profit from operations in the future in a CPFF level of effort, term contract. Thus, all of the language of the Contract is consistent. The Court believes that if a second payment structure were contemplated by the

---

[11] The level of effort provisions are found in Part I, Section F.2 of the Contract.

[12] The term is found in Part I, Section F.3 of the Contract, entitled "PERIOD OF PERFORMANCE."

Contract, the Contract language would more clearly indicate it.

The Court has already determined that the lack of specific cost estimates for port operations is not fatal to the conclusion that the Contract is a CPFF contract in its entirety. Plaintiff has pointed to no requirement to do so, and the Contract contains general language that does not exclude the specific operations from the general cost estimate.

Finally, the Court notes that the references to the FAR found in the Contract are consistent with a CPFF contract.

For these reasons, this Court holds that the Contract is entirely a cost-plus-fixed-fee contract. As such, the Contract is subject to a 10 percent limit with regard to the fee or profit paid to the contractor. Therefore, Defendant's motion for partial summary judgment is GRANTED.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge