**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **SSA MARINE, INC.,** | |
| **Plaintiff,** | **Civil Action No. 05-490C** |
| **v.** | **(Chief Judge Damich)** |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SSA'S MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR MODIFICATION OF THE OPINION TO PERMIT INTERLOCUTORY APPEAL**

John W. Butler
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2510 (tel)
(202) 463-4950 (fax)

Of counsel:

Heather M. Spring
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2516 (tel)
(202) 463-4950 (fax)

*Counsel for Plaintiff, SSA Marine, Inc.*

August 14, 2007

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

I. MOTION FOR RECONSIDERATION. .......... 2

A. Standard Of Review For Motion For Reconsideration. .......... 2

B. Issues For Which Reconsideration Or, In The Alternative, Leave To Appeal, Is Sought. .......... 2

C. The Court's Finding That The Contract Is Unambiguously Solely A Cost-Plus-Fixed-Fee Contract Is Based On A Clearly Erroneous Application Of The Law. .......... 4

1. The Court never determined that SSA's reading of the contract was unreasonable, and it was therefore plain error to find that the contract was unambiguous. .......... 4

2. The Court's reliance on extrinsic facts contradicts its finding that the contract was unambiguous, and the Court impermissibly read the facts in a light most favorable to the moving party. .......... 9

3. The government's treatment of the FPO clause language is not reasonable. .......... 17

D. The Court Improperly Failed To Consider Whether The Contract Was Subject To The 10% Limit On Fees As A Matter Of Law. .......... 19

II. ALTERNATIVE MOTION FOR CERTIFICATION FOR INTERLOCUTORY APPEAL. .......... 21

A. Controlling Question Of Law. .......... 22

B. Substantial Ground For Difference Of Opinion. .......... 24

C. Materially Advance The Disposition Of The Litigation. .......... 26

# TABLE OF AUTHORITIES

Page

**Cases**

*Ammex, Inc. v. United States*, 52 Fed. Cl. 555 (2002) .......... 2

*APCC Services, Inc. v. ESH AT&T Corp.*, 297 F. Supp. 2d 101 (D.D.C. 2003) .......... 22, 24

*C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539 (Fed. Cir. 1993) .......... 4, 5, 8, 16

*Fluor Enterprises, Inc. v. United States*, 64 Fed. Cl. 461 (2005) .......... *passim*

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 233 F. Supp. 2d 16 (D.D.C. 2002) .......... 22

*Klinghoffer v. Achille Lauro Lines*, 921 F.2d 21 (2d Cir. 1990) .......... 22, 24

*In re Magic Marker Securities Litigation*, 472 F. Supp 436 (E.D. Pa. 1979) .......... 25

*Metric Constructors, Inc. v. National Aeronautic & Space Admin.*, 169 F.3d 747 (Fed. Cir. 1999) .......... 7, 8

*NVT Technologies, Inc. v. United States*, 370 F.3d 1153 (Fed. Cir. 2004) .......... 4, 7

*Principal Mutual Life Ins. Co. v. United States*, 29 Fed. Cl. 157 (1993) .......... 2

*Record Steel and Const., Inc. v. United States*, 62 Fed. Cl. 508 (2004) .......... 6

*Turner Const. Co., Inc. v. United States*, 367 F.3d 1319 (Fed. Cir. 2004) .......... 6

*Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577 (Fed. Cir. 1990) .......... 2

**Statutes**

28 U.S.C. § 1292(b) .......... 1, 22

28 U.S.C. § 1292(c) .......... 1, 21

41 U.S.C. § 254 .......... 3, 10, 14

**Regulations**

48 C.F.R. § 16.306(d)(2) .......... 18, 19

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SSA MARINE, INC.,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 05-490C** |
| **v.** | ) | **(Chief Judge Damich)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SSA'S MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR MODIFICATION OF THE OPINION TO PERMIT INTERLOCUTORY APPEAL**

Plaintiff SSA Marine, Inc. ("SSA"), pursuant to RCFC 59, respectfully submits this Memorandum of Points and Authorities in support of SSA's Motion for Reconsideration or, in the Alternative, for Modification of the Opinion to Permit Interlocutory Appeal, of the Court's July 31, 2007, opinion (the "Opinion"). The Opinion granted partial summary judgment to the government. SSA respectfully seeks reconsideration of the Court's Opinion in order to correct plain and controlling errors of law and mistakes of fact in the Opinion and in order to facilitate a more efficient conclusion to the litigation. In the event that the Court denies reconsideration, or if the Court reconsiders but reaches the same outcome as was stated in the Opinion, SSA moves for modification of the Opinion to state that the Court grants its consent for SSA to seek interlocutory review in the Federal Circuit pursuant to 28 U.S.C. §§ 1292(b) and (c).

SSA explains the grounds for its request for reconsideration in Section I, below. Section II, presented in the alternative (i.e., if the Court denies the request for reconsideration or if the Court reconsiders but does not reverse its grant of partial summary judgment for the government), addresses SSA's request for modification of the Court's Opinion to expressly allow permission for SSA to seek interlocutory review of the two issues raised by the government in its Motion for Partial Summary Judgment.

