**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SSA MARINE, INC.,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 05-490C** |
| **v.** | ) | **(Chief Judge Damich)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

SUPPLEMENTAL BRIEF IN SUPPORT OF SSA'S MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR MODIFICATION OF THE OPINION TO PERMIT INTERLOCUTORY APPEAL

John W. Butler
SHER & BLACKWELL
1850 M St., N.W., Ste. 900
Washington, D.C. 20036
(202) 463-2510 (tel)
(202) 463-4950 (fax)

Of Counsel:
Heather M. Spring
SHER & BLACKWELL
1850 M St., N.W., Ste. 900
Washington, D.C. 20036
(202) 463-2516 (tel)
(202) 463-4950 (fax)

*Counsel for SSA Marine, Inc.*

Dated: December 21, 2007

# TABLE OF CONTENTS

Page

INSTRUCTION 1. .......... 2

INSTRUCTION 2. .......... 3

INSTRUCTION 3.. .......... 6

INSTRUCTION 4. .......... 8

INSTRUCTION 5. .......... 12

INSTRUCTION 6. .......... 13

INSTRUCTION 7. .......... 14

INSTRUCTION 8. .......... 15

INSTRUCTION 9. .......... 17

INSTRUCTION 10. .......... 19

INSTRUCTION 11. .......... 20

INSTRUCTION 12. .......... 21

INSTRUCTION 13. .......... 22

INSTRUCTION 14. .......... 24

INSTRUCTION 15.. .......... 28

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000) ................................ 9, 28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ......................................................... 17, 22

*Arizona v. United States*, 575 F.2d 855 (Ct. Cl. 1978) .............................................................. 23

*Beta Systems, Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988) .......................................... 22

*C. Sanchez & Son, Inc. v. United States*, 6 F.3d. 1539 (Fed. Cir. 1993) ....................................... 4

*Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ........................................................ 13

*Cisneros v. Alpine Ridge Group*, 508 U.S. 10 (1993).................................................................. 25

*Conyers v. Merit Sys. Protection Bd.*, 388 F.3d 1380 (Fed. Cir. 2004)................................. 25, 26

*Crown Laundry & Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506 (1993) .................. 28, 29

*Edward R. Marden Corp. v. United States*, 803 F.2d 701 (Fed. Cir. 1986) .................................. 3

*Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469 (1992) ................................................. 13

*Fluor v. United States*, 64 Fed. Cl. 461 (2005).................................................... 13, 14, 17, 19, 23

*Fort Stewart Schs. v. FLRA*, 495 U.S. 641 (1990)......................................................................... 26

*Fry Communications, Inc. v. United States*, 22 Cl. Ct. 497 (1991) ............................................. 10

*Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972 (Ct. Cl. 1965) ............................................. 23

*LSi Service Corp. v. United States*, 422 F.2d 1334 (Ct. Cl. 1970)............................................... 28

*Maintenance Eng'rs v. United States*, 749 F.2d 724 (Fed. Cir. 1984)......................................... 28

*Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.*, 169 F.3d 747 (Fed. Cir. 1999) ........................................................................................................ 3, 4, 10

*NVT Techs., Inc. v. United States*, 370 F.3d 1153 (Fed. Cir. 2004).................................... 3, 4, 28

*Ralph Constr., Inc. v. United States*, 4 Cl. Ct. 727 (1984)........................................................ 28

*Record Steel & Constr. Inc. v. United States*, 62 Fed. Cl. 508 (2004) .......................................... 4

*Sadler v. Department of the Army*, 68 F.3d 1357 (Fed. Cir. 1995)............................................. 26

*Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329 (Fed. Cir. 2006) .......................... 3, 10

*The Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) .......................................... 26

*Torncello v. United States*, 681 F.2d 756 (Ct. Cl. 1982) ........................................................... 23

*Turner Constr. Co. v. United States*, 367 F.3d 1319 (Fed. Cir. 2004)..................................... 4, 12

*United Pacific Ins. Co. v. United States*, 497 F.2d 1402 (Ct. Cl. 1974) ...................................... 10

*Veit & Co., Inc. v. United States*, 56 Fed. Cl. 30 (2003)................................................................ 2

**Statutes**

41 U.S.C. § 254.......................................................................................... 13, 15, 23, 27

41 U.S.C. § 403......................................................................................................... 27

**Regulations**

48 C.F.R. § 2.101 ................................................................................................ 26, 27

**Other**

66 Fed. Reg. 2117 ......................................................................................................... 27

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SSA MARINE, INC.,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 05-490C** |
| **v.** | ) | **(Chief Judge Damich)** |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

SUPPLEMENTAL BRIEF IN SUPPORT OF SSA'S MOTION FOR RECONSIDERATION OR, IN THE ALTERNATIVE, FOR MODIFICATION OF THE OPINION TO PERMIT INTERLOCUTORY APPEAL

In accordance with the Court's Order of December 4, 2007, plaintiff, SSA Marine, Inc., submits the following responses to the 15 Instructions set forth in the Order. In accordance with the Court's instructions, each Instruction is restated in its entirety (on a new page) with the response following.

**1. Provide quotations and corresponding citations from the Plaintiff's brief in opposition to the Defendant's motion for summary judgment, filed October 13, 2006, where Plaintiff states that the contract at issue is ambiguous.**

In Plaintiff's Opposition to the Government's Motion for Partial Summary Judgment and Plaintiff's Request for Oral Argument, filed October 13, 2006 (hereinafter "Plaintiff's Opposition" or "Pl. Opp."), SSA cited the proper standard of review in the event that the Court determined that the relevant contract terms were ambiguous. Specifically, plaintiff stated:

> Even if there were ambiguity, which there is not, it would be construed against the government as the drafter of the contract, because SSA's interpretation was reasonable and relied upon. *See Veit & Co., Inc. v. United States*, 56 Fed. Cl. 30, 35 (2003); *see also* Pl. App. 2, 3 (Abood Tr. at 11, 14) (confirming that Mr. Abood drafted the contract and, particularly, the FPO clause).