## I. <u>MOTION FOR RECONSIDERATION</u>.

### A. Standard Of Review For Motion For Reconsideration.

The decision of whether to grant a motion for reconsideration rests in the sound discretion of the Court. *See Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1583 (Fed. Cir. 1990). In order to prevail on a motion for reconsideration, "the movant must point to a manifest (i.e., clearly apparent or obvious) error of law or a mistake of fact." *Ammex, Inc. v. United States*, 52 Fed. Cl. 555, 557 (2002); *Principal Mutual Life Ins. Co. v. United States*, 29 Fed. Cl. 157, 164 (1993).

### B. Issues For Which Reconsideration Or, In The Alternative, Leave To Appeal, Is Sought.

The government's Motion for Partial Summary Judgment sought a ruling on the two following questions:

> "1. Whether the contract was a cost-plus fixed fee contract.

> 2. Whether any fee and/or profit received by SSA Marine, Inc. ('SSA') is limited to ten percent of the estimated cost of performance."

Government Motion for Partial Summary Judgment at 1.

The Opinion provides various explanations for the Court's ruling that the contract was solely a cost-plus-fixed-fee contract. SSA explains in detail in Section C, *infra*, why the Court's application of the law with respect to that issue constitutes plain error that requires reconsideration and reversal of the Opinion. SSA also explains why the Court erred in its treatment of the facts that necessarily underlie the Court's legal conclusions.

With respect to the second issue presented in the government's motion, the Opinion states that there is a ten percent limitation, but fails to acknowledge SSA's argument that even if the contract had been solely a cost-plus-fixed-fee arrangement, it was nevertheless not governed by a ten percent cap. *See* SSA Opposition at 28-32. In other words, the Opinion fails to recognize that an affirmative answer to the first question presented by the government does not by itself mandate an affirmative answer to the second question presented. Because the Court mistakenly assumed that the answer to the first issue automatically controlled the answer to the second, the Court simply did not address SSA's arguments for why the fee cap limitations of 41 U.S.C. § 254(b) do not apply here even if the contract were properly found to be a cost-plus-fixed-fee type. As is discussed in more detail in Section D, *infra*, that failure to address an issue that directly controls the outcome of the government's motion is clear legal error that provides an independent basis for reconsideration.

### C. The Court's Finding That The Contract Is Unambiguously Solely A Cost-Plus-Fixed-Fee Contract Is Based On A Clearly Erroneous Application Of The Law.

1. The Court never determined that SSA's reading of the contract was unreasonable, and it was therefore plain error to find that the contract was unambiguous.

The motion for partial summary judgment was filed by the government. In order to be entitled to judgment as a matter of law with respect to the issue of whether the contract was solely a cost-plus-fixed-fee arrangement, the government as the moving party was required to show either (1) that the contract was, on its face, unambiguously and solely a cost-plus-fixed-fee contract, or (2) that the contract was patently ambiguous and that SSA failed to inquire as to that ambiguity. *See, e.g., C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539 (Fed. Cir. 1993); *NVT Technologies, Inc. v. United States*, 370 F.3d 1153 (Fed. Cir. 2004). The government clearly did not argue (nor could it) that the contract was patently ambiguous,[1] so the government would

[1] If the Court on reconsideration were to consider *sua sponte* the possibility that the contract contained a patent ambiguity about which SSA had a duty to inquire, the Court would have to rule against the government on that point because the facts, read in a light most favorable to SSA as the non-moving party, indicate that: (1) SSA, at the government's written request, made clear in writing that it understood the FPO clause to contain a second source of profit (*see* Pl. Opp. at 6-7); (2) the government awarded the contract to SSA after receiving that requested confirmation; (3) the gentleman who drafted the contract for USAID confirmed at his deposition that the profit called for in the FPO clause was separate from the fixed fee otherwise provided for under CLIN 003 (*see* Pl. App. 7 – John Abood Deposition Transcript at 49); and (4) the Contracting Officer confirmed after award that SSA's reading was reasonable and that SSA had relied upon that reading (*see* Pl. Opp. at 8, quoting the Contracting Officer's comment to Mr. Abood regarding the FPO Clause: "I know you put it in to get them to sign the contract, but it certainly gives the impression that we were acknowledging that there would probably be profit associated with the port fees.").

have been entitled to summary judgment on the first issue presented only if it had demonstrated that its reading was the only reasonable one. In order for the Court to have made a determination that the government's reading was the only reasonable one, it would have had to determine whether SSA's reading was also reasonable. "A contract term is unambiguous if there is only one reasonable interpretation." *C. Sanchez & Son, Inc.*, 6 F.3d at 1544. As the Court said in that case:

> The question before the Claims Court *was not to decide the better reading* of the contract, or whether the Army's post-award reading was reasonable. *The question was whether* [plaintiff's] *reading was reasonable*, for it was on the basis of [plaintiff's] reading that the contract was bid.