Pl. Opp. at 17, n. 8.

SSA did not, however, state that the relevant contract language was ambiguous. To the contrary, SSA took the position, and continues to take the position, that the financing port operations clause unambiguously provided a payment mechanism and source of profit that was separate and distinct from the limited cost-plus-fixed-fee portion of CLIN 003. Moreover, SSA takes the position that the government's interpretation, which has changed frequently and has never been clearly explained, is unreasonable.

As explained in Plaintiff's Motion for Reconsideration and as discussed further below, the fact that SSA argued that the contract was unambiguous did not preclude the Court from determining that the contract was ambiguous. Indeed, the Court was *required* to find that the contract was ambiguous if the Court determined that the contract was susceptible to more than one reasonable interpretation.

**2. Provide a citation to a Federal Circuit case, which is binding precedent on this court, in which the Federal Circuit holds that, in the context of a government contract dispute, where neither party has alleged that a contract is ambiguous, it is reversible error for the trial court not to engage sua sponte in a determination of whether the contract is ambiguous or not. In addition to the citation, provide any relevant quotations from the opinion and citations to those quotations.**

Contract interpretation is a question of law to be decided by the Court. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). "Whether a contract provision is ambiguous is also a question of law." *Id.* Where, as here, opposing parties each argue that a contract clause is unambiguous, but offer different plain meaning interpretations, the legal question of whether the contract is ambiguous is squarely placed before the court.

A contract cannot be considered unambiguous if it is susceptible to more than one reasonable interpretation. *See Metric Constructors, Inc. v. Nat'l Aeronautics and Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999) ("When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity."); *Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous"); *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986) ("It is a generally accepted rule, which requires no citation of authority, that if a contract is reasonably susceptible of more than one interpretation, it is ambiguous"). As such, a court must consider the reasonableness of the interpretations presented before it can determine whether a contract is ambiguous. To start with the assumption that a contract is unambiguous turns the standard on its head and leaves the court in a position of then having to choose the best meaning. The law is clear that such an approach is not permissible:

> The question before the Claims Court was not to decide the better reading of the contract, or whether the [government's] post-award reading was reasonable. The question was whether [the contractor's] reading was reasonable, for it was on the basis of [the contractor's] reading that the contract was bid.

*C. Sanchez & Son, Inc. v. United States*, 6 F.3d. 1539, 1544 (Fed. Cir. 1993). The Court in *Sanchez* went on to state that:

> *We conclude that the Claims Court incorrectly described the contract as "unambiguous*." A contract term is unambiguous if there is only one reasonable interpretation. Although a disagreement as to the meaning of a contract term does not of itself render the term ambiguous, if more than one meaning is reasonably consistent with the contract language it can not be deemed unambiguous.

*Id.* at 1544 (emphasis added) (citations omitted).

If a trial court is faced with opposing plain language readings, it is obligated to consider the reasonableness of those readings. If both fall within the zone of reasonableness, it must treat the contract as ambiguous and apply the principles of *contra proferentum*. This is precisely what was done in *Turner Constr. Co. v. United States*, 367 F.3d 1319 (Fed. Cir. 2004), and *NVT Techs., Inc. v. United States*, 370 F.3d 1153 (Fed. Cir. 2004), both of which were cited in Plaintiff's Motion for Reconsideration at 6-7; *see also Record Steel & Constr. Inc. v. United States*, 62 Fed. Cl. 508, 513 (2004). In *NVT Techs.*, the Court stated:

> *The threshold question in this appeal is whether the solicitation plainly supports only one reading or supports more than one reading and is ambiguous*. To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a 'zone of reasonableness.' *Before this court, each party argues that there is no ambiguity* because its respective interpretation of the solicitation is plainly supported, and thus reasonable, while the other party's interpretation is unreasonable.

*NVT Technologies*, 370 F.3d at 1159 (emphasis added) (citations omitted). Notwithstanding the fact that both parties argued that the contract was unambiguous, the Court considered the parties' interpretations and concluded that both fell within the zone of reasonableness and that the contract was, accordingly, ambiguous. *Id.* at 1162 ("Because 'both interpretations . . . fall within a zone of reasonableness,' *Metric Constructors, 169 F.3d at 751*, we conclude that the solicitation, with respect to these disputed line items, was ambiguous" (ellipses in original)).

It is clear from the judicial definition of ambiguity (the existence of two reasonable interpretations), as well as the approach taken by the Federal Circuit in these cases, that a court must consider the reasonableness of the parties' interpretations in order to determine whether contract language is ambiguous. The Court is bound to address that question of law regardless of whether the parties allege the existence of an ambiguity. The Court's failure to determine the reasonableness of plaintiff's interpretation of the contract accordingly constitutes reversible error.

**3. Provide binding authority which states: (1) that when a court finds that a contract is unambiguous (i.e. has only one reasonable interpretation), the court has not also implicitly found that all other interpretations before the court are unreasonable and (2) that it is reversible error for a court not to explicitly state that all interpretations, other than the one reasonable interpretation, are unreasonable.**

This Instruction assumes the Court applied the correct analysis and determined that the contract was unambiguous on the ground that there was only one reasonable interpretation. The Opinion does not, however, reflect such an analysis. To the contrary, the Opinion indicates that the Court determined the contract was unambiguous on the ground that both parties asserted that the language was unambiguous. In this respect, the Court stated: "The parties do not appear to argue that the Contract language is ambiguous. . . . Therefore, in the absence of a clear assertion that the Contract language is ambiguous, the Court will not have recourse to facts extrinsic to the Contract in order to aid it in interpretation." Opinion at 5; *see also* Opinion at 8 ("because Plaintiff has not argued that the contract language is ambiguous, the argument must be proved by language in the Contract itself"). In addition, Instruction 2 above confirms that the Court did not engage in an analysis of whether the contract language was ambiguous.