*Id.* (emphasis added) (brackets added).

The Opinion nowhere states that the Court believed that SSA's reading of the contract was unreasonable. Instead, because each party asserted that its reading was supported by the plain language, it appears that the Court believed that its task was to decide which of the two readings was *better*[2]–

---

[2] In the final paragraph on page 5 of the Opinion, the Court states that:

> The parties do not appear to argue that the Contract language is ambiguous. . . . Therefore, in the absence of a clear assertion that the Contract language is ambiguous, the Court will not have recourse to facts extrinsic to the Contract in order to aid it in interpretation.

That the Court believed that the lack of an allegation of ambiguity precluded the Court from finding ambiguity as a result of its own analysis is also indicated by the Court's language at page 8 of the Opinion: "[B]ecause Plaintiff has not argued that the contract language is ambiguous, the argument must be proved by language in the contract itself." *See also* Opinion at 12 ("Just as Plaintiff cannot rely on documents and negotiations leading up to the Contract because there has been no assertion that the Contract is ambiguous, for the same reason Defendant cannot rely on facts subsequent to contract formation.").

precisely what the *Sanchez* court said was *not* the proper inquiry. In other words, the Court proceeded on the understanding that if neither party alleged ambiguity, then the court was precluded from finding any. That is not the law.

As a factual matter, as discussed below, SSA *did* note the proper analysis to be followed if indeed the Court found the contract ambiguous, so there was no basis in the pleadings for the Court to restrict its options to choosing between two competing assertions based on the plain contract language, even if the law allowed that approach. In any event, Federal Circuit precedent makes clear that a party's assertion that a contract is unambiguous does not preclude the court from finding that the contract is in fact ambiguous. That precedent makes equally clear that if the Court finds ambiguity it must construe the ambiguous contract against the drafter under the *contra proferentum* principle. *See Turner Const. Co., Inc. v. United States*, 367 F.3d 1319 (Fed. Cir. 2004).

In *Turner*, the plaintiff plainly took the position that the contract was not ambiguous, 367 F.3d. at 1321 ("[plaintiff] states that the contract is not ambiguous"), but the Court nevertheless went on to hold that the contract *was* ambiguous and that plaintiff was entitled to recover on its reading of the contract under the rule of *contra proferentum*:

> When a dispute arises as to the interpretation of a contract and the contractor's interpretation of the contract is reasonable, we apply the rule of *contra proferentum*, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document.

*Id.*; *see also Record Steel and Const., Inc. v. United States*, 62 Fed. Cl. 508, 513 (2004) (holding that the contract was ambiguous despite claims by each party

that the contract unambiguously supported its reading); *NVT Technologies*, 370 F.3d at 1159-61 (same).

The rule that a party's assertion that a contract is unambiguous does not prevent the court from finding that the contract is in fact ambiguous is a necessary corollary to the well-established rule that the fact that parties disagree about the meaning of a contract does not make it ambiguous. *See, e.g., Metric Constructors, Inc. v. National Aeronautic & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999). Just as the parties cannot create an ambiguity by disagreeing as to the meaning of a contract, they similarly cannot preclude a finding of ambiguity by arguing conflicting versions of what they believe is unambiguous. "Whether a contract provision is ambiguous is . . . a question of law" for the Court to decide. *See NVT Technologies,* 370 F.3d at 1159.

Applying the proper rule to the present case, the Court's choices are not merely between the government's asserted unambiguous reading and SSA's asserted unambiguous reading. There is a third option – that the contract is ambiguous. Because it appears that the Court did not believe that it had that third option, it apparently felt constrained to choose what it deemed the *better* of only two options. It therefore failed to consider whether SSA's reading was reasonable, an option SSA expressly noted in its opposition at page 17 n.3 (arguing that if the contract were deemed ambiguous, then it would have to be construed in SSA's favor under the doctrine of *contra proferentum*). Because the Court never analyzed whether SSA's reading was reasonable, it was plain

error to hold that the government's reading was the only possible reading, that is, that the contract was unambiguous.

On reconsideration, SSA urges the Court to apply the proper test by determining whether SSA's reading of the contract was reasonable, that is, whether SSA's reading was "reasonably consistent with the contract language," *Sanchez*, 6 F.3d at 1544, and whether it fell within the "zone of reasonableness." *Metric Constructors*, 169 F.3d at 751. In making that determination, SSA respectfully urges the Court to review its own findings as stated in the Opinion, including in particular the Court's statements at page 8 that "[t]he Contract does lend some support to Plaintiff's argument," and that the "Plaintiff appears to be correct" that costs for many necessary port functions were not included in the initial estimate. *See also infra* at 24-25 (collecting Court's statements regarding the merits of SSA's position).

In addition to answering the necessary question of whether SSA's contract interpretation was reasonable, SSA respectfully requests that the Court on reconsideration revisit its determination that the government's reading is reasonable. As demonstrated below, the Court's reasons for finding that the government's interpretation was reasonable were themselves the result of plain error.