The Court never stated that the government's interpretation was the only reasonable interpretation. In fact, the Court repeatedly questioned the reasonableness of the government's interpretation, while simultaneously suggesting that plaintiff's interpretation was reasonable. For example, the Court stated: (1) "Two sentences in the FPO provision give the Court pause in hastening to the conclusion that the Contract is solely a CPFF contract" (Opinion at 6); (2) "Why would USAID have to approve the level of contractor profit from port operations if the Contract already provided that '[t]he fixed fee is $354,148' for CLIN 003 Port Operations?" (Opinion at 7); (3) "Defendant does not explain why USAID is to approve the level of contractor profit from operations if this has been foreordained by the CPFF contract (Opinion at 7); (4) "The Contract

does lend some support to Plaintiff's argument" (Opinion at 8); (5) "At this point, Defendant has not adequately explained the troublesome language in Sentence 1" (Opinion at 9); (6) "one sentence in the FPO seems to support the Plaintiff's contention that there was another payment structure" (Opinion at 13); (7) "There are two sentences in the controversial FPO clause that suggest a non-CPFF, second payment structure" (Opinion at 13).

These comments and other discussion in the Opinion clearly suggest that SSA's interpretation was within the zone of reasonableness. Instead of indicating that the Court *implicitly* found plaintiff's interpretation unreasonable, these seven findings by the Court are *explicit* statements by the Court that plaintiff's reading is in fact reasonable. Under the authorities cited, quoted, and discussed in response to Instruction 2, the Court's findings indicating the reasonableness of SSA's interpretation precluded a finding that the contract was unambiguous, unless it concluded that SSA's was the only reasonable interpretation.

**4. Explain how Plaintiff's interpretation of the holding in C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539 (Fed. Cir. 1993), that "[i]n order for the Court to have made a determination that the government's reading was the only reasonable one, it would have had to determine whether SSA's reading was also reasonable," (Mot. for Recons. at 5) is not satisfied by the following excerpts from the Court's Opinion:**

> **The Court's adoption of the Government's reading of the contract as reasonable: "[T]he Contract is entirely a cost-plus-fixed-fee contract." Op. at 14.**
>
> **The Court's finding that SSA's interpretation was unreasonable: "[The Contract] cannot be a combination contract of [the] type" espoused by Plaintiff. Op. at 10.**
>
> **The Court's conclusion that: "The Contract language is not ambiguous." Op. at 13.**

Each of these statements is conclusory in nature and provides no analysis whatsoever of SSA's interpretation of the language of the contract.

The statements on pages 13 and 14 of the Opinion, that "The Contract language is not ambiguous," and "[T]he Contract is entirely a cost-plus-fixed-fee contract," do nothing more than indicate that the Court agreed with or preferred the government's interpretation of the contract language. The conclusions do not address the reasonableness of SSA's interpretation.

The statement on page 10 of the Opinion, that the contract cannot be a combination CPFF/incentive contract, likewise does not address the reasonableness of SSA's reading of the Financing Port Operations Clause ("FPO clause"). SSA asserted that the FPO clause was a unique provision, inserted to address the unusual circumstances of this contract. (Pl. Opp. at 2, 16, 17). It further argued, *and the government agreed*, that the financing mechanism included in the FPO clause did not have to be of a contract type specifically recognized by the FAR in order to be valid and enforceable (Pl. Opp. at 14, 23, 25; Def. Reply at 12). However, SSA also noted that to the extent that the government or the Court wished to characterize the clause, it could fit within the general class of "incentive contracts" as that contract type is defined by the FAR. (Pl. Opp. at 14, 24). The point was not that the contract was specifically structured as an incentive

contract, or that such a finding was necessary to SSA's interpretation, but merely that the concept of providing a performance incentive is recognized by the FAR. SSA's reading of the FPO clause was in no way dependant upon the mechanism being deemed an incentive type contract. *See*, *e.g.*, Pl. Opp. at 25 ("[a] contract is not unenforceable merely because it does not fit neatly into a recognized category," *citing Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed. Cir. 2000)).

SSA interprets the FPO clause as providing for a separate payment mechanism that was to take effect after port operations began. That mechanism provided for the port operations to be funded in a commercial manner, with costs and profits to be covered by port fees collected by SSA. (The one exception to this commercial type funding was the man-hour costs, which were funded on a pre-established cost-plus-fixed-fee basis so that the contractor would have some guaranteed payment to justify mobilization in Iraq.) After port operations began, the government was required to approve a fee schedule as well as the maximum level of profit to be earned from the port operations. This interpretation is supported by the plain language of the contract, which provides that: "*After port operations begin*, working capital for labor, facilities and equipment operation and maintenance, port overhead and *contractor profits shall be obtained from fees and charges to carriers and cargo owners*. *USAID shall approve* the fee and charge schedule and *the level of contractor profit from operations*." The language clearly provided for the level of contractor profit to be approved along with the fees and charges *after contract operations began*. If the "level of contractor profit from operations" is read to mean the amount of "fixed fee" already established by the contract, this clause is rendered meaningless.