To be clear, SSA continues to believe that if the contract is read to give effect to its plain meaning, to give meaning to all parts of the contract, and to avoid conflict between and among sections of the contract, then the only permissible reading is the one relied upon by SSA – that the FPO clause

provides for a profit mechanism that is separate and distinct from the limited fixed-fee provision in CLIN 003. The issue before the Court, however, is whether the government is entitled to summary judgment on the two questions that it presented in its motion. The Court must reverse its initial decision if it finds on reconsideration *either* that the contract unambiguously supports SSA's reading *or* that SSA's reading of the contract is reasonable. In making either of those determinations, the Court must construe all facts in a light most favorable to SSA as the non-moving party, as discussed in the section immediately below.

2. The Court's reliance on extrinsic facts contradicts its finding that the contract was unambiguous, and the Court impermissibly read the facts in a light most favorable to the moving party.

Despite repeated assertions that extrinsic evidence and factual assertions could not be considered (*see* Opinion at 5, 8, 12), the Court itself materially relied on factual allegations. In doing so it failed to construe the facts in a manner most favorable to the non-moving party. It also relied on certain factual allegations to the exclusion of others and failed to base its factual findings on the evidence in the record.

Both in its discussion of the language of the contract and in its discussion of the rule set forth in *Fluor Enterprises, Inc. v. United States*, 64 Fed. Cl. 461 (2005), the Court concluded that although CLIN 003 did not contain specific cost estimates for each item of work required in connection with port operations, it did contain a total estimate encompassing all work.

*See* Opinion at 9 ( finding it "plausible that, because specific requirements were not known in advance, the Contract would state the requirements and costs in general terms") and 12 ("if it was impossible to estimate the costs of certain items specifically, but it was possible to estimate a total for port operations, then *Fluor* would not apply"). This factual finding was essential to the Court's conclusion that there was not a separate cost mechanism. In addition, without this factual determination it would not be possible to accept the government's "quite problematic" (Opinion at 12) assertion that it is unnecessary to read the FPO clause as a second payment and profit mechanism in order for the cost-plus-fixed-fee portion of the contract to be legal under the FAR, 41 U.S.C. § 254, and *Fluor* – authorities that require cost estimates to be made at the time of award if a cost-plus-fixed-fee contract type is to be employed.

These two sections of the Opinion, with their shared factual issue regarding the scope of costs covered in the CLIN 003 cost estimate at the time of award, make up the bulk of the Court's rationale for its holding. The Court claims to have reached its conclusion that there was an estimate of total contract costs at the time of award solely by reviewing the contract language, but it is obvious from the discussion in the Opinion that the Court considered facts recited in the Joint Preliminary Status Report ("JPSR") and factual statements made in the government's reply brief. *See, e.g.,* Opinion at 9, n. 7 (quoting the government's reply brief regarding factual assertions); Opinion at 12 (quoting the government's reply brief and the statement of undisputed facts in the JPSR).

The Court plainly *did* make factual findings regarding what costs were and were not included in the initial award, and it is equally plain that making such factual findings was necessary in order to answer the question that the Court (properly) found was central to its analysis of the contract. Such factual findings were appropriate because the contract arguably does not conclusively describe all of the costs that went into the estimate set forth in CLIN 003. As the Court notes in the second paragraph of page 8 of its Opinion, "[t]he Contract does lend some support to Plaintiff's argument" (noting that costs listed did not cover numerous costs that could be incurred based on the tasks listed in the CLIN 003 scope of work).

Because some factual inquiry was appropriate, SSA does not allege plain error on the basis that the Court took factual issues into account in construing the contract. To the contrary, as discussed immediately above, it would have been difficult to answer the important question of what costs were covered by the initial estimate if the Court had not delved into the facts. The Court went astray, however, and SSA alleges clear error of law because of: (1) the manner in which the Court examined the pertinent facts (failing to consider all of the facts and failing to construe them in the light most favorable to the non-moving party), and (2) the Court's assertion that the contract was unambiguous even though the Court itself found it necessary to resort to factual statements outside of the four corners of the contract in order to determine the contract's meaning.

Taking the second point first, the Court's recourse to facts not discernable from the contract itself is contrary to the Court's own explanation of the manner in which it conducted its analysis. Thus, although the Court held at page 8 of its Opinion that the meaning of the contract "must be proved by language in the Contract itself," the Court itself was plainly unable to make sense of the contract without resort to outside facts. Under the Court's own analysis (and simple logic), the need for recourse to extrinsic facts means that the contract's plain language was not in the Court's view sufficient to reveal its meaning. In other words, under the Court's actual analysis (as opposed to its stated analysis), the contract *was* ambiguous. Were it not so, it would have been both unnecessary and impermissible for the Court to engage in the detailed factual determinations that underlie the Court's core conclusions of law. That implicit finding of ambiguity, in turn, triggered a requirement that the Court decide whether SSA's reading was reasonable, as discussed in Section C.1, *supra*. As also discussed in that section, however, the court never made that determination, and it never applied the principle of *contra proferentum* as required by controlling circuit precedent. Those omissions were plain error.