Not only do the Opinion excerpts quoted by the Court in this Instruction 4 fail to address the reasonableness of this interpretation, they are contradicted by other statements in the

Opinion, which suggest that plaintiff's interpretation was, in fact, reasonable. (*See* response to Instruction 3, above). In addition, the government has never offered a consistent or reasonable interpretation of this language. Indeed, the FPO clause is not even discussed in its Motion for Partial Summary Judgment. The Court instead attempted to explain the language using its own theories. While the Court may believe that its interpretation is reasonable, or even more reasonable than SSA's interpretation, that is not the proper standard of review. The Court must stand in the shoes of a reasonably prudent contractor, acquainted with the contemporaneous circumstances, and determine whether SSA's interpretation was reasonable. *See, e.g., Metric Constructors, Inc.*, 169 F.3d at 752 ("the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances"); *Teg-Paradigm*, 465 at 1338 ("When interpreting a contract, 'the language of [the] contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances'"); *United Pacific Ins. Co. v. United States*, 497 F.2d 1402, 1407 (Ct. Cl. 1974) ("it is well established that if a drawing or specification is ambiguous and the contractor follows an interpretation that is reasonable, this interpretation will prevail over one advanced by the Government, even though the Government's interpretation may be a more reasonable one since the Government drafted the contract"); *see also Fry Communications, Inc. v. United States*, 22 Cl. Ct. 497, 505-06 (1991) ("The government cannot prevail simply by showing that its interpretation of the IFB is somehow 'better' than Fry's interpretation; the crucial issue in this connection is whether *Fry's* interpretation is *within the zone of reasonableness*" (emphasis in original)).

Plaintiff sought reconsideration of the Opinion in the hope that the improper analysis and lack of findings regarding the reasonableness of SSA's interpretation would be corrected. If the court has determined that plaintiff's interpretation is unreasonable, SSA respectfully requests that the basis for that finding be explained and that leave be granted for appeal. If the Court has not found that SSA's interpretation is unreasonable, it must reconsider its decision and rule for SSA.

**5. Provide a citation and the corresponding language in Turner Construction v. U.S., 367 F.3d 1319 (C.A. Fed. 2004), that states that the court held that the contract was ambiguous.**

In *Turner Constr. v. United States*, 367 F.3d 1319 (Fed. Cir. 2004), each party alleged that the plain language of the contract supported its interpretation of the requirements. *Id.* at 1321. The government further asserted that if there was an ambiguity, it was patent and thus should have been raised by the contractor prior to award. *Id.* The Federal Circuit explained the standard of review for *ambiguous* contracts:

> When a dispute arises as to the interpretation of a contract and the contractor's interpretation of the contract is reasonable, *we apply the rule of contra proferentem, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document*. However, the court will consider whether the ambiguity or lack of clarity was sufficiently apparent that there arose an obligation on the contractor to inquire as to that provision before entering into the contract.

*Id.* at 1321 (citations omitted). The Court then applied this principle and found that: "Turner's reading of the contract in conjunction with the codes was that of a *reasonable* and prudent contractor. If there indeed were governmental error, it is *not apparent from the relevant documents*. We conclude that Turner's reading of the contract and reliance on the specifications and drawings was *reasonable*." *Id.* at 1324 (emphasis added).

The Court did not determine that the contractor's interpretation was the only reasonable interpretation. Rather it found that the interpretation was reasonable and found that any error was not apparent from the face of the solicitation. Applying the rule of *contra proferentum*, *which only applies to ambiguous contracts*, the Court then held for the contractor. This analysis accordingly makes clear that the Court found the contract language to be ambiguous.

**6. Provide a citation to a Federal Circuit case, which is binding precedent on this court, that has the same holding as Fluor v. U.S., 64 Fed. Cl. 461 (2005). Explain how this Federal Circuit case has the same holding as Fluor, with quotations and corresponding citations. The explanation shall include a showing of how the facts are the same and how the rationale for the holding is the same.**

Plaintiff is not aware of any Federal Circuit case dealing specifically with the legality of entering into a cost-plus-fixed-fee contract when costs cannot reasonably be estimated in advance of contract award. However, the Court explicitly recognized the persuasive value of *Fluor* stating that: "*Fluor*, of course, is not binding precedent, but the opinion is thorough and well-reasoned." (Opinion at 12). We are aware of no basis for the Court to alter its opinion of *Fluor*. In addition, the *Fluor* court merely applied the plain language of 41 U.S.C. § 254(b) to facts legally indistinguishable from those in this case. The statute states that "in the case of a cost-plus-a-fixed-fee contract the fee shall not exceed 10 percent of the estimated cost of the contract, exclusive of the fee, as determined by the agency head *at the time of entering into such contract*." 41 U.S.C. § 254(b) (emphasis added). It is clear from the statutory language that the costs must be capable of estimation by the agency at the time the contract is awarded. This clear statement of Congress is binding on this Court. *See, e.g., Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 842-43 (1984) ("the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"); *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992) ("courts must give effect to the clear meaning of statutes as written").

**7. In Fluor v. U.S., explain the meaning of this sentence: "The instant dispute stems from NOAA's inability to estimate project costs before Fluor performed under the contract," if it means other than NOAA was unable to estimate the costs of the project before Fluor performed the contract. Id., at 463.**

SSA agrees that the quoted statement from *Fluor v. United States*, 64 Fed. Cl. 461, 463 (2005), means that NOAA was unable to estimate the costs of the project before Fluor performed the contract. The *Fluor* court further explained that:

> Because of a confluence of factors, it was not possible to develop a reasonable estimate at the statutorily mandated time. Chief among those factors was the fact that the scope of NOAA's project was uncertain and Fluor was hired to perform an array of services, among which included tailoring the scope of NOAA's project and, therefore, Fluor's own undertaking.