Returning to the issue of the manner in which the Court dealt with the factual determinations that were central to its holding, the Court erred as a matter of law by not considering all of the relevant record facts and by not construing those facts in a light most favorable to the non-moving party, SSA. The key question on which the Court improperly dealt with issues of fact was

whether the CLIN 003 cost estimate set forth in the contract covered the total estimated costs of the contract (albeit imprecisely), or whether instead that estimate only covered certain costs, with other costs to be dealt with under a separate, non-cost-pus-fixed-fee provision (i.e., the FPO clause) as urged by SSA's reading and as required by statute and the logic of *Fluor*.

At page 12 of the Opinion, the Court explained that, although an estimate in a contract that was solely of the cost-plus-fixed-fee type that did not make *some* provision for all types of anticipated costs would be legally suspect and would support the conclusion that the FPO clause constituted a second payment mechanism, such an estimate would be legal under a solely cost-plus-fixed-fee arrangement if it generally covered such expenses without specifically allocating monies among them:

> This lack of clarity is quite problematic. On the one hand, if it was impossible to estimate the total costs for operating the port pursuant to CLIN 003, then *Fluor* urges that at least CLIN 003 is illegal as contrary to 41 U.S.C. § 254(b), unless CLIN 003 included a non-CPFF provision, to which the statute would not apply. On the other hand, if it was impossible to estimate the total cost of certain items specifically, but it was possible to estimate a total for port operations, then *Fluor* would not apply.

Opinion at 12.

In determining whether all CLIN 003 costs were included in the estimate (as the government argues), or whether only certain cost types were included (as SSA argues), the Court considered in isolation a single factual statement from the JPSR that "it was not possible to *accurately* estimate the total costs for operating the port pursuant to CLIN 003 at the time the parties entered into

the contract." Opinion at 12 (quoting JPSR at 6) (emphasis in Opinion). On the basis of its reading of the government's supposed distinction between a cost estimate being, on the one hand, "simply, 'impossible'" and being, on the other hand, impossible of being accurately determined, the Court discounted SSA's arguments that the government's claim that the contract was solely a cost-plus-fixed-fee arrangement would have rendered the contract illegal under 41 U.S.C. § 254 and *Fluor*. The problem with that central distinction drawn by the Court is that it is flatly contradicted by the papers filed by the parties in connection with the government's Motion for Partial Summary Judgment. The government did not stop with an admission that it was impossible "accurately" to estimate all CLIN 003 costs; rather, it unambiguously admitted that it was impossible to estimate those total costs *at all*. Consider the following from Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact:[3]

> 9. At the time the solicitation was drafted, it was not known whether it would be necessary to implement CLIN 003. *See* Pl. App. 3 (Abood Tr. at 14). It was also impossible to estimate the costs that would be associated with operating the port. *See* JPSR at 6.
>
> **Response: Not disputed, but this proposed fact is irrelevant extrinsic evidence that is not admissible for the purposes of defining the terms of an unambiguous contract. The unambiguous terms of SSA's contract is the issue that is before the Court in defendant's motion for partial summary judgment.**
>
> 10. During the planning period and prior to award the conditions of the port were unknown to USAID. The Director of the Office of Iraq affairs at USAID, Ross Wherry, stated that:

[3] As in the original, SSA's proposed finding is set forth in regular type, with the government's response following in bold type.

> We didn't know what it might look like, and we didn't know what kind of a port would be left. We weren't sure who was to be – if it would be destroyed, if there would be infrastructure left there. We didn't know anything about the labor force. All of the – the details of how one manages a port were opaque to us at that point. Pl. App. 33 (Wherry Tr. At 45).

**Response: Not disputed but this proposed fact is irrelevant extrinsic evidence that is not admission for the purposes of defining the terms of the unambiguous contract. The unambiguous terms of SSA's contract is the issue that is before the Court in defendant's motion for partial summary judgment.**

* * *

15. At the time the proposal was submitted it was not possible to estimate all the costs of port operations under CLIN 003. The initial proposal included estimated costs and provided a fixed fee for CLINs 001 and 002 as well as limited items within CLIN 003. All other items within CLIN 003 were to be estimated in the CLIN 002 Implementation Plan. Pl. App. 43-46.

**Response: Not disputed.**

In addition, the factual determination that $3,541,480 constituted a general estimate of total costs without specifying particular cost items is contradicted by SSA's proposal, which the Court declined to consider. The proposal clearly establishes each specific element of the estimate. The estimate is limited solely to in-house man-hour costs and associated housing, food and transportation costs for those personnel, and expressly states that all other costs will be addressed in the CLIN 002 Implementation Plan. *See* Pl. Opposition at 5 and Pl. App. at 43-46. The additional costs required to make the port fully operational were later estimated in the Implementation Plan to be $164,832,000. *See* Defendant's Response to Plaintiff's Proposed Findings of Uncontroverted Fact at ¶ 23. Because this estimate was prepared by the

contractor as part of the CLIN 002 work, after contract award, it obviously played no part in the pre-award estimate of costs. Moreover, USAID's lead contract drafter and negotiator testified at his deposition that he did not recall that the government ever prepared any cost estimate. Pl. App. 9 (J. Abood Deposition Tr. at 58-59). Despite a specific request and search, the government did not identify or produce any estimate during discovery.