*Id.* It is undisputed that these same factors were present in the instant case. *See* Pl. Mot. for Recons. at 14-16; Contract CLINs 001 and 002 (requiring plaintiff to assess the condition of the Port and define the scope and cost of and plan the implementation of the port management improvements). Finally, we note that although the *Fluor* court used the phrase "before *Fluor* performed under the contract," the statute upon which the case turned requires the government to make its cost estimate "at the time of entering into such contract." That means at the time of contract award.

**8. If the contract at issue in this case is entirely a CPFF contract, please explain how this language, taken from B.3 of the contract (Def.'s App. at 3), and entitled, "ESTIMATED COST, FIXED FEE, AND OBLIGATED AMOUNT," does not provide the estimated cost of performance for CLIN 003:**

> **(c) CLIN 003 Port Operations - The estimated cost for the performance of the work required hereunder, exclusive of fixed fee is $3,541,480. The fixed fee is $354,148. The estimated cost plus fixed fee is $3,895,628.00[.]**

If the contract at issue in this case was entirely a CPFF contract, as alleged by the government, the inclusion of a portion of the operating costs in the contract would not have satisfied the legal requirement that the agency estimate the total cost of performance prior to award. *See* 41 U.S.C. § 254(b) (""in the case of a cost-plus-a-fixed-fee contract the fee shall not exceed 10 percent of the estimated cost of the contract, exclusive of the fee, as determined by the agency head *at the time of entering into such contract*" (emphasis added)). The estimate must relate to the total costs of performance, not just the portion that could be estimated at the time of award. The $3.8 million estimate included in the CPFF portion of the contract could under no circumstances be understood to represent an estimate of the total cost of port operations for a period of one year. As previously explained, the condition of the port was unknown, and would remain unknown until SSA completed its assessment under CLIN 001 of the Contract. As such the total port operation costs were not capable of estimation at the time of award. *See* Pl. Mot. for Recons. at 14-16 (citing undisputed facts and deposition testimony on this issue). Moreover, no rational person could believe that $3,541,480 was a reasonable estimate for total performance given the scope of work involved in operating any port, let alone a port in unknown condition, located in a war zone.

The only way it makes sense for such a limited amount to be included as the obligated amount is if the clause is read in conjunction with the FPO clause, which provides the additional financing mechanism. Because the port operation costs and a negotiated level of contractor

profit were to be determined at a later date and paid out of port fees pursuant to the FPO clause, they were not addressed under the description of obligated amounts.

**9. Explain how the Court can find, without considering evidence extrinsic to the contract at issue in this case, that the contract is illegal under Fluor because it attempts to form a CPFF agreement for a service for which it is impossible to come up with a cost estimate, when the contract itself expressly states a cost estimate for the service.**

To be clear, Plaintiff is not suggesting that the Court find the contract to be illegal under *Fluor*. Under SSA's interpretation, the contract is not illegal, because the contract avoids illegality in precisely the manner suggested by the *Fluor* court. Specifically, the portion of the contract that could not be estimated at the time of award was segregated and financed under a separate mechanism. (*See* Pl. Opp. 26-27). The contract would only be illegal if it is determined to be solely a cost-plus-fixed-fee contract with no additional payment mechanism.

Nor does SSA contend that the Court must determine that the contract would be illegal under the government's interpretation without resorting to extrinsic evidence. As discussed in the Motion for Reconsideration (9-17), consideration of extrinsic evidence is entirely appropriate in this context, especially where the parties agree that it was impossible to estimate total costs at the time of award. However, in considering the extrinsic evidence, the Court must apply the appropriate standard and construe all facts in a light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")

To respond more specifically to the Court's question, the Court may determine that it was impossible to estimate total contract cost at the time of the award simply by examining the structure of the contract. CLINs 001 and 002 required that SSA evaluate the condition of the port and prepare a plan, with a budget, describing what would be necessary in order to reopen and operate the port. The very fact that the contract itself required the contractor to determine

the scope and cost of the necessary work compels a finding that it was impossible to estimate total contract cost at the time of award.

Additionally, the contract did not expressly state a cost estimate for the entire range of services to be provided under CLIN 003. The language in the contract itself indicates only that there was a cost estimate for the man-hour costs that both parties agree were to be covered by a cost-plus-fixed-fee mechanism. Since only a portion of the contract was to be funded under this mechanism, with the remainder to be funded under the FPO clause, the contract language does not demonstrate that the total costs were capable of being estimated at the time the contract was awarded.

As such, if the contract were entirely cost-plus-fixed-fee it would be unlawful under section 254(b).

**10. Define the meaning of the phrase "in any event" used in the third paragraph on page twelve of the Court's Opinion, and explain how this phrase does not contradict Plaintiff's argument that the Court's distinguishing of Fluor was based "entirely" upon evidence extrinsic to the contract itself. See Mot. for Recons. at 16.**

The Court is in a better position to explain what it meant by the phrase "in any event" in its Opinion at page 12; however, plaintiff does not in any way view the words as contradicting SSA's statement that the Court's distinguishing of *Fluor* was based "entirely on an ambiguous qualification ("accurate") in a government statement." (Mot. for Recons. at 16).

The "in any event" language is found at the beginning of the following sentence: "In any event, the difference between a CPFF contract with no estimate, as in *Fluor*, and *a CPFF contract with clearly a cost estimate (no matter how accurate), as in this case*, is enough for this Court to conclude that *Fluor* may be distinguished from this case" (Opinion at 12) (emphasis added). The Court's determination that this case involved a contract with a cost estimate that was simply inaccurate derived from extrinsic evidence (the government's statement in the joint status report). The discussion of that evidence immediately precedes the "in any event" language, where the Court stated that: "Defendant admits that it was impossible to '*accurately* estimate' the total costs; Defendant does not state that it was simply, 'impossible.'" (Opinion at 12) (emphasis in original). Since there is discussion regarding extrinsic evidence both before and after the "in any event" language, plaintiff does not view the words as contradicting plaintiff's statement that the decision regarding application of *Fluor* was based entirely upon the "accurate" qualification. In other words, the language that follows the phrase does not constitute a separate discussion or an independent ground for the Court's conclusion.