Weighing these undisputed facts against the single, earlier JPSR statement containing the qualifier "accurate," the Court's determination that the contract is susceptible of a reading that CLIN 003 contained a cost estimate covering all anticipated costs is plain error both in terms of the weight of the evidence and in terms of the requirement that the facts be construed in a manner most favorable to the non-moving party. *See, e.g., Sanchez*, 6 F.3d at 1544 ("judgment can not be sustained in favor of the movant unless there is no version of the facts that could support a contract interpretation in favor of the nonmovant"). Specifically, the Court based its conclusion entirely on an ambiguous qualification ("accurate") in a government statement even though the government made no such qualification in multiple later statements covering precisely the same subject. Thus, the Court's error was not merely to construe the facts in a light most favorable to the moving party, but also to treat an isolated statement as "fact" when the record clearly contradicts that statement. Those errors turn the summary judgment standard on its head.

Because the Court's determination that total costs were included in the CLIN 003 estimate was critical to both its conclusion that there was not a

separate pricing mechanism and its related conclusion that the government's interpretation of the contract would not be illegal under *Fluor Enterprises, Inc. v. United States*, 64 Fed. Cl. 461 (2005), the legal errors committed in reaching that determination must be corrected and the decision reversed.

3. The government's treatment of the FPO clause language is not reasonable.

The Court adopts the government's contention that the references to contractor profit in the FPO clause relate back to the fixed fee set forth in section B of the contract. This is so, the Court reasons, because "the Court is persuaded that the plain meaning of 'negotiated maximum profit or level,' as it is in the past tense, means the level of compensation pursuant to Section B.3(c) of the Contract." Opinion at 9. That reading, respectfully, is impossible to square with the language of the FPO clause.

The Court's conclusion that there is a past tense verb appears to be based on the word "negotiated" in the final sentence of the FPO clause. That word is used there as an adjective to modify "maximum profit margin or level." It is not used as a verb at all. In any event, that phrase comes at the end of the FPO clause, which addresses what is to happen to monies in excess of costs and reasonable contractor profits. The language does not address the issue of when, in relation to the setting of the fixed fee, the amount of profit is to be negotiated.

The question of when profit is to be negotiated (and therefore whether FPO clause profit is identical to or separate from the CLIN 003 fixed fee) is

addressed by the fourth and fifth sentences of the FPO clause, beginning with the phrase "[a]fter port operations begin." At that time – i.e., "after port operations begin" – fees and charges and "the level of contractor profit from operations" were to be approved by USAID. Clearly a time that is "after port operations begin" is a time after the award of the contract, and is therefore a time after the CLIN 003 fixed fee had been set. That the profit to be set under the FPO clause was to be established after, and therefore separate from, the CLIN 003 fixed fee is further demonstrated by the conditional phrase "[i]n the event that USAID directs the contractor to manage and operate the port" that begins the FPO clause. Because the entire FPO clause is conditional, anything that is to happen under that clause must happen, if it is to happen at all, after the contract is awarded and under performance. Accordingly, it is impossible that the action of approving a level of profit occurred before contract award.

On this same issue of timing, it is also not reasonable to construe FAR 16.306(d)(2) as requiring the government to revisit the amount of the fixed fee at the end of the contract. *See* Opinion at 13. There is simply nothing to indicate that that provision (which is a contract type description rather than a provision that prescribes actions to be taken by the contracting officer) contemplates an adjustment to the previously fixed fee. Rather, under that clause, the contracting officer would only determine whether the specified level of effort had been expended, not whether the fee was properly set in the first place. In any event, this theory is entirely inconsistent with the government's (and the Court's) theory that the contractor profit in the FPO clause refers to

the fixed fee that was set at the *beginning* of the contract. Under the section 16.306 theory, the fixed fee is set at the *end*. The two theories are logically irreconcilable with one another and with the language of the FPO clause, which plainly calls for the profit to be set after contract award and after the government gives the contractor the directive to begin port operations. Once that directive is given, the most natural reading of the sentence "USAID shall approve the fee and charge schedule and the level of contractor profit from operations" is that the two amounts (fees and profit) are to be set at the same time. That time is in the middle of the contract, not at the beginning or the end, and the amounts so set have nothing to do with the CLIN 003 fixed fee.[4]

### D. The Court Improperly Failed To Consider Whether The Contract Was Subject To The 10% Limit On Fees As A Matter Of Law.