**11. Provide the proper grammatical classification of the word "negotiated" in the phrase "negotiated maximum profit margin or level" (Def.'s App. at 11), if it is not a past participle or past participial adjective, and provide recognized authority for an alternate classification.**

SSA agrees that the word "negotiated" in the phrase "negotiated maximum profit margin or level" is being used as a past participial adjective. It is not a verb as suggested by the court's use of the words "past tense" on page 9 of the Opinion. The issue, however, is not the proper grammatical classification of the word "negotiated." The issue is identifying the activity that the adjective modifies. As explained in the Motion for Reconsideration at 17-18, the "negotiated maximum profit margin or level" in the eighth sentence of the FPO clause clearly refers back to the fourth and fifth sentences of that same clause, which provide that the "level of contractor profit from operations" will be approved by USAID, along with the fee and charge schedule, after port operations begin. The progression of activities under the FPO clause is as follows: (1) USAID directs the contractor to manage and operate the port; (2) USAID provides start up funds and working capital to begin implementation of the plans developed by SSA under CLINs 001 and 002 and to cover initial operation of the port; (3) after port operations begin, USAID shall approve the fee and charge schedule and level of profit from operations; (4) the fees and charges collected by SSA shall be used to pay for port operations and contractor profits; (5) the contractor shall maintain separate bank accounts and provide monthly reports outlining the costs, revenues, and profits earned from operations; and (6) if any funds remain after payment of port operating costs and after payment of the maximum profit margin that was negotiated under step 3 above, USAID shall determine the use of such funds. All of these events were to occur after contract award. If they had occurred prior to award, there would have been no reason for inclusion of the FPO clause, and the repeated use of the "shall" language (indicating future action) would have been senseless.

**12. Provide authority binding on this court that a portion of the fixed fee in a CPFF contract may not be paid out of non-appropriated funds.**

SSA is aware of no precedent restricting the use of non-appropriated funds for payment of a portion of the fee in a cost-plus-fixed-fee contract. SSA notes, however, that it has never made any assertion that non-appropriated funds may not be used to pay all or part of a fixed fee. The related assertion that SSA *has* made and continues to make is that the statutory 10% cap on fixed fees for cost-plus-fixed-fee contracts does not apply to contracts that are to be performed using non-appropriated funds. Both parties agree that the FPO clause at issue in this case contemplated the use of non-appropriated funds. Specifically, that clause contemplated the use of funds collected by SSA from customers of the port during CLIN 003 operations. The issue of non-appropriated funds is discussed in greater detail in SSA's response to Instruction 14(b), *infra*.

**13. Provide argument and authority that a court, in treating of a motion for summary judgment, should find statements from proposed findings of uncontroverted fact submitted by each party more credible than statements contained in a joint preliminary status report that are labeled as "relevant material facts that are not in dispute."**

The Instruction appears to make reference to the third paragraph on page 12 of the Opinion, which distinguishes between the government's statement in the Joint Status Report, filed before any discovery was conducted, and the government's statement agreeing with SSA's statement of uncontroverted facts as submitted with SSA's response to the government's Motion for Partial Summary Judgment. SSA is aware of no precedent that speaks with the level of specificity sought by this Instruction. In the context of summary judgment, however, any such precedent would be in error, because the judge is not to weigh the evidence in deciding a motion for summary judgment. Instead, there is abundant precedent that states that the Court in deciding a motion for summary judgment is to construe the facts in the light most favorable to the non-moving party, here SSA. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); *see also Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1184 (Fed. Cir. 1988) ("Summary judgment is an available procedure when material facts are undisputed, or if, when disputed facts are resolved in favor of the non-movant, judgment in law is nevertheless required in favor of the movant.").

The cases cited above and the proposition for which they stand govern the point raised by Instruction 13. Specifically, it is reversible error for the Court to weigh the evidence with respect to material questions of fact. Instead, to the extent that there are relevant factual questions, they must be resolved in favor of the non-moving party. *See Liberty Lobby*, 477 U.S. at 249 ("it is clear enough from our recent cases that at the summary judgment stage the judge's function is

not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.”). Under that rule of law, the Court here must assume that the more categorical statement–that it was impossible to estimate CLIN 003 costs at the time of contract award–is true. Once that fact, which has been admitted by the government, is established (or is viewed in a light most favorable to SSA), the government’s position regarding the nature of the contract becomes unlawful under 41 U.S.C. § 254(b) and *Fluor* (discussed *supra* at Instructions 6-10). Since the government’s interpretation would render the contract void for illegality, it is not reasonable. *See, e.g.*, *Torncello v. United States*, 681 F.2d 756, 761 (Ct. Cl. 1982) (“we assume that the parties intended that a binding contract be formed. Thus any choice of alternative interpretations, with one interpretation saving the contract and the other voiding it, should be resolved in favor of the interpretation that saves the contract” (*citing Arizona v. United States,* 575 F.2d 855 (Ct. Cl. 1978); *Hol-Gar Mfg. Corp. v. United States*, 351 F.2d 972 (Ct. Cl. 1965)).

That result supports summary judgment in favor of SSA, but at a minimum it requires that the government’s Motion for Partial Summary Judgment be denied–the issue presented here.