Two separate questions were presented for decision in the government's motion for summary judgment. The first was whether the contract was solely a cost-plus-fixed-fee contract. The second was whether profit under the contract was limited to 10% of contract cost. The Court addressed the first question, but then ruled on the second without any analysis. The Court seems to have concluded that, because it found the contract to be solely of a cost-plus-fixed-

[4] The only basis for the Court's Opinion not otherwise discussed in this Section C is the reliance on contract labels. Although the Court properly states that "[a] contract's label does not determine what kind of contract it is" (Opinion at 10), the Court nevertheless refers to the label in the contract at pages 6, 9, 11, and 13 of the Opinion, leaving the distinct impression that the Court did in fact rely on the contract label in rendering its decision. If in fact the Court did so, that is also plain error.

fee type, the contract necessarily must have been subject to the 10% limit on fees or profit. For the reasons set forth in SSA's Opposition, however, that is simply not the case.

The Court agreed, as it had to, that the contract provided for a non-appropriated source of funding for port operations, that is, port fees and charges collected from customers. *See* Opinion at 7. Because the FAR does not apply to nonappropriated funds contracts, the Court's finding that the FPO clause provided a source of non-appropriated funds from which the contractor was to be paid should logically and necessarily have been accompanied by a finding that that the 10% limit on cost-plus-fixed-fee contracts did not apply to the port operations funding even if the contract was entirely cost-plus-fixed-fee. *See* Pl. Opp. at 30-31.

This conclusion cannot be altered by the fact that the government used appropriated funds despite the language of the contract. First, as recognized by the Court, the government's actions after execution of the contract cannot change the contract terms. *See* Opinion at 12. Second, the appropriations ultimately used by the government were also exempt from procurement regulations. *See* Pl. Opp. at 29-30.

Thus, under either the contracted-for payment mechanism or the funding actually used by the government, the contract was exempt from any 10% limit on fixed fees or profit that might otherwise have been applicable. The Court's failure to even consider SSA's arguments on this issue is plain error, as is its holding that the contract was subject to a 10% profit cap, a

finding that is internally inconsistent with the Court's finding about the source of monies collected under the FPO clause. The government presented two questions for consideration on summary judgment. SSA addressed both of those questions, and the Court must address both as well.

The Court should reconsider and, for the reasons set forth herein and in SSA's Opposition Brief, reverse its holding that the contract was subject to a 10% limit on profit.

## II. ALTERNATIVE MOTION FOR CERTIFICATION FOR INTERLOCUTORY APPEAL.

If the Court does not reconsider its Opinion and reverse its holding that that SSA's profit claim is limited to 10% of the total contract cost, SSA respectfully requests that the questions presented on summary judgment be certified for interlocutory appeal to the Federal Circuit pursuant to 28 U.S.C. §§ 1292(c)(1) and 1292(b). Specifically, those questions are as follows:

> 1. Whether the contract was a cost-plus-fixed fee contract; and
>
> 2. Whether any fee and/or profit received by SSA Marine, Inc. ("SSA") is limited to ten percent of the estimated cost of performance.

Government Motion for Partial Summary Judgment at 1.

Certification for interlocutory appeal is appropriate when an interlocutory order "[1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the

litigation. . . .” 28 U.S.C. § 1292(b) (brackets added). All three elements are present in this case.

**A. Controlling Question Of Law.**

Under § 1292(b), a “controlling question of law” is one that “would require reversal if decided incorrectly or that could materially affect the course of litigation with resulting savings of the court’s or the parties’ resources.” *APCC Services, Inc. v. ESH AT&T Corp.*, 297 F. Supp. 2d 101, 105 (D.D.C. 2003) (*citing Judicial Watch, Inc. v. Nat’l Energy Policy Dev. Group*, 233 F. Supp. 2d 16, 19 (D.D.C. 2002)); *see also Klinghoffer v. Achille Lauro Lines*, 921 F.2d 21, 24 (2d Cir. 1990).

As the Court noted, interpretation of the contract is a question of law, and there can be no dispute that the interpretation questions are controlling in this case. The result of the holding that the contract is subject to a 10% cap on the amount of profit SSA may earn has the result of capping SSA’s potential recovery at $888,814.76. This is substantially less than the $4,400,004.40 claimed by SSA. Moreover, the holding that the contract is exclusively a cost-plus-fixed-fee contract materially affects the manner in which damages would be proved and calculated. If the only profit that SSA is entitled to is a “fixed fee” as described in the FAR, the method of establishing the appropriate amount of fee is governed by the FAR. If, however, SSA is correct that the cost of port operations after initial start-up, including contractor profit, was to be

funded under an entirely separate mechanism, the manner for determining the appropriate profit level is commercial reasonableness.