**14. If the contract at issue is solely a CPFF contract, and assuming, as Plaintiff argues, that it is not subject to a statutory ten percent profit cap, explain how Plaintiff would be entitled to a fixed fee for CLIN 003 that is greater than the fixed fee of $354,148 to which Plaintiff agreed under the terms of the contract. See Mot. for Recons. at 19-20; Pl.'s Resp. at 29-32 ("even assuming arguendo that the government were correct that the SSA contract was solely a cost-plus-fixed-fee contract, it would not be subject to a ten percent profit cap").**

**(a) Chapter 5 of Public Law 108-11, entitled "Iraq Relief and Reconstruction Fund," states that "[f]or necessary expenses for humanitarian assistance in and around Iraq ... there is appropriated to the President, $2,475,000,000," which "shall be available notwithstanding any other provision of law." (Emphasis added). Plaintiff's brief characterizes this language as being a "waiver of all other laws (including, necessarily, the procurement laws)" which "takes the SSA contract out of the FAR and out of any statutory restrictions on contracting, including 41 U.S.C. § 254(b)." Pl.'s Resp. at 29. The definition of "available" is: "1. Present and ready for use; at hand; accessible.... 2. Capable of being gotten; obtainable.... 3. Qualified and willing to be of service or assistance....." The American Heritage Dictionary of the English Language (4th ed. 2000). Thus, the plain meaning of "available" in Public Law 108-11 would indicate that the appropriated funds must be "present and ready for use," "at hand," "accessible," "capable of being gotten," or "obtainable," which says nothing about negating 41 U.S.C. § 254(b). In light of this plain meaning, please explain how the language of Public Law 108-11 should be interpreted otherwise.**

**(b) Provide binding authority which specifically requires that the "appropriated funds" language found in the definition of the term "acquisition" in 41 U.S.C. §403(16) must be read into the definition of "procurement" adopted in 41 U.S.C. §259(c)(1) (which does not use the word "acquisition"), and then provide binding authority which specifically requires that the "appropriated funds" language thus read into the definition of "procurement" in §259(c)(1) must then be read into the ten percent limitation of 41 U.S.C. § 254(b) (which does not use the word "procurement").**

At the outset, SSA notes that this Instruction contains an implicit assumption with which SSA does not agree. That assumption is that a fixed fee of $354,146 represents compensation associated with activities and costs beyond the in-house man-hour costs. The Court itself held that such an assumption is not accurate:

> Similarly, Plaintiff points out (what appears to be true) that "the cost reimbursement and associated fixed fee provision in CLIN 003 did not address costs for equipment, dredging, buildings, office supplies and computers, water, fuel, electricity, cargo cranes, repairs to wharves and docks, etc." associated with operating the port.

Opinion at 8. Assuming that the thrust of the question is that SSA agreed to $354,148 as full compensation under the contract even if there is no statutory cap, the fact is that SSA did not and does not agree that that figure represents full compensation. Because the costs associated with the $354,148 reflected only a fraction of the total costs of the contract, SSA in no way accepted or now accepts that partial fee as the entire bargained-for compensation under the contract.

(a) SSA does not disagree with the Court's statement of the definition of "available," but the definition of "available" is beside the point. The relevant language, and the language that SSA emphasized by placing it in italics on page 29 of its brief in opposition to the government's motion, is "notwithstanding any other provision of law." The combination of the word "available" in the supplemental appropriations bill with the phrase "notwithstanding any other provision of law" means that the monies designated were appropriated by the Congress to support the purposes set forth in that bill without being restricted by any law outside of that bill that might otherwise restrict or condition their use. That the phrase "notwithstanding any other provision of law" indicates a broad purpose to override otherwise applicable existing laws was conclusively and recently determined by the Federal Circuit in *Conyers v. Merit Sys. Protection Bd.*, 388 F.3d 1380 (Fed. Cir. 2004). There, dealing with precisely the same phrase as was used in the supplemental appropriations bill relied upon by SSA here, the Court held with respect to a refusal to hire claim by an applicant for an airline passenger screener position that:

> The language "[n]otwithstanding any other provision of law" signals that this screener-specific provision is to override more general conflicting statutory provisions to the extent that they would apply to screeners. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18, 113 S. Ct. 1898, 123 L.Ed.2d 572 (1993) (explaining that use of a "notwithstanding" clause "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section."). We think that the "[n]otwithstanding *any other provision of law*" language renders inapplicable general federal statutes that otherwise would apply to the Under Secretary's power to "employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of Federal service" for screener positions.

*Conyers*, 388 F.3d at 1382 (emphasis in original).

Just as Congress dictated maximum flexibility for the TSA regarding hiring for the security-sensitive position of airline passenger screener by employing the "notwithstanding any other provision of law" language, so too Congress employed that language in the supplemental appropriations bill for the reconstruction of post-war Iraq in order to provide maximum flexibility with respect to engaging contractors to perform work the scope of which was as yet undefined and the conditions under which that work would be performed uncertain. If this Court were to fail to give effect to that plainly expressed will of Congress, it would, in addition to contravening Federal Circuit and Supreme Court precedent, effectively be asserting that the powers of a court are greater than the powers of the Congress in responding to a wartime emergency. Such a course would plainly constitute reversible error.

(b) SSA is not aware of any case that precisely addresses the question as phrased by the Court. That said, there is binding Supreme Court precedent that enunciates rules of statutory interpretation that clearly control the issue raised in Instruction 14(b). First, agencies are required to follow their own regulations. *The Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) ("Commerce, like other agencies, must follow its own regulations."); *Sadler v. Department of the Army*, 68 F.3d 1357, 1358 (Fed. Cir. 1995) (same); *Fort Stewart Schs. v. FLRA*, 495 U.S. 641, 654 (1990) (same). The FAR as it existed at the time the contract was awarded (and as it exists today) contains the following two definitions (in relevant part) at 48 C.F.R. § 2.101:

> *Acquisition* means the acquiring by contract *with appropriated funds* of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated.