The witnesses that would be called and the testimony to be elicited would be different under these two differing standards. For example, there is a pending motion to exclude the government's expert witness. If the standard under which additional profit is to be judged is a FAR standard, the government might continue to seek testimony from this witness. If the standard is one of what is a commercially reasonable profit for foreign port operations, however, the government might not call that witness given his lack of experience in that field. From a practical standpoint, unless the Court were to allow evidence on both theories (which would be cumbersome and complicated, for example, when ruling on relevance objections), a reversal on appeal of the Court's decision on the issues presented in the motion for partial summary judgment would require a new trial on remand. The issues presented here do not affect merely the quantum of a potential recovery by SSA; they affect the nature of the evidence to be offered at trial. Inasmuch as the very purpose of the Court's directing the government to file its motion for partial summary judgment was to simplify these issues of quantum and proof, there can be no doubt that their early resolution by the appellate court would serve the same efficiency-enhancing purposes that caused the Court to prescribe this procedure in the first place.

## B. Substantial Ground For Difference Of Opinion.

A substantial ground for difference of opinion can be demonstrated by a "dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits. A substantial ground for dispute also exists where a court's challenged decision conflicts with decisions of several other courts." *APCC Services, Inc.*, 297 F. Supp. 2d at 107 (citations omitted). Substantial ground for difference of opinion may also exist where "the issues are difficult and of first impression." *Klinghoffer*, 921 F.2d at 25.

In this case, the Opinion conflicts with decisions of this Circuit as well as other circuits. As discussed in greater detail above, the Court acted contrary to settled authority when it interpreted the contract by choosing the competing interpretation it preferred rather than determining that SSA's interpretation was unreasonable or that the government's interpretation was the only reasonable interpretation. Separately, the Court misapplied the standard for treatment of facts on motions for summary judgment when it failed to construe facts in a light most favorable to the non-moving party. Applying that improper framework, the Court also failed to give effect to what it recognized as a well-reasoned opinion in *Fluor Enterprises, Inc. v. United States*, 64 Fed. Cl. 461 (2005), when it held, contrary to the undisputed record facts, that the CLIN 003 cost estimates made some provision, however, vague, for all anticipated contract costs.

Moreover, the Court's own difficulty in grappling with the questions serves as evidence of substantial ground for difference of opinion. The Court

states that "[a]lthough the language is not ambiguous, it is not free of difficulty in interpretation" (Opinion at 6); "[t]he Court puzzles over the language of these two sentences" (Opinion at 7); "[t]he Contract does lend some support to Plaintiff's argument" (Opinion at 8); "[a]t this point, Defendant has not adequately explained the troublesome language in Sentence 1" (Opinion at 9); "one sentence in the FPO seems to support the Plaintiff's contention that there was another payment structure" (Opinion at 13); "[t]here are two sentences in the controversial FPO clause that suggest a non-CPFF, second payment structure" (Opinion at 13). Given the many questions raised by the Court within the Opinion itself, it is clear that there is substantial ground for difference of opinion. *See, e.g., In re Magic Marker Securities Litigation*, 472 F. Supp 436, 438 (E.D. Pa. 1979) (finding substantial ground for difference of opinion where court "acknowledged . . . that defendants' argument . . . had 'considerable appeal,' . . . that it was difficult to reconcile. . . and that the court of appeals might 'view the matter differently'").

The Court's understandable uncertainty arises from the fact that this contract is of an admittedly unusual type, thus raising an issue of first impression regarding the combination of contract vehicles in an agreement designed to allow the government maximum flexibility in an inherently fluid military situation. The resolution of the issues presented here could have a real impact on the government's ability to procure services on short notice in volatile situations in the future. For all of these reasons, early appellate resolution of these issues is appropriate.

### C. Materially Advance The Disposition Of The Litigation.

The purpose of the summary judgment motion was to substantially narrow the issues for trial and possibly encourage settlement discussions. Those purposes, however, cannot be fulfilled absent final resolution of the controlling legal questions. As noted above, the manner in which litigation will proceed in this case is substantially affected by the Opinion. The quantum of damages available and the manner of proving damages are both materially affected by the holding. Having a trial on these issues without resolving the legal questions presented will substantially complicate the presentation of the evidence. Either SSA will need to present damages evidence on all theories of the case, or a new trial would be required should the Opinion be reversed on later appeal. Either way judicial efficiency is not served. On the other hand, if an interlocutory appeal is taken, the cloud of a future appeal and possible reversal will not hang over the trial. Moreover, the parties would be much more likely to discuss settlement once the question has been resolved on appeal. Thus, the need for a trial could be avoided completely if an interlocutory appeal is granted.

For all of these reasons, in the event that the Court does not grant reconsideration and deny the government's motion for partial summary judgment, SSA respectfully requests that the Court modify its Opinion to state that interlocutory appeal may be sought on the grounds that the questions presented on summary judgment are controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate

appeal of the Opinion may materially advance the ultimate termination of the litigation.

Respectfully submitted,

/s/ John W. Butler
John W. Butler
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2510 (tel)
(202) 463-4950 (fax)

Of counsel:

Heather M. Spring
SHER & BLACKWELL, LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
(202) 463-2516 (tel)
(202) 463-4950 (fax)

Dated: August 14, 2007