*Procurement* (see "acquisition").

*Id.* (emphasis added)*; see also* 66 Fed. Reg. 2117 (Jan. 10, 2001) (restating the definition of "acquisition" and adding the definition of "procurement"). The words defined in the FAR are the same words used in the statutory provisions referenced in the Court's Instruction. The FAR definitions set forth above are binding and conclusive on the point that the term "procurement" applies to the purchase of goods and services with appropriated funds.

Furthermore, although the defined term "procurement," 41 U.S.C. § 403(2), does not use the word "acquisition," it does use the phrase "process of acquiring." "Process of acquiring," in turn, is the operative phrase in the statutory definition of "acquisition." 41 U.S.C. § 403(16). Thus, both statutory definitions employ precisely the same language as the key descriptive phrase.

With respect to the Court's final question of why the "appropriated funds" language in the definition of "acquisition" (and therefore in "procurement") also applies to 41 U.S.C. § 254(b), the answer is in the FAR-defined term "contract," which is the term used in section 254(b). The FAR defines "contract" in relevant part as follows:

> Contract means a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It *includes all types of commitments that obligate the Government to an expenditure of appropriated funds* and that, except as otherwise authorized, are in writing.

48 C.F.R. § 2.101 (emphasis added). That section 254(b) applies only to the obligation of appropriated funds is reinforced by the fact that section 254(b) refers twice in its final sentence to the "procuring agency." The "procuring agency" is rather plainly one that that engages in a "procurement," which process is, as discussed above, defined as one involving the expenditure of appropriated funds.

**15. Provide authority binding on this Court which states that it is reversible error for a Court to give any weight or consideration to the headings or labels of a contract. See Mot. for Recons. at 19, n.4.**

*Maintenance Eng'rs v. United States*, 749 F.2d 724, 726 n.3 (Fed. Cir. 1984), held that "[d]etermination of the type of contract is a matter of law – not controlled by a label in the contract." Matters of law, and specifically interpretations of contracts, are reviewable *de novo* by the appellate courts. *See, e.g., NVT Techs.*, 370 F.3d at 1159 (Fed. Cir. 2004) ("The interpretation of a contract or solicitation is a question of law which we review de novo."). By definition, if an appellate court finds that the trial court committed an error of law, the appellate court will reverse.

The rule that contract labels do not control is consistent across all Federal Circuit, Court of Claims, and Court of Federal Claims cases that address the issue. In addition to *Maintenance Eng'rs, supra, see, e.g., LSi Service Corp. v. United States*, 422 F.2d 1334, 1336 (Ct. Cl. 1970) ("Neither the heading of the contract, nor its description in a Government audit report is sufficient to change the nature and legal import of the provisions of the contract itself."); *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1331 (Fed. Cir. 2000) ("we should not be blinded by how one labels a contract").

In *Ralph Constr., Inc. v. United States*, 4 Cl. Ct. 727, 731 (1984), the Court found a contract to be an indefinite quantities contract "[n]otwithstanding that the contract says, 'This is a requirements contract. . . . ;' the parties stipulated that this was a requirements contract; and the contracting officer and representatives of DFAE considered the agreement to be a requirements contract. . . ." In *Crown Laundry & Dry Cleaners, Inc. v. United States*, 29 Fed. Cl. 506 (1993), the Court provided an extensive analysis of the minimal role to be played by contract labels, stating first that:

> In determining which type of contract was entered into by the parties, the court will be guided by three contract interpretation rules in particular. First, the court is not bound by the name or label given to a contract. Rather, it must look beyond the first page of the contract to determine what were the legal rights for which the parties bargained, and only then characterize the contract.

*Id*. at 515. The Court then went on to say this:

> In urging the court to find the contract to be for indefinite quantities, the government stresses the fact that the contract labels itself as an indefinite quantities contract and included an indefinite quantities contract clause (§H-22). The language the government relies on simplistically suggests that the parties entered into such a contract. Case law warns that reliance on labels and contract provisions is most risky. In any event, the determination of the type of contract the parties entered into is a matter of law and is not controlled by any label or contract provision. . . . Merely because the contract at issue is labeled an "Indefinite Quantity" contract and contains an indefinite quantity provision (§H-22) does not, without more, require that it be deemed an indefinite quantity contract.

*Id*. at 516-517 (footnote and internal citation omitted). Although these Court of Federal Claims cases are not binding on this Court, the decisions are based on binding Federal Circuit precedent. Moreover, the uniformity of the conclusions is highly persuasive.

Reliance on contract labels and clauses is especially improper with respect to the contract before the Court in this case, because the parties agree that some portion of the contract was of the cost-plus-fixed-fee type. The existence of the label and clauses relied upon by the government, therefore, are entirely unremarkable. The point is that the label and clauses say absolutely nothing about how the Financing Port Operations clause and the second payment mechanism set forth therein is to be implemented. It is the meaning of the FPO clause that is the central issue in this case. The government to this day has provided no plausible explanation of what it thinks that clause means. SSA, in contrast, has provided a reasonable explanation that gives meaning to the clause and that is consistent with the contract as a whole. Under these circumstances, the Court is required to deny the government's Motion for Partial Summary Judgment.

Respectfully submitted,

/s/ John W. Butler
John W. Butler
SHER & BLACKWELL
1850 M St., N.W., Ste. 900
Washington, D.C. 20036
(202) 463-2510 (tel)
(202) 463-4950 (fax)

Of Counsel:
Heather M. Spring
SHER & BLACKWELL
1850 M St., N.W., Ste. 900
Washington, D.C. 20036
(202) 463-2516 (tel)
(202) 463-4950 (fax)

Dated: December 21, 2007